**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------- x
   :
   :
CHARISS FINAN, *et al.*,   :
   :
       Plaintiffs,   :
   :
   :
       v.   :   22-cv-07831 (NGG) (PK)
   :
LAFARGE S.A., *et al.*,   :   **Oral Argument Requested**
   :
       Defendants.   :
   :
   :
------------------------------------------------------- x
   :
TAMARA FIELDS, *et al.*,   :
   :
       Plaintiffs,   :
   :
       v.   :   23-cv-00169 (NGG) (PK)
   :
LAFARGE S.A., *et al.*,   :   **Oral Argument Requested**
   :
       Defendants.   :
   :
------------------------------------------------------- x
   :
DIANE FOLEY, *et al.*,   :
   :
       Plaintiffs,   :
   :
       v.   :
   :   23-cv-05691 (NGG) (MMH)
LAFARGE S.A., *et al.*,   :
   :   **Oral Argument Requested**
       Defendants.   :
   :
   :
------------------------------------------------------- X

**COMBINED MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'**
**MOTIONS TO DISMISS THE PLAINTIFFS' COMPLAINTS**

Jay K. Musoff
John Piskora
Sarah Levitan Perry
**LOEB & LOEB LLP**
345 Park Avenue
New York, NY 10154
Telephone:    212-407-4212
Facsimile:    212-407-4990

*Attorneys for Lafarge S.A.,*
*Lafarge Cement Holding Limited, and*
*Lafarge Cement Syria S.A.*

Served on December 7, 2023

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

FACTUAL BACKGROUND .................................................................................5

    A.    Lafarge, Lafarge Cyprus, LCS, and the Cement Plant. ...........................................5

    B.    The Syrian Civil War Begins and
Armed Factions Converge on the Cement Plant.................................................6

    C.    Payments to Intermediaries in Syria From 2013 Until 2014. .................................6

    D.    Alleged Contacts with New York and the United States. ......................................7

    E.    September 2014:  ISIS Seizes the Cement Plant. ....................................................8

    F.    Lafarge and LCS's Actions Are
Subsequently Investigated and Disclosed Publicly.................................................9

    G.    The U.S. DOJ Investigation Leads to a 2022 Guilty Plea. ....................................9

    H.    The Alleged Injuries. .........................................................................................10

APPLICABLE STATUTORY FRAMEWORK........................................................11

LEGAL STANDARD..........................................................................................12

ARGUMENT .....................................................................................................13

I.    THE COURT LACKS PERSONAL JURISDICTION OVER EACH
DEFENDANT.................................................................................................13

    A.    The Court Lacks Personal Jurisdiction
Under New York's Long-Arm Statute.................................................................14

    B.    The Court Lacks Personal Jurisdiction Under Rule 4(k)(2). ................................29

    C.    The Court Lacks Personal Jurisdiction Over Defendants Under the ATA's
Nationwide Service Provision............................................................................38

II.    THE COMPLAINTS FAIL TO STATE A CLAIM FOR AIDING AND
ABETTING UNDER THE ATA.......................................................................40

    A.    The Complaints Do Not Allege That the Defendants Were "Generally
Aware" That They Were Assuming a Role in ISIS or ANF's Terrorist
Activities. ........................................................................................................40

B.     The Complaints Do Not Allege That the Defendants Knowingly Provided Substantial Assistance to the Injury-Causing Terrorist Attacks. ..........................46

C.     In Five of the Twenty-Two Attacks, Plaintiffs Fail to Plead an Act of "International Terrorism."...............................54

III.    THE COMPLAINTS DO NOT STATE A CLAIM FOR CIVIL CONSPIRACY UNDER THE ATA.........................................................................................55

A.     The Complaints Do Not Allege an Agreement Between the Defendants and ISIS or ANF. ...........................................56

B.     The Complaints Do Not Allege an Overt Act in Furtherance of a Common Scheme................................................61

C.     The Complaints Do Not Allege That Lafarge Cyprus Participated in Any Alleged Conspiracy.....................................63

IV.    THE THIRD AND FOURTH COUNTS IN *FIELDS* (ASSERTING PRIMARY LIABILITY) FAIL AS A MATTER OF LAW.........................................................63

A.     The *Fields* AC Fails to Allege That Any of the Defendants Committed an Act of International Terrorism. ......................................64

B.     The *Fields* AC Fails to Allege That the Defendants' Supposed Conduct Proximately Caused the *Fields* Plaintiffs' Injuries................................67

V.    IN ALL THREE CASES, THE IMPOSITION OF SECONDARY LIABILITY ON DEFENDANTS WOULD VIOLATE THE DUE PROCESS CLAUSE. .................71

CONCLUSION....................................................................................................755

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>                                                                                                  <u>Page(s)</u>

*In re Aegean Marine Petroleum Network, Inc. Securities Litigation*,
    529 F. Supp. 3d 111 (S.D.N.Y. 2021) ................................................................................14

*Al Rushaid v. Pictet & Cie*,
    28 N.Y.3d 316 (2016) ................................................................................15, 19, 27

*Andrews v. Metro North Commuter Railroad Co.*,
    882 F.2d 705 (2d Cir. 1989) ................................................................................60

*Arrowsmith v. United Press International*,
    320 F.2d 219 (2d Cir. 1963) (en banc) ................................................................................13

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................13, 22

*Bank of America Corp. v. City of Miami*,
    581 U.S. 189 (2017) ................................................................................68

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................5, 13

*Bellefonte Re Insurance Co. v. Argonaut Insurance Co.*,
    757 F.2d 523 (2d Cir. 1985) ................................................................................60

*Berdeaux v. OneCoin Ltd.*,
    561 F. Supp. 3d 379 (S.D.N.Y. 2021) ................................................................. *passim*

*Bernhardt v. Islamic Republic of Iran*,
    47 F.4th 856 (D.C. Cir. 2022),
    *cert. denied*, No. 23-18, 2023 WL 6558423 (U.S. Oct. 10, 2023) ............................ *passim*

*Biocad JSC v. F. Hoffmann-La Roche Ltd.*,
    No. 16-cv-4226 (RJS), 2022 WL 268102 (S.D.N.Y. Jan. 28, 2022) ................................36

*Bluewaters Communications Holdings, LLC v. Ecclestone*,
    No. 653965/2012, 2014 WL 220779
    (N.Y. Sup. Ct. N.Y. Cnty. Jan. 16, 2014),
    *aff'd*, 996 N.Y.S.2d 232 (1st Dep't 2014) ................................................................................17

*Bristol-Myers Squibb Co. v. Superior Court*,
    582 U.S. 255 (2017) ................................................................................14

*Brown v. National Bank of Pakistan*,
    No. 19 Civ. 11876 (AKH), 2022 WL 1155905 (S.D.N.Y. Apr. 19, 2022) ........................17

*B.T. Produce Co. v. Robert A. Johnson Sales, Inc.*,
    354 F. Supp. 2d 284 (S.D.N.Y. 2004)..............................................................16

*Burger King Corp. v. Rudzewicz*,
    471 U.S. 462 (1985)...................................................................................30

*Caballero v. Fuerzas Armadas Revolucionarias de Colombia*,
    No. 1:18-cv-25337-KMM, 2020 WL 7481302 (S.D. Fla. May 20, 2020) ......................74

*Calder v. Jones*,
    465 U.S. 783 (1984)...................................................................................36

*Charles Schwab Corp. v. Bank of America Corp.*,
    883 F.3d 68 (2d Cir. 2018)..............................................................26, 36, 37

*Chirag v. MT Marida Marguerite Schiffahrts*,
    604 F. App'x 16 (2d Cir. 2015) .......................................................12, 13

*Cohen v. Facebook, Inc.*,
    252 F. Supp. 3d 140 (E.D.N.Y. 2017),
    *aff'd in part, dismissed in part sub nom.*
    *Force v. Facebook, Inc.*, 934 F.3d 53 (2d Cir. 2019) ...................................14, 39

*Community Finance Group, Inc. v. Stanbic Bank Ltd.*,
    No. 14cv5216(DLC), 2015 WL 4164763 (S.D.N.Y. July 10, 2015)..............................22

*Daou v. BLC Bank S.A.L*,
    42 F.4th 120 (2d Cir. 2022) ...........................................................................28

*Ehrenfeld v. Bin Mahfouz*,
    9 N.Y.3d 501 (2007) ...............................................................................14, 23

*Estates of Ungar & Ungar ex rel. Strachman v. Palestinian Authority*,
    304 F. Supp. 2d 232 (D.R.I. 2004)....................................................................73, 74

*Fields v. Twitter, Inc.*,
    881 F.3d 739 (9th Cir. 2018) ...................................................................68, 70, 71

*Financial Guaranty Insurance Co. v. Putnam Advisory Co.*,
    No. 12-cv-7372, 2013 WL 5230818 (S.D.N.Y. Sept. 10, 2013) ..............................16

*Fischbarg v. Doucet*,
    9 N.Y.3d 375 (2007) ...............................................................................15

*Forgione v. Gaglio*,
    No. 13 Civ. 9061(KPF), 2015 WL 718270 (S.D.N.Y. Feb. 13, 2015) ..........................16

*Freeman v. HSBC Holdings PLC*,
    413 F. Supp. 3d 67 (E.D.N.Y. 2019),
    *aff'd on other grounds*, 57 F.4th 66 (2d Cir. 2023),
    *cert. denied*, No. 22-1117, 2023 WL 6377871 (U.S. Oct. 2, 2023) ......................64, 70, 71

*Freeman v. HSBC Holdings PLC*,
    57 F.4th 66 (2d Cir. 2023),
    *cert. denied*, No. 22-1117, 2023 WL 6377871 (U.S. Oct. 2, 2023) .......................... *passim*

*Gill v. Arab Bank, PLC*,
    893 F. Supp. 2d 474 (E.D.N.Y. 2012) ............................................................69

*Grove Press, Inc. v. Angleton*,
    649 F.2d 121 (2d Cir. 1981)..........................................................................26

*Gucci America, Inc. v. Weixing Li*,
    135 F. Supp. 3d 87 (S.D.N.Y. 2015)...............................................................30

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ...........................................................51, 52, 53

*Hartford Fire Insurance Co. v. M/V "MSC INSA"*,
    No. 03 Civ. 2196(SAS), 2003 WL 22990090 (S.D.N.Y. Dec. 18, 2003).........................30

*Henkin v. Qatar Charity*,
    No. 21-CV-5716 (AMD) (VMS), 2023 WL 2734788
    (E.D.N.Y. Mar. 31, 2023) ........................................................................26, 29

*Hinds County, Mississippi v. Wachovia Bank N.A.*,
    620 F. Supp. 2d 499 (S.D.N.Y. 2009) ............................................................63

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010)......................................................................................60

*Honickman v. BLOM Bank SAL*,
    6 F.4th 487 (2d Cir. 2021) ....................................................40, 41, 43, 51, 52

*Hungerstation LLC v. Fast Choice LLC*,
    No. 19-CV-05861, 2020 WL 137160 (N.D. Cal. Jan. 13, 2020),
    *aff'd*, No. 20-15090, 2021 WL 963777 (9th Cir. Mar. 15, 2021),
    *amended*, 857 F. App'x 349 (9th Cir. 2021).............................................31, 32

*International Distribution Centers, Inc. v. Walsh Trucking Co.*,
    812 F.2d 786 (2d Cir. 1987) ........................................................................56

*Johnson v. Ward*,
    4 N.Y.3d 516 (2005) ...................................................................................27

*Kaplan v. Al Jazeera*,
No. 10 Civ. 5298, 2011 WL 2314783 (S.D.N.Y. June 7, 2011) ........................................74

*Kaplan v. Lebanese Canadian Bank, SAL*,
405 F. Supp. 3d 525 (S.D.N.Y. 2019),
*vacated in part on other grounds*, 999 F.3d 842 (2d Cir. 2021) ......................................65

*King v. Habib Bank Ltd.*,
No. 20 Civ. 4322 (LGS), 2022 WL 4537849 (S.D.N.Y. Sept. 28, 2022) .........................65

*Koulkina v. City of New York*,
559 F. Supp. 2d 300 (S.D.N.Y. 2008) ..............................................................................13

*Landgraf v. USI Film Productions*,
511 U.S. 244 (1994) ..........................................................................................................72

*Laydon v. Mizuho Bank, Ltd.*,
No. 12 Civ. 3419(GBD), 2015 WL 1515358 (S.D.N.Y. Mar. 31, 2015) .........................31

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
673 F.3d 50 (2d Cir. 2012) ("*Licci I*") .............................................................................14

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
20 N.Y.3d 327 (2012) ("*Licci II*") ..............................................................................27, 29

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
732 F.3d 161 (2d Cir. 2013) ("*Licci III*") ..................................................12, 16, 18, 31, 36

*Linde v. Arab Bank, PLC*,
882 F.3d 314 (2d Cir. 2018) ..................................................................................... *passim*

*Louis Vuitton S.A. v. Spencer Handbags Corp.*,
765 F.2d 966 (2d Cir. 1985) ..............................................................................................72

*MacDermid, Inc. v. Dieter*,
702 F.3d 725 (2d Cir. 2012) ..............................................................................................33

*Official Committee of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*,
549 B.R. 56 (S.D.N.Y. 2016) .............................................................................................31

*OOO Brunswick Rail Management v. Sultanov*,
No. 5:17-cv-00017-EJD, 2017 WL 264047 (N.D. Cal. Jan. 20, 2017) ............................31

*Opati v. Republic of Sudan*,
140 S. Ct. 1601 (2020) .......................................................................................................72

*Przewozman v. Charity*,
No. 20-CV-6088 (NGG) (TAM),
2023 WL 2562537 (E.D.N.Y. Mar. 17, 2023) .......................................................... *passim*

*Regina Metropolitan Co. v. New York State Division of
Housing & Community Renewal*,
35 N.Y.3d 332 (2020) ......................................................................................72, 74

*Robinson v. Overseas Military Sales Corp.*,
21 F.3d 502 (2d Cir. 1994)...........................................................................................17

*Rosenberg v. Lashkar-e-Taiba*,
No. 10-CV-5381 (DLI) (CLP), 2014 WL 12834840 (E.D.N.Y. Aug. 1,
2014), *report and recommendation adopted* (E.D.N.Y. Sept. 10, 2014)..........................74

*Rothstein v. UBS AG*,
708 F.3d 82 (2d Cir. 2013) ....................................................................................68, 70, 73

*Schrier v. Qatar Islamic Bank*,
No. 20-60075-CIV-ALTMAN/Hunt, 2022 WL 4598630 (S.D. Fla. Sept.
30, 2022), *appeal filed*, No. 22-13513 (11th Cir. Oct. 19, 2022) ......................................39

*Schwab Short-Term Bond Market Fund v. Lloyds Banking Group PLC*,
22 F.4th 103 (2d Cir. 2021) ......................................................................................36

*Siegel v. HSBC North America Holdings, Inc.*,
933 F.3d 217 (2d Cir. 2019)...................................................................................... *passim*

*Smith ex rel. Smith v. Islamic Emirate of Afghanistan*,
262 F. Supp. 2d 217 (S.D.N.Y. 2003),
*amended*, No. 01 Civ.10132(HB), 2003 WL 23324214
(S.D.N.Y. May 19, 2003)...........................................................................................74

*Sonterra Capital Master Fund Ltd. v. Credit Suisse Group AG*,
277 F. Supp. 3d 521 (S.D.N.Y. 2017)...........................................................................31

*Spetner v. Palestine Investment Bank*,
70 F.4th 632 (2d Cir. 2023) ....................................................................15, 18, 26, 27

*SPV Osus Ltd. v. UBS AG*,
882 F.3d 333 (2d Cir. 2018)...........................................................................................12

*Stansell v. BGP, Inc.*,
No. 8:09-cv-2501-T-30AEP, 2011 WL 1296881
(M.D. Fla. Mar. 31, 2011).......................................................................................66, 67

*Strauss v. Crédit Lyonnais, S.A.*,
    379 F. Supp. 3d 148 (E.D.N.Y. 2019),
    *aff'd in part, dismissed in part*, 842 F. App'x 701 (2d Cir. 2021) .................................. 41

*Tamam v. Fransabank Sal*,
    677 F. Supp. 2d 720 (S.D.N.Y. 2010) ........................................................................ 16, 17

*In re Terrorist Attacks on September 11, 2001*,
    714 F.3d 659 (2d Cir. 2013) ........................................................................................ 13, 37

*In re Terrorist Attacks on September 11, 2001*,
    298 F. Supp. 3d 631 (S.D.N.Y. 2018) .............................................................................. 69

*Thorne v. Square, Inc.*,
    No. 20-CV-5119 (NGG) (TAM), 2022 WL 542383
    (E.D.N.Y. Feb. 23, 2022) .................................................................................................. 24

*Twitter, Inc. v. Taamneh*,
    598 U.S. 471 (2023) ................................................................................................. *passim*

*United States v. Maruyasu Industries Co.*,
    229 F. Supp. 3d 659 (S.D. Ohio 2017) ............................................................................ 34

*Universal Trading & Investment Co. v. Tymoshenko*,
    No. 11 Civ. 7877(PAC), 2012 WL 6186471 (S.D.N.Y. Dec. 12, 2012) .......................... 18

*Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1 (1976) ............................................................. 72

*V&A Collection, LLC v. Guzzini Properties Ltd.*,
    46 F.4th 127 (2d Cir. 2022) ............................................................................................. 35

*Vasquez v. Hong Kong & Shanghai Banking Corp.*,
    477 F. Supp. 3d 241 (S.D.N.Y. 2020) .............................................................................. 22

*In re Vitamins Antitrust Litigation*,
    120 F. Supp. 2d 45 (D.D.C. 2000), *amended in part*,
    No. 99-197 TFH, 1285, 2000 WL 33142129 (D.D.C. Nov. 22, 2000) ............................ 34

*Walden v. Fiore*,
    571 U.S. 277 (2014) ......................................................................................................... 30

*Waldman v. Palestine Liberation Organization*,
    835 F.3d 317 (2d Cir. 2016) ........................................................................................ 37, 38

*Weiss v. National Westminster Bank PLC*,
    768 F.3d 202 (2d Cir. 2014) ............................................................................................. 54

*Weiss v. National Westminster Bank PLC*,
 993 F.3d 144 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 2866 (2022) ...................................65

*WhatsApp Inc. v. NSO Group Technologies Ltd.*,
 472 F. Supp. 3d 649 (N.D. Cal. 2020) .......................................................................32, 33

*Wildman v. Deutsche Bank Aktiengesellschaft*,
 No. 21-CV-04400 (HG) (RML), 2022 WL 17993076 (E.D.N.Y.
 Dec. 29, 2022), *appeal filed*, No. 23-132 (2d Cir. Jan. 30, 2023) ........................... *passim*

*Wultz v. Islamic Republic of Iran*,
 755 F. Supp. 2d 1 (D.D.C. 2010) .................................................................................39

*Zapata v. HSBC Holdings PLC*,
 414 F. Supp. 3d 342 (E.D.N.Y. 2019),
 *aff'd*, 825 F. App'x 55 (2d Cir. 2020) ..................................................................... *passim*

**Statutes and Rules**

18 U.S.C. § 2331(1) ...........................................................................................................12

18 U.S.C. § 2331(1)(B) ......................................................................................................65

18 U.S.C. § 2333(a) ................................................................................................11, 67, 71

18 U.S.C. § 2333(b) ...........................................................................................................71

18 U.S.C. § 2333(c) ...........................................................................................................71

18 U.S.C. § 2333(d) ...........................................................................................................71

18 U.S.C. § 2333(d)(2) ...............................................................................................12, 56

18 U.S.C. § 2334(a) .....................................................................................................14, 38

18 U.S.C. § 2339A ......................................................................................................61, 67

Justice Against Sponsors of Terrorism Act,
 Pub. L. No. 114-222, 130 Stat. 852 (2016) ...............................................................12

Justice Against Sponsors of Terrorism Act,
 Pub. L. No. 114-222, § 4, 130 Stat. 852, 854 (2016) ................................................71

Justice Against Sponsors of Terrorism Act,
 Pub. L. No. 114-222, § 7, 130 Stat. 852, 855 (2016) ................................................71

Fed. R. Civ. P. 4(k) ...........................................................................................................14

N.Y. C.P.L.R. § 301 ..................................................................................................14

N.Y. C.P.L.R. § 302 ..................................................................................................14

N.Y. C.P.L.R. § 302(a)(1) ....................................................................................14, 30


**Other Authorities**

162 Cong. Rec. H5239-03 (daily ed. Sept. 9, 2016) ................................................73

162 Cong. Rec. S6116-03 (daily ed. Sept. 28, 2016) ..............................................73

Bank for Int'l Settlements,
   *The BIS: Promoting Global Monetary and*
   *Financial Stability Through International Cooperation* (Aug. 2023),
   https://www.bis.org/about/profile_en.pdf ..........................................................17

Comm. on the Glob. Fin. Sys., Bank for Int'l Settlements,
   *US Dollar Funding: An International Perspective* (2020),
   https://www.bis.org/publ/cgfs65.pdf .................................................................16

Comm. on Payments & Mkt. Infrastructures, Bank for Int'l Settlements,
   *Correspondent Banking* (July 2016),
   https://www.bis.org/cpmi/publ/d147.pdf .....................................................19, 25

Comm. on Payments & Mkt. Infrastructures, Bank for Int'l Settlements,
   *Cross-Border Retail Payments* (Feb. 2018),
   https://www.bis.org/cpmi/publ/d173.pdf ...........................................................20

Press Release, European Ctr. for Const. & Human Rights (ECCHR),
   Charges Confirmed Against Lafarge for Complicity in Crimes Against
   Humanity in Syria (May 18, 2022), https://www.ecchr.eu/en/press-
   release/charges-confirmed-against-lafarge-for-complicity-in-crimes-
   against-humanity-in-syria ....................................................................................9

Fin. Crimes Enf't Network, *Feasibility of a Cross-Border Electronic Funds*
   *Transfer Reporting System under the Bank Secrecy Act, App'x D –*
   *Fundamentals of the Funds Transfer Process* (2006),
   https://www.fincen.gov/sites/default/files/shared/Appendix_D.pdf.................20

Press Release, Holcim, Holcim Affirms Support for Lafarge SA Resolution with
   the U.S. Department of Justice Regarding Legacy Lafarge Operations in
   Syria (Oct. 18, 2022), https://www.holcim.com/media/media-
   releases/statements-18-october-2022 ..................................................................9

H.K. Interbank Clearing Ltd., *List of USD Clearing Participants as of 31 August 2015*, https://web.archive.org/web/20150919085519/ http://www.hkicl.com.hk/clientbrowse.do?docID=7196&lang=en ..................................24

Restatement (Third) of Torts: Liability for Economic Harm § 27 (Am. L. Inst. 2020) .............................................................................................................62

Lafarge S.A. ("Lafarge"), Lafarge Cement Holding Limited ("Lafarge Cyprus"), and Lafarge Cement Syria S.A. ("LCS") respectfully submit this combined Memorandum of Law in support of their Motions to Dismiss the Plaintiffs' operative complaints in *Finan et al. v. Lafarge S.A. et al.*, No. 22-CV-07831 (E.D.N.Y. Nov. 7, 2023) (ECF No. 37) (the "*Finan* 2AC"); *Fields et al. v. Lafarge S.A. et al.*, No. 23-CV-00169 (E.D.N.Y. Sept. 8, 2023) (ECF No. 16) (the "*Fields* AC"); and *Foley et al. v. Lafarge S.A. et al.*, No. 23-CV-05691 (E.D.N.Y. July 27, 2023) (ECF No. 1) (the "*Foley* Complaint," together with the *Finan* 2AC and the *Fields* AC, the "Complaints"), pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6).

## PRELIMINARY STATEMENT

Each of these actions concern alleged conduct by Defendants in Syria during the early 2010s. In 2010, LCS, an indirect subsidiary of Lafarge, opened a cement plant (the "Cement Plant") in northern Syria. The timing was inauspicious. In less than a year, what started as a peaceful, civil protest against the Syrian government transformed into a civil war. By May 2012, armed conflict among various rival insurgent factions spread into the region immediately surrounding the Cement Plant.

The conflict intensified rapidly as even civilian bystanders became targets of war. Indeed, as acknowledged in a Statement of Facts ("SOF") agreed between Lafarge, LCS, and the U.S. government in October 2022, which is incorporated in the Complaints, LCS employees or their family members were kidnapped or detained by armed groups on numerous occasions to extract ransom payments from LCS; an LCS contractor was killed at a checkpoint; and armed militants began to regularly hijack LCS trucks. In the midst of this volatility and chaos, and in an effort to protect its employees and facilities from the violence besieging the region and to keep the Cement Plant operating, LCS arranged to make "protection" payments for approximately 14 months to persons holding themselves out as making payments to the Islamic State of Iraq and al Sham

("ISIS") and the Al Nusra Front ("ANF").  However, and as the U.S. government concluded after years of investigation, there was no evidence to suggest that either Lafarge or LCS (or Lafarge Cyprus or any of their employees) "shared or supported the terrorist ideologies or goals" of any such Foreign Terrorist Organizations ("FTOs").  Ultimately, LCS evacuated the Cement Plant in September 2014 due to the ever-increasing threat of harm.

In 2016, Lafarge's new parent company initiated a full internal investigation after allegations of misconduct by LCS surfaced publicly.  At the end of the investigation, employees involved in the misconduct were terminated (and many of them now face criminal prosecution in France) and new internal controls and compliance programs were adopted and implemented. Government authorities in France and the United States also commenced investigations into these matters.  Lafarge fully cooperated with French authorities and voluntarily provided information and materials to the U.S. Department of Justice (the "DOJ").  At the completion of the U.S. investigation, in 2022, Lafarge and LCS entered a guilty plea to one count of criminal conspiracy to provide material support to an FTO, in violation of 18 U.S.C. § 2339B(a)(1).

Although LCS's activities in Syria were confined to operating the Cement Plant, which occurred between May 2010 and September 2014, each Complaint attempts to allege that Defendants are secondarily liable under the Antiterrorism Act of 1990 ("ATA"), for a series of alleged acts that killed or injured Plaintiffs and their family members over a five-year span.  These acts include alleged terrorist kidnappings and murders in which Defendants had absolutely no prior knowledge or involvement, as well as alleged injuries or deaths suffered by U.S. soldiers during military operations against ISIS in Syria, Iraq, and Niger—in which Defendants again had no knowledge or involvement, and which occurred some time after LCS evacuated the Cement Plant. They also include alleged attacks on civilians that occurred predominantly outside of Syria, years

after LCS ceased operations, once again without any knowledge or involvement of Defendants. Some of these same Plaintiffs have previously pursued ATA and related claims against Syria and other non-party companies arising from the same events.

The Complaints' expansive theory of liability appears to rest on the legally unsound notion that the Defendants can be held liable for civil claims under the ATA—seemingly in perpetuity and worldwide, regardless of the timing, nature or place of plaintiffs' alleged injuries or the actual timing, nature and ultimate destination of Defendants' payments—for the sole reason that Lafarge and LCS pleaded guilty to a violation of 18 U.S.C. § 2339B(a)(1). Not so.

Although Lafarge and LCS accepted responsibility for the conduct of former employees, they (and Lafarge Cyprus) cannot be held legally responsible for every subsequent terrorist act or alleged injury to Plaintiffs. The Supreme Court recently rejected just such a sprawling theory of ATA liability in its decision in *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023). Moreover, to proceed, the Complaints not only must establish a basis for this Court's exercise of personal jurisdiction over each foreign defendant, they also must adequately plead each of the substantive elements of an ATA claim, which includes elements wholly unrelated to criminal liability such as (i) whether each Defendant was "generally aware" of its role in the tortious activity at the time that it provided the assistance (in certain cases *years earlier*), and (ii) whether each Defendant "knowingly and substantially assisted" each discrete attack. With the deepest respect to the Plaintiffs, and while acknowledging the tragic losses endured by them and their families, the reality is that the Complaints are legally unsustainable and must be dismissed with prejudice.

*First*, the Court lacks personal jurisdiction over the Defendants. Although the Complaints invoke New York's long-arm statute, they fail to meet the necessary standards, including showing that the Defendants' actions arise from a transaction of business in which the Defendants

3

purposefully availed themselves of the opportunity of doing business in New York.  Indeed, the Complaints allege only three instances (at most) where the Defendants' actions have any link to New York: one in October 2014 in which Lafarge requested its French bank to wire U.S. dollars to an account in Dubai, and in processing that transaction the French bank (not Lafarge), used a correspondent bank in New York; and two alleged instances, both in August 2011, in which Lafarge Cyprus's Dubai bank (not Lafarge Cyprus) processed two intercompany loan payments through New York banks, which then transmitted such funds to LCS.  These incidental links with New York, which did not occur at Lafarge or Lafarge Cyprus's direction, fall far short of the types of contacts needed to confer personal jurisdiction.  Indeed, at most, Plaintiffs' personal jurisdiction allegations indicate that: (i) on three occasions, the Defendants requested their banks to transact in U.S. dollars, and (ii) banks that effectuate U.S. dollar transactions often (but not invariably) route such transactions through New York.  But, as courts applying New York's long-arm statute have repeatedly held, these kinds of allegations are insufficient to show that the Defendants deliberately and purposefully availed themselves of the privilege of conducting business within New York.

*Second*, the Complaints should be dismissed because they do not state a viable claim against the Defendants for secondary liability under the ATA.  The aiding-and-abetting claims fail because the Complaints do not—and cannot—allege (i) that the Defendants were "generally aware" of their alleged role in any of the various incidents alleged in the Complaints, (ii) that the particular alleged injuries were "foreseeable" to Defendants, or (iii) that the Defendants provided knowing and substantial assistance to any of the twenty-two discrete attacks that injured the Plaintiffs.  Under *Taamneh*, it plainly is not sufficient to allege that the Defendants gave substantial assistance to ISIS or ANF generally.  The separate conspiracy claims must similarly be dismissed because the Complaints fail to allege any "shared purpose" or "common intent" between the

4

Defendants and any FTO, and also because the Complaints do not adequately allege a "common scheme," let alone any "overt act" in support thereof.

*Third*, the *Fields* AC's additional claims for primary liability under the ATA must be dismissed because the Plaintiffs have not alleged that the Defendants engaged in any act of international terrorism, acted with terrorist "intent," or "caused" injury to the *Fields* Plaintiffs.

*Fourth*, even had the Complaints adequately alleged claims for secondary liability under the ATA, imposing such liability (and treble damages) on the Defendants for conduct that preceded the 2016 amendment to the ATA would violate the Due Process Clause of the Constitution.

## FACTUAL BACKGROUND[1]

### A.  Lafarge, Lafarge Cyprus, LCS, and the Cement Plant.

Lafarge is a building materials manufacturer organized under the laws of France and headquartered in Paris.  (*Foley* ¶ 12; *Finan* 2AC ¶ 29; *Fields* AC ¶ 45.)  Lafarge owns Lafarge Cyprus, a holding company organized under the laws of and headquartered in Cyprus.  (*Foley* ¶ 13; *Finan* 2AC ¶ 31; *Fields* AC ¶ 49.)  Lafarge Cyprus, in turn, is the primary shareholder of LCS, a Syrian company.  (*Foley* ¶¶ 13–14; *Finan* 2AC ¶ 31; *Fields* AC ¶¶ 48–49.)  LCS operated the Cement Plant, in the Jalabiyeh region of Syria, from May 2010 until September 2014.  (*Foley* ¶ 14; *Finan* 2AC ¶ 31; *Fields* AC ¶105.)  LCS is no longer operational.  (*See* SOF ¶ 116.)

---

[1] For purposes of these Motions, the Court may take the well-pleaded allegations in the Complaints as true, excluding inherently implausible or speculative allegations. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).  The original *Finan* and *Fields* Complaints explicitly incorporated, "in its entirety as though fully set forth herein," the SOF accompanying the guilty plea by Lafarge and LCS.  (*Finan*, ECF No. 1 ¶ 3; *Fields*, ECF No. 1 ¶ 56; *see* ECF No. 10-1, *United States v. Lafarge S.A.*, Case No. 1:22-cr-00444-WFK.)  The amended pleadings in *Finan* and *Fields* incorporate the SOF in its entirety "to the extent not inconsistent with the allegations [t]herein."  (*Finan* 2AC ¶ 2; *Fields* AC ¶ 24.)

**B.      The Syrian Civil War Begins and Armed Factions Converge on the Cement Plant.**

In 2011, just a year after the opening of the Cement Plant, civil war broke out in Syria. (SOF ¶ 15; *Foley* ¶ 31; *Finan* 2AC ¶ 63; *Fields* AC ¶ 88.)  By the summer of 2012, armed conflict spread to the Jalabiyeh region.  (SOF ¶ 25; *see Finan* 2AC ¶ 90; *Fields* AC ¶ 112.)  "[N]umerous armed factions," eventually including ISIS and ANF, converged on the area surrounding the Cement Plant.  (SOF ¶¶ 15, 29; *see Foley* ¶ 48; *Finan* 2AC ¶¶ 90–95; *Fields* AC ¶¶ 112, 117.) This caused volatility and chaos for individuals and companies in the region—and led to, among other things, the kidnapping of LCS employees and the hijacking of LCS trucks.  (SOF ¶ 25.)

**C.      Payments to Intermediaries in Syria From 2013 Until 2014.**

After the advent of the Syrian civil war, in an effort "to protect LCS employees, to ensure continued operation of the . . . Cement Plant, and to obtain economic advantage over . . . competitors in the Syrian cement market," LCS began to arrange making payments to "intermediaries" of "numerous armed factions."  (*Id.* ¶ 15; *see also Foley* ¶¶ 4, 10, 88; *Finan* 2AC ¶¶ 104, 118; *Fields* AC ¶¶ 126, 140.)  According to the Complaints, it was not until 2013 that Lafarge and LCS began making payments to intermediaries who purported to pay ISIS or ANF. (*Foley* ¶¶ 63–64, 112; *Finan* 2AC ¶¶ 92, 107, 112, 115; *Fields* AC ¶¶ 114, 129, 134, 137; SOF ¶ 29.)  Of course, neither Lafarge nor LCS, nor any of their employees, "shared or supported the terrorist ideologies or goals of ISIS, ANF or any other FTO."  (*Id.* ¶¶ 17, 111.)

The Complaints reference various forms of payments allegedly made by the Defendants:

(i)      fixed monthly "donation" or "security" payments through intermediaries to armed factions "that controlled the area surrounding the Cement Plant," beginning in 2013 to ANF and the spring of 2013 or November 2013 to ISIS (*Finan* 2AC ¶¶ 103, 110–15; *Fields* AC ¶¶ 125, 132–37; *Foley* ¶¶ 60–64; SOF ¶ 15);

(ii)     "safe passage" or "access" payments to allow for the safe passage of trucks to and near the Cement Plant, first as fixed payments per truckload made by customer-distributors to ISIS and ANF, and then as an agreement to pay ISIS based on the volume of cement sold (*Foley* ¶¶ 60, 67–70; *Finan* 2AC ¶¶ 103, 105–09; *Fields*

AC ¶¶ 125, 127–31; SOF ¶¶ 15, 34–36); and

(iii)   purchases of raw materials from ISIS-controlled suppliers, who then "paid ISIS based on the amount of [the suppliers'] sales to LCS" (*Finan* 2AC ¶¶ 121–31; *Fields* AC ¶¶ 143–53; SOF ¶ 15; *see Foley* ¶¶ 60, 71–75.)

Citing the DOJ's estimate, the Complaints allege that these payments (many of which were made or were agreed to be made in Syrian pounds (SOF ¶¶ 36, 38–39, 44–45, 47, 53–54, 58, 66, 80)) totaled the equivalent of approximately $5.92 million.  (*See* SOF ¶ 19.)[2]  The Complaints also claim "on information and belief" that Lafarge and LCS sold cement to ISIS.  (*Foley* ¶ 76; *see Finan* 2AC ¶ 132; *Fields* AC ¶ 143.)  The Complaints further allege that after LCS's evacuation in September 2014, ISIS stole cement from the Cement Plant.  (*Foley* ¶ 54; *Finan* 2AC ¶ 83; *Fields* AC ¶ 104; SOF ¶ 19.)

## D.    Alleged Contacts with New York and the United States.

The Complaints allege that Defendants had three contacts with New York (and just one contact during the period of the alleged conspiracy).  The first two alleged contacts occurred on August 25, 2011—before ISIS and ANF were even formed, before any protection payments were made, and over a decade before these actions were commenced.  The Complaints allege that, on that date, Lafarge Cyprus's Dubai bank processed two intercompany loan payments for a total of $15 million to provide operating funds for LCS.  (*Foley* ¶ 173; *Finan* 2AC ¶ 228; *Fields* AC ¶

---

[2]   Alternatively, the Complaints allege, based "on information and belief" and without any specific calculation or even a basis therefore, that the payments "likely" amounted to around $15 million.  (*Foley* ¶ 54; *Finan* 2AC ¶¶ 17, 180; *Fields* AC ¶¶ 202.)  Based upon the foregoing, it is far from clear whether Plaintiffs include in their calculations: (1) the value of cement that, "upon information and belief" Plaintiffs claim LCS sold to ISIS (*Foley* ¶ 76; *see Finan* 2AC ¶ 132; *Fields* AC ¶ 143) or that ISIS stole when the Cement Plant was evacuated (*Foley* ¶ 54; *Finan* 2AC ¶ 83; *Fields* AC ¶ 104; SOF ¶ 19); or (2) "taxes" paid by intermediaries to ISIS, in an amount equivalent to costs to be imposed by ISIS on imports of Turkish cement, for the Cement Plant's continued security and business operations.  (*Finan* 2AC ¶¶ 154, 159–60; *Fields* AC ¶¶ 176, 182; *see Foley* ¶ 81; SOF ¶¶ 85–86.)

251.)  The bank in Dubai allegedly processed these intercompany loan payments "through New York banks," which then transmitted the wired amounts to LCS.  (*See Foley* ¶ 173; *Finan* 2AC ¶ 228; *Fields* AC ¶ 251.)  The Complaints do not allege that these intercompany loan payments were connected to the specific terrorist incidents underlying the Complaints.  The third alleged contact with New York occurred on October 23, 2014, after LCS had evacuated the Cement Plant.  The Complaints allege that, on that date, Lafarge Cyprus's French bank wired $210,000 to an intermediary's bank account in Dubai to reimburse him for past work.  (*Foley* ¶¶ 96, 173–74; *Finan* 2AC ¶¶ 174, 228–29; *Fields* AC ¶¶ 69, 196, 199; SOF ¶¶ 101, 103.)  The French bank allegedly processed the $210,000 payment "through New York banks," which then transmitted the wired amounts to the intermediary's account in Dubai.  (*See Foley* ¶ 173; *Finan* 2AC ¶ 228; *Fields* AC ¶ 251; SOF ¶ 103.)  The Complaints additionally allege, "[o]n information and belief," that foreign banks opted to clear "some" other U.S. dollar-denominated transactions of Lafarge Cyprus and LCS through New York correspondent banks.  (*Foley* ¶¶ 154, 162–66; *Finan* 2AC ¶¶ 214–15; *Fields* AC ¶¶ 237–38.)

Finally, the Complaints allege that Lafarge and LCS executives used "personal email accounts serviced by U.S.-based email service providers" to "plan their conspiracy" and "conceal their conduct from others within and outside of [Lafarge] and LCS."  (*Foley* ¶¶ 202–04; *Finan* 2AC ¶¶ 51, 250; *Fields* AC ¶¶ 70, 273.)

**E.    September 2014:  ISIS Seizes the Cement Plant.**

ISIS seized the Cement Plant just after LCS's evacuation in September 2014.  (*Foley* ¶ 54; *Finan* 2AC ¶ 169; *Fields* AC ¶ 191; SOF ¶ 95.)  The Complaints allege no facts indicating that Defendants made any payments to ISIS or ANF, via an intermediary or otherwise, after October 2014, although the *Finan* 2AC and *Fields* AC allege "on information and belief" that payments to an intermediary pursuant to a consulting agreement continued after the last October 2014 payment

for prior work.  (*Finan* 2AC ¶ 178; *Fields* AC ¶ 69.)

**F.    Lafarge and LCS's Actions Are Subsequently Investigated and Disclosed Publicly.**

On July 10, 2015, Holcim Ltd. ("Holcim"), a building materials business based in Switzerland, completed its acquisition of Lafarge, after which Lafarge became a wholly owned, indirect subsidiary of Holcim.  (*See* SOF ¶¶ 1, 116; *Foley* ¶ 12; *Finan* 2AC ¶ 30; *Fields* AC ¶ 46.) After learning of the accusations against Lafarge, Holcim commissioned an investigation conducted by independent external counsel with substantial experience in complex cross-border issues.  (*See* SOF ¶ 109; *see also Foley* ¶ 98; *Finan* 2AC ¶ 192; *Fields* AC ¶ 208.)  Holcim periodically issued public statements regarding the investigation's preliminary and final findings. (*See* SOF ¶ 110.)  As an indirect subsidiary of Holcim, Lafarge has implemented Holcim's enhanced global compliance program and robust third-party due diligence, sanctions, and export control screening processes.  (*See id.* ¶¶ 116–17.)

Following the public disclosures of the internal investigation, Lafarge cooperated with the French authorities in their criminal investigation into Lafarge's actions in Syria.[3]  The French proceedings are ongoing.[4]

**G.    The U.S. DOJ Investigation Leads to a 2022 Guilty Plea.**

The DOJ also investigated Lafarge and LCS's actions; at the conclusion of the investigation, Lafarge and LCS pleaded guilty to one count of conspiracy to provide material

---

[3]    Press Release, Holcim, Holcim Affirms Support for Lafarge SA Resolution with the U.S. Department of Justice Regarding Legacy Lafarge Operations in Syria (Oct. 18, 2022), https://www.holcim.com/media/media-releases/statements-18-october-2022.

[4]    Press Release, European Ctr. for Const. & Human Rights (ECCHR), Charges Confirmed Against Lafarge for Complicity in Crimes Against Humanity in Syria (May 18, 2022), https://www.ecchr.eu/en/press-release/charges-confirmed-against-lafarge-for-complicity-in-crimes-against-humanity-in-syria.

support to one or more FTOs in violation of 18 U.S.C. § 2339B(a)(1).  (*See Foley* ¶ 361; *Finan 2AC* ¶ 330; *Fields* AC ¶ 334.)  In that plea (and on prior occasions), Lafarge acknowledged the underlying conduct was "unacceptable" and reflected "significant errors of judgment."  (SOF ¶ 110; *Foley* ¶ 98.)  The DOJ recognized that Lafarge and LCS's "willingness to accept responsibility for their crimes evidences a commitment to preventing such serious crimes from occurring again," and that the "remediation efforts following the discovery of [Lafarge] and LCS's offense conduct have been significant" so as to "detect and prevent any potential future criminal conduct like that committed by [Lafarge] and LCS."  (SOF ¶ 117.)

### H.    The Alleged Injuries.

Plaintiffs' Complaints contend that Defendants should be held liable for twenty-two separate incidents in which American nationals were injured or killed allegedly by ISIS or ANF.[5] The alleged incidents vary greatly not only in time and geography, but also in circumstance, and

---

[5]    Most of the *Fields* Plaintiffs have previously sought relief under the ATA and the Foreign Sovereign Immunities Act of 1976 ("FSIA") for the same injuries in actions against Twitter or the Syrian government.  *See Fields v. Twitter, Inc.*, No. 3:16-cv-00213 (N.D. Cal. filed Jan. 13, 2016) (dismissed; appeal denied); *Copeland v. Twitter, Inc.*, No. 3:17-cv-05851 (N.D. Cal. filed Oct. 12, 2017) (dismissed; on appeal); *Fields v. Syrian Arab Republic*, No. 1:18-cv-01437 (D.D.C. filed June 18, 2018) (default judgment entered); *Copeland v. Syrian Arab Republic*, No. 1:21-cv-03381 (D.D.C. filed Dec. 29, 2021) (default judgment pending).  Like the *Fields* Plaintiffs, many of the *Foley* Plaintiffs have also previously sought relief under the ATA and the FSIA for the same injuries in actions against other corporations or the Syrian government. *See Schrier v. Qatar Islamic Bank*, No. 0:20-cv-60075 (S.D. Fla. filed Jan. 13, 2020) (dismissed; on appeal); *Schmitz v. Ericsson Inc.*, No. 1:22-cv-02317 (D.D.C. filed Aug. 4, 2022) (pre-answer); *Long v. MTN Grp. Ltd.*, No. 1:23-cv-05705 (E.D.N.Y. filed July 28, 2023) (pre-answer); *Hughes v. Zarrab*, No. 1:23-cv-06481 (S.D.N.Y. filed July 26, 2023) (pre-answer); *Sotloff v. Qatar Charity*, No. 9:22-cv-80726 (S.D. Fla. filed May 13, 2022) (dismissed with prejudice); *Zobay v. MTN Grp. Ltd.*, No. 1:21-cv-03503 (E.D.N.Y. filed June 22, 2021) (pre-answer); *Sotloff v. Syrian Arab Republic*, No. 1:16-cv-00725 (D.D.C. filed April 18, 2016) (default judgment entered); *Foley v. Syrian Arab Republic*, No. 1:18-cv-01625 (D.D.C. filed July 10, 2018) (default judgment entered); *Foley v. Syrian Arab Republic*, No. 1:22-cv-03508 (D.D.C. filed Nov. 16, 2022) (pre-answer); *Mueller v. Syrian Arab Republic*, No. 1:18-cv-01229 (D.D.C. filed May 25, 2018) (default judgment as to liability entered).

can be divided into five categories, some of which overlap:

- **External Attacks**: The *thirteen* attacks that took place outside of Syria, which the Complaints concede was the only country in which LCS operated and the Defendants allegedly paid intermediaries. (*Finan* 2AC ¶¶ 264, 287, 293, 302; *Fields* AC ¶¶ 296, 320, 323; *Foley* ¶¶ 269–70, 281–82, 303–04, 309–10, 326, 329, 332, 336, 343, 353.)

- **Post-Evacuation Attacks**: The *seventeen* attacks that took place after LCS evacuated the Cement Plant and after the Defendants made their last alleged payment to intermediaries. (*Finan* 2AC ¶¶ 264, 271, 278, 287, 293, 314; *Fields* AC ¶¶ 296, 320, 323; *Foley* ¶¶ 269–70, 281–82, 291–92, 298, 301, 303–04, 309–10, 311–12, 326, 329, 332, 336, 343, 353.)

- **Syrian Kidnappings**: The *four* kidnappings alleged in the *Foley* Complaint that took place in Syria in 2012 and 2013, two of which occurred before Defendants are alleged to have known that any relevant payments were being made to intermediaries, and three of which were carried out by FTOs which Defendants have not been accused of supporting. (*Foley* ¶¶ 235, 246, 254, 262.)

- **Combat Incidents**: The *four* incidents in which ISIS operatives are alleged to have deployed weapons during military operations against U.S. soldiers, in locations in Syria, Iraq or Niger, which in this case does not constitute "international terrorism" under the ATA. (*Finan* 2AC ¶¶ 269–70, 287–89, 291–308; *Foley* ¶¶ 332, 336, 343, 353.)

- **Ekren**: The situation involving Ekren from the *Finan* action, who was brought into Syria by her ISIS-fighter parents, is unique in many respects, as discussed in Section II.C below.

On August 8, 2023, the Defendants waived service of the *Foley* Complaint, without conceding personal jurisdiction. (*Foley*, ECF No. 15.) On September 15, 2023, Lafarge Cyprus and LCS waived service of the *Finan* Amended Complaint and *Fields* AC, again without conceding personal jurisdiction. (*Finan*, ECF No. 33; *Fields*, ECF No. 22.)

## APPLICABLE STATUTORY FRAMEWORK

Plaintiffs bring their claims under the ATA which, as originally enacted, provided a private civil right of action for U.S. nationals "injured . . . by reason of an act of international terrorism." 18 U.S.C. § 2333(a). The statute defines "international terrorism" as activities that:

(A)    involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

(B)     appear to be intended—(i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

(C)     occur primarily outside the territorial jurisdiction of the United States . . . .

*Id.* § 2331(1).  In 2016, Congress enacted the Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 (2016) (codified at 18 U.S.C. § 2333(d)) ("JASTA"), which, among other things, amended the ATA by adding causes of action for aiding-and-abetting and conspiracy:

> In an action under subsection (a) for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization . . . , liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism.

18 U.S.C. § 2333(d)(2).

Each Complaint claims Defendants are liable under JASTA's secondary liability provisions (aiding-and-abetting and conspiracy under Section 2333(d)(2)).  The *Fields* AC also claims (Counts III and IV) that Defendants are primarily liable under Section 2333(a).

## <u>LEGAL STANDARD</u>

Under controlling authority, "[i]n order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a *prima facie* showing that jurisdiction exists."  *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 167 (2d Cir. 2013) ("*Licci III*").[6]  To satisfy this burden, a plaintiff must provide "an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant."  *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 342–43 (2d Cir. 2018).  Importantly, this standard requires "non-conclusory fact-specific allegations" in support of personal jurisdiction, *Chirag v. MT Marida Marguerite Schiffahrts*, 604

---

[6]     Unless otherwise noted, all emphasis is added and citations and quotation marks are omitted.

F. App'x 16, 19 (2d Cir. 2015), and a court will not accept a "legal conclusion couched as a factual allegation" or "argumentative inferences [drawn] in the plaintiff's favor." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013).

A motion to dismiss for failure to state a claim under Rule 12(b)(6) asks whether the complaint pleads "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In making the plausibility determination, a court may consider only well-pleaded factual allegations, and must ignore "legal conclusions [and] [t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

On these Motions to Dismiss, the Court should consider the Defendants' jurisdictional argument first.  "Where a Court is asked to rule on a combination of Rule 12 defenses, it will pass on the jurisdictional issues before considering whether a claim is stated in the complaint." *Koulkina v. City of New York*, 559 F. Supp. 2d 300, 310 (S.D.N.Y. 2008) (collecting cases); *see also Arrowsmith v. United Press Int'l*, 320 F.2d 219, 221 (2d Cir. 1963) (en banc) ("[L]ogic compel[s] initial consideration of the issue of jurisdiction over the defendant—a court without such jurisdiction lacks power to dismiss a complaint for failure to state a claim . . . .").

## ARGUMENT

## I.    THE COURT LACKS PERSONAL JURISDICTION OVER EACH DEFENDANT.

The Court should dismiss the Complaints because they do not plausibly allege a basis for asserting personal jurisdiction over any Defendant.  Establishing personal jurisdiction over a defendant requires that plaintiffs satisfy three elements: "(1) procedurally proper service of process on the defendant; (2) a statutory basis for personal jurisdiction; and (3) [an] exercise of jurisdiction

[that is] consistent with constitutional due process principles." *Cohen v. Facebook, Inc.*, 252 F. Supp. 3d 140, 152 (E.D.N.Y. 2017) (Garaufis, J.) (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59–60 (2d Cir. 2012) ("*Licci I*")), *aff'd in part, dismissed in part sub nom. Force v. Facebook, Inc.*, 934 F.3d 53 (2d Cir. 2019).    Furthermore, a plaintiff must carry this burden with respect to each defendant. *See In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 135 (S.D.N.Y. 2021); *Bristol-Myers Squibb Co. v. Superior Ct.*, 582 U.S. 255, 268 (2017) ("[A]s we have explained, [t]he requirements of *International Shoe* . . . must be met as to each defendant over whom a . . . court exercises jurisdiction." (second and third alterations in original)).

The Complaints do not meet this burden.    None of the statutory bases on which the Complaints rely—N.Y. C.P.L.R. § 302, Fed. R. Civ. P. 4(k), or 18 U.S.C. § 2334(a)[7]—confers personal jurisdiction over the Defendants.    Nor do the Complaints allege a ground for jurisdiction that satisfies due process.

### A.    The Court Lacks Personal Jurisdiction Under New York's Long-Arm Statute.

The Complaints seek to rely on New York's long-arm statute, N.Y. C.P.L.R. § 302, as conferring personal jurisdiction over the Defendants.    (*Foley* ¶ 24; *Finan* 2AC ¶ 43; *Fields* AC ¶ 62.)    That statute permits the exercise of personal jurisdiction over a non-domiciliary if (1) the defendant "transacts any business within the state" and (2) the "cause of action arise[s]" from that transaction.    N.Y. C.P.L.R. § 302(a)(1).    Transacting business in this context means purposeful activity—"some act by which the defendant purposefully avails itself of the privilege of conducting activities within [New York]." *Ehrenfeld v. Bin Mahfouz*, 9 N.Y.3d 501, 508 (2007)

---

[7]    The Complaints do not plead a theory of general jurisdiction under either New York's general jurisdiction statute, N.Y. C.P.L.R. § 301, or the federal due process standard.

(alteration in original). In other words, "[p]urposeful activities are those with which a defendant, through *volitional* acts, avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Przewozman v. Charity*, No. 20-CV-6088 (NGG) (TAM), 2023 WL 2562537, at *9 (E.D.N.Y. Mar. 17, 2023) (Garaufis, J.) (quoting *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (2007)).

"Because the touchstone for jurisdiction under New York's long-arm statute is the intent to reach the forum," jurisdiction will not extend to contacts with the forum that are "extraneous or coincidental," rather than purposeful and volitional. *Spetner v. Palestine Inv. Bank*, 70 F.4th 632, 640 (2d Cir. 2023). As the New York Court of Appeals clarified, "[i]t is precisely the fact that [a] defendant[] *chose* New York, when other jurisdictions were available, that [will] make[] the New York connection volitional and not coincidental." *Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 328 (2016). The Complaints here do not allege that any Defendant (let alone all three) engaged in a volitional or purposeful act to reach and avail itself of New York, sufficient to constitute a "transaction of business."

> **1.    The Complaints Do Not Allege That the Defendants Transacted Business in New York.**

> **a.    The Complaints Fail to Allege Purposeful Availment.**

In asserting that the Defendants "transacted business" in New York, the Complaints seek to pin personal jurisdiction on a single type of contact: foreign banks' use of New York-based correspondent banks to "clear" transactions in U.S. dollars on behalf of the Defendants. (*Foley* ¶¶ 148, 173; *Finan* 2AC ¶¶ 212, 228; *Fields* AC ¶¶ 235, 251.) But despite the benefit of the DOJ's detailed SOF and the extensive pre-filing research in *Foley*, many of the payments alleged in the Complaints were made in Syrian pounds, not U.S. dollars. (*See* SOF ¶¶ 36, 38, 39, 44, 45, 47, 53, 54, 58, 66, 80.) Of course it is not alleged that the payments in Syrian pounds involved

15

correspondent banks in New York.

That leaves only 23 alleged transactions in U.S. dollars. To make up for the lack of any evidence whatsoever that most of those transactions had a link to the United States, the Complaints ask the Court to assume that "some or all" of these transactions *must* have been cleared through New York banks. (*Foley* ¶ 162; *see Finan* 2AC ¶ 219; *Fields* AC ¶ 242.) This allegation should be rejected as conclusory because, as numerous courts have noted, it can never be assumed that U.S. dollar-denominated transactions occurring outside the U.S. must necessarily have involved financial institutions located in New York. *See, e.g.*, *Tamam v. Fransabank Sal*, 677 F. Supp. 2d 720, 729 (S.D.N.Y. 2010) ("Underlying Plaintiffs' argument is the faulty assumption that U.S. dollars can only be obtained in the United States . . . . [G]iven the worldwide availability of U.S. currency, it does not follow that New York (or even the United States) is essential to the provision of said currency."); *cf. Licci III*, 732 F.3d at 171 (acknowledging that the foreign bank defendant could have "processed U.S.-dollar-denominated wire transfers . . . through correspondent accounts anywhere in the world" in light of the "widespread acceptance and availability of U.S. currency"); Comm. on the Glob. Fin. Sys., Bank for Int'l Settlements, *US Dollar Funding: An International Perspective* 5 (2020), https://www.bis.org/publ/cgfs65.pdf ("The international US dollar funding network is highly globali[z]ed and interconnected. US dollar end users and suppliers are quite dispersed . . . . Most strikingly, however, much of the non-US activity occurs directly between non-US entities and does not flow through the US banking system . . . .").[8]

---

[8]    Courts have "frequently taken judicial notice of official government reports as being capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." *B.T. Produce Co. v. Robert A. Johnson Sales, Inc.*, 354 F. Supp. 2d 284, 285 n.2 (S.D.N.Y. 2004) (USDA report); *see also Forgione v. Gaglio*, No. 13 Civ. 9061(KPF), 2015 WL 718270, at *17 (S.D.N.Y. Feb. 13, 2015) (report on FINRA's website); *Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, No. 12-cv-7372, 2013 WL 5230818, at *3 n.1 (S.D.N.Y. Sept. 10, 2013) (financial crisis report). The Bank for International Settlements "is an international

This inference is not only factually unsustainable, but also would require that the Court infer the factual predicate on which it could base its exercise of jurisdiction—*i.e.*, the actual transfer of funds through New York.  It is well-established that a court will not draw "argumentative inferences" when determining whether a plaintiff has met the burden of demonstrating personal jurisdiction. *Robinson v. Overseas Mil. Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994).  Indeed, courts have declined to adopt the very argumentative and speculative inference advanced here. *See Tamam*, 677 F. Supp. 2d at 727 (refusing to make the "speculative leap" that the relevant funds passed through New York merely because U.S. dollars were involved); *Brown v. Nat'l Bank of Pak.*, No. 19 Civ. 11876 (AKH), 2022 WL 1155905, at *3 (S.D.N.Y. Apr. 19, 2022) (deeming insufficient "generalized allegations and speculations that some funds were transferred through [New York] . . . based on an assumption that transactions from one currency to another are dollar transactions passing through Federal Reserve Banks in New York"); *Bluewaters Commc'ns Holdings, LLC v. Ecclestone*, No. 653965/2012, 2014 WL 220779, at *11 (N.Y. Sup. Ct. N.Y. Cnty. Jan. 16, 2014) (rejecting jurisdictional theory that "would vest a New York court with jurisdiction over any party anywhere in the world who does a dollar-denominated transaction even though the transaction has no connection to New York"), *aff'd*, 996 N.Y.S.2d 232 (1st Dep't 2014); *cf. Przewozman*, 2023 WL 2562537, at *12 (allegations with insubstantial support for purposeful availment of the New York banking system "come[] dangerously close to asserting New York jurisdiction over any financial transaction conducted in U.S. dollars").

For this reason, at most, the only transactions that should be considered on these Motions

---

organi[z]ation that serves central banks and other financial authorities across the globe to support their pursuit of monetary and financial stability through international cooperation." Bank for Int'l Settlements, *The BIS: Promoting Global Monetary and Financial Stability Through International Cooperation* 2 (Aug. 2023), https://www.bis.org/about/profile_en.pdf.

to Dismiss are the three transactions Plaintiffs allege were cleared through New York: two intercompany transfers in August 2011 and one $210,000 payment on October 23, 2014, to an intermediary's bank account in Dubai to reimburse him for past work.  (*See Foley* ¶¶ 96, 173; *Finan* 2AC ¶ 228; *Fields* AC ¶ 251.)

These three transactions cannot demonstrate the purposeful availment required under New York law.  Indeed, the Defendants know of no case in New York in which a court exercised jurisdiction over a *non-bank* based solely on the allegation that a transaction involved a New York-based correspondent bank.  *See, e.g.*, *Universal Trading & Inv. Co. v. Tymoshenko*, No. 11 Civ. 7877(PAC), 2012 WL 6186471, at *3 (S.D.N.Y. Dec. 12, 2012) ("[I]t appears that courts have only found *the banks themselves* to be subject to jurisdiction where they have moved money through New York."); *Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 404 (S.D.N.Y. 2021) ("Plaintiffs have identified no authority, nor is the Court aware of any, standing for the principle that a non-domiciliary individual defendant may be subject to specific jurisdiction in New York under Section 302(a)(1) because the non-domiciliary moved money between foreign bank accounts, with the transfer passing through New York via a correspondent account.").  This alone is reason enough to dismiss Plaintiffs' claims for lack of personal jurisdiction.

To be sure, there is a narrow line of cases holding that a *foreign bank* may subject itself to jurisdiction in New York through "repeated use of a correspondent account in New York."  *Licci III*, 732 F.3d at 168.  The rationale animating those cases is that a foreign bank's repeated and volitional choice to use New York correspondent banks "show[s] purposeful availment of New York's dependable and transparent banking system."  *Id.*; *see also Spetner*, 70 F.4th at 640 ("[A] foreign bank's *choice* to project itself in New York can be evident through the selection and repeated use of an agent's correspondent account in the forum.").

18

Yet this doctrine has never been extended to non-banks, and for good reason.  It is "[b]anks themselves" that "maintain correspondent relationships to facilitate transactions that otherwise have no other connection to New York, or indeed the United States." *Berdeaux*, 561 F. Supp. 3d at 404 n.25.  And it is foreign banks—*not* their customers—that evidence purposeful and volitional contact with New York when they *choose* to engage with New York correspondent banks, even when acting "on behalf [of] and for the benefit of a customer." *Al Rushaid*, 28 N.Y.3d at 327; *see also id.* at 328 ("The focus of the jurisdictional analysis is the foreign bank's conduct vis-à-vis the correspondent bank, meaning how it uses the correspondent accounts. . . .").

Even Plaintiffs appear to acknowledge that correspondent banking and the "*clearing process for cross-border funds*" involve relationships and services exchanged between and among banks themselves:

- "Correspondent banking is often defined as 'an arrangement under which one bank (correspondent) holds deposits owned by other banks (respondents) and provides payment and other services to those respondent banks.'" (*Foley* ¶ 149 (quoting Comm. on Payments & Mkt Infrastructures, Bank for Int'l Settlements, *Correspondent Banking* 9 (July 2016), https://www.bis.org/cpmi/publ/d147.pdf); *see Finan* 2AC ¶ 213 (explaining that correspondent banks act as "conduit[s]" for other banks); *Fields* AC ¶ 236 (same).)

- "Clearing generally refers to the process of transmitting, reconciling, and confirming payment on electronic-funds transfers . . . CHIPS is the main electronic-funds-transfer system for clearing U.S.-dollar transfers **among international banks**." (*Foley* ¶ 152; *Finan* 2AC ¶ 213 (stating that CHIPS is an *interbank* payment system); *Fields* AC ¶ 236 (same).)

Other authoritative treatises, including the ones cited by the *Foley* Plaintiffs in their Complaint, likewise define correspondent banking as business-to-business relationships established between financial institutions:

- "All these definitions highlight the main components of correspondent banking:  a bilateral agreement between two banks by which one of them provides services to the other; the opening of accounts (by the respondent in the books of the correspondent) for the provision of services and the importance of payment services as a core function of correspondent banking."  Comm. on Payments & Mkt. Infrastructures, Bank for Int'l Settlements, *Correspondent Banking* 9 (July 2016), https://www.bis.org/cpmi/publ/d147.pdf.

19

- "These more complicated scenarios are far more common in the cross-border context, especially if an originator's institution does not have a branch in the beneficiary's foreign location. In this case, one financial institution may rely upon established business relationships with additional financial institutions to complete the transaction. Such relationships are correspondent relationships. A correspondent relationship, simply put, is the provision of banking services by one financial institution to another financial institution." Fin. Crimes Enf't Network, *App'x D – Fundamentals of the Funds Transfer Process* 56 (2006), https://www.fincen.gov/sites/default/files/shared/Appendix_D.pdf.

- "End users [(bank customers like businesses or individuals)] rarely have direct links to back-end service providers, and PSPs [(payment service providers)] usually obtain these services through service agreements . . . Back-end service providers generally focus on specific stages of the payment chain and may cover several payment instruments. Examples are transaction banks offering correspondent banking services . . . ." Comm. on Payments & Mkt. Infrastructures, Bank for Int'l Settlements, *Cross-Border Retail Payments* 11–12 (Feb. 2018), https://www.bis.org/cpmi/publ/d173.pdf.

In light of this reality, courts have noted that, "[a]bsent unusual circumstances, an individual bank customer would have no reason to direct its foreign bank to use a New York-based correspondent account for a transaction that . . . has no other connection to New York." *Berdeaux*, 561 F. Supp. 3d at 404 n.25. For this reason, it is "nonsensical" to "attempt to base jurisdiction" over non-bank defendants "on wire transfers of funds moving through a New York correspondent account." *Id.*; *see, e.g.*, *Przewozman*, 2023 WL 2562537, at *12 n.15, *13 (relying on *Berdeaux* and expressing "serious doubts that Plaintiffs have alleged purposeful actions in New York" where the complaint failed to allege that the non-bank "intended to use or was even aware of the existence" of the specific "correspondent account in New York" used by the bank).

The Complaints strain to plead around this fundamental flaw by alleging that this case presents the unusual circumstance where an originating bank's choice to use a New York-based correspondent bank evidences its *client's* purposeful and volitional act in New York. (*See Foley* § V.A.3; *Finan* 2AC § XI.a.ii; *Fields* AC § K.i.b.) In support of this extraordinary claim, the Complaints seek to draw a series of inferences to suggest that the Defendants not only sought to obtain U.S. dollars, but also positively sought to ensure that those U.S. dollars in each instance

20

were cleared through correspondent banks in New York.  These inferences are factually unfounded and the theory they support is illogical, particularly when weighed against the presumption that individual bank customers play no role in the correspondent banking or clearing processes for the cross-border transfer of funds.  *See Berdeaux*, 561 F. Supp. 3d at 404 n.25 (citing OCC Interpretive Letter No. 796 (Sept. 1997)).

Indeed, there are no allegations that the Defendants even knew their foreign bank would implement the three transfers through correspondent banks in New York, much less that the Defendants purposefully or deliberately accessed New York correspondent banks.  The closest that the Complaints come to alleging purposeful availment is through the theory that the Defendants' efforts to conceal their transactions demonstrate that they were "actively seeking to benefit from New York clearing."  (*Foley* ¶ 192; *see Finan* 2AC ¶ 243; *Fields* AC ¶ 266.)  But this is implausible and contradicted by other allegations elsewhere in the Complaints because Plaintiffs allege that the Defendants' purported "financial machinations" were done to conceal their illegal conduct.  (*Foley* ¶¶ 89, 92, 179; *see Finan* 2AC ¶¶ 138, 141; *Fields* AC ¶¶ 160, 163; SOF ¶ 56.)  This alleged aim, however, has no inherent link with New York or even with U.S. dollars.  In fact, according to the SOF, the Defendants advised one of the intermediaries that even if they continued "to settle the invoices in Syrian Pounds," they needed to pay him through the "company [he] ha[d] formed in Dubai" to "avoid problems with the Syrian authorities and with our auditors."  (*Id.* ¶¶ 57–58.)  Thus, the Defendants' actions did not depend on U.S. dollars at all, let alone New York banks in particular.  Using U.S. dollars was merely incidental to the Defendants' alleged desire to avoid detection and could not, even under Plaintiffs' theory, demonstrate that they were "actively seeking to benefit from New York clearing."  (*Foley* ¶ 192; *see Finan* 2AC ¶ 243; *Fields* AC ¶ 266.)

Nor does Defendants' "preference" to pay in U.S. dollars,[9] or the alleged benefits obtained from transactions in U.S. dollars, mean that they "purposefully chose to make those payments via New York [correspondent] banks." (*Foley* ¶¶ 176–81, 189; *see Finan* 2AC ¶¶ 23, 231–35, 241; *Fields* AC ¶¶ 17, 254–58, 264.) As discussed above, it can never be assumed that U.S. dollars are obtained only in the United States or New York. Even Plaintiffs acknowledge that "[t]ransacting through other clearing centers," *i.e.*, those outside the United States in Tokyo, Hong Kong, Singapore, and Manila, "is possible." (*Foley* ¶¶ 183, 185; *see Finan* 2AC ¶ 237; *Fields* AC ¶ 260.) In addition to the implausible inferences discussed above, the *Foley* Complaint includes the barebones allegation that the Defendants "were regularly and actively involved" in directing the banks "how to route their money" because the financial details of the transactions "were too important to Lafarge." (*Foley* ¶ 190.) Absolutely no facts support this conclusory allegation, which the Court should disregard on Defendants' Motions. *See, e.g.*, *Iqbal*, 556 U.S. at 678.

Finally, even if the three transactions evinced purposeful availment of New York as a forum (and they do not), they still would be insufficient to establish personal jurisdiction here. Although Section 302(a)(1) is a "single act statute," courts in ATA cases have declined to exercise personal jurisdiction where, as here, so few transactions involving a New York correspondent bank are at issue. *See, e.g.*, *Cmty. Fin. Grp., Inc. v. Stanbic Bank Ltd.*, No. 14cv5216(DLC), 2015 WL 4164763, at *4 (S.D.N.Y. July 10, 2015) (single instance was insufficient); *Berdeaux*, 561 F. Supp. 3d at 404 n.26 (same); *Vasquez v. H.K. & Shanghai Banking Corp.*, 477 F. Supp. 3d 241, 258 (S.D.N.Y. 2020) (three transactions "too sparse" to warrant inference of purposeful availment).

---

[9] Importantly, as the *Finan* and *Fields* Plaintiffs concede elsewhere in their pleadings and the SOF confirms—Defendants expressed this preference with respect to only *one* specific type of transaction: monthly compensation payments to Tlass. (*See Finan* 2AC ¶ 141; *Fields AC* ¶ 163; SOF ¶¶ 56, 60.) Plaintiffs have alleged no facts supporting such preference with respect to *any* other transactions.

   b.  **The Plaintiffs Cannot Establish Personal Jurisdiction Through Allegations That the Defendants Merely Were Aware of New York Contacts.**

Without facts plausibly alleging purposeful availment, Plaintiffs resort to inferences that the Defendants knew their banks would use correspondent counterparts in New York in each alleged transfer. (*Foley* ¶¶ 194–200; *Finan* 2AC ¶¶ 244–49; *Fields* AC ¶¶ 267–72.) As a threshold matter, mere knowledge of U.S. contacts is not sufficient to support the exercise of personal jurisdiction. *See, e.g.*, *Ehrenfeld*, 9 N.Y.3d at 508; *Przewozman*, 2023 WL 2562537, at *9. Consequently, even had the Complaints plausibly alleged that the Defendants knew that their banks were using New York correspondent accounts (which they do not), that still would not establish personal jurisdiction over the Defendants.

In any event, the Complaints fail to plausibly allege that the Defendants were aware of their banks' alleged contacts with New York. Simply because the existence of correspondent banking relationships among banks are often publicly available does not mean that the Defendants actually knew their banks had a preexisting relationship with correspondent banks in New York, or that their banks would rely on those relationships to execute any of the three transactions at issue. Defendants obviously are not banks and had no reason to know—either from standard settlement instructions listed in the *Banker's Almanac* (*Foley* ¶ 168; *Finan* 2AC ¶ 223; *Fields* AC ¶ 246) or the undated "worldwide correspondents" page on bank websites (*Foley* ¶ 197; *Finan* 2AC ¶ 246; *Fields* AC ¶ 269)—that foreign banks would settle these specific U.S.-dollar transactions through correspondent accounts in New York or in Tokyo. And even if the Defendants had researched their banks' correspondent banking relationships (and there can be no plausible allegations that they did), they would have found that BNP Paribas, for example, had a relationship with HSBC to

clear U.S. dollars in Hong Kong.[10]

The Complaints unsuccessfully try to infer the Defendants' knowledge by citing an email exchange from June 2014, in which Lafarge internally discussed processing a wire transfer a few days early "due to [the] time needed to channel the funds to Syria through Lebanon, to lower the risk of cash being trapped by banks' compliance policies linked to sanctions affecting Syria." (*Foley* ¶ 191; *Finan* 2AC ¶ 242; *Fields* AC ¶ 265.)  From this generic concern about timing, the Complaints seek to infer that Lafarge employees were "intimately aware of the correspondent-account network their banks used" and, in this case of this email, of "Bank Audi's correspondent-banking policies." (*Foley* ¶¶ 190–91; *see Finan* 2AC ¶ 242; *Fields* AC ¶ 265.)  This is untenable.  At most, the email shows that the Defendants believed international money transfers take longer to complete.  The email does not reference correspondent banking or "correspondent-banking policies" at all, much less any connection to correspondent bank accounts in New York.  In fact, according to the email, Lafarge only knew that LCS was receiving U.S. dollars "through Lebanon"—whether those dollars came from correspondent accounts in New York or Manila, or from cash reserves in Lebanon, is entirely speculative and, moreover, was immaterial to a customer in Lafarge's position.  In this way, the transaction described in this email actually *undermines* Plaintiffs' key assumption that by "mak[ing] payments in U.S. dollars, Defendants also purposefully chose to make those payments via New York banks." (*Foley* ¶ 189.)

For the same reason, it is not at all plausible to infer that the Defendants reviewed the

---

[10]  *See* H.K. Interbank Clearing Ltd., *List of USD Clearing Participants as of 31 August 2015*, https://web.archive.org/web/20150919085519/http://www.hkicl.com.hk/clientbrowse.do?doc ID=7196&lang=en (showing that BNP Paribas was a direct participant of the CHATS program as of August 31, 2015); *Thorne v. Square, Inc.*, No. 20-CV-5119 (NGG) (TAM), 2022 WL 542383, at *1 (E.D.N.Y. Feb. 23, 2022) (joining the "chorus of others" and taking "judicial notice of . . . archived webpages from the Wayback Machine" on a motion to dismiss).

intricacies of SWIFT MT103 messages (including "[f]ields 53, 54, and 56"). (*Foley* ¶ 193; *Finan* 2AC ¶ 244; *Fields* AC ¶ 267.)    As a preliminary matter, according to the Bank for International Settlements report cited in the *Foley* Complaint, MT103 messages are not even intended for bank customers like the Defendants—they are payment messages and settlement instructions transmitted between the banks themselves. *See* Comm. on Payments & Mkt Infrastructures, Bank for Int'l Settlements, *Correspondent Banking* 34 (July 2016), https://www.bis.org/cpmi/publ/d147.pdf. But even if the Defendants did receive SWIFT MT103 messages, that fact alone cannot demonstrate purposeful availment because such messages serve as proof of transmission—*i.e.*, "confirming the details of an executed transaction"—for cross-border wire transfers. (*Foley* ¶ 193; *Finan* 2AC ¶ 244; *Fields* AC ¶ 267.) They are not, as the Complaints later imply to infer Lafarge's "purposeful availment," part of the "process of approving [a] transaction[]." (*Foley* ¶ 193; *Finan* 2AC ¶ 244; *Fields* AC ¶ 267.)   In the same vein, it is not plausible that the Defendants reviewed Field 71A of the SWIFT MT103 messages to determine who was responsible for paying the banking fees. (*Foley* ¶ 196; *Finan* 2AC ¶ 245; *Fields* AC ¶ 268.) According to the Complaints, the banking fees were either covered by the originating bank or deducted from the transferred amount.  (*Id.*)   In either case, the bank fees were paid automatically without any approval, involvement, or knowledge of the Defendants.

For all of these reasons, the Complaints do not plausibly allege that the Defendants knew of their banks' use of New York correspondent accounts, much less "*purposefully* chose to make" these three transactions "via New York banks." (*Foley* ¶ 189; *Finan* 2AC ¶ 241; *Fields* AC ¶ 264.)

### c.    The *Foley* Complaint Does Not Adequately Allege Personal Jurisdiction Under an Agency Theory.

Nor does the *Foley* Complaint adequately plead that the banks' decision to transact in New

York should be imputed to the Defendants through an agency theory.[11]  (*Foley* ¶ 194.)  While

jurisdiction under Section 302(a) can be based on a transaction of business by a defendant's agent,

the alleged agent must have acted in New York "for the benefit of, with the knowledge and consent

of, and under some control by, the nonresident principal." *Charles Schwab Corp. v. Bank of Am.

Corp.*, 883 F.3d 68, 85 (2d Cir. 2018) (quoting *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122

(2d Cir. 1981)).  The key elements of knowledge and control are both missing here.

     As discussed above, the Complaints do not plausibly allege that the Defendants had any

knowledge of their banks' correspondent relationships.  Nor do the Complaints allege that the

Defendants exercised any control as to where or how their banks chose to execute a wire transfer

order.  The *Foley* Complaint alleges only that the Defendants specified "each transfer's date,

amount, and currency denomination." (*Foley* ¶ 194.)  There are no allegations that the Defendants

also specified that their banks rely on New York correspondent banks or otherwise controlled the

way that their banks selected or used their correspondent banking relationships to facilitate these

transactions.  Without such allegations, "the only allusion to control is conclusory." *Henkin v.

Qatar Charity*, No. 21-CV-5716 (AMD) (VMS), 2023 WL 2734788, at *8 (E.D.N.Y. Mar. 31,

2023) (finding no agency relationship where the allegations "said nothing about whether [the

client] controlled the way [its bank] selected or used the correspondent account").

     The Second Circuit's recent opinion in *Spetner v. Palestine Investment Bank*, 70 F.4th 632

(2d Cir. 2023), confirms the lack of an agency relationship here.  There, the Second Circuit held

that a Palestinian bank's use of a Jordanian bank's correspondent accounts in New York (a practice

---

[11]   The *Finan* and *Fields* pleadings vaguely refer to "Defendants[] and its agents," but they neither
identify those agents nor allege that any banks acted as Defendants' agents. (*Finan* 2AC ¶ 44;
*Fields AC* ¶ 63.)  To the extent that these pleadings can be interpreted to predicate personal
jurisdiction on an agency theory, those attempts would fail for the same reasons as in *Foley*.

known as "nested" correspondent banking) conferred personal jurisdiction in New York over the Palestinian bank pursuant to the agency theory of personal jurisdiction. *Id.* at 639–43. The Second Circuit held that the Palestinian bank exercised sufficient control based on allegations that it "instructed [the Jordanian bank] to make certain transfers to the U.S. bank." *Id.* at 641. According to the Second Circuit, these allegations showed that the Jordanian bank's conduct "vis-à-vis the correspondent account was not 'unilateral.'" *Id.* (citing *Al Rushaid*, 28 N.Y.3d at 326).

There are no analogous allegations of control here. Unlike the defendant bank in *Spetner*, the Defendants here did not instruct their banks to "use N.Y. banks" to facilitate the transactions. At most, the Defendants specified "each transfer's date, amount, and currency denomination" (*Foley* ¶ 194), but like any customer, left it to their bank to figure out where and how to execute that request. And given the many "alternative channels" available to foreign banks to clear U.S.-dollar transactions—and the lack of any facts to suggest the Defendants' awareness of the correspondent banking relationships here—it is implausible to infer that "processing the payments through New York was part of [Lafarge's] design." *Spetner*, 70 F.4th at 641–42.

## 2. All Three Transactions With an Alleged Connection to New York Lack a Sufficient Nexus to Plaintiffs' Claims.

None of the three alleged transactions that can be considered on these Motions to Dismiss share a sufficient nexus with the ATA claims asserted here. To satisfy the statutory "arise from" requirement in the New York long-arm statute, a plaintiff must show "an articulable nexus or substantial relationship between the business transaction and the claim asserted." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 20 N.Y.3d 327, 328 (2012) ("*Licci II*"). A connection that is "too attenuated" from, or "merely coincidental" to, the New York transaction cannot support jurisdiction. *Id.* at 339–40 (citing *Johnson v. Ward*, 4 N.Y.3d 516, 520 (2005)). As relevant here, a claim does not arise from the use of a New York correspondent bank account without allegations

27

that the defendant "used an actual, specific transaction through a New York correspondent account in the course of bringing about the injuries on which the claims are predicated." *Przewozman*, 2023 WL 2562537, at *13 (quoting *Daou v. BLC Bank S.A.L.*, 42 F.4th 120, 132 (2d Cir. 2022)).

The allegations do not come close to demonstrating the requisite "articulable nexus or substantial relationship" between the three alleged contacts and the injuries suffered as a result of the terrorist attacks. The Complaints allege that two of the three contacts were in 2011, when Lafarge Cyprus transferred U.S. dollars to LCS pursuant to an intercompany loan. (*Foley* ¶¶ 155, 173; *Finan* 2AC ¶¶ 216, 228; *Fields* AC ¶¶ 239, 251.) All told, Lafarge Cyprus allegedly made nine such disbursements under the intercompany loan to LCS between 2011 and 2014, which the Complaints concede "supplied LCS with cash it needed to fund its operations," but then speculate that "a substantial portion of [the intercompany loans] were used to pay terrorists."[12] (*Foley* ¶ 155; *see Finan* 2AC ¶ 216 *Fields* AC ¶ 239.) But the Complaints do not allege that the two 2011 transfers were used to "pay terrorists" rather than "to fund [LCS's] operations" or to repay foreign lenders (*see Foley* ¶¶ 51, 155; SOF ¶ 28), nor do the Complaints allege which FTO, or attack, those intercompany funds were alleged to have aided. The Complaints also do not (and cannot) explain how intercompany transfers from 2011 could be used "in the course" of attacks perpetrated years later by ISIS and ANF. "This temporal gap leaves the nexus between the Defendants' New York-related acts and Plaintiffs' injuries far too attenuated." *Przewozman*, 2023 WL 2562537, at

---

[12] The *Finan* 2AC and *Fields* AC claim that the 2011 intercompany payments were made "to give LCS operational funding, including for the purpose of maintaining its conspiracy with ISIS and ANF." (*Finan* 2AC ¶ 216; *Fields* AC ¶ 239.) This allegation is undermined by Plaintiffs' own allegations, which make clear that Lafarge and LCS did not even decide to make payments to surrounding militant groups until the summer of 2012. (*See Finan* 2AC ¶¶ 92–93 (alleging Lafarge and LCS "plan[ned] to make financial payments to various armed factions" "[s]tarting in summer of 2012" and first met with representatives of armed militant groups in September 2012); *Fields* AC ¶¶ 114–15 (same).)

*13 (four-year gap too attenuated).

The only remaining New York transaction—an October 23, 2014 wire transfer from Lafarge Cyprus to a bank account in Dubai associated with a Syrian intermediary—also is insufficient. The Complaints do not and cannot allege that this sole transaction even reached an FTO, let alone that it shares an "articulable nexus or substantial relationship" with an attack carried out by ISIS. *See Licci II*, 20 N.Y.3d at 328. According to the Complaints, the funds involved in this transaction were sent to an intermediary, not to an FTO (*Foley* ¶ 174; *Finan* 2AC ¶ 229; *Fields* AC ¶ 252); were meant to compensate the intermediary "for work he had already done" (*Foley* ¶ 96; *see Finan* 2AC ¶ 175; *Fields* AC ¶ 197), and therefore were not intended for an FTO; and were transferred more than a month *after* LCS had evacuated the Cement Plant and ceased operations. (*Foley* ¶ 14; *Finan* 2AC ¶ 31; *Fields* AC ¶ 198.)

At bottom, the Complaints do not identify the use of "an actual, specific transaction through a New York correspondent account in the course of bringing about the injuries on which the claims are predicated." *Przewozman*, 2023 WL 2562537, at *13.

### B.    The Court Lacks Personal Jurisdiction Under Rule 4(k)(2).

As an alternative basis for personal jurisdiction, the Complaints invoke Federal Rule of Civil Procedure 4(k)(2). (*Foley* ¶ 24; *Finan* 2AC ¶ 43; *Fields* AC ¶ 62.) Rule 4(k)(2) allows federal courts to exercise personal jurisdiction if "(1) . . . [the] plaintiff's cause of action arise[s] under the federal law; (2) . . . the defendant is not subject to the jurisdiction of the courts of general jurisdiction of any one State; and (3) . . . the defendant's total contacts with the United States as a whole are sufficient to confer the court with personal jurisdiction without offending due process."[13]

---

[13]    The Complaints fail to certify that the Defendants are *not* subject to jurisdiction in any other state. *See Henkin*, 2023 WL 2734788, at *9 ("In this Circuit, to meet the second requirement

*Hartford Fire Ins. Co. v. M/V "MSC INSA"*, No. 03 Civ. 2196(SAS), 2003 WL 22990090, at *3 (S.D.N.Y. Dec. 18, 2003) (third alteration in original).  The Complaints do not allege that the Defendants had sufficient contacts with the United States under either the traditional constitutional minimum contacts analysis or a conspiracy theory of personal jurisdiction.

### 1.    The Complaints Do Not Allege Sufficient Minimum Contacts with the United States.

Similar to the New York long-arm statute, "[d]etermining whether an entity has sufficient 'minimum contacts' with a forum turns on whether the entity 'purposefully directed' [its] activities at . . . the forum and [whether] the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Gucci Am., Inc. v. Weixing Li*, 135 F. Supp. 3d 87, 96 (S.D.N.Y. 2015) (second and third alterations in original) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985)).  Importantly, the relationship between the defendant and the forum "must arise out of contacts that the 'defendant *himself*' creates with the forum." *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (quoting *Burger King*, 471 U.S. at 475).

The contacts here consist of allegations that the Defendants used U.S.-based email service providers and U.S.-based correspondent bank accounts.  (*Foley* ¶ 24; *Finan* 2AC ¶¶ 45–46, 51 (alleging the "use of U.S. dollar transactions and banks in New York"); *Fields* AC ¶¶ 64–65, 70 (same).)  For the reasons discussed above with respect to the New York long-arm statute, the allegations relating to U.S. dollar-denominated transactions and contacts with correspondent banks in the state of New York cannot confer personal jurisdiction.  In light of the "striking similarities between the analysis conducted under N.Y. C.P.L.R. § 302(a)(1) and constitutional due process," the allegations on this score also do not provide a constitutionally adequate basis for asserting

---

of Rule 4(k)(2), plaintiffs need to certify that, to their knowledge, the foreign defendant is not subject to jurisdiction in any other state.") (collecting cases).

jurisdiction.  *Off. Comm. of Unsecured Creditors of Arcapita v. Bahr. Islamic Bank*, 549 B.R. 56, 68 (S.D.N.Y. 2016); *see, e.g.*, *Licci III*, 732 F.3d at 170 (observing that it would be "rare" to reach different outcomes under § 302(a)(1) and federal due process standards).

The allegations relating to Defendants' use of Gmail and its "U.S.-based servers" to "carry out their scheme to pay ISIS and ANF" also cannot establish personal jurisdiction.  (*See Foley* § V.B; *see also Finan* 2AC § XI.b; *Fields* AC § K.ii.)  The Complaints seek to base jurisdiction in the United States on the allegation that the Defendants accessed servers owned by a non-party that happens to be domiciled in California.  As many courts have held, however, "the mere location of a third party or its servers is insufficient to give rise to personal jurisdiction."  *Hungerstation LLC v. Fast Choice LLC*, No. 19-CV-05861, 2020 WL 137160, at *5 (N.D. Cal. Jan. 13, 2020) (collecting cases), *aff'd*, No. 20-15090, 2021 WL 963777 (9th Cir. Mar. 15, 2021), *amended*, 857 F. App'x 349 (9th Cir. 2021) ("Our circuit has never decided that personal jurisdiction is proper over a private foreign entity solely because that entity engaged in tortious conduct from a location outside of the United States by remotely accessing servers located in the United States."); *OOO Brunswick Rail Mgmt. v. Sultanov*, No. 5:17-cv-00017-EJD, 2017 WL 264047, at *2–4 (N.D. Cal. Jan. 20, 2017) (declining jurisdiction over Gmail user because the use of Gmail was "incidental" rather than "purposefully directed" toward California and holding otherwise would render "every one of Gmail's billion users . . . subject to personal jurisdiction in California based solely on their email activity"); *see also Laydon v. Mizuho Bank, Ltd.*, No. 12 Civ. 3419(GBD), 2015 WL 1515358, at *3 (S.D.N.Y. Mar. 31, 2015) (use of Bloomberg messages that "passed through and/or were stored within the United States" does not demonstrate "purposeful[] avail[ment]" and so is insufficient to assert personal jurisdiction over a defendant (alterations in original)); *Sonterra Cap. Master Fund Ltd. v. Credit Suisse Grp. AG*, 277 F. Supp. 3d 521, 590 (S.D.N.Y. 2017) ("But the

happenstance that the electronic communications of defendants acting abroad were routed through a server in the United States cannot substantially contribute to a finding of sufficient contacts with the United States" as such contacts would be merely "random, fortuitous, or attenuated.").

This robust line of cases forecloses the Complaints' reliance on the "pure happenstance" that Google "owns and operates" its email service in the "United States." *Hungerstation*, 2020 WL 137160, at *5. Even so, borrowing from the correspondent banking cases, the Complaints allege that the Defendants' use of "U.S.-based email service providers" was "purposeful" and reflected "a conscious choice" to "reach[] into the United States" and "exploit[] an iconic American service." (*Foley* ¶¶ 204, 206, 213; *see Finan* 2AC ¶¶ 250, 253; *Fields* AC ¶¶ 273, 276.) These additional allegations do not change the analysis. First, these allegations do not plausibly suggest that the Defendants purposefully chose a U.S.-based email service. The Complaints allege that the Defendants' executives and agents used personal rather than "corporate email addresses in a conscious effort to conceal their conduct from others." (*Foley* ¶ 204; *see Finan* 2AC ¶¶ 16, 147–48; *Fields* AC ¶ 11, 169–70.) Thus, even according to the Complaints, the purpose of using a U.S.-based email service was not to gain any particular benefits of U.S. servers, but to avoid the risk of detection that would come from using their professional email accounts. That the personal email service happened to have servers in the United States cannot plausibly reflect a "conscious choice" to digitally "reach[] into the United States." (*Foley* ¶¶ 204, 206; *see Finan* 2AC ¶¶ 250, 253; *Fields* AC ¶¶ 273, 276.) Second, even if the Defendants' access of Gmail servers was "purposeful," the servers were not affiliated with any party. As the *Hungerstation* court noted, there are no cases "where the location of third-party servers, *as opposed to servers affiliated with one of the parties*, was sufficient to" confer personal jurisdiction. *Hungerstation*, 2020 WL 137160, at *5; *see also WhatsApp Inc. v. NSO Grp. Techs. Ltd.*, 472 F. Supp. 3d 649, 671 (N.D.

Cal. 2020) (distinguishing between third-party servers and WhatsApp's servers in finding that only access of the latter conferred jurisdiction).

For similar reasons, Plaintiffs' allegations are readily distinguishable from the narrow line of cases finding personal jurisdiction when an out-of-forum defendant uses servers in the forum affiliated with the plaintiff to commit acts that constitute an intentional tort. In *WhatsApp Inc. v. NSO Group Technologies Ltd.*, 472 F. Supp. 3d 649 (N.D. Cal. 2020), for example, the court held that it could exercise personal jurisdiction over an Israeli company that sent malware to WhatsApp's servers in California. Because the defendant Israeli company "sought out WhatsApp's California-based servers for the purpose of routing malicious code through those servers," it had expressly aimed its intentional act constituting a tort at the forum state. *Id.* at 673. Similarly, in *MacDermid, Inc. v. Dieter*, 702 F.3d 725 (2d Cir. 2012), the Second Circuit held that a former employee residing in Canada was subject to personal jurisdiction in Connecticut when she stole emails and files from her Connecticut employer. *Id.* at 730. By accessing servers in Connecticut to misappropriate confidential information, "which itself constituted the alleged tort," the defendant former employee had "purposefully availed herself of the privilege of conducting activities within Connecticut." *Id.* Here, however, the Complaints do not allege that the Defendants accessed Google's servers in the United States to commit a tort in California against Google. Rather, the Complaints allege that the Defendants used Google's servers to "carry[] out their scheme to pay ISIS and ANF," which payments ultimately aided and abetted attacks that injured the Plaintiffs in the Middle East, Europe, and Africa.[14] (*Foley* § V.B; *see Finan* 2AC § XI.b; *Fields* AC § K.ii.) This is not enough to establish personal jurisdiction.

In addition to alleged banking and email contacts, the *Finan* 2AC and *Fields* AC also

---

[14]   Plaintiffs have alleged no facts that Lafarge Cyprus employees used U.S.-based email servers.

appear to allege personal jurisdiction over Lafarge and LCS (not Lafarge Cyprus) based on their consent to jurisdiction upon entering their criminal guilty plea in this District.  (*See Finan* 2AC ¶ 62; *Fields* AC ¶ 81.)  As many courts have recognized, however, the jurisdictional inquiries in civil and criminal cases are markedly different.  *See, e.g.*, *United States v. Maruyasu Indus. Co.*, 229 F. Supp. 3d 659, 670 (S.D. Ohio 2017) ("[D]ue process in the civil and criminal contexts simply is *different*. . . .  [I]n a criminal prosecution, [i]t is well settled that a district court has personal jurisdiction over any party who appears before it, regardless of how his appearance was obtained." (third alteration in original)); *In re Vitamins Antitrust Litig.*, 120 F. Supp. 2d 45, 53 (D.D.C. 2000) ("[T]he Court recognizes that . . . criminal pleas and agreements do not confer civil jurisdiction on this Court."), *amended in part*, No. 99-197 TFH, 1285, 2000 WL 33142129 (D.D.C. Nov. 22, 2000).

In *Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379 (S.D.N.Y. 2021), for example, the court considered whether the defendants' criminal indictments, pleas, and convictions in the Southern District of New York conferred personal jurisdiction in a subsequent civil case in the same district arising from the same conduct.  *Id.* at 398.  The court held that the plaintiffs could not rely on the criminal prosecutions to establish civil personal jurisdiction because the "venue statutes for criminal offenses . . . do not focus on the defendant's contacts with the district."  *Id.* at 398 n.17.  The court also noted the absence of "any authority supporting the proposition that personal jurisdiction may be exercised over a party in a particular jurisdiction because venue was proper for criminal charges against that party."  *Id.* at 398.  Accordingly, the *Finan* and *Fields* Plaintiffs cannot rely on the fact that Lafarge and LCS entered a guilty plea, or that jurisdiction was conceded in the criminal case, to establish personal jurisdiction in this civil action.

Nor can the *Finan* and *Fields* Plaintiffs infer that Lafarge or LCS conceded that the

34

stipulated facts in the criminal SOF give rise to civil personal jurisdiction.  Lafarge and LCS did not, as the *Finan* 2AC and *Fields* AC suggest, admit the Court's jurisdiction based on, or having anything to do with, "contacts with the United States."  (*Finan* 2AC ¶ 62; *Fields* AC ¶ 81.)  On the contrary, the plea expressly permits Lafarge and LCS to "raise[] legal defenses and arguments in other proceedings" (ECF No. 10 ¶ 19, *United States v. Lafarge*, No. 1:22-CR-00444), such as whether the stipulated facts are legally sufficient to confer personal jurisdiction.  Moreover, and generally, while a party can consent to jurisdiction in one case, that consent "extends to that case alone" and does not "open[] that party up to other lawsuits in the same jurisdiction in which consent was given, where the party does not consent and no other jurisdictional basis is available."  *V&A Collection, LLC v. Guzzini Props. Ltd.*, 46 F.4th 127, 132 (2d Cir. 2022).  Lafarge and LCS do not consent to personal jurisdiction in these civil cases and are, as the guilty plea expressly permits, raising the legal defense and argument that this Court lacks personal jurisdiction over them.

**2.    The Complaints Do Not Adequately Allege a Conspiracy Theory of Personal Jurisdiction.**

The Complaints proffer an alternative theory that Defendants are subject to personal jurisdiction under Rule 4(k)(2) "based on Defendants' conspiracy with ISIS, a terrorist group that purposefully targeted the United States, caused tortious effects on and within the United States, and carried out overt acts in furtherance of the conspiracy within and targeting the United States."  (*Foley* ¶ 24; *see Finan* 2AC ¶ 52; *Fields* AC ¶ 71.)  A co-conspirator's minimum contacts can allow for specific personal jurisdiction over a defendant only where "(1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with a state to subject that co-conspirator to jurisdiction in

that state."[15]  *Charles Schwab*, 883 F.3d at 87.  This doctrine does not dilute the constitutional requirements for personal jurisdiction.  Plaintiffs still must allege that the co-conspirator had sufficient suit-related contacts with the forum "in furtherance of the conspiracy."  *Id.*  In this way, *Schwab*'s three-part test "*serves* the purposeful availment requirement, rather than supplants it." *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 125 (2d Cir. 2021); *see also Charles Schwab*, 883 F.3d at 87 ("To allow jurisdiction absent a showing that a co-conspirator's minimum contacts were in furtherance of the conspiracy would be inconsistent with the purposeful availment requirement.").

For the reasons described in Section III, *infra*, the Complaints do not adequately plead a civil conspiracy between any FTO and any Defendant.  But even if they had, the Complaints still do not allege sufficient suit-related contacts between ISIS and the United States to confer personal jurisdiction over the Defendants as co-conspirators.  In asserting that ISIS engaged in "overt acts . . . expressly aimed at the United States" (*Foley* ¶ 219; *Finan* 2AC ¶ 258; *Fields* AC ¶ 282), the Complaints appear to invoke the "effects test" theory of personal jurisdiction under which "the conduct that forms the basis for the controversy occurs entirely out-of-forum, and the only relevant jurisdictional contacts with the forum are therefore in-forum effects harmful to the plaintiff."  *Licci III*, 732 F.3d at 173.  "Exercise of jurisdiction in such circumstances 'may be constitutionally permissible if the defendant *expressly aimed* its conduct at the forum.'"  *Charles Schwab*, 883 F.3d at 87 (citing *Calder v. Jones*, 465 U.S. 783, 789 (1984)).  Without "express aiming," the fact that a foreign tortfeasor's suit-related conduct caused an "effect" in the forum or resulted in injury or

---

[15]  "The Second Circuit has not conclusively answered whether *Schwab*'s standard for finding 'minimum contacts' under a conspiracy-based jurisdiction theory can apply to cases involving Rule 4(k)(2)."  *Biocad JSC v. F. Hoffmann-La Roche Ltd.*, No. 16-cv-4226 (RJS), 2022 WL 268102, at *7 n.6 (S.D.N.Y. Jan. 28, 2022) (Sullivan, J.).

harm in the forum that was foreseeable can never establish personal jurisdiction. *In re Terrorist Attacks*, 714 F.3d at 674; *see also Charles Schwab*, 883 F.3d at 87 ("The foreseeability of causing injury in another State, however, will not suffice."); *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 339 (2d Cir. 2016) ("[T]he fact that harm in the forum is foreseeable . . . is insufficient for the purpose of establishing specific personal jurisdiction over a defendant.").

The Second Circuit's opinion in *Waldman v. Palestine Liberation Organization*, 835 F.3d 317 (2d Cir. 2016), is instructive. There, the Second Circuit held that the PLO was not subject to suit under the ATA in New York for its alleged support of terrorist attacks in Israel that killed or wounded American citizens. *Id.* at 337. While the PLO had some contacts in the United States, including a diplomatic presence, lobbying operations, and commercial transactions, those contacts were "insufficiently suit-related . . . to support specific jurisdiction." *Id.* at 344. And the relevant "suit-related conduct"—*i.e.*, the terrorist attacks "that could have subjected them to liability under the ATA"—occurred in Israel and was unconnected to the United States, save for the fact that Americans abroad (and their families at home) were foreseeable victims. *Id.* at 335. That U.S. citizens in Israel were targets of the attacks was insufficient to establish "express aiming," because the evidence demonstrated "the random and fortuitous nature of the terror attacks." *Id.* at 337.

The Complaints here advance many of the same allegations found insufficient in *Waldman*. First, the Complaints rely on U.S. contacts unrelated to the terrorist attacks themselves to infer express aiming. For example, the Complaints allege that ISIS transmitted threats to the United States, targeted U.S. citizens for recruitment, and sought to finance other attacks in the United States. (*Foley* ¶¶ 224, 225; *Finan* 2AC ¶ 53; *Fields* AC ¶ 72.) But these contacts did not give rise or relate to the Plaintiffs' ATA claims and so are "insufficiently suit-related . . . to support specific jurisdiction." *Waldman*, 835 F.3d at 344, 335 ("The question in this case is whether the

defendant's suit-related conduct—their role in the six terror attacks at issue—creates a substantial connection with the forum State pursuant to the ATA. The relevant suit-related conduct by the defendants was the *conduct that could have subjected them to liability under the ATA*."). Second, while the terrorist attacks themselves unquestionably inflicted harm on families in the United States (*Foley* ¶ 219; *Finan* 2AC ¶ 258; *Fields* AC ¶ 282), they do not show *express aiming* at the United States sufficient to confer personal jurisdiction. Indeed, with the potential exception of the kidnapping and murders of Foley and Sotloff, there are no allegations that the terrorist attacks giving rise to each ATA claim were anything but "indiscriminate violence that occurred abroad" that foreseeably and regrettably victimized American citizens. *Waldman*, 835 F.3d at 337.[16]

### C.    The Court Lacks Personal Jurisdiction Over Defendants Under the ATA's Nationwide Service Provision.

Finally, the ATA's nationwide service provision cannot furnish a statutory basis for personal jurisdiction, not only because it does not purport to address personal jurisdiction but also because, in any event, the *Finan* and *Fields* Plaintiffs did not use the nationwide service provision to serve Defendants.[17] *See* 18 U.S.C. § 2334(a) ("Any civil action under section 2333 of this title

---

[16]    Even as to Foley and Sotloff, the allegations in the *Foley* Complaint are insufficient to establish jurisdiction under a conspiracy theory. First, the Complaint alleges that ISIS abducted and murdered Foley and Sotloff to influence U.S. policy. (*Foley* ¶ 43.) But, as the Second Circuit has emphasized, simply targeting U.S. citizens in an attempt to "influence United States policy" is "insufficient for purposes of due process . . . without some other connection among the activities underlying the litigation, the defendants, and the forum." *Waldman*, 835 F.3d at 341–42. Second, neither the conspiracy theory nor the effects test can be used to sidestep constitutional limitations on the exercise of personal jurisdiction. *See, e.g.*, *id.* at 344 ("[T]he federal courts cannot exercise jurisdiction in a civil case beyond the limits prescribed by the due process clause of the Constitution, no matter how horrendous the underlying attacks or morally compelling the plaintiffs' claims."). As shown above, the assertion of personal jurisdiction over the Defendants in this matter plainly would violate due process.

[17]    The *Foley* Plaintiffs have not alleged the ATA's nationwide service provision as a basis for personal jurisdiction over Defendants.

against any person may be instituted in the district court of the United States for any district . . . where any defendant . . . is served . . .").  Because Lafarge was served in France, not in "any district" in the United States (*Finan* ECF No. 8-1; *Fields* ECF No. 12-1), and LCS and Lafarge Cyprus waived service (*Finan*, ECF No. 33; *Fields*, ECF No. 22),[18] the nationwide service provision can play no role here.  *See, e.g.*, *Przewozman*, 2023 WL 2562537, at *7 n.10 ("Even if [2334(a)] could be read to apply to personal jurisdiction, there are no allegations to support a claim that any Plaintiff resides, or that any Defendant resides or has an agent, in New York."); *Cohen*, 252 F. Supp. 3d at 152 ("Various opinions, including two recent decisions from this district, have held that this provision authorizes nationwide service of process and so provides personal jurisdiction over defendants who are properly served *anywhere in the United States*."); *Schrier v. Qatar Islamic Bank*, No. 20-60075-CIV-ALTMAN/Hunt, 2022 WL 4598630, at *11 (S.D. Fla. Sept. 30, 2022) ("Schrier, in short, cannot invoke the ATA as a basis for our exercise of personal jurisdiction over QIB" because "[h]e only served QIB in Qatar—a place *outside* the United States."), *appeal filed*, No. 22-13513 (11th Cir. Oct. 19, 2022); *see also Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 31–32 (D.D.C. 2010) (finding jurisdiction under the ATA where the defendant "d[id] not argue that it was [not] served . . . with process *within the United States*").[19]

---

[18]    The service waiver stipulations entered into by LCS, Lafarge Cyprus, and the *Finan* and *Fields* Plaintiffs specifically provide that "Plaintiffs agree that they will not argue that waiver of service or negotiation of this Stipulation supports personal jurisdiction over [Lafarge Cyprus] and LCS" and that "Plaintiffs agree that [Lafarge Cyprus] and LCS will not be deemed 'served' in any 'district court of the United States' for purposes of 18 U.S.C. § 2334(a) as a result of waiving service."  (*Finan*, ECF No. 33 ¶¶ 4–5; *Fields*, ECF No. 22 ¶¶ 4–5.)

[19]    Even if the ATA could be read to provide a statutory basis for jurisdiction here, asserting jurisdiction over Defendants still would violate due process for the reasons outlined above.

## II.    THE COMPLAINTS FAIL TO STATE A CLAIM FOR AIDING AND ABETTING UNDER THE ATA.

To assert a claim under the ATA for aiding and abetting, a complaint must plausibly allege three elements:  "(1) the party whom the defendant aids . . . perform[ed] a wrongful act that causes an injury . . . ; (2) the defendant [was] *generally aware* of his role as part of an overall illegal or tortious activity at the time that he provides the assistance . . . ; [and] (3) the defendant . . . *knowingly and substantially assist[ed]* the principal violation."  *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 494 (2d Cir. 2021) (fifth and eighth alterations in original); *see also Taamneh*, 598 U.S. at 486.  Because the Complaints fail to plausibly allege the second and third elements, and because the Complaints posit too remote a theory of causation, the Court should dismiss the aiding-and-abetting claims.

### A.    The Complaints Do Not Allege That the Defendants Were "Generally Aware" That They Were Assuming a Role in ISIS or ANF's Terrorist Activities.

The aiding-and-abetting claims fail because the Complaints do not allege that the Defendants were aware of their supposed role in ISIS or ANF's terrorist activities that foreseeably injured Plaintiffs.  In this respect, "[t]he general awareness element requires the defendant to be generally aware of its role in an *overall illegal or tortious activity* at the time that [it] provides the assistance."  *Honickman*, 6 F.4th at 496 (second alteration in original).  In other words, a plaintiff bringing an ATA aiding-and-abetting cause of action "must plausibly allege that the defendant was aware that, by assisting the principal, it is itself assuming a role in terrorist activities."  *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 224 (2d Cir. 2019).  Moreover, a plaintiff must allege that the defendant was "generally aware of its role in an overall illegal activity from which the act that caused the plaintiff's injury was *foreseeable*."  *Honickman*, 6 F.4th at 496.

It is well-settled that "[f]oreseeability is . . . central" to the general awareness inquiry.  *Id.* at 496–97.  Notably, "[t]he question is not whether a defendant was generally aware of its role in

illegal activity that foreseeably risked terrorism *in general*, but whether [a] defendant was aware of its role in [the] overall illegal activity from which the act that caused the plaintiff's injury was foreseeable." *Wildman v. Deutsche Bank Aktiengesellschaft*, No. 21-CV-04400 (HG) (RML), 2022 WL 17993076, at *6 (E.D.N.Y. Dec. 29, 2022) (second emphasis omitted), *appeal filed*, No. 23-132 (2d Cir. Jan. 30, 2023); *accord Honickman*, 6 F.4th at 496 ("[The defendant] must be generally aware of its role in an overall illegal activity from which the act that caused the plaintiff's injury was foreseeable."). Put another way, "JASTA only provides for civil liability where a plaintiff can establish general awareness of a defendant's role in the *specific terrorist attacks* which caused her injury." *Wildman*, 2022 WL 17993076, at *10. A complaint thus must allege a "sufficient nexus" between the defendant's conduct and the injury-causing acts of terrorism "that would support the plausible inference the defendant was generally aware it played a role in those acts." *Id.* at *7. A defendant's mere knowledge that it was providing assistance "to a terrorist organization, without more, is insufficient to satisfy JASTA's scienter requirement." *Strauss v. Crédit Lyonnais, S.A.*, 379 F. Supp. 3d 148, 164 (E.D.N.Y. 2019), *aff'd in part, dismissed in part*, 842 F. App'x 701 (2d Cir. 2021); *accord Wildman*, 2022 WL 17993076, at *6 (explaining that "knowledge of the [assisted] organization's connection to terrorism" is insufficient). Similarly, it is not "sufficient for a defendant to knowingly violate laws which were designed to prevent terrorist activity." *Id.* at *7.

Applying these principles, courts consistently have rejected aiding-and-abetting claims predicated on injuries attenuated from the defendant's alleged conduct. *See, e.g.*, *Siegel*, 933 F.3d at 224; *Wildman*, 2022 WL 17993076, at *13, *18. In *Siegel*, for instance, the Second Circuit affirmed the dismissal of claims brought against banks based on their alleged provision of financial services to an FTO affiliate. 933 F.3d at 226. Emphasizing the "crucial" point that the defendants

"ceased doing business" with the affiliate ten months before the injury-causing attacks, the court concluded that this temporal gap "ma[de] it implausible under the circumstances that HSBC had knowingly assumed a role in the Attacks." *Id.* at 224.

Similarly, the *Wildman* court dismissed claims predicated on allegations that the defendant banks provided financial assistance to actors who helped finance injury-causing terrorist attacks in Afghanistan. 2022 WL 17993076, at *27. The complaint in that case pleaded "insufficient facts to establish that Deutsche Bank was generally aware of its role in the attacks at the time it allegedly provided its assistance." *Id.* at *9. The court emphasized, among other things, that the challenged transactions "occurred over eight years before any of the alleged terrorist attacks" such that "[t]he gap in time is too wide to find that the terrorist acts that caused Plaintiffs' injuries were a foreseeable result of Deutsche Bank's alleged assistance nearly a decade earlier." *Id.* at *13. The *Wildman* court held that the complaint in that case failed to allege general awareness on the part of another defendant bank (Standard Chartered) that ceased doing business with three intermediaries between three and eight years before the relevant attacks, holding that "[t]he span of time between when Standard Chartered provided services to these three individuals and the attacks at issue [was] too attenuated." *Id.* at *18 & n.31.

Likewise here, the alleged injury-causing acts are too remote from the Defendants' alleged assistance to "establish general awareness of [the Defendants'] role in the specific terrorist attacks which caused [Plaintiffs'] injur[ies]." *Id.* at *10. To begin with, the Complaints fail to allege that any of the External Attacks—which took place in Niger, Spain, France, Jordan, Libya, Turkey, Lebanon, and Iraq—were foreseeable to the Defendants at the time of the payments to intermediaries. Put differently, the Complaints do not allege a plausible basis for inferring that the Defendants had "knowingly assumed a role" in these future injury-causing attacks *in other*

*countries entirely*, at the time of the payments. *See Siegel*, 933 F.3d at 224. Indeed, the Complaints do not plead any facts to suggest that it was publicly known (or that the Defendants were aware) that ISIS even had a presence in Niger, Spain, France, Jordan, Libya, Turkey, or Lebanon at the relevant time. Simply pointing to sources noting that ISIS had threatened attacks in Turkey and "countries in the African conflict zones" (*Foley* ¶ 122) does not support a plausible inference that it was foreseeable to the Defendants that payments to intermediaries in *Syria* would contribute to future attacks in *Turkey* and *Niger*. *See, e.g.*, *Honickman*, 6 F.4th at 496. Nor can Plaintiffs establish general awareness by relying on public sources published *after* LCS evacuated Syria and made an alleged final payment to an intermediary (*see, e.g.*, *Finan* 2AC ¶ 186; *Foley* ¶¶ 118, 120, 135). *See, e.g.*, *Honickman*, 6 F.4th at 501 (concluding that "the public sources cited in the complaint do not plausibly support an inference that [the defendant] had the requisite general awareness" where they post-dated the time of the defendant's alleged assistance).

For similar reasons, the *Finan* 2AC and *Foley* Complaint fail to allege that the Defendants had general awareness of their supposed role in acts of international terrorism that took place in Iraq. The *Foley* Plaintiffs allege that "[m]oney paid in Syria . . . financed attacks by the same group in its caliphate across the border in Iraq." (*Foley* ¶ 117.) But this fails to adequately allege that Defendants were aware of this supposed cross-border transfer of funds at the time of their asserted assistance. As support for this proposition, the *Foley* Complaint cites a *2015* book declaring that the "Syrian-Iraqi border . . . largely ceased to exist." (*Id.*) But this book, which post-dates LCS's evacuation from Syria and the last alleged payment to intermediaries, cannot establish general awareness. *See Honickman*, 6 F.4th at 501. And the August 2014 "invit[ation]" from ISIS to "journalists from Vice News to watch as ISIS . . . bulldozed the Iraq-Syria border" (*Foley* ¶ 117) plainly does not suggest Defendants were generally aware that their actions *in Syria*

could lead to the acts of international terrorism that injured Plaintiffs *in Iraq*. Neither does the bare allegation, in *Finan* and *Foley*, that ISIS gained territory in Iraq. (*Id.* ¶ 44; *Finan* 2AC ¶ 77.)

Finally, the allegation in the *Foley* Complaint that the Defendants "knew they were contributing to ISIS's ability to launch terrorist attacks not only in Syria and Iraq, but also in places like Turkey and Niger" (*Foley* ¶ 121) is not plausible. As factual support, the *Foley* Complaint relies solely on an internal 2013 email in which an LCS official stated that "ANF follow[s] a global jihadi ideology . . . and are more open to receive foreign fighters" and that "ANF had ties to al-Qaeda, . . . exemplified by participating al-Qaida veterans, mainly from Iraq." (*Id.*) This supposed factual support refers only to ANF, not ISIS, and each of the External Attacks referenced in the *Foley* Complaint allegedly were perpetrated by ISIS. Moreover, knowledge that an FTO adheres to a "global" ideology and welcomes "foreign fighters" is a far cry from the necessary "general awareness" of the Defendants' "role in the *specific terrorist attacks*" in Iraq, Turkey, and Niger "which caused [Plaintiffs'] injur[ies]." *Wildman*, 2022 WL 17993076, at *10.

The same goes for the Post-Evacuation Attacks. All but one of the seventeen Post-Evacuation Attacks took place between one to over three years *after* the Defendants ceased making payments to intermediaries. This yawning temporal gap between the termination of the challenged conduct and the commission of the injury-causing acts by a non-party—greater than the length of time that the Second Circuit considered too long to plead general awareness in *Siegel*—"makes it implausible" that the Defendants "knowingly assumed a role" in those attacks. *See Siegel*, 933 F.3d at 224. Even the lapse of four months between the payments and the one additional Post-Evacuation Attack, which took place in Libya in January 2015, is too long to justify an inference of general awareness, particularly because the Defendants terminated all operations in Syria months prior. *See, e.g.*, *id.* (concluding that a ten-month gap precluded liability). Plaintiffs seek

44

to minimize the temporal remoteness of the Post-Evacuation Attacks by alluding to ISIS's alleged "sophisticated financial account and saving systems" and suggesting that payments from the Defendants to intermediaries "contributed to ISIS's long-term savings" and that cement sold from LCS to ISIS "was durable, by its very nature." (*Finan* 2AC ¶ 197; *Fields* AC ¶ 224; *Foley* ¶ 112.) But nowhere do the Complaints allege that the Defendants were aware of the specifics of ISIS's financial planning at the time that they allegedly paid intermediaries, or could have foreseen that ISIS would allegedly use the cement that LCS sold for the specific attacks that injured Plaintiffs. This dooms the aiding-and-abetting claims here. *See, e.g.*, *Wildman*, 2022 WL 17993076, at *7 (requiring a "sufficient nexus" between the defendants' conduct and injury-causing acts to "support the plausible inference the defendant was generally aware it played a role in those acts").

Finally, the *Foley* Complaint fails to allege general awareness as to the four Syrian Kidnappings. As an initial matter, as even the *Foley* Complaint concedes, the Defendants could not have had general awareness of the kidnappings themselves. Two of them took place before LCS is alleged to have known that any relevant payments were made to intermediaries. (*Foley* ¶¶ 235, 262.) And three of the four kidnappings were allegedly carried out by AQI, an entirely different FTO that Defendants are not alleged to have assisted. (*Id.* ¶¶ 235, 246, 254.) The *Foley* Complaint strains to suggest that Defendants provided "[p]ost-abduction financial support" (*id.* ¶ 228), but it fails to allege any facts supporting the requisite "plausible inference" that Defendants were "generally aware [they] played a role" in supporting any "[p]ost-abduction" activities related to these kidnappings. *See Wildman*, 2022 WL 17993076, at *7. As with the External Attacks and Post-Evacuation Attacks, therefore, the aiding-and-abetting claims based on the Syrian Kidnappings should be dismissed as a matter of law for failure to allege general awareness.

**B.    The Complaints Do Not Allege That the Defendants Knowingly Provided Substantial Assistance to the Injury-Causing Terrorist Attacks.**

The aiding-and-abetting claims fail for the additional reason that the Complaints do not allege that the Defendants' conduct constituted knowing and substantial assistance to the acts of terrorism that injured Plaintiffs.

**1.    The Complaints Fail to State a Claim Under the Supreme Court's Reasoning in *Taamneh*.**

Earlier this year, the U.S. Supreme Court, for the first time, examined the "knowing and substantial assistance" element of aiding-and-abetting liability under the ATA/JASTA.  As the Supreme Court explained, "[t]he point of aiding and abetting is to impose liability on those who consciously and culpably participated in the tort at issue." *Taamneh*, 598 U.S. at 506.  Under the ATA/JASTA secondary liability regime, therefore, a defendant is liable for aiding and abetting only to the extent that it "consciously and culpably participate[d] in" an act of international terrorism "in such a way as to help make it succeed."  *Id.* at 497 (alteration in original); *see also id.* at 493 ("The phrase aids and abets in § 2333(d)(2), as elsewhere, refers to a conscious, voluntary, and culpable participation in another's wrongdoing.").  And rather than artificially separating them, "the knowledge and substantial assistance components should be considered relative to one another as part of a single inquiry designed to capture conscious and culpable conduct." *Id.* at 503–04.

Importantly, the Supreme Court emphasized that the ATA "requires that defendants have aided and abetted *the act of international terrorism that injured the plaintiffs*."  *Id.* at 497; *see also id.* at 506 ("The focus must remain on assistance to the tort for which plaintiffs seek to impose liability.").  It is absolutely crucial here to recognize the Supreme Court's directive that "it is not enough . . . that a defendant ha[s] given substantial assistance to a transcendent enterprise separate from and floating above all the actionable wrongs that constitute it."  *Id.* at 495.  As applied here,

this means that the Complaints must plausibly allege that the Defendants provided substantial assistance to each of the twenty-two discrete attacks *and* that ISIS or ANF carried out such attacks. And, in light of *Taamneh*, it plainly is not sufficient to allege that the Defendants gave substantial assistance to ISIS or ANF generally.

The Supreme Court applied this standard to conclude that the *Taamneh* plaintiffs had failed to state a claim for aiding and abetting based on injuries suffered during a terrorist attack at the Reina nightclub in Turkey. As the Supreme Court explained at the outset, "because they are trying to hold defendants liable for the Reina attack, plaintiffs must plausibly allege that defendants aided and abetted ISIS in carrying out that attack." *Id.* at 497. Accordingly, the proper inquiry was whether any "allegations suggest that defendants culpably associate[d themselves] with the Reina attack, participate[d] in it as something that [they] wishe[d] to bring about, or sought by [their] action to make it succeed." *Id.* at 498 (alterations in original). In answering that question in the negative, the Supreme Court highlighted the "lack of allegations connecting the Reina attack" with the defendants' alleged conduct. *Id.* at 500. Once more the Supreme Court emphasized that "the question is whether defendants gave substantial assistance to ISIS with respect to the Reina attack" and that "[t]he focus thus must remain on the Reina attack." *Id.* at 503.

The Supreme Court also explained that "the expansive scope" of the *Taamneh* plaintiffs' claims further supported dismissal. *Id.* at 501. "Given the lack of any concrete nexus between defendants' services and the Reina attack, plaintiffs' claims would necessarily hold defendants liable as having aided and abetted each and every ISIS terrorist act committed anywhere in the world." *Id.* For a case to warrant such expansive liability, the facts must show that the "defendants so systemically and pervasively assisted ISIS" that they could be said "to aid and abet every single ISIS attack." *Id.* The *Taamneh* plaintiffs' allegations "certainly [fell] short" of that standard—

they were a "far cry from the type of pervasive, systemic, and culpable assistance to a series of terrorist activities that could be described as aiding and abetting each terrorist act." *Id.* at 502.

The exact same conclusion applies here with respect to the Complaints' aiding-and-abetting claims. Because Plaintiffs seek to hold the Defendants liable for twenty-two discrete acts of international terrorism allegedly carried out by ISIS or ANF, they "must plausibly allege that [the Defendants] aided and abetted ISIS [or ANF] in carrying out" each of those specific attacks. *See id.* at 497. This they have not come close to doing. The Complaints do not include a single allegation that the Defendants "culpably associate[d themselves] with" any of those twenty-two attacks, "participate[d] in [them] as something that [they] wishe[d] to bring about, or sought by [their] action to make them succeed." *See id.* at 498 (first, second, fourth, fifth and sixth alterations in original). Nor do the Complaints even allege any concrete connection between the twenty-two injury-causing attacks and the Defendants' alleged conduct. *See id.* at 500. Indeed, as explained above, thirteen attacks took place outside Syria (the only country in which LCS operated and the Defendants allegedly paid intermediaries), seventeen attacks took place after LCS evacuated the Cement Plant and after the Defendants made their last alleged payment to intermediaries, two kidnappings took place before the Defendants allegedly made their first relevant payment to intermediaries, and three more kidnappings were carried out by an FTO that had no alleged links to the Defendants. Thus, because Plaintiffs have failed to plausibly allege that the Defendants "gave substantial assistance to ISIS [or ANF] with respect" to any of the twenty-two attacks presented in the Complaints, *id.* at 503, their aiding-and-abetting claims fail as a matter of law.

Plaintiffs' efforts to plead around the *Taamneh* standard fall well short. First, each Complaint includes lengthy descriptions of the various ISIS "cells" that *might* have received portions of the payments from LCS to intermediaries and then seeks to link those cells to the injury-

causing attacks.  (*See, e.g.*, *Finan* 2AC ¶¶ 21, 200–03, 208–11; *Fields* AC ¶¶ 15, 227, 233; *Foley* ¶¶ 7, 132, 139, 141, 145.)  But the Complaints concede those cells were responsible for all hostage-taking attacks, all attacks on U.S. service members in Syria and Iraq, and all attacks outside Syria and Iraq—that is, a significant portion of the alleged ISIS attacks generally.  (*See, e.g.*, *id.* ¶¶ 132, 139, 145.)  In this way, the allegations regarding particular cells are tantamount to the legally insufficient pleading in *Taamneh*, namely that a defendant "ha[s] given substantial assistance to a transcendent enterprise separate from and floating above all the actionable wrongs that constitute it." *Taamneh*, 598 U.S. at 495.  The connection between Defendants' alleged assistance and the specific alleged "act[s] of international terrorism that injured [Plaintiffs]" is lacking.  *Id.* at 497.

Second, the Complaints allege that the cement that LCS supposedly sold to ISIS substantially assisted the injury-causing attacks.  (*See, e.g.*, *Finan* 2AC ¶ 133, *Fields* AC ¶ 155, *Foley* ¶ 78.)  The Complaints, of course, are silent on how the sale of cement *in Syria* could have contributed to the External Attacks, all of which took place outside of Syria.  In any event, the nub of Plaintiffs' theory is that ISIS (but, notably, not ANF) used the cement to construct "industrial-strength tunnels . . . to move terrorist operatives, hostages, weapons, and equipment . . . ." (*Finan* 2AC ¶ 133; *Fields* AC ¶ 155; *Foley* ¶ 78.)  As with claims related to the various ISIS cells, however, these allegations are far too abstract and generalized to plausibly plead that the Defendants' alleged provision of cement to ISIS "aided and abetted the act[s] of international terrorism that injured [Plaintiffs]." *Taamneh*, 598 U.S. at 497.

As in *Taamneh*, moreover, "[i]f there were any doubt, the expansive scope of plaintiffs' claims would put it to rest."  *Id.* at 501.  Because the Complaints do not identify "any concrete nexus between" the Defendants' conduct and the twenty-two injury-causing attacks, the claims "would necessarily hold [the Defendants] liable as having aided and abetted each and every ISIS

terrorist act committed anywhere in the world," *id.*—or, for that matter, any terrorist attack committed by a disaffected individual for which ISIS later claimed responsibility. The claims seem to rest on the notion that any funds that allegedly reached ISIS necessarily contributed to ISIS's terrorist activities anywhere, everywhere, and for all time. (*See, e.g.*, *Finan* 2AC ¶ 19 ("Defendants' payments to and business partnership with ISIS provided ISIS the seed capital it needed to transform from a fledgling militia in the early 2010s into a brutal terroristic behemoth with the capability and intent to kill Americans."); *id.* ¶ 20 ("Given the low cost of terrorist attacks, Defendants' payments had a substantial impact on ISIS's capabilities."); *Fields* AC ¶¶ 13–14 (same); *Foley* ¶¶ 6, 107 (similar).)

Once again, these allegations are insufficient to state a claim because "it is not enough . . . that a defendant have given substantial assistance to a transcendent enterprise separate from and floating above all the actionable wrongs that constitute it." *Taamneh*, 598 U.S. at 495. Moreover, Plaintiffs fail to allege that the Defendants "so systemically and pervasively assisted ISIS that [the Defendants] could be said to aid and abet every single ISIS attack." *Id.* at 501. Nothing in the Complaints suggests the requisite "pervasive, systemic, and culpable assistance to a series of terrorist activities that could be described as aiding and abetting each terrorist act." *Id.* at 502. The *Foley* Complaint, for its part, mechanically alleges that "Defendants' payments were sufficiently pervasive and systemic that they substantially contributed to a range of ISIS terrorist attacks." (*Foley* ¶ 111.) The Court should discard this conclusory allegation, made with no factual support. In any event, that allegation (like the others in all three Complaints) does not come close to plausibly alleging that "any time" ISIS committed a terrorist attack, it "would have relied on [the Defendants'] assistance." *See Taamneh*, 1598 U.S. at 495. For this reason as well, Plaintiffs' aiding-and-abetting claims fail.

### 2. The *Halberstam* Factors Further Support Dismissal.

Additionally, consideration of the six-factor framework articulated in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), further supports dismissal of Plaintiffs' aiding-and-abetting claims for failure to allege knowing and substantial assistance. "In enacting JASTA, Congress provided additional context by pointing to [*Halberstam*] as provid[ing] the proper legal framework for civil aiding and abetting and conspiracy liability." *Taamneh*, 598 U.S. at 485 (second alteration in original). Under this framework, a court must examine "(1) the nature of the act encouraged, (2) the amount of assistance given by defendant, (3) defendant's presence or absence at the time of the tort, (4) defendant's relation to the principal, (5) defendant's state of mind, and (6) the period of defendant's assistance." *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018). The Supreme Court in *Taamneh* cautioned that courts should refrain from "hew[ing] tightly to the precise formulations that *Halberstam* used." 598 U.S. at 493. The Supreme Court also explained that courts must not "regard[] the [six] factors as a sequence of disparate, unrelated considerations without a common conceptual core." *Id.* at 504. Rather, "[t]he point of those factors is to help courts capture the essence of aiding and abetting: participation in another's wrongdoing that is both significant and culpable enough to justify attributing the principal wrongdoing to the aider and abettor." *Id.* Here, the *Halberstam* factors cannot be satisfied.

The first *Halberstam* factor looks to "the nature of the act involved" because it "dictates what aid might matter, *i.e.*, be substantial." *Halberstam*, 705 F.2d at 484. This factor "requires assessing whether the alleged aid . . . would be important to the nature of the injury-causing act." *Honickman*, 6 F.4th at 500. Here, despite the general importance of "financial support . . . to the operation of a terrorist organization," the alleged "connection between the alleged support" in this case (which was confined to Syria and ceased in 2014) "and the terrorist attacks at issue" (each of which took place before the Defendants' alleged assistance began, occurred months or years after

LCS's exit from Syria, was perpetrated outside Syria, or was carried out by an FTO other than ISIS or ANF) is far "too attenuated to support a finding of substantial assistance." *See Wildman*, 2022 WL 17993076, at *15.

The second *Halberstam* factor "focus[es] on the amount and type of aid the defendant provided." *Honickman*, 6 F.4th at 500. The alleged assistance to ISIS and ANF was not sufficiently substantial to support a conclusion that it was an "essential part of the [criminal] pattern," especially when considered alongside the massive resources that ISIS obtained from other sources (*see, e.g.*, *Finan* 2AC ¶ 81 (alleging that ISIS obtained "a lot of" money by "robb[ing] the resources under its control"); *Foley* ¶ 100 (alleging that ISIS and ANF "financ[ed] themselves by raising taxes from entities doing business in territory they controlled")). *See, e.g.*, *Halberstam*, 705 F.2d at 488 (concluding that this factor supported liability only because the assistance "added up . . . to an essential part of the [criminal] pattern"); *Wildman*, 2022 WL 17993076, at *15 (finding of substantial assistance not supported where the complaint did not allow the court to infer a nexus between banking services and terrorist activity).

The third *Halberstam* factor examines the defendant's "[p]resence [or absence] at the time of the tort." *Halberstam*, 705 F.2d at 484. This factor obviously weighs in favor of dismissal here because the Complaints do not and cannot allege that the Defendants were present at, or even involved with, the injury-causing attacks—indeed, the Complaints aver that LCS had long-since evacuated the Cement Plant, and ceased making payments to intermediaries, at the time of the vast majority of the attacks. Thirteen of the attacks took place outside Syria, and the Complaints allege no connection between the Defendants and any of Niger, Spain, France, Jordan, Libya, Turkey, Lebanon, or Iraq. *See, e.g.*, *Siegel*, 933 F.3d at 225 (concluding that this factor cut against liability where defendant was not physically present at the time of the attacks and had "ceased transacting

any business" with an intermediary prior to the attacks); *Wildman*, 2022 WL 17993076, at *15 (finding the complaint did not allege that defendant "was present at the time of the attacks," and therefore "d[id] not support a finding of substantial assistance").

The fourth *Halberstam* factor—the "defendant's relation to the principal"—also weighs decisively in favor of dismissal because, as the SOF indicates, the payments were made under difficult and chaotic circumstances to protect the safety of the company's employees and keep the Cement Plant running, and *not* to encourage any of ISIS or ANF's violent conduct or aims. In any event, any indirect links between the Defendants and ISIS or ANF, which involved third-party intermediaries, are "too attenuated to support a finding of substantial assistance." *See Wildman*, 2022 WL 17993076, at *15.

The fifth *Halberstam* factor—the defendant's "state of mind"—also tips strongly in favor of dismissal. As the SOF makes clear, and the Complaints do not dispute, neither Lafarge nor LCS (nor Lafarge Cyprus) shared ISIS or ANF's objectives. *See, e.g.*, *Bernhardt v. Islamic Republic of Iran*, 47 F.4th 856, 872 (D.C. Cir. 2022) (noting that the "state of mind" factor "more powerfully supports aiding-and-abetting liability of defendants who share the same goals as the principal [actor] or specifically intend the principal's tort"), *cert. denied*, No. 23-18, 2023 WL 6558423 (U.S. Oct. 10, 2023). The Defendants obviously did not share the same goals and were not "one in spirit" with ISIS or ANF, *Halberstam*, 705 F.2d at 484, and for the same reasons that the Complaints have failed to allege general awareness, this factor does not support a finding of substantial assistance. *See Siegel*, 933 F.3d at 225; *Wildman*, 2022 WL 17993076, at *15.

The sixth and final *Halberstam* factor evaluates the "duration of the assistance provided." *Halberstam*, 705 F.2d at 484. This factor also counsels in favor of dismissal because LCS evacuated Syria and "terminated its relationship" with the intermediaries well prior to seventeen

of the injury-causing attacks.  *See Siegel*, 933 F.3d at 225.  The relatively brief duration of the Defendants' alleged assistance (about a year) further weighs against aiding-and-abetting liability when compared to other cases.  *See, e.g.*, *id.* (deeming 25 years of alleged assistance insufficient); *Wildman*, 2022 WL 17993076, at *15 (finding eight years of alleged assistance insufficient).

### C.    In Five of the Twenty-Two Attacks, Plaintiffs Fail to Plead an Act of "International Terrorism."

As previously noted, Section 2333(d) requires that, to establish liability, a plaintiff must have been injured by an act of "international terrorism" as defined in Section 2331(1).  This, in turn, requires a showing both that a "violent" or "dangerous" act has occurred as set forth in Section 2331(1)(A), *and* that the apparent "intent" of the act satisfies one of three alternative criteria as set forth in Section 2331(1)(B), namely, that it was meant "(i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping."  Such intent is determined objectively, "impos[ing] on the actor an objective standard to recognize the apparent intentions of actions."  *Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 207 n.6 (2d Cir. 2014).

In the case of Ekren, an act of "international terrorism" has not been pleaded.  The *Finan* 2AC alleges that Ekren was taken to Syria by her parents in 2012 while she was a child, was "subject to cruel and inhumane conditions," "forced to serve as a child soldier, sold into forced marriage, raped, [and] forced into pregnancy and birth."  (*Finan* 2AC ¶ 316.)  Yet even assuming such acts satisfy the violent/dangerous activity limb of Section 2331(1)(A), they still do not meet the "apparent intent" limb of Section 2331(1)(B).  Ekren's mistreatment, while reprehensible, is not alleged to have been done "to intimidate or coerce a civilian population" or "to influence the policy of a government by intimidation or coercion," for purposes of Sections 2331(1)(B)(i) or (ii).  Nor was she subjected to any of the actions listed in Section 2331(1)(B)(iii) (kidnapping, mass

destruction or assassination), and the abuse to which she was subjected, while tragic, is not alleged to have been "intended" to affect any government's "conduct."

The four Combat Incidents also do not involve "international terrorism." These acts comprise (i) the 2015 incident in Kirkuk, Iraq that killed MSG Wheeler (*Foley* ¶¶ 269–70); (ii) the 2016 "Konkurs missile attack" in Manjib, Syria that injured Staff Sergeant Madina, Sergeant First Class Galdes, and Senior Chief Petty Officer Stallter (*id.* ¶¶ 291–92, 298, 301); (iii) the 2016 "firefight in Tal Ashkuf, Iraq" that killed Chief Petty Officer Keating (*Finan* 2AC ¶¶ 287–89); and (iv) the 2017 "attack in Tongo Tongo, Niger that targeted American servicemembers in Africa" (*Foley* ¶ 332). In contrast to several other attacks pleaded in the Complaints, however, there is no allegation that civilians were the intended target of these attacks, meaning they were not apparently intended "to intimidate or coerce a civilian population" for purposes of Section 2331(1)(B)(i). And while the use of weaponry against U.S. troops is deplorable, the Complaints do not identify a basis to conclude that these incidents were intended "to influence the policy of a government by intimidation or coercion," for purposes of Section 2331(1)(B)(ii). Nor did these incidents involve any of the actions listed in Section 2331(1)(B)(iii) (kidnapping, mass destruction or assassination).

Thus, as regards Ekren's situation and the Combat Incidents, the Complaints have failed to plead an act of "international terrorism."

\* \* \*

Accordingly, as the Complaints fail plausibly to allege that the Defendants knowingly provided substantial assistance to any "act of international terrorism that injured the plaintiffs," *Taamneh*, 598 U.S. at 497, the aiding-and-abetting claims fail.

## III. THE COMPLAINTS DO NOT STATE A CLAIM FOR CIVIL CONSPIRACY UNDER THE ATA.

The conspiracy limb of JASTA permits an action "for an injury arising from an act of

international terrorism committed, planned, or authorized by an [FTO]" where the defendant "conspire[d] with the person who committed such an act of international terrorism." 18 U.S.C. § 2333(d)(2). To assert a JASTA conspiracy claim, a complaint must plausibly allege four elements: "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." *Freeman v. HSBC Holdings PLC*, 57 F.4th 66, 76 (2d Cir. 2023), *cert. denied*, No. 22-1117, 2023 WL 6377871 (U.S. Oct. 2, 2023). Because the Complaints fail to allege either "an *agreement* between two or more persons" or "an injury caused by an unlawful overt act . . . done pursuant to and in furtherance of the common scheme," the conspiracy claims fail as a matter of law. *Id.* at 79.

### A. The Complaints Do Not Allege an Agreement Between the Defendants and ISIS or ANF.

To allege an "agreement" for purposes of civil conspiracy liability, a complaint first must show that the defendant and the person who committed the injury-causing act of international terrorism shared a "common intent," were "pursuing the same object," or had a "shared purpose." *See id.*; *see, e.g.*, *Int'l Distrib. Ctrs., Inc. v. Walsh Trucking Co.*, 812 F.2d 786, 793 (2d Cir. 1987) ("[C]onspirators [must have] a unity of purpose or a common design and understanding."). Without an allegation that co-conspirators shared a "conscious commitment to a common scheme designed to achieve an unlawful object," a conspiracy claim necessarily fails. *Freeman*, 57 F.4th at 79. Underscoring its importance, the Supreme Court recently emphasized that the agreement element of a conspiracy claim is a "significant limiting principle." *Taamneh*, 598 U.S. at 489–90.

Time and again, courts have dismissed as insufficient JASTA conspiracy allegations that failed to allege a common purpose between the defendant and its alleged co-conspirator. *See, e.g.*,

56

*Freeman*, 57 F.4th at 79-80; *Bernhardt*, 47 F.4th at 874.  In *Freeman*, for instance, the Second Circuit affirmed the dismissal of a JASTA claim relying on an alleged conspiracy between banks and the terrorist perpetrators to circumvent U.S. sanctions, highlighting the lack of any plausible allegation of a shared objective.  57 F.4th at 84.  The court explained that "[n]owhere in the Complaint . . . do Plaintiffs plead that [defendant banks] intended to kill or injure U.S. service members in Iraq" (the alleged goal of the terrorist organizations) "or that the terrorist groups agreed to help [defendant banks] and Iranian entities evade U.S. sanctions" (the alleged goal of the banks).  *Id.* at 80.  Likewise, the D.C. Circuit in *Bernhardt* affirmed the dismissal of a JASTA conspiracy claim where "[t]he complaint state[d] that HSBC was trying to make substantial profits by evading sanctions, whereas al-Qaeda sought to terrorize the U.S. into retreating from the world stage."  47 F.4th at 873.  The complaint thus "allege[d] no common objective between HSBC and al-Qaeda" given that the goals of the alleged co-conspirators were "wholly orthogonal to one another."  *Id.*

The same conclusion is warranted here with respect to each Complaint.

***i. Foley Complaint – Alleged Conspiracies***.   The *Foley* Complaint alleges two conspiracies:  (i) a conspiracy "whose overall object was to maintain ISIS's territorial control of Syria and Iraq and thereby promote ISIS's protection rackets within that territory" (*Foley* ¶ 368); and (ii) a conspiracy "with the overall goal of providing material support" to ISIS and ANF (*id.* ¶ 378).

Regarding the first asserted conspiracy, as confirmed by the SOF—which is cited throughout the *Foley* Complaint—neither Lafarge nor LCS supported or shared the ideologies, methods or goals of ISIS.  (*See* SOF ¶ 17, 111.)  Not surprisingly, the *Foley* Complaint fails to allege any facts suggesting that Defendants' "intent," "object," or "purpose" in allegedly paying intermediaries was to "maintain ISIS's territorial control" and "promote ISIS's protection rackets"

(*Foley* ¶ 368).  *See Freeman*, 57 F.4th at 76.  To the contrary, the *Foley* Complaint claims that Lafarge and LCS entered into a "durable" profit-sharing agreement with ISIS and sought to "enlist ISIS's broader assistance" to undercut Lafarge's competitors.  (*Foley* ¶¶ 79–83.)  These allegations underscore that Lafarge and LCS were *economically* motivated in their dealings with ISIS.  So do allegations elsewhere in the *Foley* Complaint:

- "[Lafarge] operated a lucrative cement plant in northern Syria, and it decided that bribing Syrian terrorists offered the best way to ***protect its profits from the plant***."  (*Id.* ¶ 4.)

- "Defendants paid to stay on good terms with ISIS and ANF because it was ***profitable*** to do so."  (*Id.* ¶ 66.)

- "These U.S. and U.N. designations did not drive Lafarge's decision-making; its ***operating margins did***."  (*Id.* ¶ 84.)

- "That is why it entered a revenue-sharing arrangement in the first place:  to incentivize ISIS to act in a manner that would promote Lafarge's and LCS's ***security and economic interests***."  (*Id.* ¶ 88.)

These allegations confirm that *economic profit* (and protection), not ISIS's territorial control of Syria and Iraq, were the objects of Lafarge and LCS's alleged conduct.  The *Foley* Plaintiffs try to bridge this gap by inferring that, in pursuing business dealings with ISIS, Lafarge and LCS necessarily supported ISIS's territorial control and power in Syria.  (*Id.* ¶¶ 215, 217.)  But no facts have been alleged to support an inference that the Defendants even considered (much less had as their aim) ISIS's ideological goal to retain and grow territory into a "caliphate."

The *Foley* Complaint's alternative conspiracy—to provide material support—fails for similar reasons.  There are no allegations that the Defendants and ISIS or ANF had a "common intent" or "shared purpose" to provide the FTOs material support.  *See Freeman*, 57 F.4th at 79.  Rather, the *Foley* Complaint alleges that Lafarge acted to gain protection and economic benefit from the FTOs (*see Foley* ¶ 88), while the FTOs acted to "intimidate and coerce the civilian populations of Syria, Iraq, the United States, Turkey, and Niger" (*id.* ¶ 373).  These are exactly the

kind of mismatched objectives that the courts found lacking in *Freeman* and *Bernhardt.*

  ***ii. Finan 2AC - Alleged Conspiracy.*** The *Finan* 2AC alleges a conspiracy to provide material support. (*Finan* 2AC ¶ 332.) But entirely mismatched objectives defeat this alleged conspiracy as well. The *Finan* 2AC concedes as much, alleging that Defendants pursued profit while the FTOs "intended to intimidate or coerce civilian populations of Syria, Iraq, Libya, Lebanon, and the United States." (*Id.*) And while the Complaint alleges that the Defendants benefited economically from the FTOs' territorial gains and threats of violence (*see id.* ¶¶ 256–57), there are no allegations that they shared or supported the ideologies, methods, or goals of any FTO (*see* SOF ¶¶ 17, 111). Without plausible allegations that Lafarge and LCS acted with the purpose to support ISIS, there can be no conspiracy to provide material support.

  ***iii. Fields AC - Alleged Conspiracies.*** The *Fields* AC appears to allege three conspiracies: (i) a conspiracy with ISIS "to bring about acts of international terrorism against Americans" (*Fields* AC ¶ 352); (ii) a conspiracy with ISIS to "maintain ISIS's territorial control of Syria and Iraq" (*id.* ¶ 354); and (iii) a conspiracy to "provide material support to" FTOs (*id.* ¶ 355). The latter two conspiracies are not well-pleaded because, as described above, there are no allegations that the Defendants held a "common purpose" with ISIS or any FTO to support that FTO's territorial or ideological aims. For the first conspiracy, the *Fields* AC baldly alleges that the Defendants affirmatively intended to support ISIS's terrorist attacks and shared in ISIS's goal to kill and intimidate. (*Id.* ¶¶ 18–19, 184.) But of course the *Fields* AC offers no support for this wholly conclusory allegation. Nor can it. The allegation is flatly contradicted by the SOF, which makes clear that "[n]either [Lafarge] nor LCS made payments to ISIS or ANF because they support the terrorist organizations' ideology or methods" (SOF ¶ 17), and by allegations elsewhere in the Complaint that underscore the security and economic goals driving the Defendants' conduct

(*Fields* AC ¶¶ 80, 183, 280, 286).[20]  Because there are no plausible allegations that the Defendants intended to "bring about acts of international terrorism," the *Fields* AC also fails to state a claim for conspiracy.

Lastly, Lafarge and LCS's guilty plea to one count of criminal conspiracy to provide "material support" to an FTO under 18 U.S.C. § 2339B does not alter the conclusion that all three Complaints do not state a claim for *civil* conspiracy.  To establish guilt under Section 2339B, the government does not need to prove that the defendant shared the FTO's terroristic goals or intended its actions to aid an attack.  *See Holder v. Humanitarian L. Project*, 561 U.S. 1, 16–17 (2010) ("Congress plainly spoke to the necessary mental state for a violation of § 2339B, and it chose knowledge about the organization's connection to terrorism, not specific intent to further the organization's terrorist activities."); *see also Linde*, 882 F.3d at 329–30 (noting that JASTA "is different from the *mens rea* required to establish material support in violation of 18 U.S.C. § 2339B, which requires only knowledge of the organization's connection to terrorism, not intent to further its terrorist activities or awareness that one is playing a role in those activities").[21]  Thus,

---

[20]  The *Fields* AC conspicuously excises passages from the original *Fields* Complaint – passages that, when examined, further undermine the *Fields* AC's conspiracy theory because they negate any inference that the Defendants acted to promote ISIS's terrorism or terroristic acts. For example, the *Fields* AC deleted paragraph 61 of the original *Fields* Complaint (alleging that LCS employees "were being kidnapped and LCS trucks were being hijacked" and that LCS wanted to "gain protection from the terrorists [and also] wanted to remain in Syria so that they would not lose their investment") as well as paragraph 70 (alleging that ISIS would have used "force and threats of force" if "Lafarge and LCS refused to deal with ISIS").  The Court should consider these statements, from a superseded complaint, as judicial admissions.  *See Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 707 (2d Cir. 1989) ("The amendment of a pleading does not make it any the less an admission of the party."); *see also Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir. 1985) ("A party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding.").

[21]  This sharply contrasts with the preceding statute, Section 2339A, under which it is a crime to render "material support of resources" to someone, "knowing or intending that they are to be

the mere fact of the Section 2339B conviction does not excuse Plaintiffs from satisfying the distinct elements for civil conspiracy under the ATA.

### B.    The Complaints Do Not Allege an Overt Act in Furtherance of a Common Scheme.

Separately and additionally, as to all but one claimed conspiracy, the Complaints fail to allege that the Plaintiffs' injuries were caused by "an unlawful overt act done in furtherance of the [co-conspirators'] common scheme." *Bernhardt*, 47 F.4th at 873.

To plead an "overt act" to establish ATA conspiracy liability, a complaint must show that the "international terrorism that injures the plaintiff" was carried out "in furtherance of [the] conspiracy." *Id.* In other words, a complaint must explain how the injury-causing act of terrorism advanced the purported conspiracy. *See Freeman*, 57 F.4th at 80. Failure to establish this essential link compels dismissal of a conspiracy claim. *See, e.g.*, *Bernhardt*, 47 F.4th at 873 (holding that it was not "plausible to infer that an attack on a secret CIA base in Afghanistan would further HSBC's alleged objective of maximizing profits through the evasion of U.S. sanctions").

In *Freeman*, the Second Circuit held that the complaint failed to plead an "overt act" because it did not explain "how the terrorist attacks advanced the overall object of the conspiracy— the evasion of U.S. sanctions against Iran." *Freeman*, 57 F.4th at 80, 82. Instead, the complaint alleged that the terrorist acts were the "foreseeable result" of the "Bank's conspiracy with Iranian entities to circumvent U.S. sanctions." *Id.* at 80–82. The Second Circuit rejected this argument, holding that the overt act must further the "*overall object* of the conspiracy," and not be a foreseeable consequence of it, because the "very core of conspiracy liability" is "an *agreement* between the defendant and the primary wrongdoer to commit a wrong." *Id.* at 82 (citing

---

used in preparation for, or in carrying out, a violation of" various serious criminal acts. 18 U.S.C. § 2339A. Lafarge and LCS were not charged under this statute.

Restatement (Third) of Torts: Liability for Economic Harm § 27 (Am. L. Inst. 2020)); *see also id.* (explaining, by way of example of a hypothetical "conspiracy between A and B to smuggle firearms into the United States," that even though "it may well be foreseeable to A that B might use the smuggled firearms to commit a robbery," "there is no basis for concluding that B's use of the firearm in the robbery would somehow further A and B's firearms-smuggling conspiracy"). The Second Circuit emphasized that "[t]o hold a defendant liable for a coconspirator's actions merely because they are foreseeable—even though wholly detached from the shared conspiratorial plan—would stretch the concept of civil conspiracy too far beyond its origin." *Id.*

Measured against this standard, the Complaints here do not allege any cognizable overt act in furtherance of two of the three supposed conspiracies.

*i. The Supposed Conspiracy to Provide Material Support.* The *Foley* Complaint and *Finan* 2AC allege that the terrorist attacks were a "foreseeable outcome" of a conspiracy to provide material support to an FTO. (*Finan* 2AC ¶ 332; *Foley* ¶ 378.) Leaving aside the absence of foreseeability here, *Freeman* forecloses reliance on mere "foreseeability" to "meet the in-furtherance-of requirement at the heart of a conspiracy claim." *Freeman*, 57 F.4th at 80–82. For its part, the *Fields* AC is silent about how ISIS's terrorist attacks furthered the conspiracy to provide material support.

*ii. The Conspiracy to Bring About Acts of Terrorism.* The *Fields* AC does not allege an overt act in support of the supposed conspiracy to "bring about acts of international terrorism." At most, the *Fields* AC alleges that the Defendants "furthered the goals of their conspiracy with ISIS" by "rais[ing] funds for ISIS." (*Fields* AC ¶ 353.) But under the ATA, "the overt act must be the act of international terrorism that injures the plaintiff." *Bernhardt*, 47 F.4th at 873; *see also Freeman*, 57 F.4th at 80 (ATA conspiracy claim must allege "ways by which the acts of

international terrorism furthered the Conspiracy").  The overt act cannot be, as the *Fields* AC suggests, Lafarge's payments to intermediaries that allegedly reached ISIS.

Because the Complaints do not allege that the injury-causing acts of terrorism were carried out to further the purported conspiracies to provide material support or to carry out acts of international terrorism, the conspiracy claims should be dismissed for this reason as well.[22]

### C.    The Complaints Do Not Allege That Lafarge Cyprus Participated in Any Alleged Conspiracy.

The JASTA conspiracy claims against Lafarge Cyprus should be dismissed for the separate reason that there are no allegations that Lafarge Cyprus participated in any alleged conspiracy.  As with any conspiracy claim, the complaint must allege the elements of a JASTA conspiracy as to each defendant.  *See, e.g.*, *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 513 (S.D.N.Y. 2009) (for a conspiracy claim under the Sherman Act, the complaint "must make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy").  Here, the Complaints do not make any specific conspiracy-related allegations against Lafarge Cyprus.  At most, the *Finan* 2AC and *Fields* AC allege that Lafarge Cyprus entered into a loan agreement with LCS in 2011, and the pleadings baselessly allege that the proceeds were used "for the purpose of maintaining its conspiracy with ISIS and ANF."  (*See Finan* 2AC ¶ 216, *Fields* AC ¶ 239.)  There are no allegations that Lafarge Cyprus entered into any agreement with an FTO.  The JASTA conspiracy claims against Lafarge Cyprus must be dismissed on this additional basis.

## IV.    THE THIRD AND FOURTH COUNTS IN *FIELDS* (ASSERTING PRIMARY LIABILITY) FAIL AS A MATTER OF LAW.

Unlike the *Finan* and *Foley* actions, the *Fields* AC adds claims for primary liability under

---

[22]    As discussed above, the alleged conspiracy to "maintain territorial control" fails for want of a common purpose between the Defendants and any FTO.

the ATA.  Primary liability "afford[s] relief only against the perpetrators of the terrorist attacks, not against secondary, supporting actors."  *Siegel*, 933 F.3d at 222.  To state a claim for primary liability under 18 U.S.C. § 2333(a), a complaint must allege "(1) an injury to a U.S. national, (2) an act of international terrorism [carried out by the defendant], and (3) causation."  *Freeman v. HSBC Holdings PLC*, 413 F. Supp. 3d 67, 82 (E.D.N.Y. 2019), *aff'd on other grounds*, 57 F.4th 66 (2d Cir. 2023), *cert. denied*, No. 22-1117, 2023 WL 6377871 (U.S. Oct. 2, 2023).  The *Fields* claims for primary liability fail because they cannot establish two of the three required elements; they fail to allege that any of the Defendants:  (i) committed an act of international terrorism, and (ii) proximately caused the *Fields* Plaintiffs' injuries.

### A.    The *Fields* AC Fails to Allege That Any of the Defendants Committed an Act of International Terrorism.

To adequately plead an "act of international terrorism," the *Fields* AC must allege that each of the Defendants' conduct (1) "violate[d] federal or state law if committed within this country"; (2) "involv[ed] violence or endanger[ed] human life"; (3) "appear[ed] to be intended to intimidate or coerce a civilian population or to influence or affect a government"; and (4) "occurred primarily outside the territorial jurisdiction of the United States or transcend[ed] national boundaries."  *Linde*, 882 F.3d at 326.  The *Fields* AC fails to allege the second and third prongs as to both primary liability counts, and also fails to allege the first prong as to Count III.

### 1.    The *Fields* AC Fails to Allege That the Defendants Committed Acts That Were Violent or Dangerous to Human Life.

As an initial matter, there is no suggestion (nor could there be) that any of the Defendants actually committed an injury-causing act of terrorism.  The *Fields* AC alleges only that the Defendants provided financial assistance that, it claims, was dangerous to human life because it "enabled ISIS to finance its violent attacks and recruit individuals to carry out those attacks." (*Fields* AC ¶ 365.)    Yet multiple courts have held that financial assistance to a terrorist

organization (even assistance that might constitute "material support") is insufficient to show "the kind of direct connection to violence or endangerment of human life that would render" such assistance an "act[] of international terrorism" itself. *King v. Habib Bank Ltd.*, No. 20 Civ. 4322 (LGS), 2022 WL 4537849, at *5 (S.D.N.Y. Sept. 28, 2022) (dismissing primary liability claims as legally insufficient where the complaint alleged only that defendants "provided financial services to terrorists and the purpose of these transactions was to provide illegal support to terrorists engaged in extreme violence"); *see also Linde*, 882 F.3d at 326 ("[T]he provision of material support to a terrorist organization does not invariably equate to an act of international terrorism."); *Kaplan v. Lebanese Canadian Bank, SAL*, 405 F. Supp. 3d 525, 532 (S.D.N.Y. 2019) (primary liability allegations failed as a matter of law where defendant bank did not perpetrate the attacks that injured plaintiffs but rather provided financial services, which services were not themselves dangerous to human life), *vacated in part on other grounds*, 999 F.3d 842 (2d Cir. 2021). This shortcoming alone requires dismissal of the primary liability claims.

### 2.    The *Fields* AC Fails to Allege That Any of the Defendants Acted with an Apparent Terrorist Intent.

In addition, the *Fields* AC fails to allege that any of the Defendants acted with a "terrorist intent, *i.e.*, intent 'to intimidate or coerce a civilian population' or 'influence the policy of a government by intimidation.'" *King*, 2022 WL 4537849, at *4 (quoting 18 U.S.C. § 2331(1)(B)). Importantly, a complaint must "allege not that the incidents that injured [plaintiffs] meet this standard, but that the actions undertaken by [the defendants] . . . meet this standard." *Zapata v. HSBC Holdings PLC*, 414 F. Supp. 3d 342, 359 (E.D.N.Y. 2019) (Garaufis, J.), *aff'd*, 825 F. App'x 55 (2d Cir. 2020). The intent inquiry encompasses "an objective standard to recognize the apparent intentions of actions." *Weiss v. Nat'l Westminster Bank PLC*, 993 F.3d 144, 154, 161 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 2866 (2022). In *Zapata*, for instance, this Court dismissed claims

predicated on the defendant banks' alleged support of Mexican drug cartels. *Zapata*, 414 F. Supp. 3d at 347–48. The Court found dispositive that the plaintiffs' complaint "unmistakably set[] forth" a "plausible alternative explanation for [defendants'] conduct: greed." *Id.* at 358. The Court explained that "to an objective observer, [defendants'] conduct appeared to be motivated by economics, not by a desire to intimidate or coerce." *Id.* at 359. Similarly, the court in *Stansell v. BGP, Inc.*, No. 8:09-cv-2501-T-30AEP, 2011 WL 1296881 (M.D. Fla. Mar. 31, 2011), dismissed a primary liability claim where the allegation that the defendants "made payments to the FARC in exchange for the FARC's agreement to allow [Defendants] to conduct [their] oil exploration activities without fear of terrorist acts . . . . would not lead an objective observer" to conclude that the defendants acted with a terrorist intent. *Id.* at *9 (alterations in original).

So too here. For much the same reasons as applied to the secondary liability pleading, the primary liability pleading fails to allege intent. The *Fields* AC trains its focus on "[t]he actual and apparent intent of the acts *for which* Defendants provided material assistance to ISIS," alleging that the *terrorists* themselves possessed the requisite scienter in perpetrating the alleged attacks. (*Fields* AC ¶ 366.) This is plainly insufficient to allege intent on the part of *Defendants*.

The *Fields* AC does not allege any facts whatsoever to support its additional fleeting and conclusory assertion—which this Court should disregard for purposes of adjudicating these Motions—that "Lafarge and LCS" (not Lafarge Cyprus) "joined forces with the terrorists to help them maintain and expand their control." (*See id.* ¶ 112.) To the contrary, the allegations in the *Fields* AC regarding Defendants' intent actually dispose of Plaintiffs' claims. *Zapata*, 414 F. Supp. 3d at 359. As already noted, the SOF—which is "incorporate[d]" in the *Fields* AC "in its entirety to the extent not inconsistent with [its] allegations" (*id.* ¶ 24)—expressly disclaims any notion that Lafarge or LCS harbored an intent to promote terrorism. (*See* SOF ¶¶ 17, 111.) And

66

the *Fields* AC otherwise "unmistakably sets forth . . . a plausible . . . explanation for [Defendants']

conduct" other than terrorist intent, *Zapata*, 414 F. Supp. 3d at 358—namely, that Defendants

sought to ensure the continued operation of the Cement Plant and "increase[] profits." (*See Fields*

AC ¶¶ 126, 140.) Were that not enough, the original *Fields* Complaint alleged the additional

motive that Lafarge sought to "gain protection from the terrorists." (*Fields*, ECF No. 1 ¶¶ 61, 65.)

The *Fields* Plaintiffs cannot evade this judicial admission through artful amendment.

Because the *Fields* AC pleads no facts to suggest that any of the Defendants' actions were

intended to "intimidate or coerce," but instead affirmatively states that Defendants' conduct was

motivated by other factors that do not give rise to primary liability, the primary liability claims fail

as a matter of law. *See Zapata*, 414 F. Supp. 3d at 359; *accord Stansell*, 2011 WL 1296811, at *9.

### 3.    The *Fields* AC Also Fails to Allege a Statutory Predicate for Count III.

Count III of the *Fields* AC fails for the additional reason that it does not allege facts

necessary to establish that the Defendants committed a predicate statutory violation. Count III

asserts that the Defendants violated 18 U.S.C. § 2339A. (*Fields* AC ¶ 360.) But the Defendants

were not charged under Section 2339A, which requires a showing that a defendant provided

"material support or resources . . . *knowing or intending that they are to be used in preparation*

*for, or in carrying out, a violation of*" one or more of a lengthy list of specified criminal statutes.

18 U.S.C. § 2339A. The *Fields* AC not only fails to allege facts sufficient to show such heightened

knowledge, but it also fails to specify the further statutory violation that forms a required part of

Section 2339A. For this reason as well, the Court should dismiss Count III.

### B.    The *Fields* AC Fails to Allege That the Defendants' Supposed Conduct Proximately Caused the *Fields* Plaintiffs' Injuries.

The third prong of an ATA primary liability claim requires plaintiffs to establish that they

were injured "by reason of" each of the defendants' conduct. 18 U.S.C. § 2333(a). Consistent

67

with past authority, the Second Circuit has held that this element "requir[es] proof of proximate cause." *Rothstein v. UBS AG*, 708 F.3d 82, 95 (2d Cir. 2013). This means that the complaint must show "a sufficiently direct relationship between the conduct in question and the injuries for which recovery is sought." *Zapata*, 414 F. Supp. 3d at 356; *accord Linde*, 882 F.3d at 331 ("[P]roximate causation demands some direct relation between the injury asserted and the injurious conduct alleged."). Importantly, "foreseeability alone is not [enough] to establish proximate cause." *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 201 (2017).

Courts consistently have dismissed primary liability claims for failure to allege the necessary proximate causal link between conduct and injury. *See, e.g.*, *Zapata*, 414 F. Supp. 3d at 356 (dismissing primary liability claim where the requisite "direct link between the conduct . . . and injuries . . . [was] entirely lacking in the complaint"); *see also Fields v. Twitter, Inc.*, 881 F.3d 739, 749–50 (9th Cir. 2018) (affirming dismissal where plaintiffs "allege[d] no connection between the shooter [in the relevant ISIS attack] . . . and Twitter"). In *Zapata*, for example, the primary liability claims were predicated on the theory that the defendant banks facilitated Mexican drug cartels' money laundering, thereby causing the injuries that plaintiffs suffered at the hands of the cartels. 414 F. Supp. 3d at 346. The Court held that the complaint had not alleged proximate causation, noting the absence of an allegation of "any relationship between [defendants'] money laundering and the acts of violence perpetrated against [plaintiffs]." *Id.* at 356. In particular, the Court emphasized the failure to allege that the cartels "require *laundered* money to carry out any acts of violence in Mexico, let alone the specific atrocities inflicted upon Plaintiffs" and the lack of any "plausible inference that the Cartels would not be able to commit these acts of violence without [defendants] first laundering their money." *Id.*

Again echoing a dispositive flaw in its secondary liability claims, the *Fields* AC is deficient

in attempting to plead primary liability.  First, the claims depend on an inference that Defendants' payments to intermediaries in Syria, which stopped in 2014[23] (SOF ¶ 113), caused injuries suffered in three different countries years later:  in Jordan in 2015, France in 2016, and Spain in 2017. Although the *Fields* AC claims that these payments "from 2013-2014" assisted ISIS "as late as 2017" (*Fields* AC ¶¶ 216, 224), it offers no specific allegations to support those assertions.  In any event, the alleged injury-causing attacks took place too long after and much too far away from the alleged payments themselves to establish proximate causation.  *See, e.g.*, *In re Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. 3d 631, 659 (S.D.N.Y. 2018) (granting motion to dismiss after finding no proximate causation where aid provided to al-Qaeda's efforts in Europe, Africa, the Middle East, and the Far East during the 1980s and 1990s was "too temporally and geographically remote" to "bear any definite and specific, articulable connection to the 9/11 Attacks [in New York] or those who carried them out"); *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 474, 507 (E.D.N.Y. 2012) (concluding as a matter of law that "a small contribution made long before the [terrorist] event" did not support a finding of proximate causation).  Nor does the *Fields* AC allege any "definite and specific, articulable connection" between the cement ISIS supposedly purchased from LCS or seized following LCS's evacuation of the Cement Plant in September 2014 and a shooting in Jordan in 2015, a cargo truck attack in France in 2016, or a van attack in Spain in 2017. *See In re Terrorist Attacks*, 298 F. Supp. 3d at 659.

Second, any causal chain the *Fields* AC attempts to construct between the Defendants and Plaintiffs' injuries is further attenuated by the presence of intervening parties—not only the intermediaries but also the individual perpetrators who independently conducted the actual alleged

---

[23]  The *Fields AC* makes only conclusory allegations that Defendants' payments to an intermediary continued after the last alleged payment for prior work in October 2014, and makes no plausible allegations that such payments went to an FTO after 2014.

acts of terrorism.  *See, e.g.*, *Rothstein*, 708 F.3d at 92 ("[A]n intervening cause of the plaintiff's injury may foreclose a finding of proximate cause . . . ."); *Freeman*, 413 F. Supp. 3d at 92 n.32 (explaining that the presence of an intervening act "attenuates any meaningful connection" between the defendant and the injury-causing act); *Fields*, 881 F.3d at 745 (noting that a claim cannot satisfy a proximate causation requirement "if it require[s] the Court to move beyond the first step in the causal chain").[24]

Third, as in *Zapata*, "there is no plausible inference that" ISIS "would not [have been] able to commit these acts of violence" without the funds that the Defendants allegedly provided to intermediaries or the cement left behind in Syria years before.  414 F. Supp. 3d at 356.  Nor is the *Fields* AC's assertion that funds from the Defendants "allowed ISIS to create more explosives, capture more territory, recruit new members, disseminate extensive propaganda, and expand to new regions and countries" (*Fields* AC ¶¶ 13, 209–10, 234) adequate to plead proximate causation.  *See Zapata*, 414 F. Supp. 3d at 357 (rejecting as insufficient on a motion to dismiss plaintiffs' "conclusory" allegation "that the Cartels use[d] laundered money to purchase buildings, factories, equipment, weaponry, personnel, vehicles, aircraft, boats, submersible vessels, and raw materials, and that if the Cartels could no longer launder money they would cease to exist").  The allegations regarding the purported structure of ISIS's various "cells" lack sufficiently direct links between Defendants' purported conduct and the operations of those cells, much less between Defendants and the injury-causing acts of terrorism.  (*See, e.g.*, *Fields* AC ¶ 228.)  Bare allegations that a defendant's "material support . . . facilitated the [terrorist] organization's growth and ability to

---

[24]    The *Fields* AC's allegations regarding the various cells and individuals involved in "ISIS's funding apparatus" make this no less attenuated.  (*See Fields* AC § J.)  To the contrary, these allegations underscore that any purported link between Defendants and the alleged attacks is indirect and ridden with intervening actors.  (*See, e.g.*, *id.* ¶¶ 218, 227–28.)

plan and execute terrorist acts" are not nearly enough.  *Fields*, 881 F.3d at 750.

As with secondary liability, the *Fields* AC's primary liability theory of causation is tantamount to "imputing responsibility for [ISIS's] continued existence to Defendants," and would "effectively hold [Defendants] liable for all [ISIS] violence."  *See Zapata*, 414 F. Supp. 3d at 357. "[T]his is precisely the kind of unlimited, sprawling, and speculative liability that proximate cause forbids."  *Id.*  Because "a court cannot allow a plaintiff to proceed under § 2333(a) where he or she alleges only a remote, purely contingent, or overly indirect causal connection," *Freeman*, 413 F. Supp. at 84, the Court should dismiss the *Fields* AC's third and fourth causes of action.

## V.    IN ALL THREE CASES, THE IMPOSITION OF SECONDARY LIABILITY ON DEFENDANTS WOULD VIOLATE THE DUE PROCESS CLAUSE.

The Court should dismiss the secondary liability claims for the independent reason that the retroactive imposition of secondary liability on the Defendants would violate the Due Process Clause of the Fifth Amendment.

As noted above, the secondary liability claims are based on acts alleged to have occurred in 2013 and 2014.  But the ATA did not authorize secondary liability, for aiding and abetting or conspiracy to commit terrorist acts, until the enactment of JASTA two years later, on September 28, 2016.  JASTA § 4; *see also Linde*, 882 F.3d at 319–20 ("Initially, the ATA afforded civil relief only against the principals perpetrating acts of international terrorism.  It provided no civil action against secondary actors who, while not committing international terrorist acts themselves, facilitated such acts by others.").  Among other things, JASTA also authorized plaintiffs asserting claims of secondary liability to recover treble damages.  *See* 18 U.S.C. § 2333(a)–(d).  Congress provided that the "amendments" to the ATA reflected in JASTA "shall apply to any civil action . . . arising out of an injury to a person, property or business on or after September 11, 2001"—thus creating a fifteen-year period of retroactivity.  *See* JASTA § 7.

As applied to Defendants, JASTA's retroactive imposition of secondary liability violates due process.  The Supreme Court has emphasized repeatedly that the Constitution "discourages retroactive lawmaking."  *Opati v. Republic of Sudan*, 140 S. Ct. 1601, 1607 (2020); *accord, e.g.*, *Landgraf v. USI Film Prods.*, 511 U.S. 244, 266 (1994) ("[R]etroactive statutes raise particular concerns.").  Indeed, "[t]he principle that legislation usually applies only prospectively is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic." *Opati*, 140 S. Ct. at 1607.  The retroactive application of statutes authorizing punitive remedies, like JASTA, in particular "raise[s] a serious constitutional question." *Landgraf*, 511 U.S. at 281; *accord, e.g.*, *Opati*, 140 S. Ct. at 1609 ("[A]pplying new punishments to completed conduct can raise serious constitutional questions."); *see also Louis Vuitton S.A. v. Spencer Handbags Corp.*, 765 F.2d 966, 972 (2d Cir. 1985) ("[D]ue process generally does not permit retrospective application of statutes that cause especially harsh and oppressive consequences.").  For this reason, the Supreme Court has explained that it would "hesitate to approve the retrospective imposition of liability on any theory of deterrence or blameworthiness." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 17–18 (1976).  Drawing on this Supreme Court precedent, the New York Court of Appeals recently invalidated a state statutory provision that retroactively imposed "treble damages for past conduct" and consequently violated due process.  *Regina Metro. Co. v. N.Y. State Div. of Hous. & Cmty. Renewal*, 35 N.Y.3d 332, 384 (2020).

The circumstances of these cases compel the same conclusion.  To begin with, the secondary liability claims unquestionably depend on the retroactive application of JASTA.  The Complaints seek relief based on conduct that ceased long before the enactment of JASTA in

September 2016.[25]  (*See, e.g.*, *Foley*  ¶¶ 95, 161 (alleging that LCS abandoned the Cement Plant in September 2014 and that the final actual alleged payment to an intermediary occurred in October 2014); *Finan* 2AC ¶¶ 31, 215 (same); *Fields* AC ¶¶ 191, 238 (same).)  And the ATA did not authorize the imposition of secondary liability prior to the enactment of JASTA.  *See, e.g.*, *Rothstein*, 708 F.3d at 98 ("We doubt that Congress, having included in the ATA several express provisions with respect to aiding and abetting in connection with the criminal provisions, can have intended § 2333 to authorize civil liability for aiding and abetting through its silence.").

Applying JASTA to Defendants' pre-2016 alleged conduct leads to an especially acute due process violation, because it provides—and the Complaints seek—a punitive remedy in treble damages.  Punishment and deterrence are the essence of the ATA's and JASTA's remedial schemes, of which treble damages are an integral part.  *See, e.g.*, *Ests. of Ungar & Ungar ex rel. Strachman v. Palestinian Auth.*, 304 F. Supp. 2d 232, 240 (D.R.I. 2004) ("The punitive aspect and congressional intent to deter and punish those who commit terrorist acts permeate the statute and overshadow its compensatory aspects."); 162 Cong. Rec. S6116-03 (daily ed. Sept. 28, 2016) (statement of Sen. Richard Blumenthal) (explaining that JASTA would "send a message and deter violent crime in this country aided and abetted by foreign governments in the future"); 162 Cong. Rec. H5239-03 (daily ed. Sept. 9, 2016) (statement of Rep. Carolyn Maloney) (arguing that JASTA would be "a strong deterrent").

And, indeed, most courts analyzing the ATA's treble damages provision have deemed it

---

[25]  The Court should disregard Plaintiffs' conclusory assertion that the Defendants' alleged payments to intermediaries continued after October 2014, which the Complaints allege no facts to support.  (*See, e.g.*, *Finan* 2AC ¶¶ 50, 178 (stating only "[o]n information and belief" that unspecified "Defendants" made "ongoing payments after October 2014"); *Fields* AC ¶¶ 69, 200, 241 (same).).  The Complaints do not allege that Defendants' other purported acts of assistance to ISIS or ANF occurred after 2014, let alone in or after September 2016.

"overwhelmingly punitive." *See, e.g.*, *Ungar*, 304 F. Supp. 2d at 237.[26]  For precisely this reason, moreover, courts routinely have barred plaintiffs from recovering punitive damages under the ATA.  *See, e.g.*, *Smith ex rel. Smith v. Islamic Emirate of Afg.*, 262 F. Supp. 2d 217, 239–40 (S.D.N.Y. 2003) ("To the extent that § 2333's treble-damages provision already provides a penalty, this Court is foreclosed from assessing additional punitive damages against the al Qaeda defendants."), *amended*, No. 01 Civ.10132(HB), 2003 WL 23324214 (S.D.N.Y. May 19, 2003).

Because the retroactive application of JASTA's secondary liability provisions to the present cases would violate due process, the Court should dismiss each Complaint's claims for secondary liability on this basis as well.  *See, e.g.*, *Regina*, 35 N.Y.3d at 385–86.[27]

---

[26]  *See also*, *e.g.*, *Kaplan v. Al Jazeera*, No. 10 Civ. 5298, 2011 WL 2314783, at *4 (S.D.N.Y. June 7, 2011); *Caballero v. Fuerzas Armadas Revolucionarias de Colom.*, No. 1:18-cv-25337-KMM, 2020 WL 7481302, at *6 (S.D. Fla. May 20, 2020) (finding the treble damages provision of § 2333 "overwhelmingly punitive").

[27]  At a minimum, the Court should strike the request for punitive damages in the *Foley* Complaint.  *See, e.g.*, *Rosenberg v. Lashkar-e-Taiba*, No. 10-CV-5381 (DLI) (CLP), 2014 WL 12834840, at *27 n.33 (E.D.N.Y. Aug. 1, 2014) (explaining that punitive damages may not be awarded in addition to treble damages), *report and recommendation adopted*, No. 10-CV-5381 (DLI) (CLP) (E.D.N.Y. Sept. 10, 2014).  Notably, in amending their complaint in response to Lafarge's initial motion to dismiss (which raised this same argument), the *Finan* Plaintiffs withdrew their request for punitive damages.

## **CONCLUSION**

For the foregoing reasons, the Complaints should be dismissed in their entirety with prejudice.

Dated: New York, New York
      December 7, 2023

                                       */s/ Jay K. Musoff*
                                       Jay K. Musoff
                                       John Piskora
                                       Sarah Levitan Perry
                                       **LOEB & LOEB LLP**
                                       345 Park Avenue
                                       New York, NY 10154
                                       Telephone:     212-407-4212
                                       Facsimile:     212-407-4990

                                       *Attorneys for Lafarge S.A.,*
                                       *Lafarge Cement Holding Limited, and*
                                       *Lafarge Cement Syria S.A.*