**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

DIANE FOLEY, *et al.*,

               Plaintiffs,

     v.

LAFARGE S.A, *et al.*,

               Defendants.

Case No. 23-cv-05691-NGG-PK

JURY TRIAL DEMANDED

**OPPOSITION TO THE DEFENDANTS'
<u>MOTION TO DISMISS THE COMPLAINT</u>**

Served On:  January 22, 2024

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 3

    A.    Legal Background ............................................................................. 3

    B.    Factual Background ........................................................................... 5

    C.    The *Foley* Plaintiffs' Claims ........................................................ 11

STANDARD OF REVIEW ........................................................................................... 12

ARGUMENT ............................................................................................................... 12

I.   PLAINTIFFS SUFFICIENTLY PLEAD PERSONAL JURISDICTION............................ 12

    A.    Plaintiffs' Allegations Satisfy New York's Long-Arm Statute ........................... 12

        1.    Defendants transacted business in New York........................................... 13

            a.    Defendants intentionally caused their U.S.-dollar transactions to clear through New York banks ...................................................... 13

            b.    The complaint's example transactions are sufficient................... 17

            c.    Non-banks are not immune from New York jurisdiction ............. 19

            d.    Defendants' banks transacted in New York as their agents.......... 22

        2.    Plaintiffs' claims "arise from" the New York transactions ...................... 26

        3.    Alternatively, jurisdictional discovery is warranted ................................ 29

    B.    Plaintiffs Sufficiently Allege Personal Jurisdiction Under Rule 4(k)(2) ............. 30

II.  PLAINTIFFS SUFFICIENTLY PLEAD AIDING-ABETTING LIABILITY ...................... 36

    A.    General Awareness ........................................................................ 36

    B.    Knowing And Substantial Assistance ................................................ 40

        1.    Defendants culpably assisted ISIS's and ANF's terrorist attacks............. 41

        2.    Defendants' material support had a sufficient nexus to the attacks.......... 45

a.  The nexus allegations are sufficient................................................45

b.  Defendants' geographic distinctions are unpersuasive .................46

c.  Defendants' temporal distinctions are unpersuasive.....................49

III. PLAINTIFFS SUFFICIENTLY PLEAD CONSPIRACY LIABILITY ...............................50

IV. DEFENDANTS' CONSTITUTIONAL CHALLENGE LACKS MERIT............................53

V.  THE COURT SHOULD AT LEAST AUTHORIZE GOVERNMENT DISCOVERY ........55

CONCLUSION..........................................................................................................55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.I. Trade Fin., Inc. v. Petra Bank*,
  989 F.2d 76 (2d Cir. 1993) ..................................................................... 14

*Abecassis v. Wyatt*,
  785 F. Supp. 2d 614 (S.D. Tex. 2011) ..................................................... 4

*Al Rushaid v. Pictet & Cie*,
  68 N.E.3d 1 (N.Y. 2016) ................................................................. 21, 27

*Atchley v. AstraZeneca UK Ltd.*,
  22 F.4th 204 (D.C. Cir. 2022) ......................................................... passim

*AUSA Life Ins. Co. v. Ernst & Young*,
  206 F.3d 202 (2d Cir. 2000) ................................................................. 49

*Averbach v. Cairo Amman Bank*,
  2020 WL 486860 (S.D.N.Y. Jan. 21, 2020) .............................. 13, 19, 28

*Averbach v. Cairo Amman Bank*,
  2022 WL 2530797 (S.D.N.Y. Apr. 11, 2022) ...................... 36, 43, 44, 49

*Averbach v. Cairo Amman Bank*,
  2023 WL 5016884 (S.D.N.Y. June 30, 2023) ......................................... 28

*Bartlett v. Société Générale de Banque Au Liban SAL*,
  2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020) .................................. passim

*Berdeaux v. OneCoin Ltd.*,
  561 F. Supp. 3d 379 (S.D.N.Y. 2021) ............................................... 18, 21

*Bernhardt v. Islamic Rep. of Iran*,
  47 F.4th 856 (D.C. Cir. 2022) ................................................. 43, 44, 53

*Boim v. Holy Land Found. for Relief & Dev.*,
  549 F.3d 685 (7th Cir. 2008) ........................................................... 4, 49

*Bonacasa v. Standard Chartered PLC*,
  2023 WL 2390718 (S.D.N.Y. Mar. 7, 2023) .................................... passim

*Bonacasa v. Standard Chartered PLC*,
  2023 WL 7110774 (S.D.N.Y. Oct. 27, 2023) .............................. 13, 42, 45

*Brown v. Hutton Grp.*,
    795 F. Supp. 1307 (S.D.N.Y. 1992).....................................................53-54

*Brown v. Nat'l Bank of Pakistan*,
    2022 WL 1155905 (S.D.N.Y. Apr. 19, 2022)..................................... 29

*Butts v. N.Y.C. Dep't of Educ.*,
    2018 WL 4725263 n.8 (E.D.N.Y. Sept. 28, 2018) ................................ 6

*Canisius Coll. v. United States*,
    799 F.2d 18 (2d Cir. 1986).............................................................53, 54

*City Nat'l Specialty Co. v. Ashley Furniture Indus., LLC*,
    2022 WL 2918121 (E.D.N.Y. July 21, 2022)........................................ 54

*Cleveland v. Caplaw Enters.*,
    448 F.3d 518 (2d Cir. 2006)............................................................... 25

*Cmty. Fin. Grp., Inc. v. Stanbic Bank Ltd.*,
    2015 WL 4164763 (S.D.N.Y. July 10, 2015) ....................................... 18

*Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*,
    549 B.R. 56 (S.D.N.Y. 2016)............................................................. 16

*Cook Cnty. v. United States ex rel. Chandler*,
    538 U.S. 119 (2003)......................................................................... 54

*Daou v. BLC Bank, S.A.L.*,
    2021 WL 1338772 (S.D.N.Y. Apr. 9, 2021)......................................... 18

*Daou v. BLC Bank, S.A.L.*,
    42 F.4th 120 (2d Cir. 2022) .................................................18-19, 27, 29

*Dardana Ltd. v. Yugansknefteqaz*,
    317 F.3d 202 (2d Cir. 2003)............................................................... 30

*Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petrol. Corp.*,
    397 F. Supp. 3d 323 (S.D.N.Y. 2019).................................................. 20

*Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*,
    495 F. Supp. 3d 144 (E.D.N.Y. 2020) ........................................... passim

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
    141 S. Ct. 1017 (2021)...................................................................... 31

*Freeman v. HSBC Holdings PLC*,
    57 F.4th 66 (2d Cir. 2023) .....................................................51, 52, 53

iv

*Gen. Motors Corp. v. Romein*,
    503 U.S. 181 (1992)................................................................. 53

*Goldberg v. UBS AG*,
    660 F. Supp. 2d 410 (E.D.N.Y. 2009) ................................................. 4

*Great Bowery v. Best Little Sites*,
    609 F. Supp. 3d 1240 (D. Utah 2022)................................................ 32

*Gucci Am., Inc. v. Weixing Li*,
    135 F. Supp. 3d 87 (S.D.N.Y. 2015)................................................. 16

*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ....................................... 36, 42, 44, 50

*Henkin v. Qatar Charity*,
    2023 WL 2734788 (E.D.N.Y. Mar. 31, 2023).......................... 28, 29, 30, 39

*Honickman v. BLOM Bank SAL*,
    6 F.4th 487 (2d Cir. 2021) ........................................... 36, 38, 39, 41

*Hungerstation LLC v. Fast Choice LLC*,
    2020 WL 137160 (N.D. Cal. Jan. 13, 2020) ......................................... 33

*In re Chateaugay Corp.*,
    53 F.3d 478 (2d Cir. 1995)......................................................... 54

*In re Chiquita Brands Int'l, Inc.*,
    284 F. Supp. 3d 1284 (S.D. Fla. 2018) ...................................... 4, 44, 46

*In re Elec. Books Antitrust Litig.*,
    859 F. Supp. 2d 671 (S.D.N.Y. 2012)................................................ 52

*In re Platinum and Palladium Antitrust Litig.*,
    61 F.4th 242 (2d Cir. 2023) ..................................................... 33, 34

*In re Tether & Bitfinex Crypto Asset Litig.*,
    576 F. Supp. 3d 55 (S.D.N.Y. 2021).......................................... 17, 20, 32

*Kaplan v. Lebanese Canadian Bank, SAL*,
    999 F.3d 842 (2d Cir. 2021) .................................................. passim

*Khodeir v. Sayyed*,
    348 F. Supp. 3d 330 (S.D.N.Y. 2018).......................................... 25, 26

*King v. Habib Bank Ltd.*,
    2022 WL 4537849 (S.D.N.Y. Sept. 28, 2022)................................... passim

*King v. Habib Bank Ltd.*,
    2023 WL 8355359 (S.D.N.Y. Dec. 1, 2023) ............................................................ 13, 42, 45

*Lancaster v. Züfle*, 165 F.R.D. 38 (S.D.N.Y. 1996) ...................................................... 22

*Landsgraf v. USI Film Prods.*,
    511 U.S. 244, 281-82 (1994) ............................................................................... 54

*Licci ex rel. Licci v. Lebanese Canadian Bank*,
    984 N.E.2d 983 (N.Y. 2012) ............................................................. 14, 26, 27, 28

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013) ........................................................................ passim

*Lynch v. City of New York*,
    952 F.3d 67 (2d Cir. 2020) ................................................................................... 12, 49

*MacDermid, Inc. v. Deiter*,
    702 F.3d 725 (2d Cir. 2012) ................................................................................ 31, 32

*McNamee v. Clemens*,
    762 F. Supp. 2d 584 (E.D.N.Y. 2011) ............................................................... 29

*Mwani v. Bin Laden*,
    417 F.3d 1 (D.C. Cir. 2005) ................................................................................ 35

*Opati v. Rep. of Sudan*,
    140 S. Ct. 1601 (2020) ......................................................................................... 40, 53

*Owens v. Rep. of Sudan*,
    864 F.3d 751 (D.C. Cir. 2017) ................................................................ 40, 47, 48, 49

*Pension Benefit Guar. Corp. v. R.A. Gray & Co.*,
    467 U.S. 717 (1984) .............................................................................................. 53

*Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*,
    172 F. Supp. 3d 700 (S.D.N.Y. 2016) ................................................................ 18

*Przewozman v. Qatar Charity*,
    2023 WL 2562537 (E.D.N.Y. Mar. 17, 2023) .............................................. passim

*Regina Metro. Co., LLC v. New York State Div. of Hous. & Cmty. Renewal*,
    154 N.E.3d 972 (N.Y. 2020) ................................................................................ 54

*Sanders v. Allison Engine Co.*,
    703 F.3d 930 (6th Cir. 2012) .............................................................................. 54

*Schansman v. Sberbank of Russia PJSC*,
    565 F. Supp. 3d 405 (S.D.N.Y. 2021) .......................................................... 13, 19

*Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*,
  22 F.4th 103 (2d Cir. 2021) ................................................................ 33-34

*Shadburne-Vinton v. Dalkon Shield Claimants Tr.*,
  60 F.3d 1071 (4th Cir. 1995) ..................................................................... 53

*Siegel v. HSBC N. Am. Holdings, Inc.*,
  933 F.3d 217 (2d Cir. 2019) ................................................................. 39, 40

*Singer v. Bank of Palestine*,
  2021 WL 4205176 (E.D.N.Y. Apr. 30, 2021) ................................... 28, 29

*Sotloff v. Syrian Arab Republic*,
  525 F. Supp. 3d 121 (D.D.C. 2021) .................................................... 34, 50

*Spetner v. Palestine Inv. Bank*,
  70 F.4th 632 (2d Cir. 2023) ............................................................. passim

*Stansell v. BGP, Inc.*,
  2011 WL 1296881 (M.D. Fla. Mar. 31, 2011) ........................................ 50

*Stansell v. Revolutionary Armed Forces of Colombia*,
  2022 WL 17830551 (S.D.N.Y. Dec. 21, 2022) ....................................... 54

*Strauss v. Crédit Lyonnais, S.A.*,
  175 F. Supp. 3d 3 (E.D.N.Y. 2016) ................................... 13, 15, 19, 28

*Strauss v. Crédit Lyonnais, S.A.*,
  925 F. Supp. 2d 418 (E.D.N.Y. 2013) .................................................... 49

*Twitter, Inc. v. Taamneh*,
  598 U.S. 471 (2023) ........................................................................ passim

*UMG Recordings, Inc. v. Kurbanov*,
  963 F.3d 344 (4th Cir. 2020) ................................................................... 31

*United States v. Davis*,
  183 F.3d 231 (3d Cir. 1999) .................................................................... 52

*United States v. Khalupsky*,
  5 F.4th 279 (2d Cir. 2021) ................................................................. 52, 53

*Universal Trading & Inv. Co. v. Tymoshenko*,
  2012 WL 6186471 (S.D.N.Y. Dec. 12, 2012) ........................................ 21

*Usery v. Turner Elkhorn Mining Co.*,
  428 U.S. 1 (1976) .................................................................................... 53

*Vasquez v. H.K. & Shanghai Banking Corp.*,
    477 F. Supp. 3d 241 (S.D.N.Y. 2020)......................................................... 18

*Waldman v. Palestine Liberation Org.*,
    835 F.3d 317 (2d Cir. 2016)....................................................................34-35

*Wildman v. Deutsche Bank Aktiengesellschaft*,
    2022 WL 17993076 (E.D.N.Y. Dec. 29, 2022) ..................................... 37, 38

*Will Co. v. Lee*,
    47 F.4th 917 (9th Cir. 2022) ........................................................................ 31

*Zobay v. MTN Grp. Ltd.*,
    2023 WL 6304961 (E.D.N.Y. Sept. 28, 2023) ................................... passim

**Statutes**

18 U.S.C. § 2333(a) ............................................................................................ 4

18 U.S.C. § 2333(d) .......................................................................................... 36

18 U.S.C. § 2333(d)(2) ...................................................................................... 36

18 U.S.C. § 2336(b) .......................................................................................... 55

Pub. L. No. 114-222, 130 Stat. 852 (2016)
    (Justice Against Sponsors of Terrorism Act)................................. 4, 42, 54

**Rules**

Federal Rule of Civil Procedure 4(k)(1)(A)...................................................... 12

Federal Rule of Civil Procedure 4(k)(2) ........................................................... 33

Federal Rule of Civil Procedure 12(b)(6) ......................................................... 55

New York Civil Practice Law and Rules Section 302(a)(1)....................... passim

**Other Authorities**

Plea Agreement, *United States v. Lafarge S.A.*, No. 22-cr-00444-WFK
    (E.D.N.Y. Oct. 18, 2022), Dkt. 10 ............................................................ 11

Restatement (Third) of Agency § 1.01 ............................................................. 25

S. Rep. No. 102-342............................................................................................ 3, 4

## INTRODUCTION

This lawsuit seeks civil damages from the first corporation in U.S. history convicted of paying a designated terrorist group. Roughly one year ago, Lafarge[1] and its Syrian subsidiary pleaded guilty in this District to conspiring to provide material support to two such groups. The details were even more shocking than the plea itself. As an Assistant Attorney General stated, Lafarge "routed nearly six million dollars in illicit payments to two of the world's most notorious terrorist organizations – ISIS and al-Nusrah Front ["ANF"] in Syria – at a time those groups were brutalizing innocent civilians in Syria and actively plotting to harm Americans."

Plaintiffs are the American victims of Lafarge's crimes. They are U.S. journalists, aid workers, and servicemembers – and their families – who were killed and injured in terrorist attacks committed by the groups Lafarge paid. Lafarge's criminal scheme culpably aided those attacks. Its reasons were simple: it operated a lucrative cement plant in northern Syria, and it decided that partnering with terrorists would help boost its profits from that plant. So Lafarge and two of its subsidiaries – the other Defendants here – devised a scheme to buy the terrorists' cooperation. They intentionally gave ISIS and ANF millions of dollars in cash and cement; negotiated a literal *revenue-sharing agreement* with ISIS; and went to extreme lengths to cover it all up. The consequences were tragic. Defendants knew ISIS and ANF wanted the money to fund brutal terrorist attacks, yet they chose to pay anyway. Those payments financed thousands of attacks and aided the individual terrorist operatives responsible for killing and maiming Plaintiffs. For that, Defendants are civilly liable under the Antiterrorism Act ("ATA").

---

[1] "Lafarge" is Defendant Lafarge S.A. Dkt. 1 ("Compl."), ¶ 12. The other Defendants are Lafarge subsidiaries Lafarge Cement Holding Limited ("Lafarge Cyprus") and Lafarge Cement Syria S.A. ("LCS"). Compl. ¶¶ 13-14. All complaint and docket cites are to the *Foley* action. This brief addresses the *Foley* Plaintiffs; the related *Finan* and *Fields* plaintiffs are concurrently filing their own briefs that incorporate the arguments here. *See* Order (Dec. 20, 2023).

The Court has personal jurisdiction over all three Defendants.  Defendants not only used U.S.-based email services and conspired with terrorists who targeted the United States, but also used New York banks to process the U.S.-dollar wire transfers on which their terrorist payoffs depended.  The complaint spells out why Defendants chose to transact in U.S. dollars and shows how they benefited from routing those transactions through New York.  Perhaps they could have executed their transactions elsewhere.  But had they avoided New York, their scheme would have become more expensive, less efficient, and harder to conceal.  For that reason, Defendants did not simply leave the U.S.-dollar routing details to their banks.  They injected themselves into the execution process, intentionally reaping the benefit of efficient New York clearing and seeking to hide behind the legitimizing U.S.-dollar execution provided by New York banks.

Defendants' motion to dismiss ("Mot.") largely ignores these jurisdictional allegations, discarding them as "conclusory" despite the 50-plus paragraphs supporting them.  The Court should credit the allegations as pleaded, not rewrite them to conform to the caricature Defendants present.  And once the New-York-banking allegations are accepted, Defendants' arguments crumble.  Factual nitpicks aside, Defendants' jurisdictional challenge reduces to the theory that Plaintiffs were required to confirm (without discovery) the precise routing details for more than the three example wires the complaint identifies.  That argument misreads New York's long-arm statute – which is a "single act statute" – and defies basic pleading principles.  Lafarge admitted in its guilty plea that it cleared at least one pivotal transaction through a bank in this District – enough on its own to satisfy New York's single act statute.  The complaint's three hyper-detailed examples also raise a strong inference that Defendants' other U.S.-dollar wires similarly cleared through New York.  And when Defendants' banks executed those wires, they did so as Defendants' agents, subject to Defendants' control.  The Second Circuit requires nothing more.

On the merits, Defendants attack a theory Plaintiffs never pleaded. Defendants have no answer for the complaint as written, so they pretend (at 3) it alleges liability "for the sole reason that Lafarge and LCS pleaded guilty." The guilty plea is important, but it is far from the sole basis for Plaintiffs' allegations. Indeed, the complaint lays out Defendants' conduct in vivid detail – including by citing emails and transactions beyond those the plea identifies – to connect Defendants' criminal scheme to the individual attacks at issue. In doing so, the complaint disclaims any theory that Lafarge's plea makes it liable "in perpetuity and worldwide" for all terrorist violence. Mot. at 3. But it *does* allege that Defendants' payments aided *these* attacks. And it links the payments to the attacks with a granularity – down to the individual terrorists involved – far surpassing what other decisions have sustained. If even this level of detail were inadequate, nearly all the recent ATA cases in this Circuit would have come out the other way.

In the end, ATA liability hinges on a defendant's culpability, and the culpability here is breathtaking. Defendants *admittedly* met with ISIS and ANF; gave multimillion-dollar bribes to both groups knowing full well they were violent terrorists; and openly mused about how ISIS was good for business – all while their agents emailed them things like "[o]ur negotiations with ISIS are going better now, and I'm confident that we can reach [ ] a logical agreement with them." It is no surprise federal prosecutors charged Lafarge with a crime. As Deputy Attorney General Lisa Monaco observed, Lafarge "partnered with ISIS, one of the most brutal terrorist organizations the world has ever known, to enhance profits and increase market share." If that is not culpable enough to violate the ATA, nothing ever will be. The motion should be denied.

## BACKGROUND

### A.    Legal Background

Congress enacted the ATA in 1992 to "open[ ] the courthouse door to victims of international terrorism." S. Rep. No. 102-342, at 45 (1992). The ATA's private cause of action

reflected Congress's dual objectives of "providing victims of terrorism with a remedy" and stopping "the flow of money" to terrorists.  *Id.* at 22.  Congress thus originally designed the statute's civil remedy to impose "liability at any point along the causal chain of terrorism."  *Id.*

In the ensuing years, courts often applied the ATA to impose liability on secondary actors that financed terrorist groups.[2]  Courts divided on the legal theory for such funding-based liability:  some held terrorist funders were directly liable for themselves committing an "act of international terrorism," 18 U.S.C. § 2333(a); *see*, *e.g.*, *Boim*, 549 F.3d at 689-90, while others held them secondarily liable as aiders-abettors, *see*, *e.g.*, *Abecassis*, 785 F. Supp. 2d at 645-49.

Congress resolved that disagreement in the Justice Against Sponsors of Terrorism Act, Pub. L. No. 114-222, 130 Stat. 852 (2016) ("JASTA"), which codifies "causes of action for aiding and abetting and conspiracy liability."  *Id.* § 2(a)(4).  In recognizing secondary liability, Congress found that companies that "contribute material support or resources, directly or indirectly, to [terrorist groups]" threaten "vital interests of the United States."  *Id.* §§ 2(a)(1), (6).  Congress's "purpose" was to "provide civil litigants with the broadest possible basis . . . to seek relief against" entities that contribute resources "directly or indirectly" to terrorists.  *Id.* § 2(b).

Congress also designed the ATA to "extend[] the same jurisdictional structure" from "the reach of American criminal law to the civil remedies that it defines."  S. Rep. No. 102-342, at 45; *see* 18 U.S.C. § 2333(a).  The statute's broad jurisdictional structure reflects Congress's core finding:  terrorist funders "necessarily direct their conduct at the United States" and "should reasonably anticipate being brought to court in the United States."  JASTA § 2(a)(6).

---

[2] *See, e.g.*, *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685 (7th Cir. 2008) (en banc); *In re Chiquita Brands Int'l, Inc.*, 284 F. Supp. 3d 1284 (S.D. Fla. 2018); *Abecassis v. Wyatt*, 785 F. Supp. 2d 614 (S.D. Tex. 2011); *Goldberg v. UBS AG*, 660 F. Supp. 2d 410 (E.D.N.Y. 2009).  Unless otherwise specified, all internal quotations, brackets, emphases, and subsequent history are omitted from all case citations herein.

B.     **Factual Background**

**1.**     This case arises from Lafarge's first-of-its-kind guilty plea admitting that it illegally gave millions of "dollars in illicit payments to two of the world's most notorious terrorist organizations." Compl. ¶ 1.  Those organizations were ISIS and ANF, the same groups that attacked Plaintiffs and their family members.  *Id.* ¶¶ 45-60, 227.  Plaintiffs' allegations draw on a remarkable Statement of Facts ("SOF") – which Lafarge admitted in pleading guilty – laying out Defendants' criminal scheme in granular detail.  *Id.* ¶ 3.  But the complaint is based on more than Lafarge's guilty plea alone.  As Defendants concede (at 15), the complaint reflects "extensive pre-filing research in *Foley*" that supplements the facts Lafarge admitted.  These allegations tell the story of Defendants' terrorist bribes "in unusual detail," with "reference to hundreds of identified sources." *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th 204, 213 (D.C. Cir. 2022) (reversing dismissal of ATA claims).  They show how Defendants' crimes "aided the terrorist attacks that targeted Plaintiffs and their family members."  Compl. ¶ 6.

Defendants intentionally paid ISIS and ANF to facilitate their business interests in Syria. *Id.* ¶¶ 45-51, 88.  Lafarge entered the Syrian market in 2010, when it opened a lucrative cement plant near Jalabiyeh.  *Id.* ¶¶ 46-47.  A host of economic and political challenges soon imperiled Lafarge's ability to turn a profit from the plant.  *Id.* ¶¶ 31-38, 48-50.  At the time, the rapid proliferation of Syrian terrorist groups posed risks to businesses there and sparked an "exodus of multinational corporations from Syria."  Compl. ¶ 50 (quoting SOF ¶ 24).  But Lafarge chose to stay.  Sensing an opportunity to exploit the chaos and corner the Syrian market, Lafarge – acting through LCS, its Syrian subsidiary – decided to buy the terrorists' cooperation.  *Id.* ¶¶ 50-59.

That decision led Defendants to intentionally give millions of dollars to ISIS and ANF. *Id.* ¶¶ 54-78.  Those payments began in late 2012 or early 2013 and continued through at least October 2014.  *Id.* ¶ 61.  They included flat monthly "donations" to terrorists; volume-based

payments keyed to the amount of cement LCS sold; and payments to buy raw materials from ISIS-controlled suppliers. *Id.* ¶¶ 60-75. Internally, Defendants often likened those payments to "taxes" charged by ISIS. *Id.* ¶¶ 4, 81. Defendants also provided ISIS with LCS-manufactured cement, which was vital to its terrorist operations. *Id.* ¶¶ 76-78. All told, Lafarge admitted that these payments to terrorists were worth at least $5.92 million. *Id.* ¶ 54; SOF ¶ 19. But the complaint alleges that the true figure likely exceeded $15 million. Compl. ¶ 54.[3] The complaint also details how each individual Defendant – Lafarge and its two subsidiaries, Lafarge Cyprus and LCS – played a culpable role in orchestrating those payments. *Id.* ¶¶ 56-59, 96, 152.

Defendants did not stop with mere payments. They also extracted what they called a "durable agreement" from ISIS. *Id.* ¶ 79. Based on a trove of shocking emails, the complaint recites the negotiations through which Defendants secured ISIS's commitment to harm Lafarge's competitors while ensuring ISIS's continued control over its caliphate. *Id.* ¶¶ 55, 79-86, 214-16. To that end, Christian Herrault, Lafarge's EVP of Operations, touted in one internal email the "principle that we are ready to share the 'cake'" with ISIS. *Id.* ¶¶ 4, 17, 81. The logic of the "cake"-sharing was simple: by using revenue-sharing to align ISIS's incentives with its own, Lafarge secured ISIS's commitment to interdict cement from Lafarge's competitors. *Id.* ¶ 81. These and other internal emails reflected Defendants' sentiment that it was good for profits if ISIS stayed in power. *Id.* ¶¶ 55, 84-85, 214-16. As U.S. Attorney Breon Peace put it, Lafarge paid ISIS "not merely in exchange for permission to operate its cement plant – which would have been bad enough – but also to leverage its relationship with ISIS for economic advantage,

---

[3] Defendants criticize (at 7 n.2) this and other allegations for being based "on information and belief." *E.g*, Compl. ¶¶ 54, 153-54, 173-74. Pleading on information and belief is proper when, as here, the factual details rest within Defendants' exclusive control. *See Butts v. N.Y.C. Dep't of Educ.*, 2018 WL 4725263, at *9 n.8 (E.D.N.Y. Sept. 28, 2018) (Garaufis, J.).

seeking ISIS's assistance to hurt Lafarge's competition." *Id.* ¶¶ 10, 79.

Defendants knew all this conduct was illegal and went to great lengths to hide it from auditors, regulators, and law enforcement. *Id.* ¶¶ 5, 87-98, 177. One way they disguised their payments was by using consultants to secretly coordinate payment. *Id.* ¶¶ 61, 89. Defendants used two main cutouts – Firas Tlass and Amro Taleb – to direct their payments to ISIS and ANF and to obscure their own role in doing so. *Id.* ¶¶ 21-22, 52-53, 72-73, 89. For similar reasons, they instructed their cutouts to create shell companies outside Syria, *id.* ¶ 92; generated fake invoices to paper over the payments, *id.* ¶ 91; used pseudonyms and other code words, *id.* ¶¶ 82, 91; and opened a web of 54 hard-to-trace bank accounts to funnel the money, *id.* ¶ 179. They took these steps so they could falsely disclaim knowledge of the criminal scheme. *Id.* ¶¶ 89-97.

**2.** Defendants' multimillion-dollar payments financed the terrorist attacks that targeted Plaintiffs and their family members. *Id.* ¶ 99. Money was vital to ISIS's and ANF's ability to execute successful terrorist operations, and "tax" payments – like the ones Defendants made in Syria – supplied a crucial funding stream for both groups. *Id.* ¶¶ 100-05. Those payments translated directly into fighters, guns, and bombs the terrorists used to attack Americans, including Plaintiffs. *Id.* ¶¶ 106-12. Defendants also knew that ISIS and ANF were raising their so-called "tax" money to fund terrorist attacks. *Id.* ¶¶ 88, 106, 226. As a former LCS official acknowledged, the terrorists' "motivation" for demanding payment was "obvious: they wanted money! Money to use for arms, ammunition, and battalion funding." *Id.* ¶ 106. His assessment was accurate. Such payments, the United States' former U.N. Ambassador summarized, enabled ISIS to "pay its followers and fund attacks around the world." *Id.* ¶ 100.

The low marginal cost of each terrorist attack made Defendants' support particularly lethal. *Id.* ¶¶ 107-08. At the going per-attack rate, even just the $5.92 million Defendants

admittedly gave was more than enough to fund *thousands* of terrorist attacks – sufficient to kill every Plaintiff many times over. *Id.* ¶¶ 6, 109.  The complaint cites several credible sources, including one prominent DOD study, discussing the linear relationship between such terrorist donations and terrorist violence. *Id.* ¶¶ 109-11.  By pumping millions of dollars into those groups, Defendants enhanced the number of attacks each could execute. *Id.* ¶¶ 99-112.

The complaint also traces Defendants' payments to the individual attacks that killed and injured Plaintiffs. *Id.* ¶¶ 7, 115-46.  For each geography where the *Foley* Plaintiffs were attacked – Syria, Iraq, Turkey, and Niger – the "tax" money collected in Syria reached the local terrorist cells responsible for the attacks. *Id.* ¶¶ 115-23.  The complaint further connects Defendants' payments to the key terrorist operatives responsible for those attacks. *Id.* ¶¶ 124-46.  One was Abu Bakr al-Baghdadi, *id.* ¶¶ 124-30, ISIS's despicable leader whose "Leadership Cell" supervised each attack, and who personally raped Kayla Mueller (Ms. Mueller's estate and family are Plaintiffs), *id.* ¶¶ 130-32, 228, 230-32, 246-53.  Another was Abu Luqman, an ISIS leader in Raqqa (near Jalabiyeh) whom intelligence reports placed "on the shadow board of Lafarge's factory in Syria." *Id.* ¶ 138.  Luqman and his "Raqqa Cell" captured revenue from Defendants' payments and used it to orchestrate the attacks against Plaintiffs. *Id.* ¶¶ 134-40. Indeed, Luqman effectively commanded the "Beatles," an infamous ISIS hostage cell whose members were convicted of committing three of the heinous murders at issue. *Id.* ¶¶ 138(a), 230-32.  Through Luqman and others, Defendants' money funded the brutal attacks that killed and maimed Plaintiffs and their family members. *Id.* ¶¶ 115-46, 228-34, 267-68, 334-35.

**3.**    Defendants' scheme also led them to reach into the United States.  In pleading guilty to the crime of conspiring to provide material support to terrorists, Lafarge and LCS admitted that their "offense occurred in part within the United States." *Id.* ¶ 147.

    **a.**      Defendants' criminal scheme relied on New York's banking system to facilitate their U.S.-dollar transactions. *Id.* ¶¶ 148-52. New York banks served as *correspondents* and *intermediaries* for those transactions. *Id.* ¶¶ 152-61. That means that, when Defendants ordered wire transfers in U.S. dollars, they relied on New York banks to route the dollars and to facilitate settlement with their recipients' banks. *Id.* This process is often called *clearing*. *Id.* ¶ 151. In moving U.S. dollars into Dubai, Lebanon, and Syria, Defendants instructed their banks to execute U.S.-dollar wires that cleared through New York. *Id.* ¶¶ 8, 148, 152-54, 162-64, 189-96.

    Defendants intentionally chose to transact in U.S. dollars. *Id.* ¶¶ 152, 176-82. Dollars offered several advantages for Defendants' scheme: they helped Defendants conceal their payments by avoiding the red flags associated with making payments in Syria and in Syrian pounds; they let Defendants manage the foreign-exchange risk that threatened LCS's business; and they supplied ISIS and ANF with the terrorists' preferred currency. *Id.* ¶¶ 176-82. Defendants discussed these criteria internally and made a choice to transact in U.S. dollars when possible. *Id.* ¶¶ 152, 174, 190-91. As LCS CEO Bruno Pescheux told Tlass, "bank transfer[s] in USD" were Defendants' "preferred option" for making their payoffs. *Id.* ¶¶ 92, 152.

    Defendants' choice of currency led them to rely on New York's financial system. *Id.* ¶¶ 162-75, 183-88. The complaint alleges 23 examples of U.S.-dollar transactions and explains why Defendants used New York banks to clear them. *Id.* ¶¶ 153-54, 162-64. Defendants also originated those U.S.-dollar wires through two primary banks – Bank Audi Lebanon and BNP Paribas Egypt – whose standard settlement instructions called for execution through identified New York correspondent accounts. *Id.* ¶¶ 166-72. Defendants instructed each bank to execute in accordance with that standard practice. *Id.* ¶¶ 194-95. The complaint further identifies three examples – one wire transfer to Tlass, and two intracompany loans to LCS – in which Plaintiffs

have confirmed the New York clearing details.  *Id.* ¶¶ 173-75.  All these New York transactions were part of the terrorist-funding scheme:  they either paid Tlass and Taleb for bribing ISIS and ANF, or they sourced the U.S.-dollar capital LCS used to fund those payments.  *Id.* ¶¶ 155-61.

Defendants routed their transactions through the Clearing House Interbank Payments System ("CHIPS"), a New York-regulated clearing center for U.S.-dollar transfers.  *Id.* ¶¶ 151, 162-63.  CHIPS's involvement meant that New York banks – mainly, JPMorgan Chase and Citibank – cleared Defendants' U.S.-dollar transactions.  *Id.* ¶¶ 163, 166, 168, 193.  By sending their U.S.-dollar wires through CHIPS rather than off-shore centers, Defendants gained from the relative legitimacy and convenience afforded by New York's banking system.  *Id.* ¶¶ 176-88.

Defendants knew all this.  *Id.* ¶¶ 189-200.  Among other things, they requested and received SWIFT[4] confirmations disclosing the routing details for the wire transfers they ordered.  *Id.* ¶¶ 193-96.  In 2011, for example, Pescheux approved a U.S.-dollar wire after reviewing the SWIFT confirmation describing the New York routing.  *Id.* ¶ 193.  Defendants had good reason to involve themselves in such details.  Due to U.S. sanctions on Syria, Defendants struggled to move U.S. dollars to and from LCS, which impeded their terrorist-financing scheme.  *Id.* ¶¶ 180, l89-92.  So they instructed Tlass and Taleb to create shell companies outside Syria to which they could wire dollars through New York.  *Id.* ¶¶ 178, 187, 192.  They also opened a bank account in Cairo – nominally for Lafarge's Egyptian subsidiary – they could use to receive U.S. dollars for LCS's benefit.  *Id.* ¶¶ 170-71, 187, 192.  This so-called "LMEA Account," falsely named for the Egyptian subsidiary, allowed Defendants to route dollars through New York with impunity.  *Id.* Such machinations, the complaint explains, show how Defendants "were regularly and actively

---

[4] SWIFT refers to the Society for Worldwide Interbank Financial Telecommunication, which is the standard protocol for sending cross-border wire-transfer messages.  Compl. ¶ 193.

involved" in the decisions about "how to route their money." *Id.* ¶ 190.

**b.** Lafarge also admitted (SOF ¶ 18) to relying on U.S. email providers – mainly Gmail – to communicate about its scheme. Compl. ¶¶ 9, 201-13. Defendants' agents used Gmail, rather than their corporate email, to hide their conversations from auditors and regulators. *Id.* ¶¶ 201-02, 211-13. Because Gmail is an American service, U.S. legal protections impeded foreign agencies from easily accessing Defendants' emails. *Id.* ¶¶ 211-13. By sending their emails through the United States, therefore, Defendants concealed their scheme in reliance on U.S. infrastructure provided by a U.S. counterparty protected by U.S. law. *Id.* ¶¶ 204-12.

**4.** These events forced Lafarge and LCS to plead guilty in this District to the crime of conspiring to provide material support to ISIS and ANF. *Id.* ¶¶ 1, 3, 85-86. French authorities are also criminally prosecuting several former Lafarge and LCS executives responsible for the payments. *Id.* ¶ 98. Yet even after news of their criminal scheme emerged, Defendants refused to fully cooperate with DOJ's criminal investigation. *Id.* ¶ 86. As the Plea Agreement states, Lafarge's "criminal conduct" was "not voluntarily self-reported to the Department of Justice," which "did not receive timely and full cooperation with [its] investigation."[5]

### C. The *Foley* Plaintiffs' Claims

Plaintiffs are 58 Americans – including journalists, aid workers, and servicemembers (and their families) – whom ISIS and ANF killed or injured between 2013 and 2017. *Id.* ¶¶ 235-357. ISIS and ANF were designated Foreign Terrorist Organizations ("FTOs") before and during those attacks. *Id.* ¶¶ 33-35, 227. Each Plaintiff brings one ATA aiding-abetting claim (*id.* ¶¶ 358-366) and two ATA conspiracy claims (*id.* ¶¶ 367-385) against all three Defendants.

---

[5] Plea Agreement ¶ 7(f), *United States v. Lafarge S.A.*, No. 22-cr-00444-WFK (E.D.N.Y. Oct. 18, 2022), Dkt. 10.

**STANDARD OF REVIEW**

To survive a motion to dismiss for lack of personal jurisdiction, Plaintiffs need only "make a prima facie showing that jurisdiction exists." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL* ("*Licci IV*"), 732 F.3d 161, 167 (2d Cir. 2013). The Court accepts as true all well-pleaded allegations and "construe[s] the pleadings and any supporting materials in the light most favorable to the plaintiffs." *Id.* Similarly, on the motion to dismiss for failure to state a claim, the Court accepts as true Plaintiffs' well-pleaded allegations and "draw[s] all reasonable factual inferences" in Plaintiffs' favor. *Lynch v. City of New York*, 952 F.3d 67, 75-76 (2d Cir. 2020).

**ARGUMENT**

**I.     PLAINTIFFS SUFFICIENTLY PLEAD PERSONAL JURISDICTION**

Plaintiffs properly plead personal jurisdiction under two long-arm statutes and under constitutional due-process principles. *See Przewozman v. Qatar Charity*, 2023 WL 2562537, at *7 (E.D.N.Y. Mar. 17, 2023) (Garaufis, J.) (noting "two steps of analysis"). Jurisdiction exists under Federal Rule of Civil Procedure 4(k)(1)(A), which confers "personal jurisdiction over a defendant to the extent allowed by the law of the state in which [a federal court] sits." *Spetner v. Palestine Inv. Bank*, 70 F.4th 632, 639 (2d Cir. 2023). That test is met because New York's long-arm statute authorizes jurisdiction. *Infra* Part I.A. Alternatively, the Court has jurisdiction under Rule 4(k)(2), which applies when a defendant has constitutionally sufficient U.S. contacts but "is not subject to jurisdiction in any state's courts of general jurisdiction." *Infra* Part I.B.

**A.     Plaintiffs' Allegations Satisfy New York's Long-Arm Statute**

Personal jurisdiction first arises from N.Y. C.P.L.R. § 302(a)(1), which covers persons who "transact[] any business" in New York either directly or "through an agent." Both its elements are met here: (1) Defendants transacted business in New York, and (2) the New York contacts had some "articulable nexus" to Plaintiffs' claims. *Spetner*, 70 F.4th at 643-44.

12

### 1.    Defendants transacted business in New York

Defendants transacted business in New York by purposefully using New York correspondent banks to clear the cross-border U.S.-dollar transactions at the heart of their terrorist-financing scheme. *Supra* pp. 8-11.  Courts have long held that a defendant's "use of a correspondent bank account" can "involve[] transacting business" in New York.  *Spetner*, 70 F.4th at 639.  The "use of a New York correspondent bank account, standing alone," creates jurisdiction when "use of the correspondent account was purposeful."  *Licci IV*, 732 F.3d at 168.

In recent years, "a series of terrorism-financing cases in the Second Circuit" have applied *Licci* to uphold jurisdiction over foreign terrorist funders that "executed funds transfers in New York."  *King v. Habib Bank Ltd.* ("*King I*"), 2022 WL 4537849, at *2 (S.D.N.Y. Sept. 28, 2022), *reconsideration denied*, ("*King II*"), 2023 WL 8355359 (S.D.N.Y. Dec. 1, 2023).[6]  Those cases reflect the principle that a terrorist funder's "use of New York's banking system" can amount to "purposeful availment of the privilege of doing business in New York."  *Licci IV*, 732 F.3d at 171.  Defendants' use of New York's banking system supports personal jurisdiction here.

### a.    Defendants intentionally caused their U.S.-dollar transactions to clear through New York banks

Defendants repeatedly and purposefully executed U.S.-dollar wire transfers through New York banks.  Compl. ¶¶ 8, 148, 152-54, 162-64, 189-96.  The complaint supplies ample "specificity regarding the scope of the use of the [New York bank] account[s]" and "indication[s]

---

[6] *See, e.g.*, *Zobay v. MTN Grp. Ltd.*, 2023 WL 6304961, at *16 (E.D.N.Y. Sept. 28, 2023); *Bonacasa v. Standard Chartered PLC* ("*Bonacasa I*"), 2023 WL 2390718, at *5-7 (S.D.N.Y. Mar. 7, 2023), *reconsideration denied*, ("*Bonacasa II*"), 2023 WL 7110774 (Oct. 27, 2023); *Schansman v. Sberbank of Russia PJSC*, 565 F. Supp. 3d 405, 412-14 (S.D.N.Y. 2021), *reconsideration denied*, 2022 WL 4813472 (S.D.N.Y. Sept. 30, 2022); *Bartlett v. Société Générale de Banque Au Liban SAL*, 2020 WL 7089448, at *5-6 (E.D.N.Y. Nov. 25, 2020); *Averbach v. Cairo Amman Bank* ("*Averbach I*"), 2020 WL 486860, at *4-9 (S.D.N.Y. Jan. 21, 2020); *Strauss v. Crédit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 18-30 (E.D.N.Y. 2016).

of *why* the transfers were made 'through' New York." *Przewozman*, 2023 WL 2562537, at *12. It identifies the banks Defendants used to send their U.S.-dollar wires, Compl. ¶¶ 165-72; traces those banks to specific New York correspondent accounts, *id.* ¶¶ 166, 172; describes 23 exemplar U.S.-dollar transfers Defendants made using those banks, *id.* ¶ 154; and supplies New York clearing details for three of them, *id.* ¶¶ 173-74.  It also alleges – based on Defendants' sophisticated efforts to evade U.S. sanctions, *id.* ¶¶ 185-86 – that they intended their transactions to clear in New York.  *Id.* ¶¶ 189-200.  These allegations show Defendants' "purposeful" choice "to gain convenient access to New York's financial system." *Spetner*, 70 F.4th at 642.

Defendants' reliance on New York banks matched industry practice.  Compl. ¶¶ 162-64, 183, 185, 200.  Sophisticated companies like Lafarge typically route cross-border U.S.-dollar transactions through New York to gain from the speed and convenience of New York clearing. Runge Decl. ¶¶ 7-13.[7]  Such conduct often "shows purposeful availment of New York's dependable and transparent banking system, the dollar as a stable and fungible currency, and the predictable jurisdictional and commercial law of New York." *Licci IV*, 732 F.3d at 168 (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank* ("*Licci III*"), 984 N.E.2d 983, 900 (N.Y. 2012)).

Defendants sought those very benefits (and others) here.  Compl. ¶¶ 152, 176-92.  They chose to transact in U.S. dollars – calling "bank transfer[s] in USD" their "preferred option" for paying their terrorist intermediaries, *id.* ¶ 177 – for several reasons.  Concealment was the most important.  Because the United States imposed a suite of counterterrorism sanctions on Syria, *id.* ¶ 49 & n.23, transacting in Syrian pounds risked scrutiny from the very auditors and regulators

---

[7] "Runge Decl." is the Declaration of Sarah K. Runge (attached as Ex. A).  Ms. Runge is an expert in correspondent banking and terrorist finance, and her declaration explains why Defendants' jurisdictional arguments conflict with industry custom and practice concerning cross-border U.S.-dollar payments.  Runge Decl. ¶¶ 1-2.  The Court may consider her declaration for that purpose. *See A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 82-83 (2d Cir. 1993).

Lafarge was trying to evade, *id.* ¶¶ 176-79, 184.  So Defendants denominated their transfers in U.S. dollars – the global reserve currency for legitimate business dealings – to avoid "suspicion" of their terrorist payoffs.  *Id.* ¶ 178.[8]  Using U.S. dollars also shielded Defendants from Syria-specific foreign-exchange risk and supplied ISIS with its preferred currency.  *Id.* ¶¶ 180-82.

Similar considerations led Defendants to seek New York clearing.  Defendants knew what the Second Circuit has long recognized:  "bypass[ing] the United States to clear dollars" adds to a transaction's cost and risk.  *Spetner*, 70 F.4th at 641; *see* Compl. ¶¶ 185-88, 190-92; Runge Decl. ¶¶ 14-19, 21.  The risks Defendants faced were especially acute.  They knew they were illegally paying terrorists, and they (correctly) feared prosecution if anyone found out. Compl. ¶¶ 87-96, 179.  Routing money through New York reduced that risk.  Indeed, off-shore clearing centers for U.S. dollars – mostly in East Asia – would have been an unusual fit for Defendants' wires from France, Lebanon, and Egypt.  *Id.* ¶¶ 184-86; Runge Decl. ¶¶ 19, 22. Using such alternatives would have created operational headaches and attracted the scrutiny Defendants hoped to avoid.  Compl. ¶¶ 183-85.  For example, Defendants needed nobody to look too closely at one $210,000 wire Lafarge illegally sent to Tlass in Dubai for "Consulting Services."  *Id.* ¶¶ 95-96.  Wiring the $210,000 through New York made it look like an ordinary transaction.  *Id.* ¶¶ 173-74, 183-86.  Had Lafarge taken the odd step of sending the money through East Asia, it would have invited unwanted questions about what the money was for.  *Id.*

Defendants thus made three choices confirming that their "contact with New York was not random or fortuitous but sufficiently purposeful."  *Spetner*, 70 F.4th at 642.  *First*,

---

[8]  Defendants err (at 15-16) in touting their other transactions in Syrian pounds.  Section 302(a)(1) does not demand *exclusive* use of New York banks.  *See, e.g.*, *Strauss*, 175 F. Supp. 3d at 20-21 ("New York Transfers accounted for approximately 1.8% of the total").  Defendants' related assertion (at 21) that concealment "has no inherent link with New York" contradicts detailed allegations showing otherwise.  Compl. ¶¶ 152, 176-79, 184, 187; *see* Runge Decl. ¶ 22.

Defendants purposefully denominated their transactions in U.S. dollars, knowing that choice entailed use of New York banks.  Compl. ¶¶ 152-54, 162-64, 198-200; *see Off. Comm. of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*, 549 B.R. 56, 68 (S.D.N.Y. 2016) (upholding jurisdiction over defendants that "selected U.S. dollars as the currency in which to execute").  *Second*, Defendants intentionally used banks that advertised their New York-based U.S.-dollar clearing services.  Compl. ¶¶ 166-72, 197; *see Gucci Am., Inc. v. Weixing Li*, 135 F. Supp. 3d 87, 94 (S.D.N.Y. 2015) (bank "marketing" of "U.S. dollar wire transfers" showed purposeful availment).  *Third*, despite U.S. sanctions that blocked New York banks from processing payments for Syrian entities, Defendants structured their transactions to evade those sanctions and to maintain their access to New York clearing.  Compl. ¶¶ 186-92.  They took those steps because in 2013 New York banks had refused to process one of LCS's payments to Taleb, forcing LCS to find a costly, risky workaround to move the money.  *Id.* ¶¶ 186-87.

Defendants' response to that experience illustrates their "desire to benefit from New York's 'dependable and transparent banking system.' "  *Spetner*, 70 F.4th at 640 (quoting *Licci IV*, 732 F.3d at 171).  On learning that New York banks would not process dollars for Syrian entities, Defendants did not shift course to avoid New York; they started masking the connection to Syria.  Compl. ¶¶ 187, 192.  That is why Defendants created the "LMEA Account" in Cairo: so New York banks would process U.S. dollars for LCS that appeared to be for an Egyptian affiliate instead.  *Supra* p. 10.  It is also why Defendants told Tlass to set up a Dubai company: so they could wire him U.S. dollars through New York without becoming entangled in New York banks' compliance policies targeting Syria.  *Id.*; *see* Compl. ¶¶ 178, 187-92.  Defendants' efforts to "inject[] [themselves] into the payment process" reinforce that their "contact with New York" was "sufficiently purposeful" for jurisdiction.  *Spetner*, 70 F.4th at 641.

16

**b.    The complaint's example transactions are sufficient**

Defendants' lead argument (at 15-18, 22) is that the Court should consider only the "three transactions" for which Plaintiffs specify the New York clearing details, and that jurisdiction cannot rest on "so few transactions." *See* Compl. ¶ 173.  Both premises are wrong.

**i.**    The allegations raise a plausible inference that Defendants' use of New York's banking system was "repeated." *Spetner*, 70 F.4th at 640.  Plaintiffs allege 23 examples of U.S.-dollar transactions that Defendants cleared through New York banks.  Compl. ¶¶ 153-54.  They also supply New York clearing details for three of those examples. *Id.* ¶¶ 173-75.  These illustrations are "not exhaustive." *Id.* ¶ 153.  Such examples, together with the detailed factual context the complaint provides, "plausibly plead[] that there are additional correspondent bank [transactions] located in New York." *In re Tether & Bitfinex Crypto Asset Litig.*, 576 F. Supp. 3d 55, 89 n.26 (S.D.N.Y. 2021) (inferring "additional accounts" from alleged example).

Plaintiffs do not merely "assume" that these other transactions "*must* have been cleared through New York."  Mot. at 16-17.  To start, the complaint describes how Defendants purposefully sought to benefit from New York clearing. *Supra* pp. 14-16.  And authoritative sources establish that New York banks then cleared the vast majority of cross-border U.S.-dollar wires – with CHIPS responsible for more than 95% of them.  Compl. ¶¶ 162-63, 199-200.  Those allegations support an "inference that the New York [correspondent accounts] played a significant role" in Defendants' other transactions too. *Bonacasa I*, 2023 WL 2390718, at *7 n.13; *see* Runge Decl. ¶¶ 15-19 (refuting Defendants' inferences about U.S.-dollar execution).

The complaint also offers specific indications that Defendants "followed the norm and exploited the New York banking system."  Compl. ¶ 164.  Most importantly, Defendants executed their wire transfers through Bank Audi Lebanon and BNP Paribas Egypt, both of which published "standard settlement instructions" stating that they cleared U.S.-dollar transactions

through identified New York correspondent accounts.  *Id.* ¶¶ 167-68, 171-72.  They published those settlement protocols in the Bankers' Almanac, an authoritative compendium of international banking information.  *Id.* ¶¶ 168, 172; *see Spetner*, 70 F.4th at 638 (citing the Bankers' Almanac).  Their practice was thus to execute through New York.  Compl. ¶¶ 167, 172.

The examples themselves strengthen that inference.  For three of the 23 transactions, the complaint confirms the New York clearing – based on SWIFT documents for the first two (*id.* ¶ 193) and Lafarge's guilty plea for the third (SOF ¶ 103).  Those three transfers looked a lot like the other 20:  they involved the same parties, used the same currency, and served the same function.  Compl. ¶¶ 154-61.  It is implausible that Defendants routed just the three through New York while doing the opposite for the other 20.  Runge Decl. ¶¶ 23-24; *cf. Phoenix Light SF Ltd. v. Deutsche Bank Nat'l Tr. Co.*, 172 F. Supp. 3d 700, 713-14 (S.D.N.Y. 2016) (citing "industry[] practices" plus "specific examples" to sustain broad allegations of mortgage-fraud scheme).

**ii.**     Jurisdiction would also exist even had Defendants executed only the "three transactions" through New York they now concede (at 18).  Section 302(a)(1) is a "single act statute," meaning that even "one transaction in New York is sufficient to invoke jurisdiction." *Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, 129 (2d Cir. 2022).  Applying that principle, the Second Circuit recently rejected a district court's conclusion that a "relatively small number of specific correspondent transactions alleged" defeated jurisdiction.  *Id.  Daou* post-dates the three district-court decisions Defendants cite (at 22) and abrogates their reasoning.[9]  Under this binding

---

[9] *Cf. Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 404 n.26 (S.D.N.Y. 2021); *Vasquez v. H.K. & Shanghai Banking Corp.*, 477 F. Supp. 3d 241, 258 (S.D.N.Y. 2020); *Cmty. Fin. Grp., Inc. v. Stanbic Bank Ltd.*, 2015 WL 4164763, at *4 (S.D.N.Y. July 10, 2015).  The district court in *Daou* – whose reasoning the Second Circuit rejected, *see* 42 F.4th at 129 – had cited two of the same cases Defendants invoke here.  *See Daou v. BLC Bank, S.A.L.*, 2021 WL 1338772, at *8 (S.D.N.Y. Apr. 9, 2021) (citing *Vasquez* and *Stanbic* for same proposition as Defendants).

precedent, Plaintiffs need only "allege[] one or more transactions of business in New York." *Id.* at 130.  The complaint's three examples exceed that standard.  In fact, Lafarge has admitted (SOF ¶ 103) that one of those transactions – its October 2014 wire payment to Tlass – cleared through a bank in this District and caused its criminal "offense [to] occur[] in part within the United States."  Compl. ¶ 147.  Because § 302(a)(1) is a "single act statute," that admission alone establishes personal jurisdiction over Plaintiffs' claims arising from the same conduct.

The three examples also resemble what other cases have upheld.  Some courts have exercised jurisdiction without even a single concrete example.  *See, e.g.*, *Bonacasa I*, 2023 WL 2390718, at *6 ("complaint does not point to specific, [terror]-related transactions in New York").  Another court upheld jurisdiction based on "at least one" transaction "for each Defendant."  *Bartlett*, 2020 WL 7089448, at *5 n.2.  Yet another involved just "two identified transfers."  *Schansman*, 565 F. Supp. 3d at 414.  Still others involved five or six transfers.  *See Strauss*, 175 F. Supp. 3d at 23 ("five New York Transfers"); *Averbach I*, 2020 WL 486860, at *6 (citing case "involv[ing] only six New York-based" transfers).  And the transaction volumes in those cases were smaller than here.  *Compare* Compl. ¶ 173 (totaling $15.21 million), *with Schansman*, 565 F. Supp. 3d at 414 ("transfers amounting to $300"); *Strauss*, 175 F. Supp. 3d at 21 ("just $205,000").  The total "volume" of Defendants' multimillion-dollar payments matters at least as much as their "frequency."  *Przewozman*, 2023 WL 2562537, at *11.

### c.   Non-banks are not immune from New York jurisdiction

Defendants next assert (at 18-20) that correspondent-account-based jurisdiction cannot apply to "a *non-bank*."  That argument misapprehends New York law.  Section 302(a)(1) confers jurisdiction over any person who transacts in New York "through an agent."  Even more so than foreign banks, foreign companies that execute U.S.-dollar wires through "an agent's correspondent account" in New York transact business in this forum.  *Spetner*, 70 F.4th at 640.

19

*Spetner* undermines Defendants' banks-only theory of personal jurisdiction.  The Second Circuit there refused to "cabin jurisdiction to only the *owner*" of a New York correspondent account.  *Id.*  In fact, the *Spetner* defendant "did not hold a correspondent banking account in its *own* name with any bank in the United States."  *Id.* at 637.  Nor did it directly access any New York clearing service.  *Id.* at 638.  Rather, it ordered transfers through its "correspondent account" with the "Amman branch" of a Jordanian bank, the latter of which in turn executed through its own "correspondent banking accounts" in New York.  *Id.* at 637.  The Second Circuit held the defendant's "indirect access to New York's financial system" was enough.  *Id.* at 638.

True, the defendant in *Spetner* was another bank.  But the Second Circuit's reasoning did not turn on that distinction.  Rather, it invoked a broader principle:  that a "foreign entity can be subject to suit in New York based on the acts of its agent."  *Id.* at 640.  That logic applies to banks and non-banks alike.  So long as the executing bank "act[s] as [its client's] agent" in transacting through New York, jurisdiction over the client – whoever it is – is appropriate.  *Id.*

Defendants are mistaken (at 19) that "this doctrine has never been extended to non-banks."  At least three cases have upheld jurisdiction over non-banks based at least in part on their role in New York-cleared transactions.  *See Zobay*, 2023 WL 6304961, at *16 (applying *Licci* to telecommunications company that routed "$400,000 bribe" through New York); *Tether & Bitfinex Crypto*, 576 F. Supp. 3d at 88-89 (cryptocurrency executive who "facilitate[d] . . . access to the U.S. banking system"); *Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petrol. Corp.*, 397 F. Supp. 3d 323, 344-46 (S.D.N.Y. 2019) (Nigerian petroleum company that "transact[ed] business in U.S. dollars and use[d] United States bank accounts to  . . . transfer funds"), *aff'd in relevant part*, 40 F.4th 56 (2d Cir. 2022).  Defendants' contrary rule – restricting jurisdiction to banks while immunizing their more-culpable customers – would flout the ATA's

national-security purpose. *Supra* pp. 3-4. In *Licci*, after all, "it was Hizballah that directed the wire transfers through LCB's correspondent bank and not [the] defendant [bank]." *Al Rushaid v. Pictet & Cie*, 68 N.E.3d 1, 10 (N.Y. 2016). But under Defendants' theory, jurisdiction was limited to the bank and did not reach Hezbollah itself. That cannot be right.

Defendants' cases (at 18), which predate *Spetner* and do not involve ATA claims, are off-point. *Berdeaux*, for example, addressed a wire transfer that the customer did not "direct[ ]" and that was not "otherwise purposeful." 561 F. Supp. 3d at 402. The court found no jurisdiction on those facts but noted there could be "unusual circumstances" where a "customer" might "direct its foreign bank to use a New York-based correspondent account." *Id.* at 403 n.25. This case presents such circumstances. It involves sophisticated actors whose criminal enterprise hinged on sourcing U.S. dollars. Compl. ¶¶ 179-80, 190. Unlike in *Berdeaux*, they had ample "reason" to scrutinize how their dollars moved in and out of Syria. 561 F. Supp. 3d at 403 n.25.[10]

The broader rule Defendants try to draw from *Berdeaux* is flawed and cannot survive *Spetner*. Defendants ask (at 19) the Court to take from *Berdeaux* a blanket rule that only "foreign banks – *not* their customers" can purposefully avail themselves of New York correspondent accounts. But the relative role of any given customer in benefiting from New York banks is a fact question. Here, the complaint explains why these Defendants "did not simply leave the financial details" of their wire transfers "to their banks." Compl. ¶ 190. The Court should credit that allegation as true, not discard it via the artificial "presumption" Defendants urge (at 21). And even had Defendants delegated the execution details to their

---

[10] *Universal Trading & Inv. Co. v. Tymoshenko*, 2012 WL 6186471 (S.D.N.Y. Dec. 12, 2012) likewise involved an individual who played no role in his "bank mov[ing] money through New York via a correspondent account." *Id.* at *3. Regardless, *Tymoshenko*'s "policy rationale," *id.*, must yield to the unique national-security interest in "ensur[ing]" that New York's banking "system is not used as an instrument in support of terrorism," *Licci IV*, 732 F.3d at 174.

banks, jurisdiction would remain appropriate because the banks acted as Defendants' agents.  *See Spetner*, 70 F.4th at 640-41; *infra* Part I.A.1.d.  Refusing jurisdiction just because Lafarge is not a bank would represent the sort of "wooden approach . . . exalting form over substance" courts have long repudiated under § 302(a)(1).  *Lancaster v. Züfle*, 165 F.R.D. 38, 41 (S.D.N.Y. 1996).

### d.    Defendants' banks transacted in New York as their agents

Defendants fare no better in shifting (at 23-27) their New York contacts to their banks.  When Defendants instructed their banks to execute these transfers, the banks did so as their agents.  Compl. ¶¶ 173, 194-95.  Courts give agency a "broad interpretation" under § 302(a)(1).  *Spetner*, 70 F.4th at 640.  The agent need only act "for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal."  *Id.*  Plaintiffs properly allege these elements.  Compl. ¶¶ 183-95.  Defendants' challenges to knowledge and control fail.

**i.    Knowledge.**  Plaintiffs sufficiently allege that Defendants "had knowledge of [their banks'] activities" in New York.  *Spetner*, 70 F.4th at 641; *see* Compl. ¶¶ 189-200.  As a matter of basic pleading principles, a "complaint is allowed to contain general allegations as to a defendant's knowledge," as it is unrealistic to "expect[ ]" a plaintiff to adduce direct evidence of "a defendant's actual state of mind" before discovery.  *Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 864 (2d Cir. 2021).  The complaint surmounts that threshold in three ways.

*First*, Defendants sought and received SWIFT confirmations disclosing their wire details.  Compl. ¶¶ 193, 196.  Those confirmations included fields (53, 54, and 56) flagging the particular New York correspondent and intermediary banks used.  *Id.*  In August 2011, for example, Pescheux requested a SWIFT confirmation before he "specifically approved" the wire it described.  *Id.* ¶ 193.  The confirmation told him that JPMorgan Chase's and Citibank's New York branches cleared the transaction.  *Id.* ¶¶ 166, 193.  That example, pegged to a specific wire, illustrates Defendants' broader practice of monitoring their transaction details.  *Id.* ¶¶ 189-96.

Defendants now deny (at 24-25) they "reviewed the intricacies" of such messages, but they offer no other reason for Pescheux to personally request the 2011 confirmation before "approv[ing]" the wire it described. *Id.* ¶ 193. And the complaint explains why Defendants injected themselves into the details: they discussed internally how LCS's U.S.-dollar shortfall posed a grave threat to Lafarge's Syrian business. *Id.* ¶ 190. So Defendants devised a scheme to move U.S. dollars in and out of Syria, which demanded knowledge of how their banks routed their money. *Supra* pp. 9-11. Defendants' sweeping assertions (at 25) about SWIFT messages are too general to warrant a contrary inference and raise premature fact disputes. *See Licci IV*, 732 F.3d at 167 (courts "construe the pleadings" in "light most favorable to the plaintiffs").

A June 2014 email recited by the complaint drives home the point. In that email, Lafarge's treasury managers outlined a plan to inject LCS with U.S-dollar liquidity and discussed the need to "channel the funds to Syria through Lebanon" – the latter meaning Bank Audi Lebanon – while guarding against the "risk of cash being trapped by banks' compliance policies linked to sanctions affecting Syria." Compl. ¶ 191. Lafarge's reference to "banks' compliance policies" contemplated the involvement of *New York* correspondent banks, which would have policed violations of "sanctions affecting Syria." *Id.*; *see id.* ¶¶ 166-69, 197. Defendants are right (at 24) that the email did not say the words "correspondent bank accounts in New York," but no such words were needed. The email did not arise in a vacuum; the alluded-to "compliance policies" were the policies of the New York banks that would clear the transactions. *Id.* ¶¶ 186-87, 191. And more broadly, the email reveals that Defendants were attuned to their banks' "policies" for executing cross-border wires. *Id.* ¶¶ 189-98. It thus undercuts Defendants' asserted inference that they paid no heed to what their banks were doing with their money.

*Second*, Defendants' banks advertised their New York dollar-clearing services. *Id.*

¶¶ 166-72, 197.  They published their correspondent accounts in the Bankers' Almanac and on public websites, *id.* ¶¶ 168, 171-72, including one where Bank Audi listed three New York banks as its sole "correspondents" for clearing "USD," *id.* ¶ 197 (screen shot).  Such "public disclosures" make it plausible Defendants "knew that the wire transfers had to route through New York."  *Spetner*, 70 F.4th at 638 (citing Bankers' Almanac).  Defendants' unsworn assertion (at 23) that they were oblivious to those websites does not warrant dismissal.  *See Kaplan*, 999 F.3d at 864 (inferring bank's knowledge of "Hizbollah's own 'official websites,'" even without "precise dates").  And they err in citing (at 23-24 & n.10) BNP Paribas's participation in a Hong Kong clearing center.  Hong Kong execution was the rare exception, not the norm, and Defendants neither wanted nor expected BNP Paribas to use exceptional means to clear these transactions.  Compl. ¶¶ 164, 170-72, 185, 200.  On these facts, no reasonable wire originator would have expected BNP Paribas to execute through Hong Kong.  Runge Decl. ¶ 19.

*Third*, other public sources notified Defendants that their U.S.-dollar transfers would clear through New York.  Those sources included a Syrian government decree disavowing dollars because "US laws stipulate that any dollar transfers must pass through the US banking system."  Compl. ¶ 198.  They also included client alerts by Lafarge's own law firms warning that "virtually all" U.S.-dollar wires "clear through correspondent banking accounts in the U.S." *Id.* ¶ 199.  And a slew of mainstream press coverage reported the same thing.  *Id.* ¶ 200.  Courts in ATA cases have relied on comparable reports to infer knowledge on the merits.  *See Kaplan*, 999 F.3d at 864 (citing "press conferences and news media"); *Atchley*, 22 F.4th at 221 (inferring drug companies' knowledge of "media report[s]").  A similar inference is warranted here.

    **ii.**    **Control.**  Plaintiffs also plausibly allege that Defendants "exercised 'some control' over" their banks.  *Spetner*, 70 F.4th at 641.  Defendants instructed their banks to

execute every wire transfer at issue and specified (at least) each wire's recipient, date, amount, and currency.  Compl. ¶ 194.  The banks were "required to follow [Defendants'] instructions." *Spetner*, 70 F.4th at 641.  When Defendants' banks executed Defendants' U.S.-dollar wires in accordance with Defendants' instructions, their conduct was hardly "unilateral."  *Id.*

Defendants say (at 26) they never "specified that their banks rely on New York correspondent banks."  That overstates the degree of control required.  "Section 302(a)(1) does not demand that the principal exercise complete control over every decision."  *Spetner*, 70 F.4th at 641.  Only "some control" is needed, *id.*, and Defendants had at least that.  They dictated the key details that prompted the New York clearing:  they directed cross-border wires to recipients with whom their banks lacked direct relationships; denominated the payments in U.S. dollars; and ordered their banks to execute knowing they would benefit from clearing through New York accounts.  Compl. ¶¶ 194-95.  Defendants (not their banks) even paid the fees that the New York banks charged for their role in clearing the transactions.  *Id.* ¶ 196.  Given all that, an explicit instruction telling Defendants' banks to "use New York" was unnecessary for an agency relationship to arise.  *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 522 (2d Cir. 2006) (under hornbook agency law, "control asserted need not include control at every moment").

In any event, Defendants had at least *the right* to dictate the correspondent banks used.  Compl. ¶ 195.  Defendants imply (at 26-27) that they declined to exercise that right.  But the "right to control," not its exercise, is what matters.  Restatement (Third) of Agency § 1.01 cmt. c (2006); *see Khodeir v. Sayyed*, 348 F. Supp. 3d 330, 345 (S.D.N.Y. 2018) ("it is not essential that the principal make use of the right to control").  Defendants do not dispute they could have stopped their banks from routing through New York but never did.  Compl. ¶ 195.  This right to control, even if never exercised, establishes a jurisdictionally sufficient agency relationship.  *See*

*Spetner*, 70 F.4th at 641 (agency for jurisdictional purposes when defendant "did not direct [its bank] to avoid New York"); *Khodeir*, 348 F. Supp. 3d at 345 (agency for broader purposes even when principal "made little or no use" of its "right to control" the agent).

Defendants portray (at 26-27) *Spetner* as hinging on the foreign defendant's "acknowledge[ment]" there that it "instructed [its Jordanian bank] to make certain transfers 'to the U.S. bank.'" *Spetner*, 70 F.4th at 641. But that very acknowledgment attributed those instructions to the bank's underlying non-bank *customer* – the equivalent of Lafarge here. *See id.* The wire instructions at issue, according to the declaration the Second Circuit cited, "simply implemented decisions made independently by, and at the express direction of," the wire originator.[11] That declaration refutes Defendants' premise (at 27) that wire originators always "le[ave] it to their bank to figure out where and how to execute." It is thus plausible Defendants issued instructions similar to those in *Spetner*. At any rate, *Spetner* did not hold a "U.S. bank" instruction is always necessary. It stressed that agency demands only "some control," exercised or not. *Spetner*, 70 F.4th at 641. And as shown above, Defendants had more than enough control to suggest that clearing "through New York was part of [their] design." *Id.* at 642.

### 2.    Plaintiffs' claims "arise from" the New York transactions

Plaintiffs satisfy § 302(a)(1)'s "arising from" element by pleading an "articulable nexus" between their claims and Defendants' forum contacts. *Spetner*, 70 F.4th at 643. The nexus element is "relatively permissive," *Licci III*, 984 N.E.2d at 900, and does not demand a "causal connection," *Spetner*, 70 F.4th at 644. It is met so long as the forum contact is "'not completely unmoored' from the claim." *Id.* (quoting *Licci III*, 984 N.E.2d at 900). Courts find a sufficient

---

[11] Decl. of Mohammad Sami Aghbar ¶ 29 (Nov. 18, 2019), Jt. App'x at A-210-14, *Spetner v. Palestine Inv. Bank*, No. 20-3849 (2d Cir. filed Mar. 1, 2021) (attached as Ex. B).

nexus in ATA cases when a defendant "engaged in terrorist financing" by using a "correspondent account in New York to move the necessary dollars." *Licci III*, 984 N.E.2d at 901.

The complaint explains how Defendants' New York wires moved dollars that were vital to their terrorist-financing scheme. Compl. ¶¶ 153-61. Rather than grapple with all the pleaded transactions, Defendants again restrict (at 27) their nexus challenge to just the "three alleged transactions" for which Plaintiffs spell out the New York clearing details. That analysis remains too narrow. *Supra* Part I.A.1.b.i. The examples make it "plausible" that, of Defendants' many terrorist-linked transactions, "at least some portion of them was transferred through New York." *Spetner*, 70 F.4th at 644. Nothing more is needed for jurisdiction at this stage. *See id.* at 644-45.

But even just the three examples Defendants isolate show "actual, specific transaction[s] through a New York correspondent account" that Defendants executed "in the course of bringing about [Plaintiffs'] injuries." *Daou*, 42 F.4th at 132. One was the $210,000 payment Lafarge wired (via Lafarge Cyprus) through New York to Tlass's Dubai shell company. Compl. ¶¶ 161, 174. Lafarge has admitted that this payment cleared through a bank in this District and that it formed a key part of the criminal scheme. SOF ¶¶ 96-103. That admission alone establishes a sufficient nexus to Plaintiffs' claims. Indeed, the payment reimbursed Tlass for bribing ISIS and ANF on Defendants' behalf. Compl. ¶¶ 95-96. Defendants also carefully orchestrated the payment to mask their role in supporting terrorism. *Id.* The payment's role in concealing Defendants' broader scheme – itself pivotal to the guilty plea, *id.* ¶¶ 5, 87-98 – strengthens the nexus to Plaintiffs' claims. *See Al Rushaid*, 68 N.E.3d at 11-12 (nexus where New York transfers were "part" of broader "bribery / kickback scheme"). Because money is fungible, and because the $210,000 advanced Defendants' "scheme," *id.*, it makes no difference if Tlass passed those specific dollars onto ISIS, *cf.* Mot. at 29. Whether or not those literal dollars ended

27

up in ISIS's coffers, they reimbursed Tlass for his role in facilitating the payments that did.

The other two examples were intracompany loans supplying LCS with the U.S.-dollar liquidity it needed to pay terrorists. Compl. ¶¶ 155-60. LCS wanted to pay the terrorists in U.S. dollars, and it knew the only feasible way to obtain those dollars was to illegally borrow them from its parent companies. *Id.* ¶¶ 157-58, 180, 190-91. A loan that knowingly sources the capital used to fund terrorist payoffs is not "completely unmoored" from claims about those payoffs. *Licci III*, 984 N.E.2d at 900. Defendants' demand (at 28) that Plaintiffs link individual dollars within each loan to a particular "FTO" or "attack" mistakes the jurisdictional standard.[12] Section 302(a)(1) does not demand that Plaintiffs pinpoint exactly which part of each wire ended up with the terrorists. It was Lafarge that obscured those links by hiding the terrorist-payoff money inside larger wires with other money "to fund [LCS's] operations." Compl. ¶ 155. The Court should not adopt a jurisdictional rule that rewards Lafarge for its money laundering.

Defendants' analogy (at 28-29) to *Przewozman*'s four-year "temporal gap" is inapt. Jurisdiction failed there because the New York transactions "occurred, at latest, in 2015, while the rocket attacks did not happen until 2019." 2023 WL 2562537, at *13. The transfer-to-attack window here is at least a year shorter – and for most attacks, even shorter than that. *Compare* Compl. ¶ 154 (transfers from 2011 to 2014) *with id.* ¶¶ 227-357 (attacks from 2013 to 2017). In fact, the zero-to-three-year window here matches the temporal nexus other courts have upheld.[13]

---

[12] *See e.g.*, *Averbach v. Cairo Amman Bank*, 2023 WL 5016884, at *9 (S.D.N.Y. June 30, 2023) (no requirement that wires be "earmarked as being for a terroristic purpose"); *Singer v. Bank of Palestine*, 2021 WL 4205176, at *6 (E.D.N.Y. Apr. 30, 2021) ("plaintiffs need not . . . trace specific dollars to specific attacks"); *Bartlett*, 2020 WL 7089448, at *6 (similar).

[13] *See Henkin v. Qatar Charity*, 2023 WL 2734788, at *12 (E.D.N.Y. Mar. 31, 2023) ("there could be an articulable nexus between the transfer of funds that occurred between 2009 and 2015 and the 2018 terrorist attack"); *Strauss*, 175 F. Supp. 3d at 23 (transfers in "June and July of 2001" and attacks through "September 2004"); *Averbach I*, 2020 WL 486860, at *1-3, *7 (transfers "through September 2001" and attacks "through August 19, 2003").

That remains true for the 2011 transfers, which implemented a multiyear scheme to inject LCS with dollars to cover its bribes to violent Syrian actors.  Compl. ¶¶ 154-57.  True, the recipient list evolved over time:  it started in 2010 with the Assad regime and later grew to include ISIS and ANF directly.  *Id.* ¶¶ 154, 159-60.  But *all* these bribes benefited ISIS, *id.* ¶¶ 159-60, so they formed part of the same overall "unlawful course of conduct" that creates jurisdiction.  *Daou*, 42 F.4th at 130.  New York's long-arm statute does not demand more.  *See McNamee v. Clemens*, 762 F. Supp. 2d 584, 597 (E.D.N.Y. 2011) (upholding nexus between 2008 tort and 2001 contract despite 7-year gap "in time," where contract was "part of a long relationship").

### 3.    Alternatively, jurisdictional discovery is warranted

Alternatively, the Court should order jurisdictional discovery.  Discovery is proper "where the plaintiff has made a sufficient start toward establishing jurisdiction."  *Przewozman*, 2023 WL 2562537, at *18; *see Singer*, 2021 WL 4205176, at *7-8 (similar).

Plaintiffs have made more than a sufficient start.  The complaint's many pages of allegations that Defendants "used correspondent bank accounts in New York" at a minimum justify further inquiry.  *Id.* at *7.  That is especially true because "there is no way for [Plaintiffs] to know" more details – like the total "number of transfers" or the exact clearing details for every transaction – without "information in the control of [Defendants]."  *Henkin*, 2023 WL 2734788, at *11.  For that reason, courts in ATA cases often permit discovery based on allegations sparser than those here.  *See, e.g.*, *Brown v. Nat'l Bank of Pakistan*, 2022 WL 1155905, at *3 (S.D.N.Y. Apr. 19, 2022) ("generalized allegations"); *Singer*, 2021 WL 4205176, at *6 ("conclusory web").

*Przewozman* provides a useful contrast.  The Court there considered a complaint "entirely devoid of statements regarding the volume and frequency of transfers."  2023 WL 2562537, at *11.  The allegations also gave no "indication of *why* the transfers were made 'through' New York."  *Id.* at *12.  Yet this Court still "decline[d]" to dismiss "on this basis," reasoning that

§ 302(a)(1) is a "single act statute" and that Plaintiffs could "fill in the many gaps" through discovery. *Id.* at *13. This case is easier. The complaint here already supplies the details *Przewozman* lacked. And unlike in *Przewozman*, Defendants' New York activity is sufficiently "proximate in time" to at least justify discovery. *Id.* at *18; *see Henkin*, 2023 WL 2734788, at *12 (distinguishing *Przewozman*). Dismissal is therefore inappropriate.

### B.    Plaintiffs Sufficiently Allege Personal Jurisdiction Under Rule 4(k)(2)

Rule 4(k)(2) provides an additional, independent basis for jurisdiction. That rule authorizes jurisdiction over each Defendant if its aggregate U.S. contacts satisfy "the Due Process Clause of the Fifth Amendment." *Dardana Ltd. v. Yugaskneftegaz*, 317 F.3d 202, 207 (2d Cir. 2003).[14] The New York contacts remain relevant to that analysis. *See Przewozman*, 2023 WL 2562537, at *14. Defendants do not mount (at 30-31) an independent constitutional challenge to those contacts. For the reasons those contacts satisfy New York's long-arm statute, they satisfy constitutional due process. *See Spetner*, 70 F.4th at 645; *Licci IV*, 732 F.3d at 170.

Even if the New York transactions were inadequate in isolation, they would suffice when combined with Defendants' other U.S. contacts. *See Zobay*, 2023 WL 6304961, at *16 (applying Rule 4(k)(2) to uphold jurisdiction based on New York "financial market contacts" plus other "U.S. contact[s] . . . in the aggregate"). But the New York contacts are also unnecessary. Alone or together, Defendants' other contacts create a constitutionally adequate U.S. connection.

### 1.    *U.S.-based email.* Defendants formed U.S. contacts by selecting U.S.-based

---

[14] In a footnote, Defendants criticize (at 29 n.13) Plaintiffs for "fail[ing] to certify that the Defendants are *not* subject to jurisdiction" under state law. Plaintiffs did not certify under Rule 4(k)(2) because Defendants *are* "subject to jurisdiction in [New York's] courts of general jurisdiction." Fed. R. Civ. P. 4(k)(2); *see* Compl. ¶ 24. For the avoidance of doubt, Plaintiffs now certify their belief that Defendants would not be subject to jurisdiction in any other state. *See Przewozman*, 2023 WL 2562537, at *14 ("declin[ing] to dismiss" for "failure to certify").

email providers to carry out their scheme. Compl. ¶¶ 9, 201-13; SOF ¶¶ 18, 88. At the direction of a Lafarge in-house lawyer, Defendants' agents purposefully chose to plan their terrorist payoffs via U.S.-based email accounts – mainly, Gmail – rather than via their "corporate email addresses." Compl. ¶ 204. The complaint identifies many of the Gmail addresses used, *id.* ¶ 202; surveys inculpatory emails sent to and from those accounts, *id.* ¶ 203; alleges Defendants planned their terrorist payoffs by transmitting "hundreds" of emails through U.S. servers, *id.* ¶¶ 202, 210; and details why the U.S. connection benefited the scheme, *id.* ¶¶ 204-13.

Defendants' use of in-forum "e-mail system[s]" shows that they "purposefully availed [themselves] of the privilege of conducting activities within [the United States]." *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 730 (2d Cir. 2012). In *MacDermid*, the Second Circuit upheld jurisdiction over a foreign defendant who facilitated her tortious conduct – there, her theft of trade secrets – by transmitting those secrets using an "e-mail system" she knew was "centraliz[ed] and hous[ed]" in the forum. *Id.* Here, too, Defendants knowingly used an in-forum email system to facilitate their unlawful conduct.[15] Such use of a U.S. email service gives rise to jurisdiction because it reflects purposeful availment of the United States. *See Will Co. v. Lee*, 47 F.4th 917, 924-25 (9th Cir. 2022) (use of U.S. servers supported jurisdiction when servers gave defendant unique efficiency advantages); *UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 354 (4th Cir. 2020) ("U.S.-based servers" supported jurisdiction).

These U.S. contacts were no accident. In opening and using Gmail accounts, Defendants' agents agreed to terms of service stating that the email service was provided by a

---

[15] Defendants are incorrect (at 33) that *MacDermid* requires a defendant to "access[ ]" in-forum servers "to commit a tort in [the forum]." Requiring the in-forum email itself to constitute the tort would defy the settled jurisdictional principle that forum contacts need not be unlawful on their own. *See Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1028-29 (2021) (contacts had no "causal link[ ]" to tort); *Atchley*, 22 F.4th at 237-38 (similar for ATA).

company "located" in "Mountain View, CA 94043" and subject to U.S. law. Compl. ¶ 207. Defendants also understood that U.S. servers hosted by U.S. email providers offered a uniquely secure pipeline for their communications. *Id.* ¶¶ 205, 210, 213. Such reliance on American infrastructure governed by American law supports jurisdiction. *See MacDermid*, 702 F.3d at 730 (defendant "knew that the email servers she used" were "located in" the forum); *Great Bowery v. Best Little Sites*, 609 F. Supp. 3d 1240, 1251 (D. Utah 2022) ("a terms-of-service agreement" with in-forum nonparty could "support[ ] a prima facie showing of personal jurisdiction").

The U.S. connection also helped Defendants conceal their scheme by shielding their emails from outside surveillance. Except in unusual circumstances, U.S. privacy laws barred European law enforcement – including French criminal authorities – from obtaining a suspect's Gmail messages from the United States. Compl. ¶¶ 211-12. Those laws have long made Gmail "especially attractive" to terrorists and their funders who fear prosecution. *Id.* ¶¶ 205, 211-13. Defendants' French executives felt that fear acutely here. *Id.* ¶¶ 5, 9, 87-98. So Defendants sent their emails through the United States, making "it harder for French law enforcement – the authority otherwise most likely to criminally charge their executives – to discover their scheme." *Id.* ¶ 9. Using the United States to help conceal a criminal scheme creates strong U.S. contacts. *See Tether & Bitfinex Crypto*, 576 F. Supp. 3d at 88 (exercising jurisdiction over defendant who "provid[ed] . . . access to the U.S. banking system in order to cover up" unlawful scheme).

All this supports jurisdiction for much the same reason as the "use of a New York correspondent bank." *Licci IV*, 732 F.3d at 168. In cases like *Licci*, a foreign defendant sends money through U.S. correspondent banks and so reaps the benefit of the United States' "dependable and transparent banking system" backed by the "commercial law of New York and the United States." *Id.* at 171. Defendants' emails here did something similar, just with their

data rather than their dollars.  Compl. ¶¶ 202-03, 208-09.  Indeed, Google played a similar role in the sequence as the correspondent banks in *Licci*:  whereas the latter moved the defendant's *money*, Google moved Defendants' *communications*.  As with their wire transfers, Defendants' scheme-related communications through the United States manifested their purposeful availment "of the privilege of conducting activities within the forum."  *Spetner*, 70 F.4th at 639.

Defendants caricature (at 31) these allegations as showing merely that their email providers "happen[ed] to be domiciled in California."  But the complaint alleges that Defendants sought out U.S. email services because of the unique-to-the-United-States benefits those services offered for their scheme.  Compl. ¶¶ 204-12; *cf. Atchley*, 22 F.4th at 233-34 (upholding jurisdiction based on sourcing U.S. drugs); *Zobay*, 2023 WL 6304961, at *14 (same for U.S. technology).  That choice to exploit U.S. law and capitalize on reliable U.S. communications infrastructure distinguishes this case from the "robust line of cases" Defendants cite (at 31-32).  In those cases, the server location was a mere fortuity from which the defendant derived no benefit, making the link to California "pure happenstance."  *Hungerstation LLC v. Fast Choice LLC*, 2020 WL 137160, at *5 (N.D. Cal. Jan. 13, 2020) (defendant did not choose forum servers to procure forum-linked benefits).   The U.S. connection here was not so coincidental.  And Defendants' assertions to the contrary (at 32) merely raise premature fact disputes.

    **2.**    ***Conspiracy jurisdiction.***  Conspiracy jurisdiction also exists under Rule 4(k)(2). Compl. ¶¶ 214-26.  "[C]onspiracy jurisdiction is based on the time-honored notion that the acts of a conspirator in furtherance of a conspiracy may be attributed to the other members of the conspiracy."  *In re Platinum and Palladium Antitrust Litig.*, 61 F.4th 242, 269 (2d Cir. 2023).  It has three elements:  that "(1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient

contacts with a forum to subject the co-conspirator to jurisdiction." *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 123 (2d Cir. 2021).

Plaintiffs address most of those elements below in explaining why the complaint states an ATA conspiracy claim. *Infra* Part III. And Defendants concede (at 61-62) that ISIS's terrorist attacks were overt acts that furthered the main conspiracy alleged. *See* Compl. ¶¶ 367-76. The sole remaining question is whether those acts created enough U.S. contacts. But "[t]hat is not a difficult requirement to meet" for jurisdictional purposes, as "an overt act is any act performed by any conspirator for the purpose of accomplishing the objectives of the conspiracy." *Platinum*, 61 F.4th at 271. The very terrorist attacks that targeted Plaintiffs qualify. Compl. ¶¶ 227-357.

Those attacks conferred jurisdiction over ISIS (and its co-conspirators) by "expressly aim[ing] [ISIS's] conduct at the forum." *Licci IV*, 732 F.3d at 173. ISIS's terrorist attacks aimed at the United States by seeking to influence U.S. policy. Compl. ¶¶ 42-43, 219, 227. For example, ISIS publicized its barbaric murders of James Foley and Steven Sotloff (whose families and estates are Plaintiffs here) in videos titled "A Message to America" and "A Second Message to America." *Id.* ¶¶ 43, 220. The message was simple: ISIS was a fearsome terrorist group willing to follow through on its heinous threats. *Id.* ¶¶ 219-223. Other courts have recognized that ISIS purposefully targeted the United States through these very attacks. *See, e.g.*, *Sotloff v. Syrian Arab Republic*, 525 F. Supp. 3d 121, 136 (D.D.C. 2021) ("ISIS threatened to kill, injure, or continue to detain Foley and Sotloff to compel the United States to make concessions").

Defendants' reliance (at 37-38) on *Waldman v. Palestine Liberation Org.*, 835 F.3d 317 (2d Cir. 2016), is misplaced. *Waldman* involved Palestinian terrorist attacks *in Israel*, targeting *Israeli* citizens, to sow terror *in Israel*. *Id.* at 337-38. Those attacks tragically killed some Americans too, but the American deaths were a "random and fortuitous" byproduct of the

terrorists' choice to indiscriminately bomb public places.  *Id.*  There was no "evidence that these indiscriminate terrorist attacks were specifically targeted against [U.S.] citizens[.]"  *Id.* at 338.

This case is different.  When ISIS murdered Plaintiffs and other Americans, it *was* intentionally targeting U.S. citizens.  Compl. ¶¶ 39-43, 219-23.  The U.S. targeting was vital to the conspiracy, because ISIS gained special credibility by showing the world its ability to kill and maim Americans.  *Id.* ¶¶ 222-23, 227.  Such attacks are just what *Waldman* identified as "the kinds of circumstances that would give rise to specific jurisdiction."  835 F.3d at 338.[16]  On that score, *Waldman* cited *Mwani v. Bin Laden*, 417 F.3d 1 (D.C. Cir. 2005), which upheld jurisdiction over Osama Bin Laden and al-Qaeda.  *Waldman*, 835 F.3d at 338-39.  Al-Qaeda had "'orchestrated the bombing of the *American* embassy in Nairobi, not only to kill both American and Kenyan employees inside the building, but to cause pain and sow terror in the embassy's home country, *the United States*.'"  *Id.* (quoting *Mwani*, 417 F.3d at 13) (emphasis in *Waldman*).

Like al-Qaeda in *Mwani*, ISIS targeted the United States on purpose.  Compl. ¶¶ 39-43, 219-23.  Multiple U.S. officials even noted that ISIS sought to intimidate the United States through such attacks, *see, e.g.*, *id.* ¶¶ 41, 43, 219 – another factor *Mwani* cited for jurisdiction, *see* 417 F.3d at 13 n.12.[17]  This Court thus would have jurisdiction over ISIS for the same reason as al-Qaeda in *Mwani*.  And because ISIS's acts furthered the conspiracy Defendants joined, *infra* Part III, the Court has jurisdiction over Defendants as well, *see Schwab*, 22 F.4th at 123.

---

[16] Defendants mischaracterize (at 38) *Waldman* as holding that "targeting U.S. citizens in an attempt to 'influence United States policy'" cannot create jurisdiction.  835 F.3d at 341-42.  In fact, *Waldman* held the attacks there did *not* represent such an attempt.  *See id.* (discounting political pamphlets as evidence because they "sp[oke] in broad terms" untethered from attacks).

[17] *Mwani* also cited "overt acts occurring within this country's borders," including al-Qaeda's "plot to bomb" targets "in New York."  417 F.3d at 13.  ISIS committed similar acts within the United States here, including by recruiting U.S. citizens and plotting attacks.  Compl. ¶¶ 224-25.

## II.    PLAINTIFFS SUFFICIENTLY PLEAD AIDING-ABETTING LIABILITY

The ATA imposes secondary liability on those who contribute to terrorist attacks "committed, planned, or authorized" by a designated FTO.  18 U.S.C. § 2333(d)(2).  ISIS and ANF were so designated at all relevant times.  Compl. ¶¶ 33-35, 227.  Aiding-abetting liability thus exists if:  (1) the FTO "perform[ed] a wrongful act that cause[d] an injury," (2) Defendants were "generally aware of [their] role as part of an overall illegal or tortious activity," and (3) Defendants "knowingly and substantially assist[ed] the principal violation."  *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 486 (2023) (quoting *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)).  The first element is largely undisputed,[18] and Plaintiffs properly allege the other two.

### A.    General Awareness

**1.**    Plaintiffs plausibly allege that Defendants were "generally aware of [their] role in an overall illegal activity from which the act that caused the plaintiff's injury was foreseeable." *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 496 (2d Cir. 2021).  This is not an exacting standard:  it entails "something less than full, or fully focused, recognition," *Kaplan*, 999 F.3d at 863, and does not require knowledge of "specific attacks," *id.* at 859.  Courts routinely infer general awareness when a terrorist funder knows its money is "closely intertwined" with an FTO's broader "violent terrorist activities."  *Id.* at 860.[19]  That is because "terrorist attacks" are naturally a "foreseeable risk" of giving large amounts of money to terrorists.  *Averbach v. Cairo Amman Bank* ("*Averbach II*"), 2022 WL 2530797, at *10 (S.D.N.Y. Apr. 11, 2022).

---

[18] Defendants argue (at 54-55) that four attacks on U.S. servicemembers were not "act[s] of international terrorism" under 18 U.S.C. § 2333(d).  That argument fails for the reasons explained in the *Finan* brief.  *See also* Compl. ¶¶ 39-44, 223, 227, 269, 281, 291, 303, 309, 332.

[19] *See, e.g.*, *Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*, 495 F. Supp. 3d 144, 155 (E.D.N.Y. 2020) (defendant "could infer that the funds" would "make their way to Hamas . . . to support its violent activities"); *Bartlett*, 2020 WL 7089448, at *9-11; *Bonacasa I*, 2023 WL 2390718, at *10-13; *King I*, 2022 WL 4537849, at *7; *Zobay*, 2023 WL 6304961, at *23-26.

The Second Circuit has sustained general-awareness allegations much less compelling. *Kaplan*, for example, upheld allegations that the defendant bank offered banking services to known Hezbollah-linked intermediaries, 999 F.3d at 864-65, which indirectly used the money to "subsidize the families of Hizbollah suicide bombers," *id.* at 858. Unlike here, the *Kaplan* defendant never negotiated any agreement with any FTO. *Id.* at 855-56. Also unlike here, the bank's "awareness" of the terrorist links came solely from undated "press conferences and news media interviews" on uncited "websites" describing the intermediaries. *Id.* at 864. Yet the Second Circuit held it plausible that, by providing banking services to intermediaries publicly linked to Hezbollah, the bank gained general awareness that it "was playing a role in unlawful activities from which [Hezbollah's] rocket attacks were foreseeable." *Id.* at 860-61.

The complaint here alleges far more. Defendants did not merely process transactions for terrorist-adjacent intermediaries; they intentionally delivered support to two designated FTOs. Compl. ¶¶ 1-3, 28, 33-35, 45, 54-60, 89. Both FTOs' avowed purpose was to attack the United States by murdering U.S. citizens. *Id.* ¶¶ 36-44. And Defendants knew of that purpose – they even cautioned each other not to "forget that ISIS is a terrorist movement," *id.* ¶ 87 – when they chose to pay millions of dollars to both groups, *id.* ¶¶ 55, 61-75, 87-98. Indeed, Defendants knew they were aiding violent terrorists by supplying them with "tunnels and trenches" and financing terrorist "arms, ammunition, and battalion[s]." *Id.* ¶¶ 76, 106. The link to "violent terrorist activities" was no fortuity; it was the obvious consequence. *Kaplan*, 999 F.3d at 860.

**2.**    Defendants contest (at 40-45) general awareness by misstating the legal standard. They mainly argue that Plaintiffs must establish "general awareness of a defendant's role in the *specific terrorist attacks* which caused her injury." Mot. at 41 (quoting *Wildman v. Deutsche Bank Aktiengesellschaft*, 2022 WL 17993076, at *10 (E.D.N.Y. Dec. 29, 2022) and adding

emphasis).  But the Second Circuit has held the opposite:  it has twice emphasized that "defendant need not be generally aware of its role in the specific act that caused the plaintiff's injury."  *Honickman*, 6 F.4th at 496; *see Kaplan*, 999 F.3d at 859, 863-64.  For that reason, the overwhelming post-*Kaplan* trend in this Circuit is to uphold general-awareness allegations without the sort of attack-specific knowledge Defendants demand.  *Supra* p. 36 & n.19.

Defendants argue otherwise (at 41-42) based on one sentence fragment in *Wildman*.  But the district court there correctly observed that "a defendant need not know of or intend to bring about the specific attacks."  2022 WL 17993076, at *6.  It then discerned no "foreseeabl[e]" link between the alleged support – mainly for money laundering in Russia and other countries – and al-Qaeda's terrorist activities in Afghanistan.  *See id.* at *10-12.  This Court should not read that fact-bound conclusion as an attack-specific knowledge requirement that would defy binding Second Circuit precedent.  *See Honickman*, 6 F.4th at 496-99.  At any rate, this case is different because Defendants here intentionally paid the very FTOs that attacked Plaintiffs.  Even assuming that *Wildman* is correct,[20] it would not support dismissal of allegations so specific.

Defendants' factual nitpicks (at 41-45) about each attack are therefore misdirected.  Arguments about the "nexus" between Defendants' conduct and each attack are relevant to the ATA's *substantial-assistance* element, *Twitter*, 598 U.S. at 493-96, which Plaintiffs discuss below, *infra* Part II.B.2.  But the *general-awareness* element does not require a defendant to foresee any "specific" details about the injury-causing act.  *Honickman*, 6 F.4th at 496.  In fact, *Twitter* forecloses any such requirement.  That case involved zero nexus between the defendants' conduct – passively allowing ISIS onto social-media platforms – and the "Reina attack" at issue.

---

[20] Another court persuasively reached the opposite conclusion from *Wildman* on similar allegations about similar attacks in Afghanistan.  *See Bonacasa I*, 2023 WL 2390718, at *12-13 (sustaining general-awareness allegations "similar to those pleaded by the *Wildman* plaintiffs").

*Twitter*, 598 U.S. at 500-01.  Yet the Supreme Court still found general awareness satisfied because the social-media companies merely "knew they were playing some sort of role in ISIS' enterprise."  *Id.* at 497.  At a minimum, Defendants too knew they were "playing some sort of role" in ISIS's and ANF's terrorist "enterprise."  *Id.*  General awareness requires nothing more.

**3.**      Defendants place far too much weight (at 40-44, 52-54) on *Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217 (2d Cir. 2019).  HSBC there provided routine "banking services" to Al Rajhi Bank ("ARB"), which in turn offered separate banking services to al-Qaeda in Iraq ("AQI").  933 F.3d at 224.  ARB was "a large bank with vast operations," most of which had no "link[] to terrorists."  *Id.*  When ARB's terrorist ties surfaced 10 months before the attacks, HSBC "ceased doing business with ARB."  *Id.* at 221, 224.  "[U]nder th[ose] circumstances," it was "implausible . . . that HSBC had knowingly assumed a role in the Attacks."  *Id.*  In so concluding, the Second Circuit stressed the lack of allegations "that HSBC knew or intended that [the relevant] funds would be sent to AQI or to any other terrorist organizations."  *Id.* at 225.

This case is different.  Unlike in *Siegel*, Defendants "knew" and "intended" for their cash and cement to reach the "terrorist organizations" they were bribing.  *Id.*; *see* Compl. ¶¶ 53-78.  Courts in this Circuit have repeatedly distinguished *Siegel* when assessing allegations involving such knowing payments.[21]  Indeed, Defendants cite no case – and Plaintiffs know of none – applying *Siegel* to dismiss claims that a defendant intentionally directed money to an FTO.

Defendants still try to extract (at 44, 51) from *Siegel* a blanket rule extinguishing liability whenever a defendant's funding ends "ten months" before an attack.  *Siegel*, 933 F.3d at 224.  *Siegel* did not adopt such a rule.  The timing mattered there because of the context: "HSBC

---

[21] *See Kaplan*, 999 F.3d at 861-63; *Honickman*, 6 F.4th at 500-01; *Henkin*, 495 F. Supp. 3d at 159; *Bonacasa I*, 2023 WL 2390718, at *14; *Zobay*, 2023 WL 6304961, at *25.

ended the relationship [with ARB] after learning of ARB's ties to terrorism," *King I*, 2022 WL 4537849, at *9, which reinforced that HSBC never had "reason to suspect that it was assuming a role in AQI's terrorist activities," *Siegel*, 933 F.3d at 224.  Here, by contrast, Defendants knew they were dealing with terrorists *before* they decided to pay.  Compl. ¶¶ 87-88, 216-17.  That difference in mental state is decisive.  *See King I*, 2022 WL 4537849, at *9 (distinguishing *Siegel* for same reason).  Unlike HSBC, Defendants withdrew from Syria not to avoid helping terrorists, but because their business there had collapsed.  *Id.* ¶ 85; SOF ¶¶ 93-103.  Their realization that their criminal scheme was no longer profitable hardly negates the "role in the Attacks" they "assumed" by intentionally funding the terrorists beforehand.  *Siegel*, 933 F.3d at 224.

Defendants' proposed 10-month rule also fails on its own terms.  It is just the sort of "bright-line distinction[]" *Twitter* disavowed, 598 U.S. at 506, and it contradicts the settled principle that terrorist funders can remain liable for attacks even years after the funding stops.[22]  Here, Defendants' support was so massive that it aided ISIS's and ANF's attacks for years afterward.  *Infra* Part II.B.2.c.  So unlike in *Siegel*, Defendants had every "reason" to know they were "assuming a role in [ISIS's and ANF's] terrorist activities."  933 F.3d at 224.

### B.  Knowing And Substantial Assistance

*Twitter* also "clarified the pleading standard for knowing and substantial assistance." *Zobay*, 2023 WL 6304961, at *26.  Aiding-abetting allegations must raise a plausible inference of "culpable" misconduct.  *Id.* at *27 (quoting *Twitter*, 598 U.S. at 500).  There must also be an adequate "nexus between a defendant's assistance and the act of international terrorism."  *Id.* at 28.  These two factors work in tandem:  a strong showing of one permits a weaker showing of

---

[22] *See, e.g.*, *Owens v. Rep. of Sudan,* 864 F.3d 751, 796 (D.C. Cir. 2017), *vacated on other grounds*, *Opati v. Rep. of Sudan*, 140 S. Ct. 1601 (2020) ("severing ties with al Qaeda" "two years" before attack did "not preclude a finding" of causal liability for attack).

the other.  *See Twitter*, 598 U.S. at 494-96.  Plaintiffs' allegations are strong on both counts.

### 1.   Defendants culpably assisted ISIS's and ANF's terrorist attacks

**a.**   Defendants' decision to give cash and cement to terrorists represents "truly

culpable conduct."  *Twitter*, 598 U.S. at 489.  Although *Twitter* "did not define 'culpable,' it

provided examples to illuminate its meaning."  *Zobay*, 2023 WL 304961, at *27.  Passively

allowing terrorists to upload content to a general social-media site, "with little to no front-end

screening," is not culpable.  *Id.* (citing *Twitter*, 598 U.S. at 498).  But giving terrorists

"dangerous wares" or "routine services . . . in an unusual way" is.  *Twitter*, 598 U.S. at 502.  The

key is to distinguish "active abetting" from "mere passive nonfeasance," such as "fail[ing] to

stop ISIS from using" a generally available communications platform.  *Id.* at 499-500.

Defendants' criminal scheme involved the former.  Before *Twitter*, the "Second Circuit

[had] indicated that knowingly processing millions of dollars in transfers for a terrorist

organization would constitute substantial assistance."  *Bartlett*, 2020 WL 7089448, at *15.

Courts in this Circuit thus routinely sustained claims based on allegations that a defendant

knowingly funded an FTO or its affiliate.  *See, e.g.*, *Kaplan*, 999 F.3d at 866 (bank allowed

terrorist-affiliated "Customers" to "deposit large sums"); *Henkin*, 495 F. Supp. 3d at 160

(defendant "provid[ed] banking services to three customers with 'many' known connections to

Hamas"); *King I*, 2022 WL 4537849, at *9 ("terrorist financing" was substantial assistance).[23]

The D.C. Circuit persuasively did the same.  *See Atchley*, 22 F.4th at 222 (bribes substantially

aided terrorism by giving a "considerable source of funding that helped the organization commit

---

[23] Defendants assert (at 41) that "assistance to a terrorist organization, without more, is insufficient to satisfy JASTA's scienter requirement."  The Second Circuit has rejected that very argument as a reason to dismiss cases, like this one, that plausibly tie a defendant's payments to an FTO's violent activities.  *See Honickman*, 6 F.4th at 496-99; *Kaplan*, 999 F.3d at 861.

multiple terrorist acts").  These cases all reflect common sense:  knowingly bankrolling terrorists involves a "level of blameworthiness" the law typically condemns.  *Twitter*, 598 U.S. at 489.

That remains the rule after *Twitter*.  Last month, in *King*, the court affirmed that "*Twitter* largely align[s] with the Second Circuit precedent."  *King II*, 2023 WL 8355359, at *2.  Similarly, *Zobay* applied *Twitter* in upholding substantial-assistance allegations based on a company's conduct procuring "dual-use technologies" and "facilitating a steady flow of funds" to a terrorist organization.  2023 WL 6304961, at *28.  And in *Bonacasa II*, the court likewise affirmed that a bank's "provision of banking and financing services" to terrorist fronts remained culpable under *Twitter*.  2023 WL 7110774, at *11.  Plaintiffs' allegations of culpable (indeed, criminal) misconduct are even more potent.  Compl. ¶¶ 50-98; *supra* pp. 5-8.

**b.**    *Halberstam*'s "six substantiality factors" reinforce the point.  *Twitter*, 598 U.S. at 504.  Courts have "[l]ong regarded" *Halberstam* as the "leading case" on secondary liability, *id.* at 485, which Congress incorporated into the ATA, *see* JASTA § 2(a)(5).  *Halberstam* applied six factors in affirming liability based on the secondary actor's "passive but compliant" aid of a burglary enterprise.  705 F.2d at 474, 483-84.  Those factors likewise support Plaintiffs here.

**i.**    ***Nature of the act encouraged***.  The acts assisted were ISIS's and ANF's terrorist attacks.  Those attacks required money (Compl. ¶¶ 99-111) and cement (*id.* ¶¶ 76-78) to execute effectively.  This first factor thus supports liability.  *See Kaplan*, 999 F.3d at 865-66; *Atchley*, 22 F.4th at 222.  Moreover, a defendant's "culpability . . . increase[s] with an increase in . . . the blameworthiness of the tortious act aided."  *Zobay*, 2023 WL 6304961, at *30 (quoting *Kaplan*, 999 F.3d at 857).  The terrorist attacks here were "extraordinarily blameworthy," so "'even relatively trivial aid could count as substantial.'"  *Id.* (quoting *Atchley*, 22 F.4th at 222).  Defendants' material support readily exceeds that threshold.  Compl. ¶¶ 100-46.

ii.    ***Amount of assistance.***  Courts in this Circuit regularly hold that supplying

terrorists with millions of dollars satisfies *Halberstam*'s second factor.  *See*, *e.g.*, *Henkin*, 495 F.

Supp. 3d at 161; *Bartlett*, 2020 WL 7089448, at *13; *King I*, 2022 WL 4537849, at *9; *Bonacasa*

*I*, 2023 WL 2390718, at *14; *Zobay*, 2023 WL 6304961, at *31.  Defendants did that and more.

Compl. ¶¶ 54, 107-12.  Defendants downplay (at 52) their support by citing ISIS's "massive

resources . . . from other sources," but Congress did not restrict secondary liability "to the top

funder of a terrorist action," *Atchley*, 22 F.4th at 222.  Where, as here, a defendant gives the

terrorists "a considerable source of funding," this factor supports liability.  *Id.*

iii.    ***Presence.***  This factor considers whether a corporate defendant was present with

terrorists "'in a transactional sense,' which would include involvement with the terrorist group

before and leading up to the relevant Attack."  *Zobay*, 2023 WL 63044961, at *31 (quoting

*Bernhardt v. Islamic Rep. of Iran*, 47 F.4th 856, 872 (D.C. Cir. 2022)).  Defendants' calculated

negotiations with ISIS and ANF involved just this sort of "transactional" presence.  But even if it

did not, courts typically afford the presence factor little weight in terrorist-funding cases like this

one.  *See*, *e.g.*, *King I*, 2022 WL 4537849, at *10; *Bonacasa I*, 2023 WL 2390718, at *14 n.22.

iv.    ***Relationship.***  This factor turns on whether a defendant transacts with a

designated terrorist or its known affiliate.  *See Henkin*, 495 F. Supp. 3d at 161; *Averbach II*, 2022

WL 2530797, at *16; *King I*, 2022 WL 4537849, at *9.  Defendants did so here.  Compl. ¶¶ 53-

84.  Defendants assert (at 53) that their payments involved "third-party intermediaries" and

"were made . . . to protect the safety of the company's employees."  But the former just

heightens their culpability:  Defendants used intermediaries to cover their tracks, not to mitigate

their contribution to the terrorist attacks they were funding.  Compl. ¶¶ 5, 59, 89; *see Kaplan*,

999 F.3d at 855-56, 865-66 (aid through intermediaries was substantial).  And they bribed the

terrorists to boost their profit margins, not to protect their employees. Compl. ¶ 66. Their alleged fear of ISIS and ANF, even if true, does nothing to justify bribing those groups. *See Chiquita*, 284 F. Supp. 3d at 1318-19 (denying summary judgment on ATA claims about protection payments that defendant said were made to "protect[] the lives of its employees").

       **v.**     ***State of Mind.***  A secondary actor has a culpable state of mind when it knows it is funding terrorists. *See Kaplan*, 999 F.3d at 860-61, 865-66; *Atchley*, 22 F.4th at 223; *Bartlett*, 2020 WL 7089448, at *14; *Averbach II*, 2022 WL 2530797, at *16. Defendants had the requisite knowledge here. Compl. ¶¶ 55, 79-84, 87-89, 106, 121. Defendants say (at 53) they were not "one in spirit" with ISIS or ANF, but "Congress did not limit secondary liability to those who are 'one in spirit' with terrorists," *Atchley*, 22 F.4th at 223; *see Bernhardt*, 47 F.4th at 872 (same); *Kaplan*, 999 F.3d at 860 ("intent is not itself a *Halberstam* element"). Whatever Defendants' motives, their state of mind was quite blameworthy: they criminally bribed two terrorist groups, negotiated a revenue-sharing agreement with one of them to induce attacks on their competitors, tried to conceal the scheme, and then refused to fully cooperate with DOJ's investigation. *Supra* pp. 5-7, 11. If that is not enough for secondary liability, virtually nothing is.

       **vi.**     ***Duration.***  Funding terrorists for more than a year shows an adequate duration under *Halberstam*'s sixth factor, *see Atchley*, 22 F.4th at 224 – particularly when, as here, the defendant offers "a substantial amount of aid" and its support persists "even after the [recipient] was designated as an FTO," *Zobay*, 2023 WL 6304961, at *32. Defendants portray (at 53-54) their assistance as "relatively brief." But the complaint alleges at least 18 months of support that likely extended past October 2014. Compl. ¶¶ 53, 61, 96. The "duration" factor may cut against substantiality if a complaint "describe[s] a one-off transaction by a firm unfamiliar with its counterparty." *Atchley*, 22 F.4th at 224. When a complaint alleges "a set of enduring, carefully

cultivated relationships consisting of scores of transactions," by contrast, the duration factor "leans decidedly in plaintiffs' favor." *Id.* That is what Plaintiffs allege. Compl. ¶¶ 45-98.

### 2.    Defendants' material support had a sufficient nexus to the attacks

#### a.    The nexus allegations are sufficient

Plaintiffs also allege a strong "nexus" between the "assistance" and the attacks that harmed them. *Zobay*, 2023 WL 6304961, at *28. The ATA does not "demand a strict nexus between the alleged assistance and the terrorist act." *Twitter*, 598 U.S. at 497. The attacks need only be a "foreseeable risk" of the activities Defendants aided. *Id.* at 496.

*Zobay* is again instructive. The court there inferred a nexus between transactions in Iran – in which the defendant procured U.S.-embargoed communications technologies for IRGC commercial fronts – and IRGC-sponsored terrorist attacks in Iraq. 2023 WL 6304961, at *29. The nexus flowed from two core inferences: the equipment was "important to the IRGC's [terrorist] aims," and the IRGC used the fronts to "funnel money, dual-use goods, and technical aid" to other "terrorist proxies in Iraq." *Id.* No allegations traced individual pieces of equipment to individual attacks committed by those proxies. *Id.* at *29-30. But because the "technologies" were "importan[t] to terrorist activities" generally, the nexus to the attacks was "sufficiently concrete." *Id.* at *30. Other post-*Twitter* cases about terrorist funding have reasoned similarly. *See Bonacasa II*, 2023 WL 7110774, at *9-12; *King II*, 2023 WL 8355359, at *3.

The nexus here is even closer for two reasons. *First*, ISIS and ANF used Defendants' cash and cement directly in orchestrating terrorist attacks. Compl. ¶¶ 76-78, 99-105. The complaint details how "tax" payments to ISIS and ANF in Syria financed terrorist attacks throughout the Middle East and West Africa. *Id.* ¶¶ 103-05, 111-12. It also cites studies confirming the linear relationship between such payments and terrorist attacks. *Id.* ¶¶ 109-110. And Defendants' payments were causally significant. *Id.* ¶¶ 107-111. Each attack was

inexpensive on its own – costing just $2,700 – meaning Defendants' funds were enough to kill every Plaintiff many times over.  *Id.* ¶¶ 54, 109.  A jury could draw a causal inference from those facts alone.  *See Chiquita*, 284 F. Supp. 3d at 1317-18 ("reasonable jurors" could find "financial contributions" were "substantial factor" in terrorist attacks given attacks' marginal "cost").

*Second*, not only did Defendants directly engage with ISIS and ANF – the *Zobay* defendant's link to Hezbollah was less direct – but the complaint also ties Defendants' payments to the individual terrorist cells and operatives that attacked the *Foley* Plaintiffs.  *Supra* p. 8.  Those operatives included Abu Luqman, an ISIS commander "on the shadow board of Lafarge's factory" who personally helped orchestrate the attacks that targeted Plaintiffs.  Compl. ¶¶ 138-39.  Of the many ATA cases to uphold aiding-abetting claims, Plaintiffs know of none involving allegations so granular.  *See, e.g.*, *Kaplan*, 999 F.3d at 866; *Atchley*, 22 F.4th at 220-25; *Zobay*, 2023 WL 6304961, at *29-30; *Henkin*, 495 F. Supp. 3d at 160.  The cell-specific links here (Compl. ¶¶ 115-46) thus far surpass what is needed to show the requisite nexus.

In any event, Defendants' aid was "pervasive, systemic, and culpable" enough to make them responsible for the *entire* "subset of terrorist acts" alleged – with or without any attack-specific nexus.  *Twitter*, 598 U.S. at 502; *see* Compl. ¶¶ 79-84, 108-111, 359.  Even ignoring the many attack-specific allegations, Defendants' extraordinary culpability, *id.* ¶¶ 1-6, 10, associates them with "every [ISIS or ANF]-led attack" at issue, *Zobay*, 2023 WL 6304961, at *30.

### b.    Defendants' geographic distinctions are unpersuasive

Defendants mainly argue (at 42-44, 49-50) that, because they paid terrorists in Syria, there cannot be a nexus with any attack outside Syria.  But Defendants cite no case imposing a "same country" rule for ATA liability, and Plaintiffs know of none.  Courts routinely find an

adequate nexus between aid given to terrorists in one country and attacks committed in another.[24]

This Court should do the same. A same-country rule is an especially poor fit for ISIS, a group that desecrated sovereign borders in building its "global terrorist caliphate." Compl. ¶ 36; *see id.* ¶¶ 116-22. On these facts, there is a strong link to each attack in each geography:

- Syria: The *Foley* Plaintiffs allege that Defendants aided six attacks in Syria: four kidnappings (three by ISIS, one by ANF); one ISIS missile attack; and one ISIS suicide attack. *Id.* ¶¶ 235, 246, 254, 262, 291, 311. Those attacks occurred in the heart of ISIS's caliphate and were near LCS's cement plant. *Id.* ¶¶ 115-17. The four kidnappings even involved tunnels fortified with Lafarge's cement. *Id.* ¶¶ 78, 136, 229. Defendants do not seriously dispute that they could have foreseen these attacks. *Id.* ¶¶ 99-111.

- Iraq: The *Foley* Plaintiffs allege that Defendants aided four ISIS attacks on U.S. servicemembers in Iraq. *Id.* ¶¶ 269, 281, 303, 309. ISIS stands for "the Islamic State of Iraq and Syria," *id.* ¶ 34, and before 2013, was called "al-Qaeda in Iraq," *id.* ¶ 29. These names reflect ISIS's goal to establish a caliphate based in Syria *and Iraq*. *Id.* ¶ 117.[25] In August 2014, ISIS literally bulldozed the border between the two countries and declared: "we are one state, the Islamic state." *Id.* It was thus foreseeable ISIS would use funds from one country to commit attacks in the other. *Id.* ¶¶ 116-17.

- Turkey: The *Foley* Plaintiffs allege that Defendants aided one ISIS attack on a nightclub in Turkey. *Id.* ¶ 326. The complaint links that attack to funding extracted by ISIS leadership in Syria. *Id.* ¶¶ 117-22, 327. That link was foreseeable: in 2014, for example, media reports noted that ISIS was plotting external attacks, including in Turkey, from "safe-havens in Iraq and Syria." *Id.* ¶ 122 n.96. Both ISIS and the Turkish government also openly warned of such attacks. *Id.* ¶ 122 & nn.96-100.

- Niger: The *Foley* Plaintiffs allege that Defendants aided one ISIS attack on U.S. servicemembers in Niger. *Id.* ¶ 332. The complaint again links this attack to funding extracted by ISIS leadership in Syria. *Id.* ¶¶ 117-22, 333-35. That link was foreseeable: the U.S. government, ISIS, and the press all publicly warned that ISIS was using its Syria-Iraq headquarters to orchestrate attacks in West Africa. *Id.* ¶¶ 120, 122.

Defendants were well-positioned to foresee the terrorists' global ambitions. *Id.* ¶¶ 122,

---

[24] *See Kaplan*, 999 F.3d at 845, 849 (aid in Lebanon; attacks in Israel); *Zobay*, 2023 WL 6304961, at *29 (Iran-Iraq); *Henkin*, 495 F. Supp. 3d at 147-49 (Turkey-West Bank); *Bonacasa I*, 2023 WL 2390718, at *10-14 (Pakistan-Afghanistan); *Bartlett*, 2020 WL 7089448, at *9-15 (Lebanon-Iraq); *see also Owens*, 864 F.3d at 796 (Sudan-Kenya-Tanzania).

[25] The 2015 book that paragraph cites establishes that ISIS's ambitions for Iraq had long been public knowledge; it did not itself put Defendants on notice. *Compare* Mot. at 43 *with* Compl. ¶ 117 n.89. The complaint cites other, earlier sources too. *Id.* ¶ 117.

226.  In 2013, LCS's risk manager warned that ANF "follows a global jihadi ideology (similar to al-Qaida) and are more open to receive foreign fighters," including from Iraq.  *Id.* ¶ 121.  And ANF and ISIS publicly shared that same "'global' jihadist agenda."  *Id.*; *see id.* ¶¶ 33-44, 116-21.  Defendants thus should have foreseen that their payments to these *global* terrorist groups would finance the groups' attacks elsewhere in the world.  The statute does not demand (Mot. at 43, 45) precise knowledge of those "cross-border transfer[s] of funds" or the "specifics of [the terrorists'] financial planning."  *See Twitter*, 598 U.S. at 495 (secondary actor need not know "all particulars of the primary actor's plan"); *Owens*, 864 F.3d at 798 ("Sudan's claimed ignorance of al Qaeda's specific aim to bomb American embassies focuses too narrowly upon those events").

None of this blames Defendants for "ISIS's terrorist activities anywhere, everywhere, and for all time."  Mot. at 50.  The complaint disclaims that very theory.  Compl. ¶¶ 113-14.  To be clear, the *Foley* Plaintiffs acknowledge that Defendants' resources likely did not aid "ISIS-'inspired'" lone-wolf attacks, *id.* ¶ 113 & n.85, nor most locally executed ISIS "attacks in Western Europe," *id.* ¶ 113 & n.86.  The complaint explains why the specific attacks pleaded here are different, *id.* ¶¶ 113-23, which Defendants' motion ignores.  Instead, Defendants pretend (at 49) that Plaintiffs' claims are "tantamount" to boundless liability because the ISIS "cells" they funded were responsible for "a significant portion of the alleged ISIS attacks."  That argument is backwards.  Defendants' choice to support the worst ISIS cells responsible for dozens of attacks (Compl. ¶¶ 124-46) strengthens, not weakens, the nexus with the many attacks they funded.  *See Zobay*, 2023 WL 6304961, at *29.  Indeed, *Twitter* does not cap the number of attacks a plaintiff may plead, nor does it suggest a defendant's liability shrinks as the amount of violence grows.  Quite the opposite:  providing "systemic" aid to the terrorists responsible for killing so many people only magnifies Defendants' culpability.  *Twitter*, 598 U.S. at 495-96, 502.

### c.    Defendants' temporal distinctions are unpersuasive

Defendants next conjure (at 44) a "yawning temporal gap" between their payments and Plaintiffs' injuries.  But courts often hold terrorist funders liable for attacks that occur years later.[26]  That is because "[s]eed money for terrorism can sprout acts of violence long after the investment."  *Boim*, 549 F.3d at 700.  A "'two year[]' interval," the D.C. Circuit noted, is "far from the point" at which temporal considerations might preclude liability.  *Owens*, 864 F.3d at 796 (quoting *Boim*, 549 F.3d at 699-700) (brackets in *Owens*).  The intervals here are comparable.  Even if Defendants' payments stopped in 2014, *contra* Compl. ¶ 96 (alleging payments "moving forward"), that would leave no temporal gap for four attacks, *id.* ¶¶ 235, 246, 254, 262; one year or less for one attack, *id.* ¶ 269; two years or less for three attacks, *id.* ¶¶ 281, 291, 326; and three years or less for the remaining four attacks, *id.* ¶¶ 303, 309, 311, 332.  As in *Owens*, ISIS "benefited greatly from [Defendants'] aid" and grew its "capabilities" to "launch[]" the attacks – roughly three years later at most – that targeted Plaintiffs.  864 F.3d at 797.

The complaint also raises a strong inference of temporal foreseeability.  Defendants' payments were large enough to finance *thousands* of attacks across many years.  Compl. ¶¶ 107-12.  It was therefore foreseeable – indeed, obvious – that ISIS would take years to consume the resources Defendants supplied.  *Id.* ¶ 112.  Defendants' factual disputes (at 44-45) call for an excessively precise degree of foreseeability and raise jury questions in all events.  *See Lynch*, 952 F.3d at 76 (plaintiffs receive reasonable inferences); *AUSA Life Ins. Co. v. Ernst & Young*, 206 F.3d 202, 217 (2d Cir. 2000) ("A foreseeability determination in and of itself is also a

---

[26] *See Owens*, 864 F.3d at 797 (Sudan's support for al-Qaeda in 1996 proximately caused 1998 bombings); *Boim*, 549 F.3d at 700 ("interval" of "two years" did not "cut off liability"); *Averbach II*, 2022 WL 2530797, at *2, 6, 10-17 (payments within "two years" of the "first of the Attacks"); *Strauss v. Crédit Lyonnais, S.A.*, 925 F. Supp. 2d 418, 423-24, 432 & n.13 (E.D.N.Y. 2013) (adequate temporal nexus between February 2002 transfer and September 2004 attack).

question of fact for resolution by the finder of fact.").  Indeed, many ATA cases have upheld allegations based on far vaguer allegations of temporal foreseeability.  *Supra* p. 49 & n.26.

Defendants' attempt (at 45) to critique the timing of the "four Syrian Kidnappings" likewise fails.  For two of the four, Defendants do not dispute that the kidnapping started and finished entirely during Defendants' criminal scheme.  Compl. ¶¶ 246, 254.[27]  For the other two, Defendants contend (at 45) that the kidnappings started "before" their "relevant payments."  But the payments began "in late 2012 or early 2013," *id.* ¶¶ 61, 63 – close in time to (and perhaps before) the first two abductions, *id.* ¶¶ 235, 262.  When exactly the initial payments "occurred is a matter for discovery."  *Bartlett*, 2020 WL 7089448, at *15.  Regardless, the kidnappings continued long past the initial abductions, Compl. ¶¶ 246, 254, and Defendants' resources aided those ongoing kidnappings, *id.* ¶¶ 228-29.  Courts have accepted similar allegations against defendants that funded multiyear kidnappings,[28] including for the very attack in which ISIS executed Messrs. Foley and Sotloff, *see Sotloff*, 525 F. Supp. 3d at 139 (Syria contributed to ISIS's *post-abduction* conduct keeping "Foley and Sotloff hostage in multiple locations, tortur[ing] them for extended periods, [and] behead[ing] them").  This Court should too.

## III.    PLAINTIFFS SUFFICIENTLY PLEAD CONSPIRACY LIABILITY

Plaintiffs also state two claims for conspiracy liability.  Compl. ¶¶ 367-85.  *Halberstam* specifies four elements for conspiracy liability:  (1) an agreement; (2) to participate in an unlawful act; and (3) an injury caused by; (4) an overt act in furtherance of that agreement.  *See* 705 F.2d at 477.  On the first two elements, Count Two pleads an agreement between Defendants

---

[27] Defendants maintain (at 45) that three of the alleged abductions were initially "carried out by AQI, an entirely different FTO," but AQI was just ISIS by its prior name, Compl. ¶ 34. Regardless, ISIS itself later held these victims hostage and executed them.  *Id.* ¶¶ 235, 246, 254.

[28] *See Stansell v. BGP, Inc.*, 2011 WL 1296881, at *10 (M.D. Fla. Mar. 31, 2011) (upholding proximate cause for payments that began "at least two years after Plaintiffs were captured").

and ISIS whose "overall object was to maintain ISIS's territorial control of Syria and Iraq and thereby promote ISIS's protection rackets within that territory." Compl. ¶ 368; *see id.* ¶¶ 79-86, 214-16.[29] The complaint further alleges (and Defendants do not dispute) that ISIS's attacks on Plaintiffs were overt acts in furtherance of that agreement. *Id.* ¶¶ 217-23.

Defendants concede that Count Two pleads these conspiracy-liability elements save one: "an agreement between two or more persons." Mot. at 56 (quoting *Freeman v. HSBC Holdings PLC*, 57 F.4th 66, 76 (2d Cir. 2023)); *see id.* at 61-62 (admitting that overt-act element is satisfied for this "one claimed conspiracy"). To plead an agreement, a plaintiff must "allege that the coconspirators were pursuing the same object." *Freeman*, 57 F.4th at 79.

Defendants cannot deny they struck an "agreement" with ISIS; they pleaded guilty to doing it. *E.g.*, SOF ¶ 18 (Lafarge used consultants "to carry out negotiations and effect these agreements with ISIS").[30] The complaint plausibly alleges that agreement served a common object: maintaining ISIS's territorial control of its caliphate. Compl. ¶¶ 214-16. Lafarge believed ISIS would "stay in the region" and sought a "durable agreement" to align ISIS's incentives with its own. *Id.* ¶ 79. The agreement thus imposed duties on both sides: Defendants propped up ISIS with money and cement, *id.* ¶¶ 54-78, and ISIS acted to eliminate Lafarge's cement rivals, *id.* ¶¶ 79-86. Those reciprocal obligations reflected Defendants' brutal calculation that it was better for Lafarge if ISIS stayed in power. *Id.* ¶¶ 10, 81-82, 214-17. As one employee admitted, LCS expected ISIS to use its "disciplined fighters" to "bring order to the chaos of

---

[29] Count Three pleads a related conspiracy to provide material support to ISIS and ANF, Compl. ¶¶ 377-85, which states a claim for the reasons explained in the *Finan* brief.

[30] Defendants err (at 63) in divorcing Lafarge Cyprus from that conspiracy. Lafarge Cyprus was the instrument through which Lafarge controlled LCS's payments, so LCS acted as Lafarge Cyprus's (and Lafarge's) agent. Compl. ¶¶ 13-14, 45, 57-58, 96, 154-55. The ISIS agreement is thus imputed to Lafarge Cyprus. *See Atchley*, 22 F.4th at 230-31 (imputing liability to principal).

corruption that reigned in northern Syria." *Id.* ¶ 216. So Defendants thought that, as long as ISIS's caliphate remained viable, Lafarge would dominate the Syrian market by persisting in its unusual willingness to conduct business in ISIS's territory. *Id.* ¶¶ 50, 214-17.

Those allegations are stronger than conspiracy allegations that have succeeded elsewhere. In *King I*, for example, the court sustained an alleged conspiracy between a defendant bank and al-Qaeda whose object was to "drive[] the U.S. military out of Afghanistan." 2022 WL 4537849, at *10. Specifically, the bank "took deliberate steps to help customers" – "well-known terrorists, fronts, and fundraisers" tied to al-Qaeda – move money and "evade international sanctions." *Id.* at *10-11. That was enough to "raise a reasonable inference" that the bank and al-Qaeda had "agreed on the essence of the underlying illegal objectives." *Id.* at *11. The court also reaffirmed that ruling after *Freeman*. *King II*, 2023 WL 8355359, at *3-4. Defendants' agreement with ISIS was more direct and more closely tied to terrorism. Compl. ¶¶ 214-23.

Defendants respond (at 58) that they were "*economically* motivated," not ideologically motivated, in "their dealings with ISIS." But that mistakes "motive" for "intent." *United States v. Davis*, 183 F.3d 231, 244 (3d Cir.), *amended by* 197 F.3d 662 (3d Cir. 1999). Defendants' "different motivations . . . for joining the conspiracy . . . do[] not undermine the existence of the conspiracy itself." *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 690 (S.D.N.Y. 2012); *see United States v. Khalupsky*, 5 F.4th 279, 288-89 (2d Cir. 2021) (co-conspirators' "goals" "need not be congruent for a single conspiracy to exist"). After all, both sides wanted ISIS to maintain its caliphate. Compl. ¶¶ 10, 217. Their complementary reasons for sharing that intent – one wanted money, the other jihad – just shows why they were aligned in pursuing their common object. Their motives "converged to cause [them] to join a single conspiracy." *Elec. Books*, 859 F. Supp. 2d. at 690; *see Davis*, 183 F.3d at 244 (upholding conspiracy despite "different

motives"); *Khalupsky*, 5 F.4th at 288-89 (same despite co-conspirators' "individual goals").

    *Freeman* and *Bernhardt* are inapposite because they involved different, less-plausible conspiracies. *Cf.* Mot. at 57. In *Freeman*, the defendant banks intended to "provid[e] Iran . . . [with] the ability to illegally transfer billions of dollars," whereas the terrorists "engaged in planning and perpetrating the murder and maiming of hundreds of Americans." 57 F.4th at 80. No common object – uniting those facially disparate aims – was pleaded. *Id.* Similarly, in *Bernhardt*, "HSBC was trying to make 'substantial profits' by evading sanctions, whereas al-Qaeda sought to terrorize" the United States. 47 F.4th at 873. Here, the alleged conspiracy is more nuanced. Both sides had their own reasons for intending the same thing: ISIS remaining in power. Compl. ¶¶ 10, 214-17. And unlike in *Freeman* and *Bernhardt*, terrorist attacks served that *common* object. *Id.* ¶¶ 217-23. Defendants cite no case rejecting a conspiracy like that.

## IV.    DEFENDANTS' CONSTITUTIONAL CHALLENGE LACKS MERIT

    The Court should reject Defendants' due-process challenge (at 71-74). True, "legislation usually applies only prospectively." *Opati*, 140 S. Ct. at 1607. But where, as here, Congress has explicitly legislated retroactive liability, *see Freeman*, 57 F.4th at 73-74, a court's due process review is "limited," *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 731 (1984). Retroactive legislation is "constitutional unless Congress has acted in an arbitrary and irrational way." *Canisius Coll. v. United States*, 799 F.2d 18, 25 (2d Cir. 1986).

    JASTA's secondary-liability provisions are not irrational. Congress may impose retroactive liability to compensate victims for past injuries, *see, e.g., Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 17-19 (1976); *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 191-92 (1992), including by authorizing new tort claims, *see, e.g., Shadburne-Vinton v. Dalkon Shield Claimants Tr.*, 60 F.3d 1071, 1077 (4th Cir. 1995); *Brown v. Hutton Grp.*, 795 F. Supp. 1307,

1315-16 (S.D.N.Y. 1992).[31]  Here, Congress "provide[d] civil litigants with the broadest possible basis . . . to seek relief against" those who aided or conspired with the terrorists responsible for their injuries.  JASTA § 2(b).  Victim compensation is a rational objective that distinguishes JASTA from the unusual statute (Mot. at 72) in *Regina Metro. Co., LLC v. New York State Div. of Hous. & Cmty. Renewal*, 154 N.E.3d 972 (N.Y. 2020), which served no purpose beyond "punish[ing] owners more severely for past conduct they [could] not change."  *Id.* at 1002.

Defendants offer no plausible basis to conclude otherwise.  They complain (at 71) that their unlawful acts preceded JASTA by "two years," but due process tolerates much longer periods of retroactivity, *see Canisius Coll.*, 799 F.2d at 26 (four years); *In re Chateaugay Corp.*, 53 F.3d 478, 491 (2d Cir. 1995) ("unlimited retrospective temporal reach").  Defendants also say (at 72-73) that Plaintiffs' entitlement to treble damages is "oppressive" and "punitive."  But the Supreme Court distinguishes treble from punitive damages, *see Cook Cnty. v. United States ex rel. Chandler*, 538 U.S. 119, 130-33 (2003); the former often apply retroactively, *see Sanders v. Allison Engine Co.*, 703 F.3d 930, 948-49 (6th Cir. 2012); and "[t]reble damages under the ATA are compensatory" in all events, *Stansell v. Revolutionary Armed Forces of Colombia*, 2022 WL 17830551, at *3 (S.D.N.Y. Dec. 21, 2022).  Whether those damages also have a "deterrent aspect" makes no difference, because "statutes can simultaneously have punitive, deterrent and compensatory purposes."  *Id.* at *3-5.  Defendants cite no case invalidating a statute like JASTA whose treble damages reasonably serve at least one compensatory function.[32]

---

[31] Because JASTA here merely authorizes civil plaintiffs to recover civil damages for pre-enactment conduct that was already unlawful, Defendants' due-process challenge lacks any "great[] force."  *Landgraf v. USI Film Prods.*, 511 U.S. 244, 281-82 (1994).

[32] Nor should the Court "strike the request for punitive damages."  Mot. at 74 n.27.  "Courts routinely deny motions to dismiss requests for punitive damages as procedurally improper because such a request is not a cause of action subject to dismissal."  *City Nat'l Specialty Co. v. Ashley Furniture Indus., LLC*, 2022 WL 2918121, at *3 (E.D.N.Y. July 21, 2022).

## V.    THE COURT SHOULD AT LEAST AUTHORIZE GOVERNMENT DISCOVERY

If the Court does not deny the motion to dismiss outright, it should at least authorize Plaintiffs to serve the attached *Touhy* requests (attached as Ex. C) on the government seeking targeted records that DOJ collected in prosecuting Lafarge and LCS.  Those records bear on Defendants' conduct, state of mind, and U.S. contacts.  *E.g.*, SOF ¶¶ 18, 60, 77, 99-103.  The ATA authorizes civil plaintiffs to "seek[] to discover the investigative files of the Department of Justice."  18 U.S.C. § 2336(b).  DOJ may object to such discovery, which the Court may stay, if the "discovery request will substantially interfere with a criminal investigation or prosecution of the incident" at issue.  *Id.*  But any "stay of discovery" of the government's files "shall constitute a bar to the granting of a motion to dismiss under rules 12(b)(6) and 56 of the Federal Rules of Civil Procedure."  *Id.*  Plaintiffs have conferred with DOJ over their proposed requests; DOJ has not provided its position.  The Court thus cannot "dismiss" the claims until Plaintiffs are afforded the reasonable "discovery" they seek.  18 U.S.C. § 2336(b).  And a stay is unwarranted at any rate, because Lafarge and LCS have already been convicted and sentenced.  Compl. ¶ 1.

## CONCLUSION

The Court should deny the motion or order discovery.  If the Court discerns any deficiencies, Plaintiffs request leave to amend.  *See Przewozman*, 2023 WL 2562537, at *18.

Dated:  January 22, 2024

Respectfully submitted,

*/s/ Joshua D. Branson*
Joshua D. Branson (*pro hac vice*)
Andrew E. Goldsmith (No. 4312740)
Christopher C. Goodnow (*pro hac vice*)
James A. Ruck (*pro hac vice*)
Chase H. Robinett (*pro hac vice*)
Eric J. Maier (*pro hac vice*)
Kellogg, Hansen, Todd,
  Figel & Frederick, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel:  (202) 326-7900
Fax:  (202) 326-7999
jbranson@kellogghansen.com
agoldsmith@kellogghansen.com
cgoodnow@kellogghansen.com
jruck@kellogghansen.com
crobinett@kellogghansen.com
emaier@kellogghansen.com

Ryan R. Sparacino (*pro hac vice*)
Adam J. Goldstein (No. 5123286)
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel: (202) 629-3530
Fax: (202) 629-3658
ryan.sparacino@sparacinopllc.com
adam.goldstein@sparacinopllc.com

*Counsel for Foley Plaintiffs*