**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

-------------------------------------------------------- x
                                                         :
CHARISS FINAN, *et al.*,                                 :
                                                         :
        Plaintiffs,                                       :
                                                         :
        v.                                                :    22-cv-07831 (NGG) (PK)
                                                         :
LAFARGE S.A., *et al.*,                                  :    **Oral Argument Requested**
                                                         :
        Defendants.                                        :
                                                         :
-------------------------------------------------------- x
                                                         :
TAMARA FIELDS, *et al.*,                                 :
                                                         :
        Plaintiffs,                                       :
                                                         :
        v.                                                :    23-cv-00169 (NGG) (PK)
                                                         :
LAFARGE S.A., *et al.*,                                  :    **Oral Argument Requested**
                                                         :
        Defendants.                                        :
                                                         :
-------------------------------------------------------- x
                                                         :
DIANE FOLEY, *et al.*,                                   :
                                                         :
        Plaintiffs,                                       :
                                                         :
        v.                                                :    23-cv-05691 (NGG) (PK)
                                                         :
LAFARGE S.A., *et al.*,                                  :    **Oral Argument Requested**
                                                         :
        Defendants.                                        :
                                                         :
-------------------------------------------------------- X

**COMBINED REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF**
**DEFENDANTS' MOTIONS TO DISMISS THE PLAINTIFFS' COMPLAINTS**

Jay K. Musoff
John Piskora
Sarah Levitan Perry
**LOEB & LOEB LLP**
345 Park Avenue
New York, NY 10154
Telephone:    212-407-4212
Facsimile:     212-407-4990

*Attorneys for Lafarge S.A.,*
*Lafarge Cement Holding Limited, and*
*Lafarge Cement Syria S.A.*

Served on February 21, 2024

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..............................................................................................1

ARGUMENT ....................................................................................................................2

I.    THE   COURT   LACKS   PERSONAL   JURISDICTION   OVER   EACH
      DEFENDANT..........................................................................................................2

      A.    The Opposition Provides No Legal Support for Personal Jurisdiction Under
            New York's Long-Arm Statute...................................................................2

            1.    The Actions Do Not Arise from the Transaction of Business in New
                  York. ............................................................................................3

                  a.    The Opposition Fails to Distinguish Settled Authority
                        Holding that the Mere Involvement of a New York
                        Correspondent Bank Does Not, Standing Alone, Create
                        Jurisdiction........................................................................3

                  b.    The Opposition Otherwise Fails to Offer Any Support for the
                        Theory that Defendants Purposefully Availed Themselves of
                        the Opportunity to Do Business in New York. ..................5

                  c.    The Opposition Provides No Legal Basis for Asserting
                        Personal Jurisdiction Under an Agency Theory. ...............9

            2.    The Opposition Fails to Respond to the Lack of a Sufficient Nexus
                  Between Plaintiffs' Claims and the Alleged U.S. Dollar Transfers. .........12

      B.    The Guilty Plea Does Not Create Jurisdiction.......................................14

      C.    The Opposition Fails to Substantiate Personal Jurisdiction Under Rule
            4(k)(2). .....................................................................................................15

            1.    The Complaints' Assertions Concerning General Contacts with the
                  United States Are Unavailing. ...................................................15

            2.    The Complaints Do Not Adequately Allege Conspiracy Jurisdiction.
                  ......................................................................................................17

II.   THE OPPOSITION FAILS TO SALVAGE THE AIDING-AND-ABETTING
      CLAIMS. ..............................................................................................................18

      A.    The General Awareness Allegations Are Deficient..............................18

      B.    The Complaints Do Not Allege that Defendants Knowingly Provided
            Substantial Assistance to the Injury-Causing Acts. ..............................22

       1.      The Opposition Does Not Establish the Complaints' Compliance with *Taamneh*.............................................................22

       2.      The *Halberstam* Factors Support Dismissal. .............................................26

  C.     Five of the Attacks Did Not Involve an Act of "International Terrorism."...........26

  D.     The *Fields* and *Finan* Plaintiffs Have Abandoned Aiding-and-Abetting Claims. ...........................................................27

III.    THE OPPOSITIONS DO NOT SAVE CLAIMS FOR CIVIL CONSPIRACY...............28

  A.     The Oppositions Do Not Establish that the Complaints Allege an Agreement.......................................................28

       1.      The *Foley* and *Fields* Complaints Do Not Allege an Agreement to Maintain ISIS's Territorial Control. ...........................................28

       2.      The Complaints Do Not Allege an Agreement to Provide Material Support to ISIS or ANF. ...........................................30

  B.     The Oppositions Do Not Show that the Complaints Allege an Overt Act in Furtherance of the Conspiracy to Provide Material Support. ...............................31

  C.     The Opposition Cannot Rescue Conspiracy Claims Against Lafarge Cyprus. ...........................................................32

  D.     The *Fields* Plaintiffs Have Abandoned Claims Based on an Alleged Conspiracy to Bring About Acts of International Terrorism. ...............................32

IV.    THE OPPOSITION DOES NOT REFUTE THAT IMPOSITION OF SECONDARY LIABILITY ON DEFENDANTS WOULD VIOLATE DUE PROCESS. ...........................................................33

V.    THE COURT SHOULD DENY REQUESTS FOR FURTHER DISCOVERY AND DISMISS THE COMPLAINTS WITH PREJUDICE. ...........................................34

CONCLUSION...............................................................35

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Al Rushaid v. Pictet & Cie*,
    28 N.Y.3d 316 (2016) ........................................................................................12

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .......................................................................................8, 9

*Averbach v. Cairo Amman Bank*,
    No. 19-cv-0004-GHW-KHP, 2020 WL 486860 (S.D.N.Y. Jan. 21, 2020), *report*
    *and recommendation adopted*, No. 1:19-cv-00004-GHW, 2020 WL 1130733
    (S.D.N.Y. Mar. 9, 2020) ....................................................................................6

*Bartlett v. Société Générale de Banque Au Liban SAL*,
    No. 19-cv-000007 (CBA) (VMS), 2020 WL 7089448 (E.D.N.Y. Nov. 25, 2020) .......6, 24

*Berdeaux v. OneCoin Ltd.*,
    561 F. Supp. 3d 379 (S.D.N.Y. 2021) .................................................................7

*Blau v. Allianz Life Insurance Co. of North America*,
    124 F. Supp. 3d 161 (E.D.N.Y. 2015) ...............................................................30

*Bonacasa v. Standard Chartered PLC*,
    No. 22 Civ. 33202023 WL 2390718 (S.D.N.Y. Mar. 7, 2023) ......................6, 14

*Bonacasa v. Standard Chartered PLC*,
    No. 22-cv-3320 (ER), 2023 WL 7110774 (S.D.N.Y. Oct. 27, 2023) ...............24

*Chauhan v. MM Hotel Management LLC*,
    No. 18-CV-5963 (DRH)(SIL), 2019 WL 6118006 (E.D.N.Y. Nov. 18, 2019) ...........28, 33

*Cook County v. United States ex rel. Chandler*,
    538 U.S. 119 (2003) ..........................................................................................33

*Daou v. BLC Bank, S.A.L.*,
    42 F.4th 120 (2d Cir. 2022) ...............................................................................6

*In re Electronic Books Antitrust Litigation*,
    859 F. Supp. 2d 671 (S.D.N.Y. 2012) ...............................................................29

*Esso Exploration & Production Nigeria Ltd. v. Nigerian National Petroleum Corp.*,
    397 F. Supp. 3d 323 (S.D.N.Y. 2019), *aff'd in part, vacated in part on other*
    *grounds*. 40 F.4th 56, 2d Cir. 2022) ...................................................................4

*Estate of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*,
    495 F. Supp. 3d 144 (E.D.N.Y. 2020) ...............................................................24

*Freeman v. HSBC Holdings PLC*,
57 F.4th 66 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 83 (2023) ............................29, 31, 32

*Great Bowery v. Best Little Sites*,
609 F. Supp. 3d 1240 (D. Utah 2022) ..............................................................................16

*Gucci America, Inc. v. Weixing Li*,
135 F. Supp. 3d 87 (S.D.N.Y. 2015) ...................................................................................7

*Hau Yin To v. HSBC Holdings, PLC*,
700 F. App'x 66 (2d Cir. 2017) ........................................................................................11

*Honickman v. BLOM Bank SAL*,
6 F.4th 487 (2d Cir. 2021) ...............................................................................19, 20, 21

*Hungerstation LLC v. Fast Choice LLC*,
No. 19-cv-05861-HSG, 2020 WL 137160 (N.D. Cal. Jan. 13, 2020), *aff'd*, 857 F.
App'x 349 (9th Cir. 2021) ...........................................................................................15, 16

*Kaplan v. Lebanese Canadian Bank*,
999 F.3d 842 (2d Cir. 2021) .............................................................................................24

*King v. Habib Bank Ltd.*,
Nos. 20 Civ. 4322 (LGS), 21 Civ. 2351 (LGS), 21 Civ. 6044 (LGS), 2022 WL
4537849 (S.D.N.Y. Sept. 28, 2022) ..................................................................................24

*King v. Habib Bank Ltd.*,
Nos. 20 Civ. 4322 (LGS), 21 Civ. 2351 (LGS), 21 Civ. 6044 (LGS), 2023 WL
8355359 (S.D.N.Y. Dec. 1, 2023) .....................................................................................24

*Laface v. Eastern Suffolk Boces*,
349 F. Supp. 3d 126 (E.D.N.Y. 2018) ........................................................................28, 33

*Landgraf v. USI Film Products*,
511 U.S. 244 (1994) ..........................................................................................................33

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
732 F.3d 161 (2d Cir. 2013) ...........................................................................................3, 9

*MacDermid, Inc. v. Deiter*,
702 F.3d 725 (2d Cir. 2012) .............................................................................................16

*Mayes v. Summit Entertainment Corp.*,
287 F. Supp. 3d 200 (E.D.N.Y. 2018) ..............................................................................34

*Mwani v. bin Laden*,
417 F.3d 1 (D.C. Cir. 2005) ..............................................................................................17

*Official Committee of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*,
    549 B.R. 56 (S.D.N.Y. 2016) ........................................................................7

*Page v. Oath Inc.*,
    No. 17 Civ. 6990 (LGS), 2018 WL 1406621 (S.D.N.Y. Mar. 20, 2018), *aff'd*, 797
    F. App'x 550 (2d Cir. 2019) ......................................................................27

*Przewozman v. Qatar Charity*,
    No. 20-CV-6088 (NGG) (TAM), 2023 WL 2562537
    (E.D.N.Y. Mar. 17, 2023) ...........................................................4, 5, 12, 34

*Sanders v. Allison Engine Co.*,
    703 F.3d 930 (6th Cir. 2012) .....................................................................33

*Schansman v. Sberbank of Russia PJSC*,
    565 F. Supp. 3d 405 (S.D.N.Y. 2021) ..........................................................6

*Siegel v. HSBC North America Holdings, Inc.*,
    933 F.3d 217 (2d Cir. 2019) .......................................................................22

*Singer v. Bank of Palestine*,
    No. 19-cv-006 (ENV) (RML), 2021 WL 4205176 (E.D.N.Y. Apr. 30, 2021) ................12

*Sotloff v. Syrian Arab Republic*,
    525 F. Supp. 3d 121 (D.D.C. 2021) .......................................................18, 24

*Spetner v. Palestine Investment Bank*,
    70 F.4th 632 (2d Cir. 2023) ...............................................................4, 9, 11

*Stansell v. Revolutionary Armed Forces of Colombia*,
    Nos. 16 Misc. 405 (LGS) (SN), 18 Misc. 545 (LGS) (SN), 2022 WL 17830551
    (S.D.N.Y. Dec. 21, 2022) ...........................................................................33

*Strauss v. Crédit Lyonnais, S.A.*,
    175 F. Supp. 3d 3 (E.D.N.Y. 2016) ..............................................................6

*Tamam v. Fransabank SAL*,
    677 F. Supp. 2d 720 (S.D.N.Y. 2010) ......................................................7, 14

*In re Tether & Bitfinex Crypto Asset Litigation*,
    576 F. Supp. 3d 55 (S.D.N.Y. 2021) ........................................................4, 14

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016) .......................................................................30

*Twitter, Inc. v. Taamneh*,
    598 U.S. 471 (2023) ...........................................................19, 23, 25, 26

*UMG Recordings, Inc. v. Kurbanov*,
    963 F.3d 344 (4th Cir. 2020) ........................................................16

*United States v. Davis*,
    183 F.3d 231 (3d Cir. 1999)..........................................................29

*United States v. Khalupsky*,
    5 F.4th 279 (2d Cir. 2021) ............................................................29

*Vasquez v. Hong Kong & Shanghai Banking Corp.*,
    477 F. Supp. 3d 241 (S.D.N.Y. 2020)............................................7

*Waldman v. Palestine Liberation Organization*,
    835 F.3d 317 (2d Cir. 2016)....................................................17, 18

*Wildman v. Deutsche Bank Aktiengesellschaft*,
    No. 21-CV-04400 (HG) (RML), 2022 WL 17993076 (E.D.N.Y. Dec. 29, 2022),
    *appeal docketed*, No. 23-132 (2d Cir. Jan. 30, 2023) ...................21, 22

*Will Co. v. Lee*,
    47 F.4th 917 (9th Cir. 2022) ........................................................16

*Zobay v. MTN Group Ltd.*,
    No. 21-cv-3503 (CBA), 2023 WL 6304961 (E.D.N.Y. Sept. 28, 2023) .................4, 24, 26

## STATUTES

N.Y. C.P.L.R. § 302 ............................................................................2

18 U.S.C. § 2331..............................................................................27

18 U.S.C. § 2336..........................................................................27, 35

Lafarge S.A. ("Lafarge"), Lafarge Cement Holding Limited ("Lafarge Cyprus"), and Lafarge Cement Syria S.A. ("LCS") (collectively, "Defendants") respectfully submit this combined Reply in further support of their Motions to Dismiss the Plaintiffs' Complaints.[1]

## PRELIMINARY STATEMENT

Nothing in Plaintiffs' opposition briefs changes the fact that the Court lacks personal jurisdiction over any Defendant, and that the claims are insufficiently pled. To the contrary, the briefs confirm that permitting these actions to move forward would require a novel and impermissible exercise of personal jurisdiction, as well as the imposition of boundless secondary liability wholly inconsistent with binding precedent.

Plaintiffs ask this Court to be the first to exercise personal jurisdiction over a foreign, non-bank corporate defendant based solely on its bank's use of a New York correspondent account. Not only is the request legally defective, but accepting this invitation would open courthouse doors to claims against virtually anyone, anywhere, who has transacted in U.S. dollars. These actions accordingly should be dismissed at the threshold for lack of personal jurisdiction.

As to the sufficiency of the ATA claims, Plaintiffs argue that the claims should proceed because Defendants paid money to intermediaries who passed funds to ISIS and ANF, and terrorist groups use money to carry out attacks. It does not matter, according to the opposition briefs, how far attenuated in time or proximity the attacks were from the locus of Defendants' payments to intermediaries. Under the opposition briefs' logic, any U.S. national who was a victim of an ISIS

---

[1] Abbreviations and defined terms have the same meaning as in Defendants' Combined Memorandum of Law in Support of Defendants' Motions to Dismiss the Plaintiffs' Complaints (the "Motion" or "Mot."). All internal quotation marks and citations are omitted unless otherwise indicated.

or ANF terrorist attack anywhere in the world at any time could file suit against and collect treble damages from Defendants.  That is not, and cannot be, the law.

Because these ATA actions against Defendants are not the proper vehicles for seeking redress, the Court should dismiss the Complaints with prejudice.

## ARGUMENT

## I.    THE COURT LACKS PERSONAL JURISDICTION OVER EACH DEFENDANT.

As explained in the Motion (at 13–39), dismissal of the actions is required because the Court lacks personal jurisdiction over any defendant.  The Opposition[2] wrongly argues that this Court can exercise jurisdiction under New York's long-arm statute or Federal Rule of Civil Procedure 4(k)(2) based solely on a nonparty foreign bank's correspondent banking relationship, executives' use of Gmail, and a purported conspiracy.  Each of these theories is factually and legally unavailing, and the actions should be dismissed.

### A.    The Opposition Provides No Legal Support for Personal Jurisdiction Under New York's Long-Arm Statute.

The Opposition principally attempts to argue (at 12–29) that Defendants transacted business in New York.  *See* N.Y. C.P.L.R. § 302(a).  Not true.  The "transactions" on which the Opposition relies consist solely of Lafarge's foreign bank's use of a New York correspondent account to execute U.S. dollar transfers.  But the unilateral decisions of and actions taken by Lafarge's bank cannot sustain the exercise of personal jurisdiction over Defendants.  Nor, in any event, do the ATA claims in the Complaints "arise from" these transactions.[3]

---

[2]    Unless otherwise indicated, references to the "Opposition" are to the *Foley* Opposition, which the *Finan* and *Fields* Plaintiffs have adopted.

[3]    The Opposition attaches the Declaration of Sarah K. Runge, a proffered banking expert, as Exhibit A.  On February 21, 2024, Defendants moved to strike portions of the Declaration as outside the bounds of permissible expert testimony.  Regardless, nothing in the Declaration

1.    **The Actions Do Not Arise from the Transaction of Business in New York.**

a.    **The Opposition Fails to Distinguish Settled Authority Holding that the Mere Involvement of a New York Correspondent Bank Does Not, Standing Alone, Create Jurisdiction.**

As Defendants established in their Motion (at 15–25), it is well-settled that a foreign defendant does not transact business in New York by asking its foreign bank to execute a wire transfer to a foreign account holder (regardless whether *the bank* chooses to use a New York correspondent bank to facilitate that transaction).  In an attempt to evade this clear authority, the Opposition argues (at 13 & n.6) that courts purportedly have held that "a terrorist funder's use of New York's banking system can amount to purposeful availment of the privilege of doing business in New York."  That is not what those cases hold, nor is it what is alleged in the Complaints.  The cases cited by the Opposition involve foreign *banks* that have a close relationship with, and repeated pattern of using, New York correspondent banks.  *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 168 (2d Cir. 2013) ("*Licci III*") (exercising jurisdiction because the complaint "allege[d] a *foreign bank's* repeated use of a correspondent account in New York") (emphasis added).  The Court should reject the Opposition's attempted sleight-of-hand— i.e., mischaracterizing these cases as involving "terrorist funders" instead of "banks."  The cases are readily distinguishable because they clearly involved foreign banks, and no court has exercised personal jurisdiction over a *customer* of a bank based solely on the bank's correspondent banking activities in New York.  (*See* Mot. 18–20.)  For good reason.  "Absent unusual circumstances, an individual bank customer would have no reason to direct its foreign bank to use a New York-based

---

cures the Complaints' failure to allege personal jurisdiction over Defendants in these actions. Defendants are conferring with Plaintiffs and anticipate submitting a proposed briefing schedule on Defendants' motion to strike for the Court's approval.

correspondent account for a transaction that . . . has no other connection to New York." *Przewozman v. Qatar Charity*, 20-CV-6088 (NGG) (TAM), 2023 WL 2562537, at \*12 & n.15 (E.D.N.Y. Mar. 17, 2023) (Garaufis, J.).

The Second Circuit's recent decision in *Spetner v. Palestine Investment Bank* does not "undermine" the foregoing bright-line jurisdictional principle (Opp'n 20), but rather reinforces it. The defendant in *Spetner* was a bank, the court framed the issue as "whether jurisdiction can be based on a *foreign bank's* use of a correspondent account that it does not own," and the court limited its holding to "a *foreign bank's* choice to project itself into New York" through an agent. *Spetner v. Palestine Inv. Bank*, 70 F.4th 632, 640 (2d Cir. 2023) (emphasis added).

The Opposition nevertheless asserts (at 20) that "[a]t least three cases have upheld jurisdiction over non-banks based at least in part on their role in New York-cleared transactions." Plaintiffs' caveat ("at least in part") is a very significant one; the facts of those three cases involved *separate* jurisdictional contacts with New York that were far more robust than the use of correspondent accounts. *See Zobay v. MTN Grp. Ltd.*, No. 21-cv-3503 (CBA), 2023 WL 6304961, at \*13, \*15–16 (E.D.N.Y. Sept. 28, 2023) (allegations that foreign defendants "directed agents to source technologies from U.S. markets," which were then provided to an FTO); *In re Tether & Bifinex Crypto Asset Litig.*, 576 F. Supp. 3d 55, 88 (S.D.N.Y. 2021) (allegations that out-of-state defendant "created and operated a 'shadow' banking network" "across numerous states" in the United States); *Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 397 F. Supp. 3d 323, 346 (S.D.N.Y. 2019) (allegations that foreign defendant had numerous direct and purposeful contacts with the United States, including, among other things, attending a roadshow, soliciting bids, and engaging in contract negotiations in Houston, along with "visit[ing] the United States on more than one occasion during performance of the Agreement"), *aff'd in part, vacated*

*in part on other grounds*, 40 F.4th 56 (2d Cir. 2022).[4]  None of these cases supports the exercise of personal jurisdiction here.

> **b.    The Opposition Otherwise Fails to Offer Any Support for the Theory that Defendants Purposefully Availed Themselves of the Opportunity to Do Business in New York.**

Because Defendants are not banks and did not interact with the New York correspondent banks that might have been involved in any of the U.S.-dollar wire transfers identified in the Complaints, none of the Defendants has purposefully availed itself of the opportunity of doing business in New York.  Recognizing this fatal defect, the Opposition tries to characterize this case as an "unusual circumstance[]" in which a court might assert jurisdiction over a customer based on its bank's use of New York correspondent accounts.  *See Przewozman*, 2023 WL 2562537, at *12 n.15.  Yet the Complaints themselves undermine this argument by alleging that the use of New York correspondent accounts is the default approach for executing U.S.-dollar transactions.  *See, e.g.*, *Foley* ¶¶ 162, 164.  Accordingly, the only plausible reading of the facts alleged in the Complaints is that Lafarge's foreign bank used a New York correspondent bank as a default in the absence of any specific instruction from Defendants as to *how* to transfer the requested U.S. dollars, thereby precluding any showing of purposeful availment.

This is true regardless of the number of U.S.-dollar wire transfers alleged.  The Complaints have identified only three wire transfers executed by Defendants' bank—two intercompany transfers in August 2011 and one $210,000 payment on October 23, 2014 to an intermediary's bank account in Dubai.  (*See* Mot. 15–18.)  Yet, even if those particular transactions were directed

---

[4]    In an appeal to policy, the Opposition (at 21–22) urges a departure from New York and Second Circuit precedent pertaining to the use of New York correspondent accounts, on the grounds that adhering to precedent might "immuniz[e] [banks'] more-culpable customers."  Setting aside the obvious point that Defendants are not FTOs, the fact remains that Congress left the issue of long-arm jurisdiction to be determined according to state law principles.

by Defendants (and they were not), the Court would lack jurisdiction because the frequency and nature of those transactions cannot give rise to an inference of purposeful availment. The Opposition contends (at 18) that the Second Circuit's decision in *Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, 129 (2d Cir. 2022), overruled the district court decisions cited by Defendants on this score. Not so. The Second Circuit in *Daou* simply recited the principle that "proof of one transaction in New York is sufficient to invoke jurisdiction . . . *so long as the defendant's activities . . . were purposeful*." *Id.* (emphasis added). And, in assessing whether the use of New York correspondent accounts was "purposeful," the Second Circuit explained that "the frequency and deliberate nature of [the defendant's] use . . . [may] be determinative of whether that use was intentional." *Id.* (first and third alterations in original). The cases on which Defendants relied (*see* Mot. 22) thus are consistent with *Daou* and preclude the exercise of personal jurisdiction in this case based on the three U.S.-dollar wire transfers alleged in the Complaints. [5]

The Opposition (at 15–16) resorts to wrongful inference in an attempt to establish purposeful availment, arguing that Defendants "made three choices" aimed at New York. First, it suggests (at 16) that Defendants "purposefully denominated their transactions in U.S. dollars,

---

[5]    The cases cited in the Opposition (at 19) involved far more extensive New York contacts than alleged here. *See Bonacasa v. Standard Chartered PLC*, No. 22 Civ. 3320, 2023 WL 2390718, at *5 (S.D.N.Y. Mar. 7, 2023) ("*Bonacasa I*") (defendant bank's headquarters were located in New York); *Bartlett v. Société Générale de Banque Au Liban SAL*, No. 19-cv-000007 (CBA) (VMS), 2020 WL 7089448, at *5 (E.D.N.Y. Nov. 25, 2020) (alleging that defendant banks executed "dozens" of transactions through New York bank accounts); *Schansman v. Sberbank of Russ. PJSC*, 565 F. Supp. 3d 405, 414 (S.D.N.Y. 2021) (defendant banks' services, including their "cho[ice] to operate correspondent accounts in New York," facilitated the transfer of some portion of "millions of dollars" as part of a "course of dealing" involving defendants' use of "New York's banking system"); *Strauss v. Crédit Lyonnais, S.A.*, 175 F. Supp. 3d 3, 19–20 (E.D.N.Y. 2016) (defendant bank maintained a branch in New York and made five transfers using New York's banking system); *Averbach v. Cairo Amman Bank*, No. 19-cv-0004-GHW-KHP, 2020 WL 486860, at *3 (S.D.N.Y. Jan. 21, 2020) (defendant bank executed 23 transactions using its New York correspondent banks), *report and recommendation adopted*, No. 1:19-cv-00004-GHW, 2020 WL 1130733 (S.D.N.Y. Mar. 9, 2020).

knowing that choice entailed use of New York banks." But this argument is predicated on the "faulty assumption that U.S. dollars can only be obtained in the United States," *Tamam v. Fransabank SAL*, 677 F. Supp. 2d 720, 729 (S.D.N.Y. 2010); (*see also* Mot. 16), as well as the incorrect assumption that all U.S. banking is done in New York. And, in any event, mere awareness that New York correspondent banks *might* be used in a dollar-denominated transfer "is patently insufficient under New York law to constitute the transaction of business." *Berdeaux v. OneCoin Ltd.*, 561 F. Supp. 3d 379, 402 (S.D.N.Y. 2021); (*see also* Mot. 23–25.) The court's decision in *Official Committee of Unsecured Creditors of Arcapita v. Bahrain Islamic Bank*, cited in the Opposition (at 16), is not to the contrary because in that case, the bank defendants "*actively directed* the funds at issue into [the] New York accounts." *See* 549 B.R. 56, 68–69 (S.D.N.Y. 2016) (emphasis added).[6] Relatedly, the Opposition argues (at 16) that Defendants "intentionally used banks that advertised their New York-based U.S.-dollar clearing services." But the Complaints do not allege that Defendants chose banks because of those New York correspondent relationships. As explained above, even accepting the inference that Defendants knew that their foreign banks worked with U.S. correspondent banks, that does not establish purposeful availment.[7]

---

[6]   The Opposition's claim (at 14) that Lafarge's bank's use of New York correspondent accounts "matched industry practice" offers no assistance to Plaintiffs, who bear the burden of showing that Defendants purposefully availed themselves of the opportunity to transact business in New York. Nor do generalized assertions about "[s]ophisticated companies" do the trick.

[7]   *Gucci America, Inc. v. Weixing Li*, 135 F. Supp. 3d 87, 94 (S.D.N.Y. 2015) (cited in Opp'n 16) is not on point. In assessing whether the court had jurisdiction over nonparty subpoena recipient the Bank of China ("BOC"), the court noted that BOC's "marketing apparently captivated Defendants," *id.*, presumably following courts' practice of "inquir[ing] whether the defendant bank encouraged or promoted the use of the correspondent account," *Vasquez v. H.K. & Shanghai Banking Corp.*, 477 F. Supp. 3d 241, 259 (S.D.N.Y. 2020). Defendants here, of course, are not banks and are not alleged to have marketed correspondent accounts.

Second, the Opposition speculates (at 16) that Defendants "structured their transactions to evade [U.S.] sanctions and to maintain their access to New York clearing."  In particular, it claims that Defendants "started masking the connections to Syria" to ensure that New York banks would continue to "process dollars."  But this inference is drawn from two improper sources:  (i) the bare fact that a New York correspondent account was used, *see, e.g., Foley* ¶ 185 ("New York clearing also enhanced the speed and reliability of Defendants' U.S.-dollar transactions."), ¶¶ 183–84 (similar), which bears no ostensible link to any purposeful choice on Defendants' part; and (ii) "mere conclusory statements" in the Complaints, *see, e.g., id.* ¶ 189 ("Defendants' use of New York banks was deliberate."), ¶¶ 187, 190, which the Court should disregard.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Indeed, clearing U.S.-dollar transactions through the United States actually *increases* risk, in the sense that an unlawful transaction is more likely to be identified in such a highly regulated banking system.

Last, the Opposition (at 16) argues that a "desire to benefit from New York" can somehow be inferred from Defendants' alleged payments to one of the intermediaries through "shell companies," using an account opened for Lafarge's Egyptian subsidiary (the "LMEA Account"); (*see also Foley* ¶ 192 (asserting that "[t]hose steps only made sense if Defendants were actively seeking to benefit from New York clearing")).  The Opposition speculates that this was done "[o]n learning that New York banks would not process dollars for Syrian entities."  Yet the musings of the Opposition (and the Complaints) are pure conjecture.  The SOF does not link payments to "off-shore companies" to any "desire" to "benefit from New York clearing."  In fact, the SOF states that Defendants decided to pay the intermediary through his UAE-based company, *even if* they compensated him in Syrian Pounds, *to "avoid problems with the Syrian authorities and with our [i.e. Lafarge's] [a]uditors."*  (SOF ¶¶ 57–58 (emphasis added).)  As for Lafarge's "LMEA

Account," the Complaint elsewhere asserts that it was formed to conceal Defendants' conduct, (*see, e.g.*, *id. Foley* ¶¶ 89, 92, 179), not to preserve access to New York correspondent accounts. The Complaint's lone, conclusory allegation of a different motive—to "allow[] Lafarge to access the U.S. financial system" (*id.* ¶ 192)—stands contradicted within the Complaint itself, and is therefore implausible. *See, e.g.*, *Iqbal*, 556 U.S. at 678.

### c.    The Opposition Provides No Legal Basis for Asserting Personal Jurisdiction Under an Agency Theory.

The *Foley* Complaint separately attempts to assert personal jurisdiction under an agency theory. That theory fails, however, because the *Foley* Complaint does not and cannot allege that Defendants' foreign bank "acted in New York for the benefit of, with the knowledge and consent of, and under some control by" Defendants, as would be required under applicable standards. *Spetner*, 70 F.4th at 640. (*See also* Mot. 23–24.)

The principal case on which the Opposition relies, *Spetner*, is pertinent only to foreign banks as defendants: *Spetner* considered "whether jurisdiction can be based on a *foreign bank's* use of a correspondent account that it does not own," deriving its reasoning from *Licci III*, which limited its discussion to defendant banks. 70 F.4th at 639–40 (emphasis added); *see also Licci III*, 732 F.3d at 168. ("[A] *foreign bank's* choice to project itself into New York can be evident through the selection and repeated use of an agent's correspondent account in the forum.") (emphasis added)). Neither case is applicable here, where Defendants are not banks,[8] and none of the indicia of "agency" is present or could be alleged. (*See* Mot. 25–27.)

---

[8] Although the Opposition appends (as Exhibit B) a declaration submitted in the *Spetner* litigation by one of the defendant bank's officers, this merely reinforces that *Spetner* involved a defendant that was a foreign *bank*.

As noted, there is no basis to allege Lafarge actually knew of the U.S. correspondent bank's identity, much less its actions (*see* Mot. 25–26), and the Opposition merely refers (at 22) to an LCS executive's "request[ing]" an after-the-fact "SWIFT confirmation" of one wire transfer. (*See also Foley* ¶ 193.) Such an after-the-fact wire confirmation is unremarkable in and of itself, and certainly does not suggest that LCS actively engaged with (or even knew about) the New York correspondent bank that facilitated the transfer, much less "injected" itself into the detailed process of the bank transfer, as the Opposition implausibly claims (at 23).

Moreover, even though the Opposition argues that the relevant foreign bank utilized by Defendants (Bank Audi) posted advertising materials that referred to its New York correspondent banks (Opp'n 23–24), that in no way supports the notion that Defendants specifically knew the identity of that correspondent bank, much less actively sought it out and recruited the bank as their agent. At least one other bank that Lafarge allegedly used advertised that it used a Hong Kong clearing center. (Mot. 23–24.) The Opposition (at 24) seeks to brush this aside by asserting that "no reasonable wire originator would have expected BNP Paribas to execute through Hong Kong," but this is total conjecture. As for the Opposition's attempts (at 24) to impute knowledge of Defendants' banks' use of New York correspondent accounts through scattered documents, none of those generalized sources demonstrates that Defendants specifically knew the subject transfers would be routed through New York, much less planned or requested for this to occur.

The Opposition (at 23) also quotes an internal Lafarge email from June 2014 as supposedly showing how Defendants monitored "what their banks were doing with their money." In reality, this email addresses the status of a "shareholder loan" from Lafarge Cyprus to LCS and, in that context, speaks of "channel[ling] the funds to Syria through Lebanon, to lower the risk of cash being trapped by banks' compliance policies linked to sanctions affecting Syria." (*Foley* ¶ 191.)

While it is true that the United States was among the numerous countries sanctioning Syria, nothing in this email suggests an intention to use New York banks (*see* Mot. 24), much less any specific knowledge about which New York correspondent banks might end up facilitating a bank transfer on behalf of a foreign bank.

Aside from failing to plead knowledge, the *Foley* Complaint's agency theory still founders for failure to allege that Defendants had the requisite "control" over their banks. *See Spetner*, 70 F.4th at 640; (*see* Mot. 27.)  To plug this gap, the Opposition claims (at 25) that "control" can somehow be inferred from the very fact that Defendants "directed" and/or "ordered" their banks to engage in the subject transfers, and/or "paid the fees" passed on by the correspondent banks. Shorn of rhetoric, however, the Complaints do nothing more than allege that Defendants desired to make dollar-denominated wire transfers and requested that their banks arrange this.  In those circumstances, the (foreign, non-bank) customer cannot plausibly be said to have "controlled" the correspondent banks' activities.[9]

Finally, the Opposition speculates (at 25–26) that Defendants "had at least *the right* to dictate the correspondent banks used" and that "[t]his right . . . , even if never exercised, establishes a jurisdictionally sufficient agency relationship."  But Defendants ignore that "[i]t is not enough to allege that defendants had the legal ability to control the alleged agent; plaintiffs seeking to establish jurisdiction under C.P.L.R. § 302(a)(2) must allege the actual exercise of control, based on the realities of the relationship."  *Hau Yin To v. HSBC Holdings, PLC*, 700 F. App'x 66, 68 (2d Cir. 2017) (quoting *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 366 (2d Cir. 1986)).

---

[9]  By comparison, all of the "instructions" in *Spetner* were direct bank-to-bank instructions.  PIB, the defendant bank in *Spetner*, gave instructions to Amman Jordan International Bank (which maintained a correspondent account for PIB in Jordan) to "make certain transfers 'to the U.S. bank'" at which AJIB held a correspondent account in New York.  70 F.4th at 641.  Customers of banks have no role in these kinds of bank-to-bank directions.

### 2. The Opposition Fails to Respond to the Lack of a Sufficient Nexus Between Plaintiffs' Claims and the Alleged U.S. Dollar Transfers.

As already demonstrated, even had the Complaints identified any instance in which Defendants purposefully transacted business in New York (they do not), personal jurisdiction still is lacking because Plaintiffs' claims do not "arise from" any of those transactions—notably because two of the three identified bank transfers were purely intra-company loan dealings and the third was a payment to an intermediary, not an FTO. (Mot. 27–29.) Seeking to address this shortcoming, the Opposition cites *Singer* in support of the claim that "Section 302(a)(1) does not demand that Plaintiffs pinpoint exactly which part of each wire ended up with terrorists." Opp'n at 28; *see also Singer v. Bank of Palestine*, No. 19-cv-006 (ENV) (RML), 2021 WL 4205176, at *6 (E.D.N.Y. Apr. 30, 2021). Yet Plaintiffs ignore that *Singer* also holds that "the jurisdictional peg cannot attach to thin air either." 2021 WL 4205176, at *6. In sharp contrast to the one case cited by Plaintiffs, *see Al Rushaid v. Pictet & Cie*, 28 N.Y.3d 316, 330 (2016) (finding adequate nexus where plaintiffs alleged that bank accounts were active during the relevant time period and used to carry out the money laundering scheme that caused their injuries), none of the three alleged wire transfer payments was made to an FTO, negating any nexus between the bank transfers and the claims asserted in these actions. Certainly, Plaintiffs' claims do not "arise from" the two August 2011 intercompany transfers. For one thing, 15 of the 22 injury-causing acts of terrorism took place more than four years after these two transfers, precluding the establishment of a sufficient nexus even under the Opposition's reasoning (at 28–29). *See, e.g.*, *Przewozman*, 2023 WL 2562537, at *13 (deeming four-year gap between relevant transactions and injuries "far too attenuated"). And the temporal gap for the other seven injury-causing acts still is too wide to support the necessary nexus. (*See* Mot. 28–29.)

Moreover, the Opposition's suggestion that funds from these intercompany transfers somehow reached FTOs simply is not plausible. Indeed, the Complaints allege that Defendants did not make payments to the two FTOs that caused their injuries—ISIS and ANF—until "late 2012 or early 2013," more than a year after the August 2011 transfers. (*See, e.g.*, *Foley* ¶ 61.) The Complaints offer no factual support for the Opposition's unadorned claim (at 29) that money that Defendants purportedly routed to the Assad regime in 2010 somehow "benefited ISIS," which was not even in existence at the time. What is more, the Complaints allege three additional intercompany transfers between August 2011 and "late 2012 or early 2013" totaling $42 million, rendering it implausible that funds from the earlier August 2011 transfers (and not those later-in-time transfers) would have been used to make payments to FTOs. Were that not enough, the Complaints tie the use of intercompany loans to "pay terrorists" to a *2013* liquidity crunch, (*Foley* ¶ 157), ruling out any nexus between the *2011* payments and Plaintiffs' claims. That LCS experienced liquidity issues in 2013, moreover, necessarily means that it had exhausted the funds from the 2011 transfers before it began paying intermediaries to ISIS or ANF.

In an effort to stretch the Complaints beyond the three fund transfers actually alleged, the Opposition speculates there *might* have been other relevant wire transfers. Such speculation is irrelevant, given that none of the Complaints' allegations indicates that Defendants purposefully directed their activity towards New York. *See supra* pp. 3–11.

In an attempt to justify its impermissible speculation, the Opposition (at 17) claims to rely on "authoritative sources establish[ing] that New York banks then cleared the vast majority of cross-border U.S.-dollar wires." In addition to improperly assuming, without support, that each of the alleged additional transactions was a wire transfer (rather than some other method of exchanging money), this claim runs headlong into the admonition not to credit the "faulty

assumption that U.S. dollars can only be obtained in the United States." *Tamam*, 677 F. Supp. 2d at 729; (*see also* Mot. 16.)  And the Opposition otherwise offers no support for drawing an inference to satisfy "the only factual predicate on which this Court could potentially base its jurisdiction." *Tamam*, 677 F. Supp. 2d at 727; (*see also* Mot. 17.)  The two cases on which it relies are readily distinguishable.  *See In re Tether*, 576 F. Supp. 3d at 88, 89 n.26 (inferring "additional correspondent bank accounts located in New York" where plaintiffs alleged that defendant "operated a 'shadow' banking network by opening dozens of bank accounts" in the United States "across numerous states"); *Bonacasa I*, 2023 WL 2390718, at *7 & n.13 (inferring that defendant bank's New York branch "played a significant role in the conduct that Plaintiffs claim is illegal" in the context of concluding that "exercising jurisdiction over [defendant] does not offend traditional notion[s] of fair play and substantial justice").

**B.    The Guilty Plea Does Not Create Jurisdiction.**

The Opposition suggests (at 8, 19) that Lafarge's and LCS's guilty plea establishes personal jurisdiction because the charged offense "'occurred in part within the United States.'"  Yet the rest of the relevant text states that Defendants "understand that, to be guilty of this offense, the following essential elements must be satisfied: . . . after the conduct required for this offense occurred, the Defendants were brought into and found in the United States, the offense occurred in part within the United States, the offense occurred in and affected interstate and foreign commerce, *or* the Defendants conspired with a national of the United States."  (Plea Agreement ¶ 3 (emphasis added).)  Thus Defendants "admitted" only that one of the four conditions had been satisfied and did not concede that "the offense occurred in part within the United States."  Nor, in any event, would such an admission establish personal jurisdiction in these actions because jurisdictional standards in criminal and civil cases are fundamentally different.  Moreover,

Defendants expressly preserved the right to challenge personal jurisdiction in these civil actions. (*See* Mot. 33–35.)

### C.    The Opposition Fails to Substantiate Personal Jurisdiction Under Rule 4(k)(2).

As Defendants established (Mot. 29–38), Rule 4(k)(2) does not provide grounds for personal jurisdiction over Defendants based either on their alleged aggregate U.S. contacts or conspiracy jurisdiction.  The Opposition does not (and cannot) overcome these pleading failures.

#### 1.    The Complaints' Assertions Concerning General Contacts with the United States Are Unavailing.

The Opposition asserts (at 30-31) that this Court can exercise jurisdiction under Rule 4(k)(2) based on (i) Defendants' banks' use of New York correspondent accounts and (ii) Defendants' use of Gmail.

As shown above, the banks' use of New York correspondent accounts cannot sustain this Court's assertion of jurisdiction.  Likewise, Defendants' former executives' use of Gmail does not support jurisdiction because it is well established that "the mere location of a third party or its servers is insufficient to give rise to personal jurisdiction."  *Hungerstation LLC v. Fast Choice LLC*, 19-cv-05861-HSG, 2020 WL 137160, at *5 (N.D. Cal. Jan. 13, 2020), *aff'd*, 857 F. App'x 349 (9th Cir. 2021); (*see also* Mot. 30–35.).

Yet the Opposition urges this Court (at 31–32) to disregard the line of cases (*see* Mot. 31–32) rejecting jurisdiction based on the use of U.S.-based email providers or servers.  However, the Opposition does not cite "any case where the location of third-party servers"—like Google's servers in these actions—"as opposed to servers affiliated with one of the parties, was sufficient to satisfy purposeful direction."  *Hungerstation*, 2020 WL 137160, at *5.  Indeed, the cases on which the Opposition relies (at 31–32 & n.15) prove the point.  Each found jurisdiction only where

(i) the relevant computer or server was affiliated with a *party* and (ii) the alleged misuse of that computer or server constituted an element of the plaintiffs' claims.[10]

That Defendants' employees here allegedly agreed, at an unspecified time, to Gmail's terms of service, which indicated Google's U.S. location and that Gmail's service was "subject to U.S. law," is of no moment. *See, e.g.*, *Hungerstation*, 2020 WL 137160, at *6 ("Nor is it relevant that Defendants entered into agreements governed by California law with these third parties."); *see also Great Bowery v. Best Little Sites*, 609 F. Supp. 3d 1240, 1251 (D. Utah 2022) (concluding that terms-of-service agreement supported jurisdiction where, unlike here, defendants "expressly consent[ed] to personal jurisdiction in Utah" by executing agreement) (cited in Opp'n 32).

The Complaints' theory collapses as a factual matter as well. The linchpin of the Opposition's argument is that Defendants chose to use Gmail because it "afforded [them] protection from foreign law enforcement, including French prosecutors." (*Foley* ¶ 211.) But the Complaints fail to plausibly allege that Defendants were aware that Gmail could "help [them] conceal their scheme" because its status as a U.S. company purportedly "shield[ed] their emails from outside surveillance." (Opp'n 32.) Plaintiffs cite a single contemporaneous source stating that Google "[didn't] really have the same level of requirement to hand over data to foreign governments or law-enforcement." (*Foley* ¶ 211 n.159 (alteration in original).) That is far too attenuated to support the Complaints' hypothesis that Defendants purposefully availed themselves of the alleged concealment benefits of U.S. law.

---

[10]   *See MacDermid, Inc. v. Deiter*, 702 F.3d 725, 730 (2d Cir. 2012) (claim of misappropriation of confidential information based directly on defendant's access of a Connecticut server storing plaintiff's confidential information); *Will Co. v. Lee*, 47 F.4th 917, 924–25 (9th Cir. 2022) (claim of copyright infringement based directly on materials displayed on defendants' Utah website); *UMG Recordings, Inc. v. Kurbanov*, 963 F.3d 344, 349–50, 354 (4th Cir. 2020) (claims under the Copyright Act based, among other contacts, on defendant's operation of two websites that allegedly facilitated music piracy and relied on U.S.-based servers).

## 2.   The Complaints Do Not Adequately Allege Conspiracy Jurisdiction.

The Complaints likewise do not plausibly allege that Defendants are subject to jurisdiction based on their participation in a supposed conspiracy with ISIS.  (*See* Mot. 35–38.)  Conspiracy jurisdiction fails because the Complaints have not plausibly alleged a conspiracy between Defendants and ISIS in the first instance.  *See infra* pp. 28–33.

Even putting that fundamental deficiency to one side, the Complaints fail to show that ISIS's acts that caused their injuries were "expressly aimed . . . at the United States," as is necessary to sustain conspiracy jurisdiction.  *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 337 (2d Cir. 2016).  Instead, the Opposition contends (at 34) that "ISIS's terrorist attacks," as a general matter, were "aimed at the United States by seeking to influence U.S. policy."  But abstract allegations like these do not show that the particular acts that injured Plaintiffs "were specifically targeted against United States citizens" and thus are insufficient to satisfy the effects test.  *Id.* at 338.  Indeed, the D.C. Circuit upheld the assertion of personal jurisdiction in *Mwani v. bin Laden*, 417 F.3d 1 (D.C. Cir. 2005), the sole case on which the Opposition relies (at 35), only because the injury-causing attack took place at a U.S. embassy with the express aim of killing American employees.  417 F.3d at 13.  It was not enough that al-Qaeda generally aimed its terrorist attacks at the United States.

Measured against the proper standard, the Complaints allege that only two attacks were aimed at the United States:  the kidnappings and executions of Foley and Sotloff.  The Complaints allege that these attacks were designed to "horrify Americans to discourage increased U.S. military involvement and to spur potential recruits to join in the carnage and incite additional terrorist attacks against the United States."  (*Foley* ¶ 43.)  As to the former, the Second Circuit has held that "[i]t is insufficient for purposes of due process to rely on evidence" that the defendant "sought to influence United States policy, without some other connection among the activities underlying

the litigation, the defendants, and the forum." *Waldman*, 835 F.3d at 341–42.  As to the latter, boosting recruitment of ISIS members in Syria cannot plausibly be deemed an objective "specifically targeted against United States citizens."  *Id.* at 338.  Accordingly, this Court cannot assert personal jurisdiction under a conspiracy theory even as to these two claims.[11]

## II.    THE OPPOSITION FAILS TO SALVAGE THE AIDING-AND-ABETTING CLAIMS.

Defendants previously established that the Complaints have not stated a claim for aiding and abetting because they fail to allege Defendants' general awareness and that Defendants' acts constituted knowing and substantial assistance.  (Mot. 40–54.)  Defendants also showed that the Combat Incidents and the Ekren abuse are not acts of "international terrorism" under the ATA. (Mot. 54–55.)    The Opposition's responses to these arguments rest on a fundamental misapprehension of precedent and would impose boundless liability under the ATA.

### A.    The General Awareness Allegations Are Deficient.

The aiding-and-abetting claims fail because the Complaints do not plausibly allege that Defendants were "generally aware" that they were assuming a role in ISIS's or ANF's terrorist activities.  (*See* Mot. 40–45.)  The Opposition (at 38) seeks to remedy these deficiencies by setting up and attacking a straw man:  the notion—never advanced by Defendants—that the "general awareness" element "require[s] a defendant to foresee . . . 'specific' details about the injury-causing act."  In reality, Defendants' Motion focused on the lack of allegations of foreseeability—a deficiency not rebutted in the Opposition.  The Second Circuit has made clear that while a

---

[11]    The Opposition's contention (at 34) that "[o]ther courts have recognized that ISIS purposefully targeted the United States through [the Foley and Sotloff] attacks" is not accurate.  The default judgment on which the Opposition relies did not address personal jurisdiction, assessing only whether "ISIS's kidnapping of Sotloff, and detention of both Sotloff and Foley, qualifies as a hostage taking" under the Foreign Sovereign Immunities Act.  *Sotloff v. Syrian Arab Republic*, 525 F. Supp. 3d 121, 136 (D.D.C. 2021).

defendant "need not be generally aware of its role in the specific act that caused the plaintiff's injury," it "must be generally aware of its role in an overall illegal activity from which the act that caused the plaintiff's injury was *foreseeable*." *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 496 (2d Cir. 2021). Lest there be doubt, the court reiterated that "[f]oreseeability is . . . central to the *Halberstam* framework, and as a result, to JASTA aiding-and-abetting liability." *Id* at 496–97.

Under *Honickman*, the Complaints must plausibly allege that each of the 22 injury-causing acts was "foreseeable" to Defendants based on their "role in an overall illegal activity." *Id.* at 496. The Opposition instead claims (at 36) that the Complaints allege general awareness because "terrorist attacks are naturally a foreseeable risk of giving large amounts of money to terrorists." Were that enough, the requirement of foreseeability as articulated in *Honickman* would be vitiated. The Opposition cites (at 36 & n.19) several cases to support its interpretation of the general-awareness element, but all of those cases are inapposite. Each rejected arguments that the defendants *were not aware* that the persons to whom they were providing services were affiliated with terrorism. Here, by contrast, Defendants' position is that "the act[s] that caused [Plaintiffs'] injur[ies]" *were not "foreseeable*." *Honickman*, 6 F.4th at 496. Nor is it accurate to claim (Opp. at 38–39) that the Supreme Court's decision in *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), somehow weakened the general-awareness element. The plaintiffs in that case alleged that the services offered by the defendants—Facebook, Twitter, and YouTube—were accessible globally throughout the relevant time period, that the defendants knew that ISIS had used their platforms "for years," and that the defendants' platforms "have been crucial to ISIS' growth." *Id.* at 479–

19

81.  ISIS's long-standing use of those ubiquitous platforms to commit terrorist attacks thus was foreseeable to the defendants.[12]

The Opposition next claims (at 47–49) that Defendants could have foreseen each of the 22 injury-causing acts alleged in the Complaints.  But Defendants previously established that the Complaints do not plausibly allege foreseeability because the External Attacks are geographically attenuated, the Post-Evacuation Attacks are too remote in time, and the Syrian Kidnappings are devoid of necessary factual support.  (Mot. 41–45.)

Focusing first on the External Attacks, the Opposition (at 47–48) points to a 2013 email in which an LCS risk manager wrote that ANF "follow[s] a global jihadi ideology (similar to al-Qaida) and are more open to receive foreign fighters."  (*Foley* ¶ 121.)  From this, the Opposition argues (at 48) that "Defendants thus should have foreseen that their payments to these *global* terrorist groups would finance the groups' attacks elsewhere in the world."  But the Complaints fail to plausibly draw an inference that recognizing that ANF had global ambitions and was open to receiving foreign fighters in Syria connoted an awareness that LCS's payments to intermediaries *in Syria* could finance attacks in places as far-flung as Spain and Niger.  (*See* Mot. 44.)

Next, the Opposition cites (at 47) the *Foley* Complaint to support its contention that some of the injury-causing External Attacks (in Niger, Turkey, and Iraq) were foreseeable to Defendants. Many of the sources underlying these allegations post-date LCS's evacuation from Syria and its termination of payments to intermediaries and thus cannot establish foreseeability.  *See, e.g.,*

---

[12]  Even if the Court adopts the Opposition's reading of the general-awareness element, it still must conduct the more rigorous foreseeability inquiry before determining whether the Complaints state a claim for aiding and abetting.  *See Honickman*, 6 F.4th at 497 n.10 ("*Halberstam* did not specifically attach foreseeability to the general awareness or substantial assistance elements; it used foreseeability broadly for establishing the extent of liability under an aiding-and-abetting theory.  It thus is more important that courts do not skip foreseeability altogether rather than apply it at a precise stage of the JASTA aiding-and-abetting analysis.").

*Wildman v. Deutsche Bank Aktiengesellschaft*, No. 21-CV-04400 (HG) (RML), 2022 WL 17993076, at *9 (E.D.N.Y. Dec. 29, 2022) (explaining that "[p]ublic sources published *after* the attacks had occurred do not plausibly support an inference that [a defendant] had the requisite general awareness *at the time* that it" engaged in the alleged conduct (second alteration in original)), *appeal docketed*, No. 23-132 (2d Cir. Jan. 30, 2023).  The remainder of the allegations (*Foley* ¶¶ 117, 122) rely on ISIS's threats and government warnings about ISIS's aspirations to commit terrorist attacks in unidentified countries outside Syria.  At most, these sources suggest that ISIS sought to carry out attacks in countries other than Syria.  Nowhere do the Complaints allege that Defendants could have foreseen that "the act[s] that caused [Plaintiffs'] injur[ies]" in countries outside Syria were a foreseeable result of their payments to intermediaries or sale of cement *in Syria*.  *See Honickman*, 6 F.4th at 496; (*see also* Mot. 42–44.)  The Opposition has no answer for this.

The Opposition then attempts (at 49) to substantiate the "temporal foreseeability" of the Post-Evacuation Attacks, claiming that it was "obvious" to Defendants "that ISIS would take years to consume the resources Defendants supplied."  But here again, the supporting allegations in the Complaints almost exclusively cite sources post-dating LCS's evacuation from Syria and the cessation of all payments to intermediaries.  The single exception is a 2010 U.S. government study concluding that "marginal reductions in *AQI's* terrorist funds corresponded with a statistically significant reduction in terrorist violence."  (*Foley* ¶ 109 (emphasis added).)  That source did not purport to draw conclusions about the economics of ISIS and ANF—which, to be clear, were not even in existence at the time of the study's publication.  In any event, the Complaints do not allege that the study indicated how quickly AQI churned through funds, and whether funds were used to finance attacks months and years after they were received.  In the absence of allegations that

Defendants could have foreseen that payments to intermediaries in 2013 and 2014 would contribute to attacks as late as 2017, the claims based on the Post-Evacuation Attacks necessarily fail. (*See* Mot. 44–45.)[13]

Finally, the *Foley* Complaint does not plausibly allege general awareness as to the Syrian Kidnappings. (*See* Mot. 45.) The *Foley* Complaint does not explain how Defendants possibly could have foreseen that payments to intermediaries allegedly intended for ISIS and ANF would finance kidnappings that either occurred before LCS started making such payments, or were perpetrated by FTOs other than ISIS and ANF, or both.

### B. The Complaints Do Not Allege that Defendants Knowingly Provided Substantial Assistance to the Injury-Causing Acts.

The Complaints do not state a claim for aiding and abetting for the independent reason that they fail to allege that Defendants knowingly provided substantial assistance to the injury-causing acts. (*See* Mot. 46–54.) The Opposition does not actually deny that, on the Complaints' theory of liability, Defendants would be liable for virtually all ISIS and ANF attacks committed anywhere in the world at any time following 2013. The Court should reject the Opposition's entreaties to depart so drastically from long-standing principles of aiding-and-abetting liability.

#### 1. The Opposition Does Not Establish the Complaints' Compliance with *Taamneh*.

---

[13] The Opposition tries (at 39–40) to draw factual distinctions between this action and *Siegel v. HSBC North America Holdings, Inc.*, 933 F.3d 217, 224 (2d Cir. 2019). But the Second Circuit there concluded that the defendant's "decision not to provide banking services to [a terrorist affiliate] for the ten months preceding the November 9 Attacks makes it implausible under the circumstances that HSBC had knowingly assumed a role in the Attacks." *Id.* at 224. That same logic applies here. In any event, other cases within this Circuit have rejected allegations of general awareness in the face of temporal gaps similar to those found here. *See, e.g.*, *Wildman*, 2022 WL 17993076, at *18 (deeming three-year gap "too attenuated").

As Defendants explained (Mot. 46–50), the Supreme Court's decision in *Taamneh* sharpened and clarified liability for aiding and abetting under the ATA. The core teaching of *Taamneh* is that "it is not enough . . . that a defendant have given substantial assistance to a transcendent 'enterprise' separate from and floating above all the actionable wrongs that constitute it." 598 U.S. at 495. Instead, "the question is whether defendants gave substantial assistance to [the FTO] with respect to the" specific injury-causing attack. *Id.* at 503. In the absence of plausible allegations that defendants "culpably associate[d themselves] with'" the injury-causing attack itself, "participate[d] in it as something that [they] wish[ed] to bring about, or sought by [their] action to make it succeed," an aiding-and-abetting claim fails. *Id.* at 498 (alterations in original). The Complaints' efforts to link payments in Syria in 2013 and 2014 to attacks perpetrated in distant countries like Spain and Niger and on dates as late as December 2017 fall well short of this standard. (*See* Mot. 48–50.) Quite simply, the Complaints do not plausibly allege that Defendants gave substantial assistance to ISIS and ANF with respect to any of the 22 injury-causing acts.

The Opposition attempts to argue (at 47–50) that courts "routinely find an adequate nexus between aid given to terrorists in one country and attacks committed in another," "often hold terrorist funders liable for attacks that occur years later," and "have accepted similar allegations against defendants that funded multiyear kidnappings." The cases on which the Opposition relies are readily distinguishable, as explained below. More fundamentally, the Opposition's appeal to such generalized, categorical rules directly clashes with the Supreme Court's admonition that the "knowing and substantial assistance" inquiry is inherently case specific because "[t]he focus . . . must remain" on the specific injury-causing attack. *Taamneh*, 598 U.S. at 503.[14]

_____

[14]   The Opposition's claim (at 50) that a court "accepted similar allegations" related to "the very attack in which ISIS executed Messrs. Foley and Sotloff" is wrong. The court in that case concluded that "Syria's aid to ISIS was . . . a substantial factor in the sequence of events" that

The Opposition similarly advocates (at 41–42) a bright-line rule that "knowingly processing millions of dollars in transfers for a terrorist organization . . . constitute[s] substantial assistance," which it wrongly claims "remains the rule after [*Taamneh*]." But the cases the Opposition cites turn on allegations of far more extensive and indispensable assistance than those found in the Complaints.[15]

The Opposition next insists (at 45) that "[t]he nexus here" between Defendants' payments to intermediaries and each of the 22 injury-causing acts is sufficiently "close[] for two reasons."

---

led to the kidnappings and executions of Foley and Sotloff. *Sotloff*, 525 F. Supp. 3d at 139. The court pinned its holding on Syria's harboring of ISIS, which was a but-for cause of the attacks on Foley and Sotloff. *See id.* (crediting expert's testimony that "it is unlikely that ISIS would have been able to amass as much power as it did and thus kill Mr. Foley and Mr. Sotloff in the manner that it did in this case but for actions undertaken by the Syrian Arab Republic"). The Complaints here do not allege that the injury-causing acts would not have occurred but for Defendants' payments to intermediaries.

[15] *See Bartlett, v. Société Générale de Banque Au Liban SAL*, No. 19-cv-000007 (CBA) (VMS), 2020 WL 7089448, at *11 (E.D.N.Y. Nov. 25, 2020) (allegations of a "wide-ranging, years-long, knowing scheme of coordination in which Defendants acted as Hezbollah's *core financial service-providers*") (emphasis added); *Kaplan v. Lebanese Canadian Bank*, 999 F.3d 842, 866 (2d Cir. 2021) (allegations of "special treatment" that allowed Hezbollah to deposit "more than $2.5 million dollars a week" and "circumvent[] sanctions"); *Est. of Henkin v. Kuveyt Turk Katilim Bankasi, A.S.*, 495 F. Supp. 3d 144, 160 (E.D.N.Y. 2020) (allegations that defendant provided banking services to Hamas "before and even during the time of the terrorist attack at issue"); *King v. Habib Bank Ltd.*, Now. 20 Civ. 4322 (LGS), 21 Civ. 2351 (LGS), 21 Civ. 6044 (LGS), 2022 WL 4537849, at *10 (S.D.N.Y. Sept. 28, 2022) ("*King I*") (allegations that defendant provided banking services "for decades" to individuals and entities affiliated with al-Qaeda and permitted one such entity "to be one of its biggest U.S. dollar-clearing customers"); *King v. Habib Bank Ltd.*, Nos. 20 Civ. 4322 (LGS), 21 Civ. 2351 (LGS), 21 Civ. 6044 (LGS), 2023 WL 8355359, at *3 (S.D.N.Y. Dec. 1, 2023) ("*King II*") (same); *Zobay v. MTN Grp. Ltd.*, No. 21-cv-3503 (CBA), 2023 WL 6304961, at *26–30 (E.D.N.Y. Sept. 28, 2023) (allegations that defendant provided "dual-use technologies . . . of particular importance to terrorist activities" that terrorist groups otherwise could not have obtained); *Bonacasa v. Standard Chartered PLC*, No. 22-cv-3320 (ER), 2023 WL 7110774, at *11 (S.D.N.Y. Oct. 27, 2023) ("*Bonacasa II*") (allegations that defendant "carefully tailored financial instruments to fund production of a known IED ingredient known to be sold to terrorist groups known to be attacking U.S. service members" in support of claims limited to IED attacks that involved that ingredient during a limited time frame and in a confined geographical area).

According to the Opposition (at 7–8, 45–46), the relatively low cost of terrorist attacks measured against the amount of Defendants' payments means that Defendants were responsible for "*thousands* of terrorist attacks—sufficient to kill every Plaintiff many times over."  But these allegations, which do not link Defendants' payments to the specific attacks that injured Plaintiffs, are insufficient because they amount to claims that Defendants "have given substantial assistance to a transcendent 'enterprise'"—that is, ISIS and ANF—"separate from and floating above all the actionable wrongs that constitute it." *Taamneh*, 598 U.S. at 495.  The same goes for the Opposition's second "reason[]" (at 46), which is that the Complaints purportedly "tie[] Defendants' payments to the individual terrorist cells and operatives that attacked the *Foley* Plaintiffs."  What the Opposition neglects to mention is that the Complaints allege that those "individual terrorist cells and operatives" were responsible for nearly every ISIS attack:  hostage-taking attacks in Syria, attacks on U.S. servicemembers in Syria and Iraq, and attacks outside Syria and Iraq.  (*Foley* ¶¶ 132, 139.)  Again, far from providing "granular[ity]" (Opp'n 46), those allegations impermissibly seek to hold Defendants liable for "hav[ing] given substantial assistance to a transcendent 'enterprise'"—this time, "cells" responsible for a massive portion of terrorist attacks—"floating above all the actionable wrongs that constitute it."  *See Taamneh*, 598 U.S. at 495; (*see also* Mot. 48–49.)  Simply labeling those "cells" the "worst" (at 48) does not excuse the Complaints' fundamental pleading failure.

Because the Opposition's theory would permit virtually "any U.S. national victimized by an ISIS attack" to "bring the same claim," the Complaints "must allege that [D]efendants so systematically and pervasively assisted ISIS that [D]efendants could be said to aid and abet every single ISIS attack." *Id.* at 502.  The Opposition's conclusory claim (at 46) that "Defendants' aid was 'pervasive, systemic, and culpable' enough" is far from adequate.  *Compare, e.g.*, *id.* at 495

(concluding that Hamilton's assistance to Welch in *Halberstam* was "so intentional and systematic that she assisted each and every burglary committed by Welch" because "*any time* that Welch left the house to burglarize, he would have relied on Hamilton's assistance") (emphasis added); (*see also* Mot. 50.)[16]

### 2. The *Halberstam* Factors Support Dismissal.

Defendants previously explained how each of the *Halberstam* factors supports dismissal of the aiding-and-abetting claims. (Mot. 51–54.) The Opposition ignores the attenuation between Defendants' payments to intermediaries and the injury-causing acts, as well as the indisputable conclusions in the SOF about Defendants' state of mind and reasons for making the payments. In any event, "[t]he point of [the *Halberstam*] factors is to help courts capture the essence of aiding and abetting: participation in another's wrongdoing that is both significant and culpable enough to justify attributing the principal wrongdoing to the aider and abettor." *Taamneh*, 598 U.S. at 504. As outlined above, the Complaints' aiding-and-abetting claims fail under this standard.

### C. Five of the Attacks Did Not Involve an Act of "International Terrorism."

Defendants explained in their Motion (at 54–55) that the Court should dismiss claims based on the four Combat Incidents and the Ekren abuse on the independent basis that the Complaints fail to allege an act of "international terrorism" under 18 U.S.C. § 2331(1). This is because the Complaints have not plausibly alleged that the apparent "intent" of each of those five acts was "(i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by

---

[16] The court's decision in *Zobay* does not help Plaintiffs. There, the court found that the plaintiffs' allegations satisfied the Supreme Court's "systemic" standard where the defendants took a "leadership role in a procurement scheme" designed to provide terrorist groups with technology that was essential to terrorist attacks that they could not have obtained elsewhere and further provided those same groups with "pervasive, substantial assistance constituting" "tens of millions of dollars annually" "in funding . . . and operational or technical support." *Zobay*, 2023 WL 6304961, at *5, 30–31.

intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping." *Id.* § 2331(1)(B); (*see also* Mot. 54–55.)

In response, the *Finan* Opposition (at 5) advances the abstract proposition that "ISIS planned and organized its attacks . . . as a means to display its strength and authority and to intimidate civilians and governments." Similarly, it asserts (at 7) that "ISIS instituted a campaign of indiscriminate violence—including the widespread rape of innocent girls—to spread fear, and to intimidate and coerce civilians into submitting to ISIS rule." Yet the *Finan* Opposition offers only the unsupported claim (at 7) that "ISIS's sexual violence against Ekren was part of its coordinated plan to achieve greater power, influence, and territory." If the Complaints' generalized allegations and parroting of the statutory text were sufficient, the apparent "intent" element of § 2331(1)(B) would become a virtual nullity satisfied by bald assertions that persons responsible for an injury were terrorists who sought to terrorize. This is plainly insufficient.

Likewise, the *Finan* Opposition (at 6) mistakenly suggests that the only combat incidents "exclude[d]" from the reach of the ATA are those that fall within the "act of war" exception in 18 U.S.C. § 2336(a). However, Plaintiffs offer no authority supporting the notion that the apparent "intent" element cannot apply to combat incidents. Assessing the independent "intent" element in all circumstances—as the text of the ATA commands—preserves Congress's purpose rather than "nullify[ing]" it. (*Id.*)[17]

### D. The *Fields* and *Finan* Plaintiffs Have Abandoned Aiding-and-Abetting Claims.

---

[17] The *Finan* Opposition is wrong to assert (at 5–6) that this Court may not determine whether the Combat Incidents and Ekren abuse qualify as acts of "international terrorism" at the motion to dismiss stage. *See, e.g.*, *Page v. Oath Inc.*, No. 17 Civ. 6990 (LGS), 2018 WL 1406621, at *4 (S.D.N.Y. Mar. 20, 2018) (granting motion to dismiss on basis that complaint did not adequately allege apparent "intent"), *aff'd*, 797 F. App'x 550 (2d Cir. 2019).

In their Motion (at 42–43, 48–50), Defendants argued that the *Fields* Complaint fails to plausibly allege general awareness and substantial assistance as to each injury-causing act. The *Fields* Plaintiffs have not responded—either in their own Opposition or through their adoption of the *Foley* Opposition—to Defendants' arguments that the *Fields* Complaint lacks allegations to support the inference that the injury-causing attacks in Spain, France, and Jordan were foreseeable to Defendants or that Defendants substantially assisted those attacks. Accordingly, the Court should dismiss the aiding-and-abetting claims in the *Fields* Complaint as abandoned. *See, e.g.*, *Chauhan v. MM Hotel Mgmt. LLC*, No. 18-CV-5963 (DRH)(SIL), 2019 WL 6118006, at *5 (E.D.N.Y. Nov. 18, 2019) ("It is well-settled that failure to oppose an argument raised in a motion to dismiss is deemed a concession of the argument and abandonment of the claims."); *Laface v. E. Suffolk Boces*, 349 F. Supp. 3d 126, 161–62 (E.D.N.Y. 2018) (same).

For the same reason, the Court should dismiss the *Finan* Complaint's aiding-and-abetting claims based on attacks in Lebanon and Libya. (*See* Mot. 42–43, 48–50 (arguing that the *Finan* Complaint failed to allege general awareness or substantial assistance as to those attacks)).

## III. THE OPPOSITIONS DO NOT SAVE CLAIMS FOR CIVIL CONSPIRACY.

As Defendants established, none of the Complaints states a claim for civil conspiracy. (Mot. 55–63.) Plaintiffs' arguments in opposition are unavailing.

### A. The Oppositions Do Not Establish that the Complaints Allege an Agreement.

Plaintiffs' conspiracy claims fail at the outset because the Complaints do not allege that Defendants entered into an agreement with ISIS or ANF with respect to any of the pled conspiracies.

#### 1. The *Foley* and *Fields* Complaints Do Not Allege an Agreement to Maintain ISIS's Territorial Control.

28

The *Foley* and *Fields* Complaints allege that "Defendants entered a conspiracy with ISIS whose overall object was to maintain ISIS's territorial control of Syria and Iraq and thereby promote ISIS's protection rackets within those countries." (*Foley* ¶ 214; *Fields* AC ¶ 354.) In response to Defendants' explanation that the Complaints fail to allege an agreement to enter into this conspiracy (Mot. 57–59), the Opposition claims (at 52) that Defendants "mistake[] 'motive' for 'intent.'" But Defendants in fact argued that the Complaint does not allege that they and ISIS were "pursuing the same object," as is required to sustain a claim for conspiracy, *Freeman v. HSBC Holdings PLC*, 57 F.4th 66, 79 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 83 (2023), because the only "objects" that Defendants were "pursuing" were economic profit and protection. (Mot. 57–58.) The cases cited by Plaintiffs (at 52) reinforce that a conspiracy claim cannot survive in these circumstances. *United States v. Davis*, 183 F.3d 231, 244 (3d Cir. 1999) (requiring proof that co-conspirators "all agreed to interfere with a pending judicial proceeding"); *In re Elec. Books Antitrust Litig.*, 859 F. Supp. 2d 671, 690 (S.D.N.Y. 2012) (concluding that complaint plausibly alleged "that each of the defendants shared . . . twin purposes"); *United States v. Khalupsky*, 5 F.4th 279, 288 (2d Cir. 2021) ("[The government] must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal.").

The Opposition strains (at 51–52) to assert that the Complaints "plausibly allege[]" that the agreement between Defendants and ISIS "served a common object: maintaining ISIS's territorial control of its caliphate." But the SOF, which the Complaints reference throughout, dooms that argument. (*See, e.g.*, Mot. 57–58.) Indeed, the SOF makes clear that Defendants did not "share[] or support[] the terrorist ideologies or goals of ISIS, ANF or any other FTO." (SOF ¶ 111; *accord id.* ¶ 17 (similar).) Among the "goals" that Defendants did not "share[] or support[]," of course, was ISIS's aim to maintain territorial control. The SOF likewise demolishes the Opposition's

suggestion (at 51) that Defendants decided that "it was better for Lafarge if ISIS stayed in power."
To take just two examples, the SOF refers to an email in which a Lafarge executive contemplated
seeking protection from "the Kurds" if "the strikes of the coalition quickly weaken the jihadist
forces," underscoring that Defendants were agnostic as to who controlled the region and interested
only in economic profit and protection. (*Id.* ¶ 93.) Similarly, the SOF quotes another email in
which an executive declared that "LCS needed to 'stay neutral and in good terms with all the
stakeholders," again refuting that Defendants were singularly committed to ensuring that ISIS
remained in power. (*Id.* ¶ 51.) The Court should rely on the SOF to the extent that it conflicts
with the Complaints. *See, e.g.*, *Blau v. Allianz Life Ins. Co. of N. Am.*, 124 F. Supp. 3d 161, 176
n.7 (E.D.N.Y. 2015) (Garaufis, J.) ("[W]here the allegations of a complaint are contradicted by
documents made a part thereof, the document controls and the court need not accept as true the
allegations of the complaint."); *Tongue v. Sanofi*, 816 F.3d 199, 206 n.6 (2d Cir. 2016) (same).

### 2. The Complaints Do Not Allege an Agreement to Provide Material Support to ISIS or ANF.

Defendants established (Mot. 58–59) that each of the Complaints fails to allege an
agreement between Defendants and ISIS or ANF to enter into a conspiracy "with the overall goal
of providing material support for those organizations," (*Foley* ¶ 378; *Finan* 2AC ¶ 333; *Fields* AC
¶ 356.) Although purporting to address this argument, the *Finan* Opposition recycles the very
points that the Opposition raises to defend the Complaints' claim of a conspiracy to maintain ISIS's
territorial control. (*See Finan* Opp'n 4 (asserting that the same "alleged facts" that "establish a
territorial-control conspiracy" likewise "establish a conspiracy to provide material support to
ISIS").) Even if those allegations plausibly pled an agreement to enter into a conspiracy to
maintain ISIS's territorial control (they do not), the *Finan* Opposition fails entirely to explain how
those same allegations give rise to an agreement to provide material support. All it says (at 8) is

that "Plaintiffs here allege Lafarge joined a conspiracy whose object necessitated a campaign of terrorism." But that does not come close to defining the referenced "object," much less showing that Defendants and ISIS were "pursuing th[at] same object." *See Freeman*, 57 F.4th at 79.

**B.** **The Oppositions Do Not Show that the Complaints Allege an Overt Act in Furtherance of the Conspiracy to Provide Material Support.**

The Complaints do not allege that any of the injury-causing acts qualified as an "overt act" that "further[ed] the *overall object* of the conspiracy" to provide material support. *Freeman*, 57 F.4th at 82; (*see also* Mot. 62.) Instead, they allege merely that the acts were the "foreseeable outcome" of the conspiracy (*Foley* ¶ 378; *Finan* 2AC ¶ 332), which is insufficient. (Mot. 62.) In response, Plaintiffs suggest that *Freeman* forecloses reliance on foreseeability "only when foreseeable consequences are 'wholly detached from the shared conspiratorial plan.'" (*Finan* Opp'n 9.) Not so. The Second Circuit has rejected the argument that "civil conspiracy liability reaches any coconspirator conduct that 'foreseeably' results from the conspiracy." *Freeman*, 57 F.4th at 81. The Second Circuit noted that "[t]o hold a defendant liable for a coconspirator's actions merely because they are foreseeable—even though wholly detached from the shared conspiratorial plan—would stretch the concept of civil conspiracy too far beyond its origin." *Id.* at 82. But the court did not suggest that foreseeability is a proper consideration so long as an overt act is not "wholly detached from the shared conspiratorial plan." *Id.* Concluding otherwise would clash with the Second Circuit's holding and analysis.

The *Finan* Opposition (at 9–10) next tries to water down the overt act element by maintaining that any overt act, not just the injury-causing act of terrorism, can qualify. It ignores that the Second Circuit limits cognizable overt acts to those that "caused" the plaintiffs' injuries, which in the ATA context invariably are acts of international terrorism. *Freeman*, 57 F.4th at 80. Thus the Second Circuit rejected the conspiracy claim in *Freeman* because the plaintiffs did not

"explain[] how the ninety-two terrorist attacks furthered the Banks' conspiracy with Iranian entities to circumvent U.S. sanctions." *Id.* at 82.

Finally, the *Finan* Opposition conclusorily asserts (at 10) that "ISIS committed the terrorist attacks that harmed Plaintiffs in furtherance of the conspiracy's overall object." But it relies on allegations in the Complaint related to the supposed conspiracy to maintain ISIS's territorial control, not the separate conspiracy to provide material support to ISIS and ANF. *See id.* at 8. The Complaints' inability to explain how the injury-causing acts furthered the "*overall object* of the conspiracy*" to provide material support dooms these claims. *See Freeman*, 57 F.4th at 82.

### C.    The Opposition Cannot Rescue Conspiracy Claims Against Lafarge Cyprus.

Defendants previously explained that the conspiracy claims against Lafarge Cyprus must be dismissed because the Complaints fail to allege that Lafarge Cyprus participated in any of the pled conspiracies. (Mot. 63.) The Opposition responds (at 51 n.30) that "[t]he ISIS agreement is . . . imputed to Lafarge Cyprus" because "LCS acted as Lafarge Cyprus's (and Lafarge's) agent." The Complaints, however, do not allege any facts sufficient to satisfy the standard for finding an agency relationship. Nor does the Opposition address that standard.

### D.    The *Fields* Plaintiffs Have Abandoned Claims Based on an Alleged Conspiracy to Bring About Acts of International Terrorism.

The *Fields* Complaint alleges a third conspiracy: that "Defendants conspired with ISIS . . . to bring about acts of international terrorism against Americans." (*Fields* AC ¶ 352.) Defendants explained that this claim fails because the *Fields* Complaint does not allege an agreement or overt act. Mot. 59–60, 62–63. The *Fields* Plaintiffs' failure to respond to these arguments constitutes

an abandonment of this claim.  *See, e.g.*, *Laface*, 349 F. Supp. 3d at 161; *Chauhan*, 2019 WL 6118006, at *5.[18]

## IV.    THE OPPOSITION DOES NOT REFUTE THAT IMPOSITION OF SECONDARY LIABILITY ON DEFENDANTS WOULD VIOLATE DUE PROCESS.

Imposing secondary liability on Defendants for conduct pre-dating JASTA would violate the Due Process Clause.  (Mot. 71–74.)  Ignoring the Supreme Court's repeated warning that the retroactive application of statutes authorizing punitive remedies—such as JASTA—raises serious constitutional concerns (Mot. 72), the Opposition settles on the unremarkable proposition (at 53–54) that "Congress may impose retroactive liability to compensate victims for past injuries."  But that is not the issue here. What sets JASTA apart from the cases that the Opposition cites is its imposition of treble damages that are not merely compensatory.[19]  And retroactive punishments, including those based on "*any* theory of deterrence . . . or blameworthiness," are precisely what the Supreme Court has flagged for greater constitutional scrutiny.  *Landgraf v. USI Film Prods.*, 511 U.S. 244, 281 (1994) (alteration in original) (emphasis added).  Constitutional concerns thus come into play if JASTA's treble-damages provision has *any* punitive purpose.

---

[18]    Defendants also sought dismissal of the counts in the *Fields* AC asserting primary liability.  In response, the *Fields* Plaintiffs "concede[d]" those claims.  *Fields* Opp'n 1.

[19]    Two of the three treble damages cases cited by the Opposition address questions outside the due process and retroactivity context.  *See Cook County. v. United States ex rel. Chandler*, 538 U.S. 119, 130 (2003) (weighing presumption against imposing punitive damages on municipalities); *Stansell v. Revolutionary Armed Forces of Colom.*, Nos. 16 Misc. 405 (LGS) (SN), 18 Misc. 545 (LGS) (SN), 2022 WL 17830551, at *3 (S.D.N.Y. Dec. 21, 2022) (assessing whether ATA damages awards could be recovered under the Terrorism Risk Insurance Act).  And, unlike the third case, this is not a situation in which Congress explicitly enacted a retroactive amendment "to reflect the original intent of the law" or did not intend to punish.  *Sanders v. Allison Engine Co.*, 703 F.3d 930, 945–49 (6th Cir. 2012).

The Opposition's remaining argument (at 54), with the support of only a single authority, is that JASTA's imposition of treble damages is not punitive.  But it disregards both the clear weight of case law interpreting the treble-damages provision and the legislative history, which demonstrate that JASTA's treble damages are intended to punish.  (Mot. 73–74 & n.26.)[20]

## V.     THE COURT SHOULD DENY REQUESTS FOR FURTHER DISCOVERY AND DISMISS THE COMPLAINTS WITH PREJUDICE.

In light of the fundamental legal deficiencies that bar the Complaints' claims, the Court should deny the requests for discovery and dismiss the Complaints with prejudice.

The Opposition first argues (at 29) that the Court should order jurisdictional discovery. "Courts frequently permit jurisdictional discovery where the plaintiff has made a sufficient start toward establishing jurisdiction, but will not permit jurisdictional discovery on the basis of a generalized request more akin to a fishing expedition." *Przewozman*, 2023 WL 2562537, at *18. The request here falls into that latter, impermissible category.  As detailed above, the Opposition has presented no authority supporting the exercise of jurisdiction over a non-bank based on its bank's use of New York correspondent accounts, and cited no plausible allegations that Defendants purposefully directed their banks to use New York correspondent accounts.  No amount of discovery will turn the Defendant corporations (bank customers) into banks.  Nor is there a basis to suggest that additional evidence could establish purposeful availment.  To the contrary, the Opposition contends (at 5) that the Complaints "draw on a remarkable Statement of Facts . . . laying out Defendants' criminal scheme in granular detail," "reflect[] extensive pre-filing research . . . that supplements the facts Lafarge admitted," and "tell the story of Defendants'

---

[20]  Contrary to the Opposition's assertion (at 54 n.32), courts strike requests for punitive damages at the motion to dismiss stage.  *See, e.g.*, *Mayes v. Summit Ent. Corp.*, 287 F. Supp. 3d 200, 205 (E.D.N.Y. 2018) (Garaufis, J.) (striking improper prayer for punitive damages).

terrorist bribes in unusual detail, with reference to hundreds of identified sources." The Opposition's plea for additional information thus rings hollow.[21]

For similar reasons, the Court should not permit Plaintiffs to submit *Touhy* requests to DOJ for records that it obtained during the investigation and prosecution of Lafarge and LCS. (*See* Opp'n 55.) Beyond the sole conclusory assertion that "[t]hose records bear on Defendants' conduct, state of mind, and U.S. contacts," the Opposition offers no explanation why this discovery is needed to state a claim—particularly in light of the "extensive pre-filing research" and "remarkable Statement of Facts" that it trumpets. Nor does the Opposition cite any authority for deferring resolution of the Motion unless and until DOJ opens its files. The ATA outlines a process for staying discovery and withholding a ruling on a motion to dismiss following a request for information served on DOJ. 18 U.S.C. § 2336(b). But that provision, by its terms, applies only when DOJ "object[s] [to the request] on the ground that compliance will interfere with a criminal investigation or prosecution of the incident, or a national security operation related to the incident, which is the subject of the civil litigation." *Id.* It does not foreclose DOJ from denying a request for information on other grounds that would not trigger the bar on granting a motion to dismiss. Nor, in any event, does this provision apply here, where Plaintiffs have not yet submitted a *Touhy* request to DOJ and DOJ has not objected on the enumerated grounds.

## CONCLUSION

For the foregoing reasons and those stated in the Motion, the Complaints should be dismissed in their entirety with prejudice.

---

[21]  The circumstances here are markedly different from the cases on which the Opposition relies (at 29) to justify the request for jurisdictional discovery. Those cases authorized jurisdictional discovery from banks (not non-bank customers), and the plaintiffs in those cases did not have the benefit of extensive pre-filing information gathering and a lengthy SOF.

Dated:  New York, New York
        February 21, 2024

                                        /s/  Jay K. Musoff
                                        Jay K. Musoff
                                        John Piskora
                                        Sarah Levitan Perry
                                        **LOEB & LOEB LLP**
                                        345 Park Avenue
                                        New York, NY 10154
                                        Telephone:    212-407-4212
                                        Facsimile:    212-407-4990

                                        *Attorneys for Lafarge S.A.,*
                                        *Lafarge Cement Holding Limited, and*
                                        *Lafarge Cement Syria S.A.*