# Exhibit 2

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

SUMNER SQUARE
1615 M STREET, N.W.
SUITE 400
WASHINGTON, D.C. 20036-3215
———
(202) 326-7900

FACSIMILE:
(202) 326-7999

December 22, 2025

*Via Electronic Mail*

Alyson Zureick
WilmerHale
7 World Trade Center
250 Greenwich Street
New York, New York 10007

      Re:    December 22, 2025 Meet-and-Confer in *Foley et al. v. Lafarge S.A. et al.*, No. 1:23-cv-05691-NGG-PK (E.D.N.Y.); *Finan et al. v. Lafarge S.A. et al.*, No. 1:22-cv-07831-NGG-PK (E.D.N.Y.); *Black et al. v. Lafarge S.A. et al.*, No. 1:24-cv-08901-NGG-PK (E.D.N.Y.); and *Shirley et al. v. Lafarge S.A. et al.*, No. 1:25-cv-04248-NGG-PK

Dear Alyson,

      Thank you for taking the time to meet-and-confer with us this afternoon. But we do not believe the call proved to be a productive use of time. As we have made clear for weeks, it benefits no one to discuss proposed redlines to search strings that are not shared in advance. And we are surprised that Defendants thought a productive conversation about search strings could take place without first providing de-duped and unique document hit counts. We hope that the parties can put this call behind them and find ways to move forward in a more productive manner. I write regarding several items that we believe will help us do just that.

      **Standard hit counts.** The hit counts you provided 24 minutes before our call were not de-duped across custodians and did not provide unique total document hits across each string. In other words, if a search term hit on the same document for multiple custodians, it was counted multiple times. And if a document that hit on one search string also hit on a different search string, it was double counted. The hit counts Defendants provided are thus meaningless to assessing burden. Plaintiffs still have no idea how many unique documents the proposed search terms hit upon.

      If you would like us to negotiate a narrowing of the search strings we propose, we cannot do so until you provide hit counts that are de-duped and unique hit counts. This is standard practice in ESI discovery, and we were surprised that Defendants seemed to suggest otherwise. If you request these numbers from your vendor now, you should be able to have them within 24

Kellogg, Hansen, Todd, Figel & Frederick, p.l.l.c.

December 22, 2025
Page 2

hours. We thus ask that you provide us with these de-duped and unique hit counts no later than Wednesday.

**Proposed Redlines.** Relatedly, to the extent Defendants intend to propose any redlines or counters to our proposed search strings, Plaintiffs need to know what words are driving the hit counts up. We thus ask that you provide standard hit-count information with any proposed redlines, and to share those a day before our next meet-and-confer call. Although we are always happy to discuss, we do not believe more phone calls will be productive until Defendants can provide the hit counts requested above coupled with concrete positions or counteroffers on our outstanding proposals.

**The Need for Additional Searches Now.** Thank you for agreeing to run Search String 5, which includes the email addresses of various intermediaries Defendants used to reach agreements with ISIS and ANF. We understand from our conversation that Defendants are reviewing the documents they previously withheld during jurisdictional discovery, as well as documents responsive to Search String 5. But this combines to just over 3,000 documents (prior to de-duping). That is not enough to keep a dedicated review team busy more than a few days, at most.

If Defendants are committed to getting substantial productions done, as you have repeatedly stated, more documents need to be added to the queue. To that end, we propose that Defendants begin by running Search String 2, which includes the various terms used to refer to ISIS and ANF. As we explained on the call, all documents that discuss these terrorist groups are relevant and should be produced. We understand from the call that Defendants are considering proposing modifications to this search. We are unlikely to accept any such limitations, at least with respect to the core terms like ISIS and ISIL. But if Defendants are nonetheless planning to resist this search string as written, Defendants should at a minimum begin running the terms "ISIS," "ISIL," Islam* w/2 State, and the various spellings of Daesh. These terms are undisputedly relevant and should provide Defendants with a steady stream of other documents to review as we continue to reach agreement on other strings. To be clear, our preference is to reach agreement now on running Search String 2 as is (or with very minor modifications), plus many of the other search strings for which we believe there should be no real dispute. But if Defendants wish to negotiate further over this string, they should run these core terms now so that productions can proceed apace.

Please provide a position in writing on whether you agree to this reasonable proposal.

**Additional Custodians.** Based on our conversation on Thursday, we understood that the parties would pick up where we left off on this meet-and-confer: discussing Plaintiffs' remaining proposed custodians. Unfortunately, Defendants stated that they believed discussing the remaining custodians is premature. We were disheartened that Defendants appear to be taking the position that, because they have agreed to some custodians, they need not agree to any others. This is not how discovery should work, especially when each of the remaining custodians is relevant to the merits of Plaintiffs' case:

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

December 22, 2025
Page 3

- **info.syria@lafarge.com / SY-LCS@lafarge.com / SY-Excom@lafarge.com:** We understand that these three email addresses were used to convey information to key decisionmaking groups at LCS about important decisions, such as whether to evacuate the plant. We also understand that individual low-level employees used these addresses to provide grievances, as well.

- **Beat Werder:** Mr. Werder served as the head of media relations for LafargeHolcim from 2017 to 2018, a time that overlapped with Defendants' publishing of their 2017 press release. Mr. Werder subsequently answered press questions about this press release and the events underlying Plaintiffs' complaint. We believe that this press release misrepresented and downplayed Defendants' conduct and is evidence of their intent to cover up their wrongdoing. We are entitled to explore this.

- **Dan Lisnic:** Mr. Lisnic served as Lafarge's International Treasurer and explained how Defendants' money transfers would require working with partner banks in the United States – an issue at the heart of the parties' jurisdictional disputes. *See* Am. Compl. Ex. 69.

- **Michel Bisiaux:** Mr. Bisiaux signed a loan agreement on behalf of Lafarge Cyprus to LCS and oversaw its disbursements – disbursements that were used to fund terrorist groups. He is one of the key individuals associated with Lafarge Cyprus. And he is listed on Defendants' Rule 26 disclosures. Plaintiffs are entitled to have anyone listed on Defendants' Rule 26 disclosures as a custodian.

- **Isabelle Andre:** Ms. Andre was General Counsel and Compliance Director at Lafarge and served as the Head of Legal Affairs for the Aggregates and Concrete divisions. Based on the ongoing French proceedings, we understand that the legal department at Lafarge actively was advised of LCS's payments to terrorists. Given her role, we suspect that Ms. Andre received relevant communications that would not be protected by any privilege.

- **Magali Anderson:** Ms. Anderson pleaded guilty on Lafarge's behalf to conspiracy to provide material assistance to ISIS and ANF. She would thus need to have sufficient knowledge necessary to her agreeing on her company's behalf to this criminal charge.

- **Sonia Artinian:** We understand that Ms. Artinian chaired security council meetings for Lafarge, and that she was charged with endangering lives by the French government for her role in the events underlying Plaintiffs' complaint.

- **Hélène Seguin:** We understand that Ms. Seguin appears on many relevant emails, and that she took part in security calls about the Jalabiyeh plant. We also

Kellogg, Hansen, Todd, Figel & Frederick, p.l.l.c.

December 22, 2025
Page 4

understand that she performed security audits for Lafarge and helped in personnel evacuation.

- **Montaser al-Maaytah:** We understand that Mr. al-Maaytah had knowledge of the underlying terrorist agreements and was scolded for using the actual names of the terrorists that Lafarge did business with in company emails.

- **Frederic Malis:** Mr. Malis served as Country Security Coordinator for Lafarge Iraq from October 2013 to September 2017. ISIS's caliphate extended from Iraq to Syria, and we understand that he had relevant information about ISIS that he communicated to LCS – including regarding prices for inputs sold by ISIS.

- **Rachid Benyakhlef:** We understand that Mr. Benyakhlef served as a security coordinator for Lafarge in Iraq during the relevant period and that he, too, had knowledge of how ISIS was pricing cement inputs for sale into Syria, as well as opportunities available for doing business with ISIS in their caliphate. We understand that Lafarge's Iraq and Syria businesses often communicated with each other and were involved in common discussions about ISIS, thus making his documents relevant.

- **Sami Elzaim (Alzaim):** Mr. Elzaim was the central management controller for LCS, as well as a Treasury manager. His documents particularly are relevant for understanding how much money and cement Defendants funneled to ISIS and ANF.

- **Amma Alkhayer (Khayer):** Mr. Alkhayer served as the Treasurer of LCS during a key time in the conspiracy. His documents, too, are necessary to understanding how much money and cement Defendants sent to ISIS and ANF.

- **Marc Castel:** We understand that Mr. Castel was the boss of Jacob Waerness and attended meetings with armed groups in Turkey on LCS's behalf.

- **Mahmoud Hashish:** We understand that Mr. Hashish took part in recurring LCS security conference calls. He was also a manager at LCS and thus had insight into the interactions between LCS employees and terrorists.

- **Mohamed El-Ansary:** Mr. El-Ansary served as the Head of Treasury for LMEA and helped handle transfers into and out of LCS's fraudulent LMEA account – an account that was used to fund terrorist organizations. *See* Am. Compl. Ex. 60.

- **Samia Ibrahim:** Based on what we have seen from jurisdictional discovery, Ms. Ibrahim also played a key role in managing LCS's faux account at LMEA. Indeed, during the relevant time he served as Chief of Treasury & Cash Management at the company.

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

December 22, 2025
Page 5

- **Zeinab El-Orabi:** From jurisdictional discovery, we understand that Ms. El-Orabi, too, played a role on the LMEA side to help Defendants use their illicit LMEA account.

- **Tarek Abou-Eita:** Mr. Abou-Eita served as the CFO for Lafarge Cement Egypt and, based on jurisdictional discovery, also appears to have contributed to the handling of LCS's illicit account at LMEA.

- **Klaus Hammerl:** We understand that Mr. Hammerl was involved in discussions about ISIS's actions regarding the Jalabiyeh cement plant, including obtaining cement from it.

To be clear, each of these individuals is a relevant custodian for other reasons than those briefly articulated here. But as should be clear, these were not randomly chosen people. Plaintiffs selected them in good faith, due to the likelihood of their having unique documents relevant to Plaintiffs' claims.

Even so, in the spirit of compromise, Plaintiffs are willing to set aside at this time five proposed custodians: Dan Lisnic, Magali Anderson, Zeinab El-Orabi, Ahmed Seoudy, and Tarek Abou-Eita. If Defendants will remove Mr. Bisiaux from their initial disclosures and agree they will not use him as a witness, moreover, we can agree to remove him as well. Plaintiffs reserve the right to revisit any of these custodians later, once productions have begun.

Each of the remaining 18 custodians is undoubtedly relevant and, in Plaintiffs' eyes, likely to possess unique responsive documents. If Defendants are not willing to accept these custodians, we ask that they provide standard hit counts so that the parties can have an informed and meaningful conversation about which custodians to use going forward.

Please let us know if you agree to these custodians or, if not, when we can expect to see the hit counts.

*Document Database.* We also again discussed Defendants' document database. From our conversations today, we understand that Defendants plan on producing documents solely from this "database," despite current counsel not being aware of how it was compiled or by whom. As we reiterated, we continue to have many outstanding questions about what this "database" contains and how it was compiled. Until we have answers to these questions, we cannot be satisfied with Defendants' use of this database alone for providing responsive documents. We direct you to our December 18 letter, as well as Mr. Wolosky's December 21 email, for the minimum information we require to productively move our conversations forward. Please let us know when we can expect an answer to these questions.

\*   \*   \*

As we have said many times now, we appreciate your stated desire to start producing documents promptly. But events in the past few days make us question how genuine that stated

KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.

December 22, 2025
Page 6

desire is. The meet-and-confer today did little to move this case forward. Your suggestions that reviewing 1,300 documents is burdensome, or would constitute a substantial production, does not suggest a serious desire move this case forward productively. And Defendants have now filed a lengthy mandamus petition with the Second Circuit, stressing how Defendants wish to avoid (what they claim to be) "burdensome" discovery. *See* Mandamus Pet. at 16-18. That filing suggests a desire to avoid and delay discovery, which heightens our concerns about the lack of progress to date and about the mostly unproductive call today.

As you are aware, despite discovery beginning in September, Plaintiffs will be entering the new year having received less than 50 documents, many of which were duplicates. This needs to change. And the only way we can do that is by having actual data and counterproposals to move conversations about search strings and custodians forward. We also need responses to our many outstanding questions and disputes raised in our November 21 letter regarding Plaintiffs' First and Second RFPs; our November 24 email regarding issues with Defendants' first production; Plaintiffs' December 2 letter regarding Plaintiffs' Third RFPs; and Plaintiffs' December 18 letter regarding, among other things, Defendants' document database and plans to supplement interrogatory responses; as well as Defendants' position on the many items they took back during our November 18 meet-and-confer. As these letters make clear, the parties have yet to come to ground on many outstanding disputes regarding Plaintiffs' RFPs, despite each of these letters being outstanding for many weeks.

We would like to have complete agreement (or reached impasse) on these long-outstanding issues, including search strings, no later than January 2, 2026. We also expect to have agreement (or impasse) over interim dates for ensuring that rolling productions proceed in a timely fashion. If we do not have these gating issues finally resolved by then, we intend to seek relief on January 5. We look forward to working with you in the interim.

Sincerely,

*/s/ Chase H. Robinett*

Chase H. Robinett
*Counsel for Foley Plaintiffs*

cc:  Jonathan Paikin
     Karis Yi