**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DIANE FOLEY, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>LAFARGE S.A., *et al.*,<br><br>Defendants. | Case No. 23-cv-05691-NGG-PK |
| ESTATE OF AVRAHAM GOLDMAN, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>LAFARGE S.A., *et al.*,<br><br>Defendants. | Case No. 24-cv-01043-NGG-PK |
| JASON BLACK, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>LAFARGE S.A., *et al.*,<br><br>Defendants. | Case No. 24-cv-08901-NGG-PK |
| CHRISTINE STALLTER, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>LAFARGE S.A., *et al.*,<br><br>Defendants. | Case No. 25-cv-06749-NGG-PK |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR SPOLIATION SANCTIONS**

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

BACKGROUND ..... 2

A. Lafarge's Conspiracy to Pay Terrorists and Hide Evidence ..... 2

B. The Project Alpha Investigation And Defendants' Loss Of Evidence ..... 4

C. The DOJ Guilty Plea And French Conviction ..... 6

ARGUMENT ..... 7

I. DEFENDANTS FAILED TO PRESERVE RELEVANT EVIDENCE ..... 8

A. Defendants Had a Duty To Preserve the Lost Evidence ..... 8

1. Defendants reasonably anticipated litigation in 2013 and 2014 ..... 8

2. Defendants' duty arose in April 2016 at the latest ..... 10

3. Defendants foresaw more than French litigation ..... 11

B. Defendants Failed To Take Reasonable Steps To Preserve Relevant Evidence ..... 11

C. The Lost Evidence Is Not Obtainable Through Other Means ..... 18

II. THE COURT SHOULD SANCTION DEFENDANTS ..... 20

A. The Court Should Order An Adverse Inference ..... 21

B. The Court Should Also Order Lesser Sanctions To Cure The Prejudice ..... 24

CONCLUSION ..... 25

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*Alter v. Rocky Point School Dist.*,
2014 WL 4966119 (E.D.N.Y. Sep. 30, 2014) .... 8

*Babaev v. Grossman*,
2008 WL 4185703 (E.D.N.Y. Sep. 8, 2008) .... 17

*Bank of N.Y. v. Meridien BIAO Bank Tanzania Ltd.*,
171 F.R.D. 135 (S.D.N.Y. 1997) .... 12

*Boim v. Holy Land Found. for Relief & Dev.*,
549 F.3d 685 (7th Cir. 2008) .... 9

*Capricorn Mgmt. Sys., Inc. v. Government Empl. Ins. Co.*,
2019 WL 5694256 (E.D.N.Y. July 22, 2019) .... 13, 19

*Chiquita Brands Int'l, In re*,
690 F. Supp. 2d 1296 (S.D. Fla. 2010) .... 9

*Doubleline Cap. LP v. Odebrecht Fin., Ltd.*,
2021 WL 1191527 (S.D.N.Y. Mar. 30, 2021) .... 8, 9

*Fujitsu Ltd. v. Fed. Exp. Corp.*,
247 F.3d 423 (2d Cir. 2001) .... 8, 9

*Garrit v. City of Chicago*,
2018 WL 11199008 (N.D. Ill. Mar. 6, 2018) .... 14

*Gill v. JUS Broad. Corp.*,
2023 WL 7412275 (E.D.N.Y. Nov. 9, 2023) .... 18, 19

*Hoffer v. Tellone*,
128 F.4th 433 (2d Cir. 2025) .... 20, 21

*James v. US Bancorp.*,
2021 WL 1890787 (C.D. Cal. May 11, 2021) .... 14

*Klipsch Grp., Inc. v. ePRO E-Commerce Ltd.*,
880 F.3d 620 (2d Cir. 2018) .... 13, 19, 21

*Kronisch v. United States*,
150 F.3d 112 (2d Cir. 1998) .... 23, 24

*Lekomtsev v. City of New York*,
2020 WL 5878258 (E.D.N.Y. Oct. 2, 2020) .... 12, 13

*Linde v. Arab Bank PLC*,
97 F. Supp. 3d 287 (E.D.N.Y. 2015) .......... 9

*Lokai Holdings LLC v. Twin Tiger USA LLC*,
2018 WL 1512055 (S.D.N.Y. Mar. 12, 2018) .......... 25

*Luellen v. Hodge*,
2014 WL 1315317 (W.D.N.Y. Mar. 28, 2014) .......... 17

*MedCenter Holdings Inc. v. Web MD Health Corp.*,
692 F. Supp. 3d 81 (S.D.N.Y. 2023) .......... 8, 25

*Moody v. CSX Transp., Inc.*,
271 F. Supp. 3d 410 (W.D.N.Y. 2017) .......... 24

*North Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
754 F. Supp. 3d 373 (E.D.N.Y. 2024) .......... 21, 22

*Oakley v. MSG Networks, Inc.*,
792 F. Supp. 3d 377 (S.D.N.Y. 2025) .......... 12, 14, 15, 18, 19, 21, 22, 23, 24, 25

*Prelvukaj v. Naselli*,
2023 WL 3570659 (E.D.N.Y. May 18, 2023) .......... 7, 11, 16, 20, 24, 25

*Proofpoint, Inc. v. Vade Secure, Inc.*,
2021 WL 11108111 (N.D. Cal. June 1, 2021) .......... 21

*Pugh v. Socialist People's Libyan Arab Jamahiriya*,
290 F. Supp. 2d 54 (D.D.C. 2003) .......... 9

*Rivera v. Hudson Valley Hosp. Grp., Inc.*,
2019 WL 3955539 (S.D.N.Y. Aug. 22, 2019) .......... 21

*Ronen v. RedRoute, Inc.*,
2025 WL 2790808 (E.D.N.Y. June 16, 2025) .......... 21, 24

*Shim-Larkin v. City of New York*,
2019 WL 5198792 (S.D.N.Y. Sep. 16, 2019) .......... 15

*Siani v. State Univ. of N.Y. at Farmingdale*,
2010 WL 3170664 (E.D.N.Y. Aug. 10, 2010) .......... 10, 11

*StoneX Grp., Inc. v. Shipman*,
2024 WL 1509346 (S.D.N.Y. Feb. 5, 2024) .......... 8

*Taylor v. City of New York*,
293 F.R.D. 601 (S.D.N.Y. 2013) .......... 8

*We the Protesters, Inc. v. Sinyangwe*,
348 F.R.D. 175 (S.D.N.Y. 2024) .......... 14

*West v. Goodyear Tire & Rubber Co.*,
167 F.3d 776 (2d Cir. 1999).......... 7

*Williams v. New York City Transit Auth.*,
2011 WL 5024280 (E.D.N.Y. Oct. 19, 2011).......... 17

*Wultz v. Islamic Repub. of Iran*,
755 F. Supp. 2d 1 (D.D.C. 2010) .......... 9

**RULES**

Fed. R. Civ. P. 37(e) .......... 24

Fed. R. Civ. P. 37(e)(1).......... 20, 24

Fed. R. Civ. P. 37(e)(2).......... 20

## INTRODUCTION

Defendants have been criminally convicted on two continents of paying terrorist groups that were slaughtering Americans.[1] Their crimes depended on hiding evidence. They faked invoices, backdated contracts, and talked in code. They refused to cooperate with U.S. and French investigators. And their employees labored to bury their most incriminating documents, urging each other to "destroy," "erase," "shred," and "delete" records of their illegal payments. More broadly, Defendants schemed to use personal email accounts so they could move their ISIS discussions off Lafarge's servers altogether. Their executives likewise used cell phones – through platforms like WhatsApp and Skype – to talk about and even *with* ISIS. The goal was simple. Defendants knew what they were doing was illegal, so they wanted to hide the evidence.

Defendants have now spoliated that evidence. By April 2016 at the latest, Defendants knew they would face litigation in U.S. courts. That month, they hired a U.S. law firm to investigate their payments and sought its advice on their U.S. legal exposure. Meanwhile, whole troves of documents vanished. Defendants neither collected nor preserved the "personal" emails their executives had worked so hard to hide. They failed to preserve their bank statements and personnel records. Worst of all, they preserved no mobile-phone data. So all their inculpatory text messages are gone. And Defendants refuse to say what happened, claiming privilege.

The Court should sanction Defendants for that loss of evidence. Rule 37(e) allows an adverse inference when one party seeks to deprive another of evidence, and that has happened here. Defendants knew they would be sued – including by the U.S. victims of their scheme to pay U.S.-designated terrorists – so they made sure their worst documents would never see the light of day. This is why spoliation sanctions exist. The Court should order them.

---

[1] Defendants are Lafarge S.A. ("Lafarge"), Lafarge Cement Holding Limited, and Lafarge Cement Syria ("LCS"). All docket cites are to the *Foley* action unless otherwise stated.

## BACKGROUND

### A. Lafarge's Conspiracy to Pay Terrorists and Hide Evidence

This case concerns Defendants' "criminal conspiracy with ISIS and ANF." Dkt. 97 ("MTD Op.") at 46. It follows an extraordinary guilty plea in which Defendants admitted they intentionally paid millions of dollars to both terrorist groups. SOF ¶¶ 15, 28-54.[2] Defendants knew that ISIS and ANF were U.S.-designated terrorist organizations and were "committ[ing] numerous terrorists acts, resulting in the deaths of numerous U.S. citizens." *Id.* ¶¶ 23, 27, 50, 84. Yet they conspired with the terrorists anyway. To "obtain economic advantage over their competitors," Defendants struck a series of business deals with the terrorists "for the explicit purpose of incentivizing ISIS to act in a manner that would promote [Defendants'] security and economic interests." *Id.* ¶ 15. They even went so far as to negotiate a "revenue-sharing agreement" that they likened to "paying 'taxes' to ISIS." *Id.* The executives who negotiated those deals did so "at the direction of Lafarge's and LCS's senior management." *Id.* ¶ 16.

Defendants knew all this was illegal. *Id.* ¶ 50. So they "actively attempted to conceal their conduct." *Id.* ¶ 18. Defendants sought to obscure their terrorist payoffs by routing them through "third-party intermediaries" like Firas Tlass. *Id.* ¶¶ 18, 55-65. They removed the name "Lafarge" from the "documents memorializing" their crimes. *Id.* ¶¶ 18, 68. They "created invoices with false descriptions." *Id.* ¶¶ 18, 56-58. They "draft[ed] a backdated contract-termination agreement" to make it seem like their scheme had ended. *Id.* ¶ 96. And they "falsif[ied] records" about their payments to deceive their auditors. *Id.* ¶ 62; *see id.* ¶¶ 56-58.

---

[2] "SOF" refers to the Statement of Facts in *United States v. Lafarge S.A.*, No. 22-cr-444 (E.D.N.Y.) (Dkt. 10-1). Defendants stipulated to those facts at the time, *see* Plea Agreement, *id.* (Dkt. 10) ("Plea Agmt.") at ¶ 18, [redacted]. "Ex. __" refers to the exhibits attached to the accompanying Declaration of Joshua D. Branson.

Defendants also hatched a scheme to shield their emails from discovery. They did so by discussing the conspiracy via their "personal email accounts" rather than their "Lafarge corporate email addresses." *Id.* ¶ 18. Defendants' executives specially created those off-book accounts so they could [redacted] The idea to use personal email – thus keeping the most incriminating communications off Lafarge's corporate servers – came from Lafarge lawyer Jean-Jerome Khodara, whom the guilty plea calls "In-House Lawyer 1." SOF ¶ 88; *see* Dkt. 89-121 at 1-2 (Khodara's instruction). The goal, Defendants admitted, was to avoid a discoverable "email record of the communications" about ISIS. SOF ¶ 88.

Defendants had good reasons to hide their emails. The emails Defendants sent via their corporate accounts were extraordinary on their own, such as when [redacted] But their non-corporate emails were even more depraved. From their personal accounts, Defendants' executives exchanged emails describing "the agreement with ISIS, that I approve," Ex. 4 at -.001; their desire to [redacted]; their machinations to [redacted]; and even [redacted] – the very Americans whose families are Plaintiffs here.[3]

Defendants also often avoided email altogether, discussing the conspiracy via phone or text. So pervasive was that practice that [redacted]

---

[3] [redacted] Dkt. 89-121 at 1 ([redacted] conveying desire "not to receive anything by email" about Lafarge's "relationship" with "jihadist networks").

[redacted] Rather than disclaim the accusations, [redacted][4] As LCS's HR manager wrote [redacted]

The same was true of Defendants' payment records. [redacted] The message was not lost on Pescheux. [redacted] Instead, [redacted] He concluded: [redacted]

**B. The Project Alpha Investigation And Defendants' Loss Of Evidence**

On February 19, 2016, public reports began to surface documenting Lafarge's "payments to ISIS." SOF ¶ 108. Holcim, which had acquired Defendants in 2015, responded by [redacted]

[4] *See, e.g.*, [redacted]

[redacted]

[redacted] And they refused to say whether they even monitored their employees' retention of [redacted] Ex. 23 at 23-36; Ex. 25 at 2-6.

A massive loss of evidence resulted. As part of Project Alpha, Defendants identified roughly [redacted] custodians with relevant information. [redacted]. Yet they preserved no responsive mobile-phone data from any of those [redacted] custodians. [redacted]; Ex. 24 at 1. For 55 of them, Defendants never even collected their phones. Ex. 23 at 8, 12. While they did collect phones from the remaining five, the custodians apparently had already deleted the responsive data on them. Ex. 24 at 1; [redacted]. And Defendants preserved nothing from any employee's personal email account. Ex. 23 at 26. Instead, Defendants instructed their executives to erase those accounts. [redacted]

Defendants also failed to preserve bank statements for the accounts they used to funnel money to ISIS and ANF. Ex. 27 at 3. [redacted] Plaintiffs have since asked for the bank statements, but Defendants disclaimed possession of them. Ex. 29; Ex. 27. In May 2026 – a decade after the fact – Defendants finally asked their banks for the relevant account statements. Ex. 30 at 2. To date, Defendants have recovered none and produced none.

A similar saga unfolded with Defendants' personnel records. [redacted] But Defendants lost or destroyed large swaths of their personnel files for at least 29 agreed-on custodians in this case. Ex. 32 at 2-4. The gaps were especially acute for the nine employees – Pescheux, Veillard, Herrault, Jolibois, Lafont, Roux, Khodara, Waerness, and Jaloudi – most responsible for orchestrating Defendants' conspiracy. *See* Appx. C (chart identifying each). For those nine conspirators, some or all of the following files are inexplicably missing: disciplinary records, compensation data, employment agreements, severance agreements, and performance reviews. *Id.* Defendants have confirmed they no longer possess those files. Ex. 33 at 1-2.

### C. The DOJ Guilty Plea And French Conviction

In October 2022, Lafarge and LCS pleaded guilty to conspiring to provide material support to ISIS and ANF. [redacted] The Plea Agreement observed that Defendants had "undertake[n] an internal investigation into the relevant criminal conduct carried out by external U.S. legal counsel." Plea Agmt. ¶ 7(e). But that investigation, prosecutors found, yielded an alarming lack of cooperation. The plea emphasized that "the criminal conduct uncovered by the internal investigation was not voluntarily self-reported to the Department of

Justice." *Id.* ¶ 7(f). And the U.S. Attorney's Office and DOJ's National Security Division "determined that they did not receive timely and full cooperation with their investigation." *Id.*

French authorities also prosecuted Lafarge and several of its executives under French law for financing terrorism. Defendants did not cooperate with that process, either. Among other things, [redacted]

But the attempt to impede the French investigation proved fruitless. In April 2026, the French court convicted Lafarge and its executives of financing terrorism. [redacted] Those executives – the same ones whose personal emails and text messages Defendants refused to preserve – are now facing years in prison. [redacted]

## ARGUMENT

Spoliation is "the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). Rule 37(e) governs the spoliation of ESI, which occurs when "the party in possession of the ESI (1) had a duty to preserve the ESI, (2) failed to take reasonable steps to preserve the ESI, and (3) the ESI cannot be restored or replaced." *Prelvukaj v. Naselli*, 2023 WL 3570659, at *7 (E.D.N.Y. May 18, 2023) (Kuo, M.J.). Defendants committed spoliation here.

## I. DEFENDANTS FAILED TO PRESERVE RELEVANT EVIDENCE

### A. Defendants Had a Duty To Preserve the Lost Evidence

A preservation duty arises "when a party should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001). The "standard is an objective one, asking whether a reasonable party in the same factual circumstances would have reasonably foreseen litigation." *MedCenter Holdings Inc. v. Web MD Health Corp.*, 692 F. Supp. 3d 81, 90 (S.D.N.Y. 2023). A party need not predict "the *precise* nature of the *specific*" future litigation. *StoneX Grp., Inc. v. Shipman*, 2024 WL 1509346, at *9 (S.D.N.Y. Feb. 5, 2024). Nor need the prospect of litigation be "certain." *Alter v. Rocky Point School Dist.*, 2014 WL 4966119, at *8 (E.D.N.Y. Sep. 30, 2014). It is enough for litigation over the subject to be "reasonably foreseeable" when the evidence is lost. *Id.*

Defendants breached their preservation duty here. Litigation over Defendants' terrorist conspiracy became reasonably foreseeable in 2013 and inescapably so by April 2016.

#### 1. Defendants reasonably anticipated litigation in 2013 and 2014

Throughout 2013 and 2014, Defendants reasonably feared litigation over their scheme to pay U.S.-designated terrorist organizations. The scheme's very nature invited the prospect of U.S. litigation. Because "certain types of incidents tend to trigger litigation," the duty to preserve can "attach as soon as the triggering incident occurs." *Taylor v. City of New York*, 293 F.R.D. 601, 610 (S.D.N.Y. 2013). "Large-scale criminal bribery schemes fall into this category," but "[t]he phenomenon is not, of course, limited to bribery schemes." *Doubleline Cap. LP v. Odebrecht Fin., Ltd.*, 2021 WL 1191527, at *6 & n.5 (S.D.N.Y. Mar. 30, 2021).

Defendants knew in 2013 that their scheme to bribe ISIS was the "type[] of incident" that would trigger litigation. *Taylor*, 293 F.R.D. at 610. That is why they worked so hard to conceal it. SOF ¶¶ 18-19. Indeed, Defendants recognized throughout that [redacted]

[redacted], and reminded each other to "[k]eep in mind that ISIS is still a terrorist movement," Ex. 36 at -145. They also knew the U.S. government had designated those terrorists. SOF ¶¶ 27, 50, 84; *see* Ex. 37 at -.002 ("negotiat[ing]" with "networks . . . categorized as terrorists by international organizations and the US"). And given the designations, Defendants "recognized the illegality under U.S. . . . law of transacting with ISIS." SOF ¶ 50. As Lafarge's CEO stressed in 2014 about "our agreement with Daesh," they needed to "make sure that what we do is risk free (also vis-à-vis the U.S.)." *Id.* ¶ 86; [redacted]

Defendants' "criminal bribery scheme" to support U.S.-designated terrorists thus raised a reasonable prospect of U.S. litigation. *Doubleline*, 2021 WL 1191527, at *6. The "interest of the United States in preventing and punishing international terrorism has been a matter of worldwide common knowledge for years." *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F. Supp. 2d 54, 59 (D.D.C. 2003). As Defendants should have known, companies that paid U.S.-designated terrorists abroad had often faced U.S. litigation.[5] So Defendants and their executives could hardly have been ignorant that their documents "may be relevant to future litigation" about the terrorist payoffs they were trying to cloak. *Fujitsu*, 247 F.3d at 436.

That prospect became even more explicit in June 2015. Lafarge then became embroiled in a payment dispute with Amro Taleb, their "Intermediary 2" through whom they routed funds to ISIS. SOF ¶ 10. To convince Defendants to pay him again, Taleb [redacted]

---

[5] *See Linde v. Arab Bank PLC*, 97 F. Supp. 3d 287 (E.D.N.Y. 2015) (affirming 2014 jury verdict against bank); *In re Chiquita Brands Int'l*, 690 F. Supp. 2d 1296 (S.D. Fla. 2010) (banana supplier); *Wultz v. Islamic Repub. of Iran*, 755 F. Supp. 2d 1 (D.D.C. 2010) (bank); *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685 (7th Cir. 2008) (charity). Defendants were on notice of those lawsuits. *E.g.*, [redacted]; *see also* Press Release, DOJ, *Chiquita Brands Pleads Guilty* (Mar. 19, 2007) ("The message to industry from this guilty plea today is that the U.S. Government will bring its full power to bear in the investigation of those who conduct business with designated terrorist organizations, even when those acts occur outside of the United States.").

[redacted] So Defendants knew by June 2015 – explicitly so – that the (now-destroyed) evidence Taleb described would be relevant to [redacted]. They should have preserved it.

### 2. Defendants' duty arose in April 2016 at the latest

If any doubts remained, they evaporated by early 2016. Press reports had recently surfaced exposing Defendants' scheme to the world. [redacted]

[redacted] Since litigation "was reasonably foreseeable for work product

purposes . . . it was reasonably foreseeable for duty to preserve purposes." *Siani v. State Univ. of N.Y. at Farmingdale*, 2010 WL 3170664, at *5 (E.D.N.Y. Aug. 10, 2010).

### 3. Defendants foresaw more than French litigation

Defendants do not seriously dispute that they foresaw litigation by April 2016. Instead, they say they anticipated only "legal proceedings *under French law*." Dkt. 202 at 12 (emphasis added). That assertion is not credible. Defendants hired a U.S. law firm to lead the investigation and placed a U.S. lawyer – Ryan Fayhee, a former federal prosecutor – in charge of it. Dkt. 202 at 9. Mr. Fayhee does not even appear licensed to practice law in France. If Defendants truly foresaw only French litigation, their choice of counsel was inexplicable. [redacted] Had Defendants been concerned solely with litigation in France, they would not have done something so unusual.

The way Defendants conducted the investigation reinforces the point. [redacted] None of those steps makes sense if the investigation had anticipated French litigation alone.

## B. Defendants Failed To Take Reasonable Steps To Preserve Relevant Evidence

Once a preservation duty attaches, a "party must take reasonable steps" to fulfill it. *Prelvukaj*, 2023 WL 3570659, at *8. A litigation hold, though necessary, is not enough. A party

must "take follow-up steps to ensure electronic evidence is preserved after the issuance of a litigation hold." *Oakley v. MSG Networks, Inc.*, 792 F. Supp. 3d 377, 386 (S.D.N.Y. 2025). The preservation duty demands "actual, actionable steps to make sure evidence is retained." *Id.*

A company's duty to preserve evidence extends not just to the documents on its corporate servers but to any "evidence within its control." *Lekomtsev v. City of New York*, 2020 WL 5878258, at *3 (E.D.N.Y. Oct. 2, 2020). Control exists when a "party has the right, authority, or practical ability to obtain the [evidence] from a non-party to the action." *Bank of N.Y. v. Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135, 146 (S.D.N.Y. 1997). Defendants failed to preserve at least four types of evidence within their possession or control.

**1. Personal Emails.** After instructing their executives to hide emails by using personal accounts, Defendants failed to preserve those accounts. At least 15 employees used such accounts "to send or receive communications relating to Defendants' operations" in Syria. Ex. 23 at 24-25. Yet Defendants did virtually nothing to ensure their retention. [redacted] But Defendants took no steps to enforce that instruction or monitor compliance with it. Ex. 23 at 23, 26. They [redacted]; never asked their employees to turn them over, Ex. 23 at 26; Ex. 45 ("Roux Dep.") at 59:16-60:2; and have identified nothing they did to prevent their deletion, Ex. 23 at 26. In fact, they did the opposite. [redacted]

That conduct was unreasonable. Because they never collected the non-corporate emails, Defendants could not produce them here [redacted] That two-step maneuver – first telling their employees to use personal

emails, then disclaiming the ability to produce those emails – allowed them to hide a whole spate of inculpatory documents. *Supra* p. 3 & n.3 (examples). The loss of evidence was just what Defendants intended when they devised the personal-email scheme to begin with. SOF ¶¶ 18, 88. By failing to retrieve the emails they intentionally shifted off their corporate servers, Defendants acted unreasonably. *See Klipsch Grp., Inc. v. ePRO E-Commerce Ltd.*, 880 F.3d 620, 625, 628-29 (2d Cir. 2018) (affirming finding that company committed spoliation by "deny[ing] access to several custodians' email and private messenger accounts, despite [its] admission that those accounts were sometimes used for business purposes").

The emails were also within Defendants' "control." *Lekomtsev*, 2020 WL 5878258, at *3. [redacted] Defendants were thus required to "provide access[] to" the "private email accounts" they had "sanctioned for business use." *Klipsch*, 880 F.3d at 629. Indeed, the Second Circuit has found spoliation based on a company's similar failure to preserve non-corporate email accounts. *See id.* at 625-29 (inferring intentional spoliation from company's failure to "ensure that professional communications sent through personal accounts could be preserved").[6] This Court should too.

**2. Mobile-Phone Data.** Defendants likewise preserved no responsive data on their employees' mobile phones. *Supra* pp. 4-5. In fact, [redacted]

[6] *See also Capricorn Mgmt. Sys., Inc. v. Government Empl. Ins. Co.*, 2019 WL 5694256, at *9-11 (E.D.N.Y. July 22, 2019) (similar for "personal laptop and Gmail account" for "employee").

[redacted]. For the other five, Defendants let employees wipe responsive data. Ex. 24 at 1.[7] As a result, everything on those phones – all text messages, call records, and Skype data – was lost. [redacted] Ex. 23 at 12 ("The database does not contain Skype data."); Ex. 24 at 1 (no responsive data on retained devices).

Defendants' failure to preserve the mobile-phone data was unreasonable. "Text messages" have become "an increasingly common source of relevant and often critical evidence in twenty-first century litigation." *We the Protesters, Inc. v. Sinyangwe*, 348 F.R.D. 175, 177 (S.D.N.Y. 2024). Defendants thus "should have taken affirmative steps to preserve [their] text messages." *Oakley*, 792 F. Supp. 3d at 385-86. The same was true of their "Skype messages," *James v. US Bancorp.*, 2021 WL 1890787, at *6 (C.D. Cal. May 11, 2021), and "call logs," *Garrit v. City of Chicago*, 2018 WL 11199008, at *3 (N.D. Ill. Mar. 6, 2018). The total failure to preserve their employees' "phones" was indefensible. *Oakley*, 792 F. Supp. 3d at 385-86.

The lost mobile-phone data was relevant. As noted above (at 3-4), Defendants often used phones to implement their conspiracy. The nine most culpable employees all used mobile messaging, and of the four for whom Defendants preserved phone bills, each texted hundreds of times per month. *See* Appx. A (chart). One email, for example, recounted [redacted]

---

[7] Defendants (through their executives) appear to have already wiped those five phones. For example, Jolibois's phone when collected had data going back only to June 20, 2016 [redacted] *See* Ex. 25 at 6; [redacted]

[redacted]

Defendants likewise controlled the mobile-phone data they failed to preserve. Their control was clear for the 17 custodians who used company-issued phones, including all six executives identified in the guilty plea. *See* Appx. B at 1 (Veillard, Herrault, Pescheux, Jolibois, Roux, and Lafont). [redacted] Defendants should have so requested.

Defendants had a similar duty to preserve work-related communications on employees' personal phones. [redacted] Because Defendants directed and [redacted], they had a duty to preserve the text "messages pertaining to [their] work-related activities." *Shim-Larkin v. City of New York*, 2019 WL 5198792, at *10 (S.D.N.Y. Sep. 16, 2019).

The resulting loss of evidence was staggering. Due to Defendants' preservation failures, they have produced *zero* records from any of their mobile phones. Ex. 24 at 1. The "failure to take *any* affirmative steps to protect the data on [employees'] phone[s] was unreasonable." *Oakley*, 792 F. Supp. 3d at 386. Yet Defendants refuse to explain that failure. Rather than

defend their process, they attribute all their preservation decisions to Baker McKenzie while claiming privilege over the rationale. Ex. 25 at 4-5; Ex. 23 at 9 (No. 13); Dkt. 202 at 6-12. That leaves Plaintiffs and the Court with no explanation for what happened. Having used privilege to shield their decisions from scrutiny, Defendants are left with no evidence that they took "reasonable steps" to preserve the phone data they lost. *Prelvukaj*, 2023 WL 3570659, at *8.

**3. Bank Statements.** Defendants also failed to preserve bank statements for the accounts they used to pay terrorists. [redacted] At Plaintiffs' insistence, Defendants reached out to their banks for records in 2026 – a decade after the fact – but have been unable to retrieve them. Ex. 30; Ex. 29. All the bank documents have now been lost.

The lost evidence was relevant. Two questions the jury will likely decide here are *how much* and *when* Defendants paid their terrorist counterparties. *See* MTD Op. at 8-9, 44-50. The missing bank statements would help answer them. As Plaintiffs' banking expert explains, it is standard for forensic examiners to use bank statements to search for the type of illicit transactions Lafarge tried to hide. Runge Decl. ¶¶ 3-6.[8] The lack of such statements hampers the analysis and risks allowing some of Defendants' illegal payments to evade detection. *Id.* ¶ 4.

[8] "Runge Decl." refers to the attached declaration of Sarah Runge, who is a "highly qualified" expert in correspondent banking and terrorist financing. MTD Op. at 19-20.

That is especially true because the records Defendants produced instead – *internal* ledgers purporting to summarize the transactions – are of dubious veracity. *Id.* ¶ 5; *see* SOF at 43 ("LAFARGE and LCS Executives Falsify Records"). [redacted] But nobody ever did, because the documents are gone.

Those bank records were within Defendants' control. It is "common sense" that "the relationship between an account holder and a financial institution" gives the holder "sufficient control over the documents to be able to direct their preservation." *Luellen v. Hodge*, 2014 WL 1315317, at *6 (W.D.N.Y. Mar. 28, 2014); *see Babaev v. Grossman*, 2008 WL 4185703, at *3 (E.D.N.Y. Sep. 8, 2008) (similar). [redacted] Defendants should have preserved them.

**4. Personnel Files.** Defendants also failed to preserve personnel files for their key witnesses. Such files existed: [redacted] Yet many of those records are now missing. Plaintiffs have repeatedly sought the missing records, and Defendants cannot explain their absence. Ex. 33 at 1-2; Ex. 55 at 1-2. Defendants' failure to preserve those files was unreasonable. *See Williams v. New York City Transit Auth.*, 2011 WL 5024280, at *6 (E.D.N.Y. Oct. 19, 2011) (finding spoliation from company's failure to preserve "personnel file" that was "surely . . . generated").

Appendix C sets forth the missing files by custodian. The gaps are too pervasive to recount here in full. Among other problems: Defendants lost Jolibois's entire personnel file,

Appx. C at 1; their severance agreements with Jolibois and Jaloudi, *id.*; and all their disciplinary records for the executives who led the conspiracy, *id.* at 1-2. Similar problems plagued virtually every custodian. For each person, Defendants spoliated some or all their employment contracts, compensation records, or termination paperwork. *See id.*

Those missing records are relevant. Defendants here argue that their ISIS conspiracy was the work of a few rogue employees who acted without the company's knowledge or approval. *E.g.*, Dkt. 155 at 159-60 (Nos. 9-10). The missing personnel files – showing the bonuses and performance reviews they gave those supposedly rogue employees – bear on that defense. For example, [redacted], which they parlayed into sentencing leniency, *see* Plea Agmt. ¶ 7(g). That representation appears to have been misleading at best: [redacted].[9] By failing to preserve the underlying personnel files, Defendants have impeded Plaintiffs from fully testing one of their core narratives.

### C. The Lost Evidence Is Not Obtainable Through Other Means

Spoliation occurs when the lost data cannot "be restored or replaced through additional discovery." *Oakley*, 792 F. Supp. 3d at 383, 387. The movant need not exhaust "every possible avenue" for recovery but must make "some good-faith attempt to explore its alternatives." *Gill v. JUS Broad. Corp.*, 2023 WL 7412275, at *6 (E.D.N.Y. Nov. 9, 2023) (Kuo, M.J.).

---

9 [redacted]

Each type of evidence was lost despite Plaintiffs' efforts to restore it. *First*, Plaintiffs tried to recover the personal emails. Plaintiffs succeeded in part: [redacted] By then, many of the emails were likely gone. [redacted]

[redacted] tracked the whole reason the conspirators used personal email: to hide evidence. *Supra* pp. 2-4. [redacted] thus came too late to capture everything. *See Klipsch*, 880 F.3d at 626 (spoliation of personal emails even though "many of the improperly deleted documents were recovered" later); *Capricorn*, 2019 WL 5694256, at *11 (similar for employee "Gmail account" that party could "no longer access"); *Oakley*, 792 F. Supp. 3d at 387 (ESI unrecoverable given "reason to doubt" that later "subpoena" yielded records that were "complete and accurate").

Plaintiffs also tried to restore the emails through other means. In May 2026, Plaintiffs sent subpoenas to Yahoo, Microsoft, Google, and AOL requesting the contents of the relevant email (and Skype) accounts. But all four refused, pointing out that federal law bars them from producing in response to civil subpoenas. Exs. 58-61. Plaintiffs thus made a "good-faith attempt" to recover the missing emails but did not succeed. *Gill*, 2023 WL 7412275, at *6.

*Second*, Plaintiffs have no way to restore the lost mobile-phone data. That data is now over a decade old and resides on phones that were likely discarded. The phones also belonged to foreign witnesses using foreign telephone providers that are beyond the Court's subpoena power. If Defendants cannot restore their own phones, there is nothing practical for Plaintiffs to do. And unlike with the personal emails, [redacted]. So all the relevant mobile-phone data has been irretrievably lost.

*Third*, the bank records cannot be replaced. Plaintiffs asked Defendants to obtain the statements from their banks, but those requests have proved fruitless. Ex. 27 at 3. Those banks are also beyond the Court's subpoena power and reside in countries – Lebanon, Egypt, and Syria – plagued by "conflict or political instability." *Id*. So it is doubtful that the parties can restore the account records more than a decade after the fact. If Defendants cannot now obtain the documents – despite having control over them – there is nothing else for Plaintiffs to do.

*Fourth*, Defendants have confirmed they have no more personnel records to produce. Ex. 55 at 1. Nor have Defendants "suggested any other sources from which the lost [records] could be restored or replaced." *Prelvukaj*, 2023 WL 3570659, at *8. Those records are likewise lost.

## II. THE COURT SHOULD SANCTION DEFENDANTS

Rule 37(e) authorizes two tiers of remedies for ESI spoliation. *See Hoffer v. Tellone*, 128 F.4th 433, 437-38 (2d Cir. 2025). One allows an adverse inference when a party acts "with the intent to deprive another party of the information's use in the litigation." Fed. R. Civ. P. 37(e)(2). The other, which applies absent such intent, authorizes "measures no greater than necessary to cure the prejudice" that the spoliation causes. Fed. R. Civ. P. 37(e)(1).

The Court should order an adverse inference because Defendants' spoliation was intentional. Alternatively, it should order measures to counteract the prejudice they caused.

### A. The Court Should Order An Adverse Inference

Defendants hid evidence with the requisite intent to deprive. The "intent to deprive" standard, though both "stringent and specific," often depends on "circumstantial evidence." *Hoffer*, 128 F.4th at 440. Courts often infer such intent when a party has "significantly failed in its obligation to preserve and collect documents," *Oakley*, 792 F. Supp. 3d at 390, or when the spoliator offers no credible justification for a "reckless abandonment of the[] known duty to preserve relevant evidence," *Ronen v. RedRoute, Inc.*, 2025 WL 2790808, at *2 (E.D.N.Y. June 16, 2025). In weighing the "spoliator's mindset," courts consider its "sophistication and resource levels." *Rivera v. Hudson Valley Hosp. Grp., Inc.*, 2019 WL 3955539, at *7 (S.D.N.Y. Aug. 22, 2019). Intent to deprive is more readily inferred when the spoliator is a sophisticated, well-represented corporation like Lafarge. *See*, *e.g.*, *Proofpoint, Inc. v. Vade Secure, Inc.*, 2021 WL 11108111, at *4, *7-8 (N.D. Cal. June 1, 2021) (finding intent where "Baker & McKenzie" represented spoliator as "the very counsel who failed to forensically preserve [the] devices").

Three indications show Defendants' intent to deprive here. To award an adverse inference, the Court need not find "each instance" to be "equally probative of willfulness." *Klipsch*, 880 F.3d at 625. It need only determine that Defendants' "various means of deleting data" together supply "cumulative proof that [their] spoliation was willful." They do.

*First*, hiding evidence was the reason Defendants relied so heavily on personal email and phone messages in the first place. They admitted that is why they used "personal email accounts": to "conceal their conduct" and avoid incriminating "email record[s]." SOF ¶¶ 18, 88. For example, LCS's board chair, Guillaume Roux, used a Hotmail account to negotiate Lafarge's illegal payments to Tlass. Ex. 62 at -057; *see* Roux Dep. at 58:3-60:12. When asked whether he did so to "hide your interactions" and "keep your emails with [Tlass] off of Lafarge's corporate servers," Roux invoked the Fifth Amendment and refused to answer. *Id.* at 246:5-249:4. The

Court should presume his answer would have been incriminating. *See North Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 754 F. Supp. 3d 373, 384-86 (E.D.N.Y. 2024).

Mobile phones were similar. [redacted] That is why Khodara said he "prefer[red] not to receive anything by email" about the ISIS conspiracy, SOF ¶ 92, and why LCS's HR manager [redacted] The spoliated phone data's very existence thus reflected Defendants' scheme to "conceal their conduct." SOF ¶ 18. Defendants' failure to preserve those records served the same design.

*Second*, Defendants' preservation failures were "so stunningly derelict as to evince intentionality." *Oakley*, 792 F. Supp. 3d at 391-92. Indeed, they still have not explained why they failed to preserve so much relevant evidence. For the bank records and personnel files, they have given no explanation at all. And for emails and phone records, their story is not credible. For example, they previously suggested that European law barred them from collecting mobile phones. Ex. 23 at 12; Ex. 25 at 6. But Defendants admitted they *did* collect mobile phones from five of their 60 custodians. Ex. 23 at 8-9. Their failure to collect the remaining 55 is inexplicable. After all, if European laws truly barred them from collecting company-issued phones – a dubious proposition for which Defendants have offered no support[10] – then Defendants already violated those laws when collecting the five phones. So the most likely

[10] When Plaintiffs pressed them to explain the "legal basis" for their suggestion about French law, Defendants backtracked. Ex. 25 at 6. They now disclaim any argument that "European law 'barred' preservation of evidence," Dkt. 202 at 8, and foreswear any "advice of counsel" argument, 7/30/26 Status Conf. Tr. 84:17-20. So French law now appears irrelevant. But French law did not justify spoliation in all events. *See* Dkt. 80 at 6-12 (expert declaration).

inference is that their rampant "failure to preserve [their] text messages" reflected an "intent to deprive" Plaintiffs and others of those messages. *Oakley*, 792 F. Supp. 3d at 391.

*Third*, the Court should infer intent from Defendants' broader efforts to bury evidence. Start with their guilty plea: Defendants neither "voluntarily self-reported" nor provided "timely and full cooperation" with DOJ's investigation. Plea Agmt. ¶ 7(f). And the plea itself abounds with examples – from faking invoices to backdating contracts – showing Defendants' varied "attempt[s] to conceal their conduct." SOF ¶ 18; *see id.* ¶¶ 55-56, 62, 68, 96. Discovery has since unearthed many more. [redacted] That episode was typical. [redacted].[11]

Add it all together and Defendants' loss of evidence "cannot be credibly explained as involving anything other than bad faith." *Oakley*, 792 F. Supp. 3d at 391. For that reason, the Court should issue an "adverse-inference instruction." *Id.* at 393. Such an instruction, the Second Circuit held, can "deter [evidence] destruction," put the "risk of an erroneous judgment

[11] *See also, e.g.*, [redacted] x. 67 at -.001 (Pescheux: "Lafarge should never appear for obvious reasons in any document of this nature"); [redacted]

on the party that wrongfully created the risk," and "restor[e] the prejudiced party to the same position" it "would have been in absent" the spoliation. *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998). An instruction here would serve those goals. So the Court should instruct the jury about Defendants' spoliation and the inculpatory inferences it supports, using the language in the attached proposed order, with the contours to "be decided at the time of trial." *Oakley*, 792 F. Supp. 3d at 394; *see Ronen*, 2025 WL 2790808, at *7 & n.4 (similar approach).

**B. The Court Should Also Order Lesser Sanctions To Cure The Prejudice**

With or without a finding of intent, the Court should order remedies "necessary to cure the prejudice" that Defendants' spoliation caused. Fed. R. Civ. P. 37(e)(1). Permitted sanctions "may include 'forbidding the party that failed to preserve information from putting on certain evidence'" or allowing the movants "'to present evidence and argument to the jury regarding the loss of information.'" *Prelvukaj*, 2023 WL 3570659, at *10 (quoting Fed. R. Civ. P. 37(e) advisory committee's note to 2015 amendment). Both sanctions are warranted here.

To show prejudice, Plaintiffs "need only make 'plausible, concrete suggestions' as to what the lost evidence might have contained." *Id.* at *9 (quoting *Moody v. CSX Transp., Inc.*, 271 F. Supp. 3d 410, 430 (W.D.N.Y. 2017)). Plaintiffs made those suggestions above. *Supra* Part I.B. For each type of missing evidence, the record "plausibly suggests that the spoliated ESI could support [Plaintiffs'] case." *Oakley*, 792 F. Supp. 3d at 387; *see supra* 3 & n.3 (personal emails); 3-4 & n.4, 14-15 (phone records and texts); 16-17 (bank statements); 17-18 (personnel files). Because the spoliation at least hindered "Plaintiff's ability to obtain potentially favorable evidence," ample prejudice exists. *Prelvukaj*, 2023 WL 3570659, at *9.

The prejudice is especially acute with respect to Defendants' defenses that they paid ISIS under "duress" and that they "withdrew from" the conspiracy in "September 2014." Dkt. 155 at 160 (Nos. 12-13). The personal email accounts – [redacted]

[redacted] – were likely full of evidence refuting the claimed duress. *E.g.*, [redacted] And the missing phone records likely refuted Defendants' claim of withdrawal. [redacted] – long after the supposed withdrawal. Such "unguarded communications in [Defendants'] text messages" would have offered an especially useful "perspective on [their] state of mind." *Oakley*, 792 F. Supp. 3d at 388; *see id.* ("text messages generally memorialize unguarded communications and contemporaneous observations that cannot be replicated through other forms of discovery"). The Court should not let Defendants advance their narrative to the jury while robbing Plaintiffs of the text messages that would have undermined it.

Two remedies are therefore warranted. *First*, the Court should "preclude" Defendants from "presenting evidence" as to the "nature" of the missing records. *MedCenter*, 692 F. Supp. 3d at 101. That is because "it would be unfair to [Plaintiffs] to require them to counter evidence" Defendants failed to preserve. *Id.*; *see Lokai Holdings LLC v. Twin Tiger USA LLC*, 2018 WL 1512055, at *17 (S.D.N.Y. Mar. 12, 2018) (similar). Put simply, Defendants should not be allowed at trial to adduce any evidence about or otherwise characterize their personal emails, text messages, bank statements, or personnel files. *Id.* *Second*, the Court should allow Plaintiffs to "present evidence to the jury" about Defendants' spoliation. *Prelvukaj*, 2023 WL 3570659, at *10. Such a "[p]resentation of evidence" is "distinguished from a mandatory or permissive adverse inference instruction" and is warranted to offset the prejudice Defendants caused. *Id.*

When the jury hears about Lafarge's gruesome crimes in Syria, it should also hear the story of their rampant spoliation to hide those crimes. The Court should let Plaintiffs tell it.

## CONCLUSION

The Court should grant the motion and sanction Defendants for spoliation.

Dated: August 24, 2026

Respectfully submitted,

*/s/ Joshua D. Branson*
Joshua D. Branson (*pro hac vice*)
Andrew E. Goldsmith
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK PLLC
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
Fax: (202) 326-7999
jbranson@kellogghansen.com
agoldsmith@kellogghansen.com

*Counsel for Foley Plaintiffs, Goldman Plaintiffs, Black Plaintiffs, and Stallter Plaintiffs*

Lillian V. Smith (*pro hac vice*)
Christopher C. Goodnow (*pro hac vice*)
James A. Ruck (*pro hac vice*)
Eric J. Maier (*pro hac vice*)
Chase H. Robinett (*pro hac vice*)
Kaleb J. LeGore (*pro hac vice*)
Seth D. Crockett (*pro hac vice*)
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK PLLC
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
Fax: (202) 326-7999
lsmith@kellogghansen.com
cgoodnow@kellogghansen.com
jruck@kellogghansen.com
emaier@kellogghansen.com
crobinett@kellogghansen.com
klegore@kellogghansen.com
scrockett@kellogghansen.com

Adam J. Goldstein
Ryan Sparacino (*pro hac vice*)
Stacey Wilson (*pro hac vice*)
SPARACINO PLLC
1920 L Street, N.W., Suite 835
Washington, D.C. 20036
(202) 629-3530
adam.goldstein@sparacinopllc.com
ryan.sparacino@sparacinopllc.com
stacey.wilson@sparacinopllc.com

Matthew Jason Fisher (*pro hac vice*)
SPARACINO PLLC
150 South Wacker Drive
Suite 2400
Chicago, IL 60606
312-216-5111
matt.fisher@sparacinopllc.com

*Counsel for Foley Plaintiffs*

Kevin L. Attridge (*pro hac vice*)
Melissa Fox
Jonathan E. Missner (*pro hac vice*)
Robert B. Gilmore (*pro hac vice*)
STEIN MITCHELL BEATO
& MISSNER LLP
2000 K Street, NW, Suite 600
Washington, D.C. 20006
Tel: (202) 737-7777
Fax: (202) 296-8312
kattridge@steinmitchell.com
mfox@steinmitchell.com
jmissner@steinmitchell.com
rgilmore@steinmitchell.com

Gavriel Mairone
Oceane A. Maher *(pro hac vice)*
MM~LAW LLC
875 North Michigan Ave, Suite 3100
Chicago, IL 60611
Tel: (312) 253-7444
Fax: (312) 275-8590
ctlaw@mm-law.com
oceane@mm-law.com

*Counsel for Goldman Plaintiffs*

James A. Ruck *(pro hac vice)*
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK PLLC
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
Fax: (202) 326-7999
jruck@kellogghansen.com

Adam J. Goldstein
Stacey Wilson (*pro hac vice*)
SPARACINO PLLC
1920 L Street, N.W., Suite 835
Washington, D.C. 20036
(202) 629-3530
adam.goldstein@sparacinopllc.com
stacey.wilson@sparacinopllc.com

Matthew Jason Fisher (*pro hac vice*)
SPARACINO PLLC
150 South Wacker Drive
Suite 2400
Chicago, IL 60606
312-216-5111
matt.fisher@sparacinopllc.com

*Counsel for Black Plaintiffs*

James A. Ruck (*pro hac vice*)
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK PLLC
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
Tel: (202) 326-7900
Fax: (202) 326-7999
jruck@kellogghansen.com

Adam J. Goldstein
Ryan R. Sparacino (*pro hac vice forthcoming*)
Stacey Wilson (*pro hac vice*)
SPARACINO PLLC
1920 L Street, N.W., Suite 835
Washington, D.C. 20036
(202) 629-3530
adam.goldstein@sparacinopllc.com
ryan.sparacino@sparacinopllc.com
stacey.wilson@sparacinopllc.com

Matthew Jason Fisher (*pro hac vice*)
SPARACINO PLLC
150 South Wacker Drive
Suite 2400
Chicago, IL 60606
312-216-5111
matt.fisher@sparacinopllc.com

*Counsel for Stallter Plaintiffs*